IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**FORT LAUDERDALE**
CASE NO. **19-CR-60056**

---

**UNITED STATES OF AMERICA**,
Plaintiff
vs. **October 7, 2019**

**BRANDON MICHAEL FLEURY**,
Defendant.

---

**JURY TRIAL DAY 4 EXCERPT - LORI BUTTS, PhD**

BEFORE THE HONORABLE **RODOLFO A. RUIZ, II**

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF: UNITED STATES OF AMERICA
**JARED M. STRAUSS**, AUSA
**AJAY ALEXANDER**, AUSA
United States Attorney's Office
500 E. Broward Blvd, Suite 700
Fort Lauderdale, FL 33394
(954) 356-7255
Jared.strauss@usdoj.gov
Ajay.alexander@usdoj.gov

FOR THE DEFENDANT: BRANDON MICHAEL FLEURY
**DARYL E. WILCOX**, AFPD
**HUDA AJLANI MACRI**, AFPD
Federal Public Defender's Office
One East Broward Blvd, Suite 1100
Fort Lauderdale, FL 33301
(954) 356-7436
Daryl_wilcox@fd.org
Huda_ajlani-macri@fd.org

REPORTED BY:
**GIZELLA BAAN-PROULX**, RPR, FCRR
United States Court Reporter
400 North Miami Avenue, 8th Floor
Miami FL 33128
(305) 523-5634
gizella_baan-proulx@flsd.uscourts.gov

Also present:
CAMERON McDOWELL, SA FBI

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| LORI BUTTS, PhD | 3 | 27 | 81 | |

**G O V E R N M E N T E X H I B I T S**

(None)

**D E F E N S E E X H I B I T S**

(None)

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

* * * * * * * * * * *

***(Thereupon, proceedings were held but not transcribed.)***

* * * * * * * * * * *

Thereupon,

**LORI BUTTS, PhD**

having been duly sworn by the courtroom deputy, testified as follows:

01:44 A. **Yes, I do.**

**THE COURTROOM DEPUTY:** Please be seated. Speak into the microphone. Say and spell your name for the record.

A. **Lori Butts, L-O-R-I B-U-T-T-S.**

01:44 ***DIRECT EXAMINATION***

**BY AFPD WILCOX:**

Q. Good afternoon, Dr. Butts.

A. **Good afternoon.**

Q. Could you please tell the members of the jury what you do
01:45 for a living.

A. **I'm a clinical and forensic psychologist. I have a law degree and a PhD in clinical psychology.**

Q. Do you work for an agency or a company, or are you self-employed?

01:45 A. **I'm self-employed, and I'm the president of the Clinical**

and Forensic Institute.
Q. How long have you been a psychologist?
A. I've been licensed in Florida since 2002.
Q. That would be about 17 years?
01:45 A. Yes, sir.
Q. Do you have a specialty?
A. Clinical and forensic psychology.
Q. And could you tell the members of the jury exactly what it is that a forensic psychologist does.
01:45 A. Sure. So a clinical psychologist is somebody that treats someone; they form a doctor/patient relationship and it's in a helping relationship with the person. And they see the person and treat them like a typical doctor would.
A forensic psychologist is somebody that evaluates a 01:46 person for a specific legal matter; in this case, it's a criminal proceeding. Sometimes it might be a family law case, sometimes it could be a civil case. It's an objective evaluation. You don't form a client/patient relationship with that person. You're evaluating somebody for a specific reason.
01:46 Q. Okay. Will you tell the members of the jury about your educational background and training.
A. Sure. My undergraduate degree is in psychology from Honors College at Clemson University. From there I enrolled in the joint degree program in both law and psychology as Villanova 01:46 School of Law and MCP Hahneman University in Philadelphia. I

obtained my law degree in 1999.

And after -- so at the joint degree program, once you finish, you go to graduate school and law school at the same time. And then I finished my law degree. And after that, in order to get licensed as a psychologist, you have two years of training after that. One year is called your internship and one year is called your post-doctoral residency.

Q. Thank you, Dr. Butts. Could you tell the members of the jury about your professional experience and training.

A. So my first year of internship was at Bellevue Hospital NYU Medical Center and Kirby Forensic Psychiatric Center. That's a year of training. And then after that I moved back home to South Florida where I worked under Dr. John Spencer at the organization that I'm the president of now for my post-doctoral residency year. And he was also a clinical and forensic psychologist as well.

Q. After your post-doctoral residency with Dr. Spencer, what was your next position?

A. Well, I've been employed at the same organization the entire time. Once I was licensed, I became the treatment director of our REACH program. It's a sex offender treatment program here in Broward and Palm Beach counties. We have contracts with federal probation and also with state probation to provide outpatient sex offender treatment.

Q. And what was your next position?

A. **Well, while I was doing that, I was also working as a clinical and forensic psychologist.**

Q. And we talked about that earlier. Can you elaborate on and be more specific as to what exactly are some of the tasks that a forensic psychologist would perform?

01:48

A. **So you get a referral question typically regarding a legal issue. And you're typically hired by an attorney or sometimes you're court appointed by a judge to answer a specific question to assist in the trier of facts, meaning the jury or the judge, in making a determination about why something happened.**

01:48

**A lot of people have heard like the insanity defense or if somebody is competent or not competent to proceed or if there's some mitigating reasons, explanation as to why somebody deserves to have a break in sentencing, mitigating their sentence.**

01:49

Q. Okay. How many times have you testified as an expert witness in a court of law in the area of forensic psychology?

A. **I think around 500 times.**

Q. Okay. And have you testified mostly for the defense or mostly for the prosecution?

01:49

A. **Both.**

Q. How could you possibly divide that?

A. **I think it's an even split.**

**AFPD WILCOX:** I would tender the witness as an expert in forensic psychology.

01:49

**THE COURT**: You may proceed. Any objection?
**AUSA ALEXANDER**: No objection.
**THE COURT**: Let's proceed.
**BY AFPD WILCOX**:
01:49 Q. Dr. Butts, did you conduct a forensic examination of Brandon Fleury?
A. **Yes, I did.**
Q. For what purpose?
A. **You asked me to assess his mental state at the time of the offense.**
01:50 Q. And would that include determining whether or not he had some mental disability at the time of the offense?
A. **Yes, sir.**
Q. And why would be important to know whether a person had a mental disability at the time of an offense?
01:50 A. **Because depending on what kind of disability it is, could potentially impact somebody's behavior at the time they commit a crime.**
Q. Understood. Did you administer any test?
01:50 A. **Yes, I did.**
Q. What type of test did you administer to Mr. Fleury?
A. **I administered different tests.**
Q. Let's take them one by one.
A. **Okay.**
01:50 Q. Just name the first one.

A. We'll go alphabetical. So this was administered to Brandon. His father completed it. It's called the Adaptive Behavior Assessment System, Third Edition, the ABS. We like to use a lot of acronyms. And that's a test that Brandon's father filled out to try to assess for how Brandon functions in different domains.

So there's a domain of communication. There's a domain of social skills. There's several domains. I have it here, but I can look at it in a second, that talk about different kinds of -- do you use an ATM machine? Do you initiate conversations? Different -- breaks down behaviors into different domains.

Q. Just go back for a little bit.

A. Okay.

Q. How do you administer this Adaptive Behavior Assessment System, Third Edition test?

A. I gave it to Mr. Fleury, Brandon's father.

Q. What did you give to him?

A. I gave him a packet and there are instructions on the packet. We went over the instructions and then he completed it. And he was confused. And I told him that he needs to give his opinion of observations of what Brandon can and cannot do. Don't make assumptions. If you've not seen Brandon do something, then don't say that he is capable of doing it. Because his father was saying, Well, he could do this, I think

he could do this.

And I would say, Well, is he able to do that? And so there was a little difficulty in understanding that task. But there wasn't a time limit on it. But I think he was anxious about it.

01:52

Q. When you say functioning in different domains, can you just take your time and explain what that means.

A. Okay. I just want to look at the testing so I don't misspeak. So as -- this kind of assessment tool is used for people that have autism, have intellectual disability, and have dementia. So it's a way to assess whether or not how the person's functioning in real life. So -- and you get that information from somebody who knows that person and what they're doing.

01:52

So one subtest is called communication. One subtest is called community use. One is called functional academics. One is home living. One is health and safety. One is leisure. Self-care, self-direction, and social. There's also a work one, but he's never had a job so that's not applicable here. So those are the domains of where the authors of the test have broken down how we function as human beings and the different kind of domains of our lives.

01:53

01:53

And then within the domains, it's broken down into behaviors, small behaviors. And the person that's rating is asked whether or not the person they're rating on -- so

01:53

Mr. Fleury was asked whether or not Brandon is able to do it, does it, and the frequency. Never, sometimes or always. And those were the readings that he was asked to....
Q. Let me just pick out. For instance, what would be some of the things you would ask with respect to the community domain. Is that a proper domain?
A. Community use.
Q. I'm sorry. Community use domain.
A. So number one would be, Find the restroom in public places. Another one would be, Looks both ways before crossing a street or parking lot. Then it kind of gets a little more difficult. Uses a credit or debit card when making purchases. Uses an ATM machine. Calling a repair person. So those kind of behaviors are broken down.
Q. How about in a communications domain?
A. Number one is, Says the names of other people. Says hello and good-bye. Speaks clearly and distinctly. Looks at people and faces. Nods or smiles to encourage others when they're talking. So those types of behaviors.
Q. How did he score on this test after you evaluated the responses from his father?
A. Extremely low.
Q. Could you expound on that?
A. Sure. So the findings of the test are that 99.9 percent of people the same age as Brandon are functioning or adoptive

functioning higher than he is. So he's at the .01 percentile in overall adaptive functioning as rated by his father on this.
Q. I mean, in non-technical terms, how would you rate that score?
01:56 A. He can't get much lower. So compared to people his age, he's functioning lower than 99 percent of the people that are his age in the community across these domains.
Q. Did you administer any other tests?
A. Yes.
01:56 Q. Go ahead.
A. The next one I'll talk about is a malingering test. So malingering is feigning or exaggerating psychiatric symptoms. So in forensic psychology when you have a referral where there's external motivation, obviously this is a criminal 01:56 proceedings, so people are motivated to maybe do their best or maybe do their worse depending on what's going on in their case. So a malingering test is a test to see if someone is exaggerating or feigning symptoms of psychiatric illness. I didn't say the name of the test.
01:57 Q. What was the name of that test?
A. Miller Forensic Assessment of Symptoms test.
Q. Is that a test that's commonly used by mental health professionals?
A. By forensic evaluators, yes, because it's a malingering 01:57 test. It's mainly for forensic purposes, yes.

01:57 Q. And what were the results of this test?
A. **That he was not exaggerating or feigning psychiatric symptoms.**
Q. So he wasn't faking?
A. **Correct.**
Q. And did you administer any other tests?
A. **Yes.**
Q. Go ahead. Tell us what the name of the test is.
A. **Another test was a screening test called the MoCA, Montreal Cognitive Assessment. It takes about five to ten minutes of administration. And it looks at -- it's a screening mainly for dementia impairments like that. Also kind of a mental status built into it. And he scored fine on that.**
Q. Okay. So his cognitive functioning is intact?
A. **Yes.**
Q. Any other tests?
A. **The other test is the Ritvo Autism Asperger Diagnostic Scale-Revised.**
Q. And what is the purpose of that test?
A. **So this is a question and answer that's given to Brandon. It's 80 statements and it's assessing autism or Asperger's in adults. So that's the purpose of the test. Typically, autism tests tend to be geared towards children and this is one that's geared toward an adult. And it's a self-administered item to where the person is responding themselves about how they**

**perceive themselves.**
Q. And what were the results of that test?
A. **That he scored over the cutoff for meeting criteria for the diagnosis of autism spectrum disorder.**
01:59 Q. Prior to giving -- well, did you interview him as well?
A. **Yes, sir.**
Q. Prior to administering these tests and interviewing Mr. Fleury, did you review any other materials?
A. **Yes.**
01:59 Q. And what were those materials, if you can list some of those materials?
A. **I reviewed the discovery, the investigative materials, the indictment. I reviewed Dr. Dietz's report.**
Q. And who is Dr. Dietz?
01:59 A. **He's the government's attorney -- sorry. Government's psychiatrist.**
Q. Was there another psychologist or health professional report that you reviewed?
A. **Dr. Sahgal.**
01:59 Q. And who was -- and who was he to --
A. **I believe he also was a psychiatrist in California that the defense had hired.**
Q. Did you review any records?
A. **I reviewed school records. I reviewed --**
02:00 Q. Whose school records?

14 of 99

A. **Brandon's school records. I reviewed his -- all the statements to the FBI. I feel like there's more that I'm missing.**
Q. When you said --
02:00 A. **It was a lot of material.**
Q. Yes. Okay. Did you reach a diagnostic conclusion? After reviewing the records, after reviewing all the material, after reviewing the test results and your interview, did you reach a diagnostic conclusion?
02:00 A. **Yes, I did.**
Q. What was that?
A. **That he was suffering from autism spectrum disorder Level 2 without intellectual impairment.**
Q. Is autism spectrum disorder a mental disability?
02:01 A. **Yes, it is.**
Q. Is autism spectrum disorder something you acquire like post-traumatic stress disorder?
A. **No, it's something that you have from birth. It's a neurobiological disorder that's something that you're born**
02:01 **with.**
Q. Can you explain the relationship between autism spectrum disorder and Asperger's syndrome?
A. **Sure. So the diagnostic and statistical manual Number 5 is what we're working on now. And when it was revised, the term**
02:01 **Asperger's disorder got subsumed under the heading of autism**

spectrum disorder. So it was no longer a standalone diagnosis as it was in prior versions. Asperger's disorder used to be its own diagnosis, now it's under autism spectrum disorder. Asperger's is a mild form of autism. And Brandon was diagnosed with Asperger's as a child.

02:02

Q. We're using this term spectrum autism disorder. Spectrum would suggest that there's a range of severity?

A. Correct. Exactly.

Q. Where would Brandon be in that range severity?

02:02 A. It would be in the middle range. So there's Level 1, Level 2, and Level 3. Level 1 would be the Asperger's. And Level 2 is -- and it's -- in the book it gives criteria. In Level 2 says -- Level 1 says requiring support. Level 2 is requiring substantial support. And when you diagnose somebody, you look at the criteria, you look at where they are in their age and compare them to what would be expected by peers his age.

02:03

So at 22, we would expect Brandon to be higher functioning and not requiring the substantial support that he does now.

02:03 Q. Could you tell us -- could you explain to the jury what the essential features of autism spectrum disorder Level 2 is?

A. Okay. Sure.

Q. Just the central features of, what is it, basically?

A. Okay. I'll try. Try and keep it simple. So there's two main criteria in order to be diagnosed with autism. The first

02:03

**main criteria is persistent deficits in social communication and social interactions. So -- and it's broken down into three subcategories. So one would be deficits in social emotional reciprocity. Should I go through all three?**

02:04 Q. Yes, go ahead. We'll come back.

A. **Okay. Number two is deficits in non-verbal communication, like gestures, non-verbal -- I'm doing a lot of non-verbal communication. Nodding. Deficits in that. And deficits in developing, maintaining, and understanding relationships. So**

02:04 **those are the three how -- deficits in social communication interaction are broken down into those three different domains or areas.**

Q. And the criteria -- I think the second criteria, criteria B, we'll call it that, of repetitive behavior and restricted

02:04 interest. Did you say that? I'm sorry. I'm getting ahead of you. Would you just explain what the first essential feature, the social interaction and deficits in social interaction and communication.

A. **Right. That's what I was on.**

02:05 Q. And what is the second essential feature?

A. **It's restrictive repetitive patterns of behaviors or interests. So somebody has to have deficits in social communication and social interaction, and deficits in having districted repetitive patterns of behavior or interest. And**

02:05 **that's broken down into four possible ways you can meet that.**

17 of 99

Q. Go ahead.
A. **One is stereotyped or repetitive motor movements or speech. One is insistence on sameness in flexibility. One is highly restricted fixed interests that are abnormal in intensity, and one is problems with sensory input.**
02:05
Q. Did you -- excuse me. Did you observe any of these features in Brandon Fleury?
A. **Yes.**
Q. And please explain.
02:06
A. **Okay.**
Q. With respect to criteria one, deficits in social emotional reciprocity, that's the first one on the criteria -- on the criteria A?
A. **Right. So the social emotional reciprocity is not being able to understand how another person is thinking and feeling when you're interacting with them. Not being able to have a kind of a normal back and forth, give and take and difficulty understanding emotions in others.**
02:06
**And so when asked -- when Brandon is asked, How do you think other people would feel about your behavior, he was unable to grasp that people would feel scared, feel frightened. He just kept saying, Angry and annoyed, angry and annoyed. And he was able during some interviews to -- he asked -- he would ask for -- in Dr. Dietz's interview, he would ask him, What does grief mean? He would ask to get the definition of**
02:06
02:07

different emotional states in other people because he's unable to recognize those emotional states.

So about -- this is kind of a hallmark of some people with autism, is that they have a difficulty recognizing their own emotional states and also understanding emotional states in other people. And so being able to describe and understand those emotional states is the crux of what's going on with people that have this disorder.

Q. With respect to criteria B, basically you described as restricted, repetitive patterns of behavior?

A. Yes.

Q. Did you observe that feature in Mr. Fleury?

A. Yes.

Q. And in any of the materials that you reviewed?

A. Can I go back up a little bit to the other? Because I didn't finish.

Q. I'm sorry.

A. It's okay. So also in social communication is understanding non-verbal communication or using non-verbal communication. When Brandon expresses himself, he's completely flat. He doesn't use gestures. He just doesn't use non-verbal communication. You see no expression on his face.

Deficits in developing, understanding and maintaining relationships. He has no friends. He has not had a friend. He had some people when he was in school, but he's been out of

school since he's 17 years old. And for the past five years, not one friend, has not engaged in any social interaction outside the home.

And then -- so B, restricted and repetitive patterns of behavior, the first criteria is stereotype or repetitive motor movements, use of objects or speech. His father testified and talks about how he says the same thing over and over and over again. That's a repetitive speech. He just says certain things over and over again.

Insistence on sameness, ritualized patterns. His father talked about that as well. As a child he would only wear green. He had certain routines. Would only eat a certain way. What's more relevant for this is highly restricted fixated interests that are abnormal in intensity and focus. So Brandon became fixed with serial killers. That's abnormal in intensity and focus. That's an abnormality, and he got a fixation with that.

And then the sensory input. Brandon is not comfortable being touched and won't allow any kind of physical hugging or anything like that.

Q. Going back to the criteria A. Could his inability to appreciate the emotion of others affect how he viewed his own behavior?

A. **Absolutely.**

Q. Could you expound on that?

A. **Sure. In all of the interviews starting with the FBI, there was this lack of Brandon understanding the emotional impact of his behavior on the victims.**
Q. Could his inability to place himself in the same emotional place as others be helpful in determining whether or not he intended his communications to be threatening?
A. **Yes.**
Q. Could you elaborate?
A. **So he kept saying, I would feel annoyed and I would delete it. I would feel irritated. Without the understanding of the fear and horror and -- that this behavior would cause in other people.**
Q. You reviewed the FBI's interview?
A. **Yes.**
Q. Of Brandon Fleury. And his interview by the government expert, Dr. Dietz; is that right?
A. **Yes. And I did my own interview as well.**
Q. Your own interview. Was his answers consistent?
A. **Yes.**
Q. Now, I want to talk to you about this fixation on serial killers. Is that somehow related to his autism in some way?
A. **Yes. So the fixation part, yes. So like we've understood for the past five years, he's -- the only thing in Brandon's life has been the internet. And the internet has no governor. The internet has no boundaries. And for the past five years,**

that's literally all he's done is be in his house and be on the internet. And for some reason, I don't know that reason, he became fixated or fascinated with serial killers.

And there is no monitoring of that and no intervention on that as to how that was inappropriate. And so if he were in treatment, somebody would say, okay, we can't do this, we're going to block this out, we're going to monitor you. And people with autism spectrum disorder, they respond well to treatment. There are good treatment interventions. He wasn't involved in any type of treatment or any type of monitoring.

Q. Now, there has been some testimony or Brandon has talked about his being sexually attracted to serial killers. How is that related to his mental disability? Or how do they interact? How does that sexual attraction interact with his mental disability?

A. So again, an inappropriate fixation. But I think it also kind of tracks back to his victimization. And he -- his fixation with -- so he identifies as being bisexual and he is sexually attracted to some of these serial killers by looking at their photos. And it's not that he identifies with their horrific behavior, but he identifies with the dominance. And his fantasy is to be dominated by these people.

And so that's -- in saying that out loud, it's a lot to piece -- pull apart and piece together because it's not normal. It's deviant. It's outside the range of what we know.

02:14

So you mix in somebody with autism spectrum disorder, somebody who has been bullied and taunted, somebody with unfettered internet and that's their only outlet and access to what's going on in their life. And so he wasn't -- to be clear, he told me -- wasn't -- he was not sexually aroused by murders or killing or aggression or violence. He was sexually aroused by the pictures and the fact that these people were dominating, they were dominant human beings. And so he identified with the person, not with their acts.

02:15

Q. Dr. Butts, earlier you testified that his inability to appreciate the emotions of others could affect his understanding that his words could be viewed as threatening. Have you seen the messages that he sent to the Parkland people?

A. Yes.

02:15

Q. Well, after seeing those messages and the content of those messages, did that alter your opinion in any way?

A. No.

Q. Why not?

A. Because you can see the repetitive nature. You can see that this is an -- that it's part of the picture that he explains of this inappropriate way of getting attention.

02:15

Q. Now, Brandon was interviewed by an FBI agent near the time of his arrest, same -- within an hour or an hour or two of his arrest. He seemed to answer questions just fine. How do you explain that with respect to him having difficulty in

02:16

communicating with people?
A. **So that's not a social communication, that's an interrogation. So he's able -- his IQ is around 92, which is in the average range. So his intelligence is average. So he has vocabulary use and he can respond to direct questions and answers, but there's not -- being interrogated or being evaluated is a different type of situation than having social interactions and making friends and being around people and initiating conversations and things like that. It's a different dynamic.**
Q. I'm going to ask you the same question with respect to -- you've reviewed his interview with government expert Dr. Park Dietz, and he seemed to answer questions -- he seemed to answer Dr. Dietz's questions. How do you explain that?
A. **The same way. It's a question and answer. I didn't view the video, but I would assume because Brandon is consistent that he doesn't use non-verbal communication. He has a flat affect. I think Dr. Dietz noted that in his report. But certainly he's able to give information and give information from his perspective.**
Q. You said you didn't review the video. Just so the ladies and gentlemen of the jury are clear as to what you did review, what did you review?
A. **A transcript of the interview.**
Q. We talked about -- let me ask you this. Do you think -- is

there anything in particular about his school records or his home life that may have exacerbated this Asperger's?
A. **Certainly. In the school records there's indications that his father was not willing to let Brandon go into therapy, was not -- Brandon was asking at school to see a therapist. His father would not permit that to happen. There's incidences of his father not following through with school recommendations and things like that.**
**So there's opportunities for intervention that weren't followed through on that could have assisted Brandon with gaining the skills where he wouldn't be so regressed right now and he would have the skills that we're talking about in order to communicate, because we have treatment interventions that work well to help people with autism spectrum disorder.**
Q. Now, have you reviewed the report from government expert Dr. Park Dietz?
A. **Yes.**
Q. And have you read his conclusion?
A. **Yes.**
Q. Do you recall what his conclusion was? Did he conclude that Mr. Fleury had autism?
A. **Yes.**
Q. How did your conclusion differ from Dr. Dietz?
A. **In one, I think, crucial way was that -- can I go to the conclusion and the report? May I look at it?**

Q. Would it refresh your recollection?
A. **Yes.**
Q. Sure. Go ahead.
A. **So he says that Brandon does not care about his -- the effect of his behaviors on others. So it's that -- it was a willing choice, that he knew that the impact on others would be to incite fear and horror and all of those things, but he chose not to. He didn't care. And it's my opinion that because the autism spectrum disorder, he did not understand the emotional impact that his behavior would have on other people. That's the crux of the difference.**
Q. Dr. Butts, based on your interview of Brandon Fleury and your complete forensic evaluation of Brandon Fleury, do you have an opinion as to whether it is a reasonable possibility that he may have failed to appreciate the emotional impact on his -- his behavior may have had on the recipients of his message?
A. **Yes.**
Q. And what is that opinion?
A. **That's the opinion. That because of the autism spectrum disorder, that impairs someone's ability to understand the emotional -- the social and emotional impact of one's behavior on other people. That was the problem.**

**AFPD WILCOX:** Thank you. The government's going to ask you a few questions, Dr. Butts.

A. **Okay.**

**THE COURT**: Cross-examination.

**AUSA ALEXANDER**: Sure, Your Honor. May we have a brief side bar.

02:21 **THE COURT**: Yes.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

**AUSA ALEXANDER**: Your Honor, as the Court is aware, Dr. Dietz -- Dr. Butts had reviewed the reports for Dr. Dietz

02:21 and Dr. Sahgal. The government doesn't want to use those reports to impeach her. My understanding based on case law is that the Court would need to advise the jury that these documents are being used for impeachment purposes if I were to read any excerpts from these reports solely for impeachment,

02:21 not for substance. I think we need to include an instruction to that matter as well.

**THE COURT**: Yeah. I'd have to go to the pattern. I can read it in. Any issue? All right.

**AUSA ALEXANDER**: No, Your Honor. Thank you, Your

02:22 Honor.

**THE COURT**: I have a couple minutes until you read it, correct?

**AUSA ALEXANDER**: Yes.

**THE COURT**: Let me just get it.

02:22 (Thereupon, the side-bar conference was concluded.)

**THE COURT:** You may proceed whenever you're ready.

**AUSA ALEXANDER:** Thank you, Your Honor.

***CROSS-EXAMINATION***

**BY AUSA ALEXANDER:**

02:22 Q. Good afternoon, Dr. Butts.

A. **Good afternoon.**

Q. Dr. Butts, you are a clinical and forensic psychologist, correct?

02:22 A. **Correct.**

Q. You are not a psychiatrist?

A. **Correct.**

Q. That means you did not attend medical school or receive an MD?

02:22 A. **Correct.**

Q. Your degree or graduate degree is a Ph.D. in clinical psychology?

A. **Yes, sir.**

Q. Have you received any specialized training in the autism spectrum disorder?

02:22 A. **I have. And I treat people with autism spectrum disorder, so continuing education. I'm also -- I'm on a podcast with a lawyer who has autism spectrum disorder, it's called Spectrumly Speaking. So unfortunately, with the advent of the internet, more of my clients have that diagnosis because of**

02:23

28 of 99

**internet-based crimes.**

Q. Have you published any articles on the autism spectrum disorder?

A. **No. I just recently taught a course a week ago to the Florida Psychological Association about autism, though, but I've not published articles.**

Q. Okay. Now, Doctor, you were hired by the defense on August 13th, 2019?

A. **Yes, sir.**

02:23 Q. And prior to this date, you had no interactions with the defendant?

A. **Correct.**

Q. And at no point prior to this date did you administer any psychological examinations to him?

02:23 A. **No.**

Q. And prior to this date, you did not review any of his medical records?

A. **Correct.**

Q. You were only hired by the defense after the defendant was charged in this case?

A. **Correct.**

Q. You reviewed the indictment in this case, I'm sure?

A. **Yes.**

Q. And you are aware that there are four counts in the indictment?

A. **Yes.**
Q. You're aware that there's one count of making a true threat?
A. **Yes.**
02:24 Q. And three counts of cyberstalking?
A. **Yes.**
Q. And when you agreed to examine the defendant, you knew that you could ultimately be called to testify on his behalf?
A. **Yes.**
02:24 Q. That's part of the contract?
A. **Yes.**
Q. And your rate, Doctor, is $300 an hour?
A. **Yes, sir.**
Q. With a maximum of 30 hours?
02:24 A. **Yes, sir.**
Q. So a total of $9,000?
A. **Yes, sir.**
Q. How much did you charge for your assistance in this case?
A. **I haven't made a bill yet. It's capped at 9,000.**
02:24 Q. It's capped at 9,000?
A. **And I know I've done over that.**
Q. Okay. And specifically, you were hired to conduct an evaluation and to testify?
A. **Potentially testify, yes.**
02:25 Q. And the defendant, during the course of your interactions

and your interview, knew that he -- that this information he was conveying to you could ultimately be used in his criminal case?
A. **Yes, sir.**
02:25 Q. And to reiterate, all your interactions with the defendant was during the time that he was facing criminal charges?
A. **Yes, sir.**
Q. Now, Doctor, you can agree with me that the more information you have, the more complete of an assessment you can conduct?
02:25
A. **Sure.**
Q. So hypothetically, if there's a hundred pages of documents and you looked at 50 pages, it's fair to say that there's still 50 pages of information that you don't know what's in there and could very well influence your ultimate decision?
02:25
A. **Certainly.**
Q. And in many respects, when you were hired to do work, you were given certain documents, certain reports, and you conduct your own examinations?
02:25 A. **Yes.**
Q. So in many respects, it's a relatively closed universe?
A. **It could be. I don't think so in this case, but it could be.**
Q. Now, Doctor, two of the documents that you reviewed were reports from two psychiatrists, Dr. Sanjay Sahgal, spelled
02:26

31 of 99

S-A-H-G-A-L; and Dr. Park Dietz, spelled D-I-E-T-Z.
A. **Correct.**
Q. And you are aware that they're both medical doctors?
A. **Yes.**
02:26 Q. Now Dr. Sahgal's report was approximately 6 pages?
A. **Yes.**
Q. And do you have a copy of that with you?
A. **I do.**
Q. And Dr. Dietz's report was approximately 36 pages?
02:26 A. **Yes.**
Q. And you have a copy of that with you as well?
A. **Yes, sir.**
Q. And you would agree that it's important to review these reports in their entirety and all of the documents that you
02:26 received thoroughly prior to making any sort of conclusion?
A. **Yes.**
Q. And you do this to make sure you don't miss anything?
A. **Yes.**
Q. Make sure you don't misunderstand anything?
02:26 A. **Yes.**
Q. In addition to reviewing these reports and documents, you also interviewed the defendant and his father; is that correct?
A. **That's correct.**
Q. So two separate interviews?
02:26 A. **Yes.**

Q. And you agree that the way a question is asked could influence a response?
A. **Sure.**
Q. For example, if you phrase the question in a leading way, 02:27 you may get one type of answer compared to a more open-ended question?
A. **Correct.**
Q. And you would agree that the way a question is asked may very well influence that response?
02:27 A. **Yes.**
Q. And you would agree that it's important to understand the question being asked almost as much as understanding the answer being given?
A. **Sure.**
02:27 Q. Now, Dr. Butts, you did not record your interview with the defendant, correct?
A. **I did not.**
Q. There's no videotape?
A. **No, sir.**
02:27 Q. No audio recording?
A. **No, sir.**
Q. No transcript?
A. **No, sir.**
Q. And the same goes for the father?
02:27 A. **Yes.**

33 of 99

Q. There's no videotape?
A. **Correct.**
Q. No audio recording?
A. **Correct.**
02:27 Q. No transcript?
A. **Correct.**
Q. And what that means is that no one outside of you can essentially examine the types of questions you asked?
A. **That's true.**
02:27 Q. And no one can examine the exact answers that the defendant gave to your questions?
A. **That's true.**
Q. We just have to take your word that there were no issues?
A. **No issues? What do you mean by no issues?**
02:28 Q. Problems with the questions or difficulty in understanding the answers. Essentially, Doctor, it's your interpretation as to what was -- what was asked, what the answer was, and we have to derive that understanding from you?
A. **Yes.**
02:28 Q. Now, you're aware that Dr. Dietz videotaped his interview?
A. **Yes.**
Q. You're also aware he audio recorded his interview?
A. **Yes, I've got a transcript of the interview.**
Q. And you have a transcript as well?
02:28 A. **Yes.**

Q. And you testified that you reviewed the transcript?
A. **Yes.**
Q. But you can admit that from a transcript, you don't know whether the defendant had good eye contact, correct?
02:28 A. **Correct.**
Q. And you don't know the way he was answering questions?
A. **Correct.**
Q. And you don't know his demeanor?
A. **Correct. Well, Dr. Dietz recorded in his report -- he**
02:28 **wrote his demeanor, but --**
Q. Actually, Dr. Dietz also mentioned that the defendant had, for example, good eye contact during the interview.
A. **Okay.**
Q. That's in the report.
02:28 A. **Okay.**
Q. I mean, do you recall that, don't you?
A. **I don't recall it, but I don't disagree. With me, when he would answer questions, he would look at me and then after the pendency of the question, he would look away. So it was a back**
02:29 **and forth. But yes, he had some eye contact.**
Q. Now, Doctor, you're aware that Dr. Dietz, in his conducting his interview of the defendant, spent eight hours with him?
A. **Yes.**
Q. So there's eight hours of video and audio that you did not
02:29 review?

A. **I reviewed the transcript of it.**
Q. But you did not review it to the extent to understand how the defendant was answering the questions, his eye contact, his demeanor, his voice?
02:29 A. **No, I did not look at the video.**
Q. And you didn't think that was important?
A. **I didn't know it was videotaped, to be honest, until I think maybe a couple days ago.**
Q. Okay.
02:29 A. **I just thought it was transcribed. And then I asked, was there a video and so --**
Q. Okay.

**AUSA ALEXANDER**: Your Honor, may the Court address the jury in terms of the impeachment?

02:29 **THE COURT**: Yeah. So ladies and gentlemen of the jury, you've heard that the government may be reading in at this point excerpts from other professionals that have seen Mr. Fleury. You just heard about Dr. Dietz, for example. The statements being read into the record through the questioning 02:30 of this witness are for impeachment purposes only. Okay? That means that you should not be evaluating these statements for their truth. That's not what they're being offered for. They're simply to draw out what the government believes may be inconsistencies in the testimony. Do you all understand?

02:30 All right. You may proceed.

36 of 99

**AUSA ALEXANDER:** Thank you, Your Honor.

**BY AUSA ALEXANDER:**

Q. And Dr. Butts, just to reiterate, you testified that you had received a copy of the transcript?

02:30 A. **Yes.**

Q. And only a few days ago you realized that there was even a video existing?

A. **Correct.**

Q. Doctor, if you can take out Dr. Dietz's report and refer to

02:30 the bottom of page 27, please.

A. **(Complies.)**

Q. And let me know when you're there.

A. **Okay.**

Q. On page 27 at the bottom, it says, Interview of Brandon

02:30 Fleury, 7-23-19.

A. **I see it, yes.**

Q. And 7-24-19. Could you please read that -- the first paragraph out loud.

A. **Sure. I conducted an interview of Brandon Fleury that was**

02:31 **recorded on a digital video recorder and a digital audio recorder. Copies of the audio and video files were provided promptly to both federal public defender and the government, and a transcript of the interview was provided days later.**

**So that's inconsistent, yeah.**

02:31 Q. So, Doctor, which was it? Either you knew a video existed

at the time you reviewed the report or you just ignored that portion of it?
A. **I must not have recalled that when I read the report.**
Q. So it's possible that you reviewed this report and other reports and just didn't pay close attention to some of the details?
A. **To those details, yes.**
Q. No, to -- I mean I'm talking generally. If you missed that detail in that report, it's possible you missed details in other reports?
A. **It's possible.**
Q. And the same would go for the FBI interview. There are probably details from that that you may have missed by not paying attention?
A. **No. I watched it and I read that several times. I watched the FBI interview and --**
Q. Several times?
A. **Yes.**
Q. You just didn't read Dr. Dietz's report seven times -- several times?
A. **Correct.**
Q. The same would go for Dr. Sahgal's report?
A. **Several times? No, I did not read those several times.**
Q. So two different psychiatrists had provided evaluations of the defendant in this case and you didn't feel the need to

review those multiple times to understand exactly what these two medical doctors had said about your client?
A. **Well, he's not my client.**
Q. It's not your client?
02:32 A. **No. Brandon Fleury is not my client.**
Q. They hired you?
A. **Right. He's their client. He's not my client. I'm hired by the attorney.**
Q. So you're Mr. Wilcox's client?
02:32 A. **Well, I'm not his client either. He hired me to do an evaluation of his client.**
Q. Doctor, please answer.
A. **But no, I read those reports. And I think that it's important to read those reports. I missed that.**
02:32 Q. And you would agree that's a pretty big thing to miss?
A. **No. I have the transcript. I have the transcript. I don't think it's a big thing, but --**
Q. Well, Doctor, when it comes to the autism spectrum disorder in discerning whether or not an individual actually has the 02:33 condition or is exhibiting the characteristics of the autism spectrum disorder, you would agree that an examination of the individual's characteristics, the manner in which they respond, the eye contact, the demeanor, is all incredibly important?
A. **Yes. And I saw that for myself when I interviewed him.**
02:33 Q. Okay. And we'll talk a little bit more about your

39 of 99

interview in just a moment. But the thing with Dr. Dietz is video recording, audio recording a transcript is that you can examine the questions he asked Mr. Fleury?

A. **Yes.**

02:33 Q. And you can also examine the exact answer he gave, your client gave -- sorry again -- Mr. Fleury gave?

A. **Yes.**

Q. And obviously, since you did not watch the video, you were not able to essentially monitor his demeanor, his eye contact,

02:33 anything of that nature, correct?

A. **Correct.**

Q. Did you draft a report specific to the interview with Mr. Fleury? Now I'm not talking about your psychological evaluation, but did you draft a separate report about the

02:34 interview?

A. **No. I took notes during the interview. Is that what you mean? I don't understand the question.**

Q. Essentially what I'm looking for, Doctor, is there anything more detailed about what was asked, the answers he gave, with

02:34 the exception of the psychological report that you drafted?

A. **My notes from the interview, my handwritten notes. I took handwritten notes.**

Q. And I assume that hasn't been turned over?

A. **Correct.**

02:34 Q. Is there a reason you didn't turn that over?

A. **I wasn't asked to.**
Q. And you only interviewed the defendant and his father; is that correct?
A. **That's correct.**
02:34 Q. Did you interview anyone from the FBI?
A. **No, sir.**
Q. So you didn't reach out to Task Force Officer Farshid Hashenpour (ph.), who was present during the time of the FBI interview?
02:34 A. **No, I did not.**
Q. And if you recall, Doctor, the interview of the defendant, the video doesn't actually capture a lot of the defendant's demeanor or his eye contact and things of that nature?
A. **Right. It's hard to see.**
02:35 Q. But you didn't feel it was necessary to reach out to the FBI to ask them what they observed?
A. **No.**
Q. Did you interview any of the defendant's high school teachers, the ones who had observed the defendant?
02:35 A. **I did not. I read the records.**
Q. But you didn't ask -- I mean, the records themselves are limited. You would agree to that?
A. **There's -- I mean, there's good information in there. I don't know -- I wouldn't call them limited.**
02:35 Q. So there's good information in the records, but you would

agree that if you were to actually speak to the teachers and the counselors, you may have better information or greater information?
A. **Sure.**
02:35 Q. Did you speak to Dr. Sanjay Sahgal?
A. **No.**
Q. Dr. Park Dietz?
A. **No.**
Q. And as part of your assessment, you reviewed the report
02:35 from Dr. Sanjay Sahgal?
A. **Correct.**
Q. And you're aware that the defense had hired Dr. Sahgal back in May of this year?
A. **Yes.**
02:35 Q. And he conducted his own psychiatric evaluation of the defendant?
A. **Yes.**
Q. And, Doctor, I want to refer you to page 5 and 6 of Dr. Sahgal's report.
02:36 A. **Okay.**
Q. Could you please read the last paragraph on page 5 into the beginning of page 6.
A. **Into the record?**
Q. Yes.
02:36 A. **For anyone without an autism spectrum disorder,**

Mr. Fleury's behavior was malicious and dastardly. If this letter serves any purpose whatsoever, it is to underscore that for Mr. Fleury with his diagnosed autism spectrum disorder, he was literally unable to access that aspect of a mentally normal individual that would be repulsed by such behavior. This doesn't mean that he didn't understand that his behavior was wrong. This doesn't mean he didn't know that his behavior would cause fear or harm. This doesn't mean that he didn't have the ability to specifically intend to elicit such painful responses from those who read the comments. Indeed, he was aware of all of the above.

Continue? It's just that internally, because of his disability with regard to relating to the emotional impact such comments would have, Mr. Fleury didn't feel remorse by reciprocal compassion because he himself doesn't have the ability to experience the nuances of grief or emotional devastation. Mr. Fleury only had an intellectual understanding of what these reactions might mean to the recipients.

Q. Now, Dr. Butts, essentially what Dr. Sahgal is stating is that the defendant, at the very least, had an intellectual understanding of what his conduct was, correct?

A. That's what I take from that.

Q. And you disagreed with that?

A. I do.

Q. And why is that?

A. **I think it's a -- there's a fine line here. And I think when you talk to Brandon, he talks about it being the purpose was to annoy, anger. But when we talk about the understanding of the pain and the emotional pain that people would feel from it, that he was not -- was not processing that information. So certainly he knew the behavior was wrong, but it's how you define wrong and the emotional impact of his behavior on other people.**

Q. So the defendant understands that his conduct could cause anger and annoyance in other people?

A. **Right.**

Q. Anger is an emotion, correct?

A. **Yes.**

Q. So he understand that the targets of these messages could feel the emotion of anger?

A. **Right.**

Q. He denies that they could feel fear?

A. **He -- yes. He denied -- he denies knowing that these statements would cause fear. He says that because of the way that they're characterized -- he gives explanations. The way that they're characterized, the way -- and I'm not saying that the explanations are appropriate explanations. I'm saying that they're explanations through his prism. And through his prism, the explanations are, well, it would be ludicrous. It would be because this person doesn't exist or there's these emojis and**

this is what trolls do.

And so it's an irritant because he would feel irritated. And then you just hit delete or block that person is how he explained that it's trolling and not --

Q. And that's your recollection of it, of his response?

A. That's what he has told multiple people.

Q. Now, Doctor, this prism you talk about that the defendant kind of operates, does this prism also include the fact that he's a criminal defendant?

02:40 A. Certainly. Yes.

Q. And it includes the fact that the answers he gives you are more so -- could be tailored not just as to what he's experiencing under the autism spectrum disorder, but also in light of the fact that he understands that what he says could very well benefit him or assist him in a criminal proceeding?

A. Right.

Q. So the fact that he says that it angers and annoys but doesn't cause fear, grief and harm, could very well be not an aspect associated with the autism spectrum disorder but could be associated with the fact that he's a criminal defendant?

A. Well, certainly I would think that, but he's been consistent since he spoke to the FBI. And when he spoke to the FBI, he -- he wasn't aware of what the charges would be and the contents of the charges. So his explanation has been consistent over time even without, you know, specifically

**understanding the specific nature of the charges.**
Q. Does he -- Doctor, I mean, the FBI -- you're talking about his interactions with the FBI. I mean, the FBI doesn't just randomly go into people's homes and say, Let's interview you just for fun.
A. **Right.**
Q. So he understood he had done something incredibly wrong to warrant the FBI to enter his home?
A. **Absolutely.**
Q. So he understood at that point that there was some connection between the FBI's presence and the fact that he was sending these types of messages online?
A. **Correct.**
Q. In fact, he calls it trolling. But that's a term he uses, correct?
A. **Correct.**
Q. So it's not as if we can sit here and say someone is making a death threat and they refer to it as trolling automatically means it's okay?
A. **Absolutely. Of course. Absolutely.**
Q. So, Doctor, in terms of this situation when you're interviewing the defendant and you're saying it's just anger and annoyance, there's no fear, they can't feel fear, they can't feel grief, it's possible that the reason he's saying this is because he's a criminal defendant. And now, when you

were interviewing him, he knew what the charges were, correct?
A. **Correct.**
Q. So he knew when you were interviewing -- because, again, at the time that you interviewed him, he had been interviewed by
02:42 Dr. Sahgal, correct?
A. **Correct.**
Q. He had been interviewed by Dr. Park Dietz?
A. **Correct.**
Q. And then you came along?
02:42 A. **Yes.**
Q. And now, obviously, you're here testifying on -- I don't want to say on his behalf, but I understand he's not your client based on your answers; is that correct?
A. **That's correct.**
02:42 Q. But you are testifying on behalf of the defense?
A. **Correct.**
Q. Now, Doctor, when it comes to the autism spectrum disorder, it's fair to say that it's difficult to understand the boundaries of the disorder?
02:42 A. **That's fair. Absolutely.**
Q. It's a broad spectrum?
A. **Yes.**
Q. On one hand you have individuals who had terribly impaired, and what I mean by that is individuals who are incapable of
02:43 language, incapable of social interactions, and self-care to

the extent where they need to be institutionalized?
A. **Correct.**
Q. On the other hand, you have individuals who are high functioning that resemble what -- I think the psychological term, neurotypical?
A. **They don't -- I mean they're not neurotypical, they're neurodiverse. But certainly, like the woman that I cohost the podcast with, she's an attorney. So she has autism, but she's also an attorney. So she's functioning at a very high level.**
Q. So you have a great disparity?
A. **Exactly.**
Q. Between the two polar opposites?
A. **Yes.**
Q. In this situation, individuals who have Asperger's typically fall in the high-functioning range, correct?
A. **Correct.**
Q. And the defendant having previously been diagnosed with Asperger's means that he's likely high functioning?
A. **Well, he was at the time. And so what I believe has happened --**
Q. Doctor, if I could just pause you a moment. You said you believe has happened or actually know has happened?
A. **Well, it's my opinion. It's my expert opinion what has happened is that because of the lack of intervention and his lack of being promoted in the world, his lack of being out in**

**the world that he's regressed. And he's not -- so when you make the diagnosis, you need to look at what would be normative behaviors for a 22-year-old now. So maybe when he got the diagnosis when he was five, seven, nine, that it was more mild, not as exacerbated. Now, compared to other 22-year-olds, he's lagging very far behind in adaptive skills.**

02:44

Q. And we'll talk about the adaptive skill test in just a moment.

A. **Not just the test, but I mean just in his functioning. And he's never had a job. He doesn't have a cell phone. He didn't graduate high school. So all of those things that we know about his daily life are impaired.**

02:44

Q. You're aware he has a tablet, though, right?

A. **Excuse me?**

02:45 Q. You said he didn't have a cell phone. But you're aware that he's used multiple tablets?

A. **Yes, but not a phone, right. He's using tablets and not a phone. He's not communicating with people with a cell phone. He doesn't have friends that he's engaging with. He's got this tablet to the internet and --**

02:45

Q. But you realize that through the tablet, he's able to communicate with other people?

A. **Yes.**

Q. And he actually has private conversations with other people as well?

02:45

A. **Sure.**
Q. So the functionality of the cell phone could very well be served on a tablet as well, correct?
A. **Correct. But most 22-year-olds also have a cell phone and they have jobs and they have a bank account and they're paying their bills. And he does none of that.**
Q. And who told you he doesn't have any of that?
A. **He and his father.**
Q. Okay. But you didn't do any sort of independent verification to be sure that's true?
A. **No.**
Q. Because the source of most of your information about the defendant was derived from the defendant and his father, correct?
A. **And all of the documents. All the discovery documents.**
Q. All the documents, yes.
A. **And all the records. And there's a lot of records.**
Q. But I'm not aware of -- personally. And please correct me if I'm wrong. I'm not aware of any documents that actually show that there are no bank records in existence for this defendant.
A. **Correct.**
Q. And it's possible that it's -- you know, for a defendant whose father has a lot of investments and makes pretty good money, he may not need a bank account?

A. **At 22? I mean, a 22-year-old should have a job if they're not in college and should have a bank account. Should be able to have an ATM card and go to the grocery store and do all those things. And he's not engaging in those behaviors, he's at home doing nothing.**

02:46

Q. So, Doctor, let's talk about the tests that you administered, one of which was the Adaptive Behavior Assessment System, Third Edition.

A. **Okay.**

02:46

Q. That examination assesses individuals on 11 different skill assessor; is that correct?

A. **If you counted. Sure.**

Q. And as you have testified, and I'm obviously paraphrasing, the purpose of the exam is to focus on practical, everyday activities required to function, meet environmental demands, care for one's self, and interact with others effectively and independently?

02:47

A. **Yes.**

Q. This is not an exam specific to autism, it's just that determine general adaptive skills?

02:47

A. **Right. It's typically used with people with intellectual impairment, autism, or dementia.**

Q. This exam is a four-point scale? Every question has essentially four options?

02:47

A. **Yes.**

51 of 99

Q. So there's no essay. There's no oral exam. It's just where does the person fall?
A. **Right. It's a psychological test -- instrument. It's not a test, really.**
02:47 Q. The four categories is, number one, is not able; second one is never or almost never; third is sometimes when needed; and fourth is always.
A. **Yes.**
Q. So you would agree to some degree that there's some
02:48 subjectivity associated with that?
A. **Oh, yes.**
Q. Now, you had testified that you gave the exam to the father?
A. **Yes.**
02:48 Q. You did not give the exam to the defendant?
A. **Correct.**
Q. You could have given the exam to the defendant?
A. **I could have, but I wanted to get information from somebody who knew him and who observed him in the community. Typically,**
02:48 **if you've got a person that is supportive, that's the person that you typically give the -- that's a typical administration.**
Q. Would you agree, Doctor, that this is not an entirely typical case? So is it fair that you could have given this exam to the defendant and his father?
02:48 A. **I could have. You're right.**

Q. And you would agree that if you had given this exam to more than one individual that it would account for any risk of bias?
A. **They would both be biased, but it could. Sure. You could look at both. Absolutely.**
02:49 Q. And, of course, in this situation, as you mentioned, both individuals are biased, so theoretically they could have kind of skewed the answers anyways?
A. **Sure.**
Q. But in terms of giving it to someone else, I mean, you did
02:49 not reach out to teachers or counselors that could have possibly taken this exam, correct?
A. **He hasn't been in school since he's 17. It's five years ago, so --**
Q. But they probably could have given you at least some
02:49 understanding as to his general adaptive skills when he was in high school?
A. **But I'm assessing his skills now, five years later.**
Q. What about his brother?
A. **His brother could have.**
02:49 Q. You chose not to?
A. **I did not.**
Q. Now, he's a 20-year-old who is actually doing pretty well for himself in animation and things of that nature, correct?
A. **That's my understanding, yes.**
02:49 Q. And actually, I think he's accumulated a number of college

credits or graduate credits. I can't recall.
A. **I this it's undergraduate credits. I think so.**
Q. And if that's the case, wouldn't he have been a good source of information separate from obviously the father and the defendant?
A. **Yes.**
Q. You chose not to give him the exam?
A. **Right. He didn't travel here from California.**
Q. And you didn't ask to see him?
A. **Correct.**
Q. You never interviewed him, correct?
A. **Correct.**
Q. And you would agree, Doctor, that to a certain degree, depending on the dynamics between a child and a parent or a child and a sibling, oftentimes -- or sometimes siblings may have a better connection with one another, understanding of one another than a parent and a child?
A. **Absolutely. Sure.**
Q. But you did not take that into account when you decided to give the father the exam without even considering giving it to the defendant?
A. **I gave the defendant the autism spectrum checklist, so --**
Q. That's a separate exam, Doctor. I'm talking about this one.
A. **And I have the other data. But sure.**

Q. How often does the defendant and his father interact when they're home?
A. **How often do they interact?**
Q. Yes.
02:50 A. **I don't know. It doesn't sound like a lot. It sounds like from -- that they co-habitate but in separate kind of corners of the house.**
Q. So isn't it fair to say the father may not actually be the best source of information about the defendant's general
02:51 adaptive skills if they're essentially living separate lives under the same roof?
A. **I mean, Brandon doesn't interact with anybody in the world.**
Q. So it's possible that --
A. **You know, if he had been in treatment or something like**
02:51 **that, that would be a great person. But he's been at home for five years without interacting with anybody outside of that house.**
Q. So between the father, the defendant, and his brother, you chose the father?
02:51 A. **Yes.**
Q. And you'd agree that the father is aware of his son's criminal position right now or his criminal standing in this case?
A. **Yes.**
02:51 Q. Facing criminal charges?

A. **Yes.**
Q. He understands that the examination that you were conducting was going to be, at least in some respects, discussed in a criminal proceeding, in a criminal case?
02:52 A. **Yes. Could have, yes.**
Q. The exam itself, the Adaptive Behavior Assessment System, you would agree that it doesn't account for bias?
A. **Correct.**
Q. And oftentimes, the way to account for bias is you give the
02:52 exam to multiple individuals who can all provide information and then you can sit there and determine, well, these are inconsistent, why is there an inconsistency, and try to resolve it that way?
A. **Sure.**
02:52 Q. But you didn't do that here?
A. **Correct.**
Q. Was the defendant in the room when the father was taking the exam?
A. **I'm sorry.**
02:52 Q. Was the defendant in the same room as --
A. **No.**
Q. So it was just you and the father?
A. **No. I was examining Brandon and the father was in another room at my office completing this. So we were separate.**
02:52 Q. So you left the father by himself with this exam?

A. **Yes.**
Q. Now, Dr. Butts, were you in the courtroom when Patrick Fleury testified?
A. **Yes.**
02:53 Q. And you recall the statement where he testified that this exam was just really confusing?
A. **Yes.**
Q. And he said he told you up front this was confusing?
A. **Yes.**
02:53 Q. And he's testified that your response was, Don't think about it, just go through it?
A. **Right.**
Q. Was that your response?
A. **No.**
02:53 Q. So you're saying Patrick Fleury was lying when he --
A. **No. That's his --**
**AFPD WILCOX:** Objection, Judge.
**THE COURT:** Overruled. Overruled.
Go ahead. You can explain, Doctor.
02:53 A. **That's his impression of what he thought I said to him. He's not lying. Absolutely not. That's his interpretation of what I told him.**
**BY AUSA ALEXANDER:**
Q. Well, what did you tell him?
02:53 A. **I told him that I wanted him to focus on what he's observed**

in Brandon and not guess about what he thinks Brandon could do in the future or could do, but what he actually observes Brandon doing on a daily basis.

Q. And it's possible --

02:53 A. So there were things -- so Mr. Fleury has a lot of difficulty understanding what Brandon's capacity is, what he's able to do, and what he's not able to do. So I think that it's confusing for him.

Q. So you agree that the defendant's father has a hard time

02:54 understanding the scope and limitations of the defendant?

A. Yes.

Q. Now, Doctor, you would agree that the defendant's father being really confused about the questions and having difficulty answering, that's the type of information you should probably

02:54 incorporate in your report, but you didn't do that, did you?

A. I didn't know he left the office feeling really confused. I thought that we'd worked it out. I didn't know -- I didn't -- I thought that he expressed that to me, that he understood me and that it was okay when he left. So I thought

02:54 we had worked out the confusion.

Q. So the defendant's father told you he was really confused, you felt it was resolved. But at no -- and you still left him on his own to take the exam?

A. Right. But I mean, I was there to answer questions if he

02:55 had more questions.

Q. But you didn't think that was important to at least disclose that initially Patrick Fleury felt really confused by the exam but after speaking with him, it appeared that he may have understood it better?
02:55 A. **I probably should have.**
Q. But you didn't do that, though?
A. **No.**
Q. And you independently interviewed the father; is that correct?
02:55 A. **Yes, I did.**
Q. Is it possible that there were times where he was confused by the questions you were asking him?
A. **His father?**
Q. Correct.
02:55 A. **Maybe. After hearing his testimony today, it's possible. I'm not in his head. He didn't tell me.**
Q. But it's fair to say, Doctor, if you had videotaped that interview and well as him -- any interactions with him, we'd be able to go back and see exactly whether or not he was confused?
02:55 A. **I don't know if we would even still know if he was confused if he doesn't say it. I don't know if videotaping it would let us know if he's confused inside and not expressing that.**
Q. But he could have articulated in certain things, ask you to re-explain things or give an answer that are not really
02:56 answering the question that was asked; is that fair?

A. **I didn't follow that. I'm sorry.**
Q. So without a video or a transcript of your interviews with Mr. Fleury, we just have to take your word that the interview between you and him one on one, he understood it -- understood the questions you were asking and answered it without any issues?
A. **Or if there were issues, he and I discussed whatever issues were. And I felt that I got to an understanding.**
Q. Okay. But you just did not give -- you just did not record it so anyone else outside of the two of you can look at it?
A. **Correct.**
Q. Now, the decision to choose the dad, as you had mentioned, you had gone through the defendant's school records and medical records and you've seen a number of instances where his father had said that these examinations are just a waste of time?
A. **Yes.**
Q. This type of testing is a waste of time. That Brandon doesn't need this. In fact, I think one of the things was a California Healthy Kids Survey in which he says, Would love to know the idiots that came up with this survey. He doesn't really like much testing, does he?
A. **No, he doesn't.**
Q. Is it fair to say that it's possible that he didn't really think much of this testing when you gave it to him?
A. **Quite possible.**

Q. So the fact that the defendant scored extremely low on this exam may very well have been influenced by the defendant -- the defendant's father's bias or lack of interest in taking these types of tests?
02:57 A. **Absolutely.**
Q. The Miller Forensic Assessment of Symptoms test --
**THE COURT:** Some water for her, please, Gracie.
Go ahead.
**BY AFPD WILCOX:**
02:57 Q. Doctor, you also administered the Miller Forensic Assessment of Symptoms test, correct?
A. **Correct.**
Q. And that assists professionals in determining whether or not an individual is malingering?
02:58 A. **Correct.**
Q. Now, is this test also -- now, is it fair to say that an individual who's taking this test may not be malingering but may provide answers that are still beneficial on a criminal case?
02:58 A. **Sure.**
Q. Because it's not as if it's -- they're two separate things?
A. **Yes.**
Q. So it's possible the defendant could have been providing answers even though he does not -- is not malingering, his
02:58 answers could be benefitting him in his criminal case?

A. **Sure.**
Q. And you testified about the Montreal Cognitive Assessment test?
A. **Yes.**
02:58 Q. And the defendant's just fine cognitively?
A. **Yes.**
Q. You also provided the defendant with the Ritvo Autism Asperger's Diagnostic Scale-Revised. Ritvo is spelled R-I-T-V-O. Is that correct?
02:58 A. **Yes.**
Q. This is a 80 question exam, 8-0; is that correct?
A. **Correct.**
Q. And there are four different possible responses?
A. **Correct.**
02:59 Q. True now, and when I was young, true only now, true only when I was younger than 16, never true.
A. **Correct.**
Q. What is the error rate on this type of exam?
A. **That's a great question. We don't know.**
02:59 Q. What do you mean, We don't know?
A. **So it's a screening test, a scale. It's not -- there's a test/retest liability. There's a sensitivity. There's a specificity. But we don't know.**
Q. So there is potential for error here, but you just don't know the rate of possible error in this test?
03:00

A. **Right.**
Q. And you didn't feel the need to disclose that detail in your report?
A. **No.**
Q. And based on your familiarity with the Ritvo, are you aware of how often this exam has been administered to someone who is facing criminal charges?
A. **No.**
Q. Doctor, do you have a copy of that exam in front of you?
A. **Yes.**
Q. Could you go to the first page?
A. **Sure.**
Q. Now, this exam, was this administered to the defendant on his own? Did he have his father there helping him?
A. **No, on his own.**
Q. On his own?
A. **Yes.**
Q. Because he's capable of reading and writing on his own?
A. **Yes.**
Q. Could you please read the first question.
A. **I'm a sympathetic person.**
Q. What was the defendant's response?
A. **True now and when I was young.**
Q. So the defendant says, I'm sympathetic?
A. **Yes.**

Q. So understands, appreciates when other people are feeling adverse emotions?
A. **He believes that he does, yes. That's how he perceives himself.**
03:01 Q. So he perceives himself as understanding how other people feel, but you're testifying that his understanding is wrong?
A. **Yes.**
Q. What is the third question?
A. **I am often surprised when others tell me I have been rude.**
03:01 Q. And what is the sixth question?
A. **I can put myself in other people's shoes.**
Q. And he says, True now and when I was younger?
A. **Sorry. Yes. Yes.**
Q. And, Doctor, again, I assume you're going to say that's the 03:01 defendant's understanding of himself, a statement he made to you at the time of the examination, but you just think he's wrong?
A. **No. This is how he perceives himself. This isn't a statement he said to me.**
03:01 Q. No, of course.
A. **And in assessing all of the data and all of the information, certainly a person who would -- who claims to have no idea that these would be perceived -- that these threats and statements would be perceived as threatening or engaging in any** 03:02 **type of fear, certainly could not put themselves in somebody**

64 of 99

**else's shoes, even though he believes that he's capable of doing that.**
Q. But again, Doctor, your conclusion doesn't take into consideration that this is an individual facing criminal charges who provided answers specific to the fact that he's facing criminal charges. So --
A. **That's assuming -- that's assuming a lot of sophistication. That is not apparent throughout and not consistent with all of the data. So that's making a lot of sophisticated jumps that I don't believe Brandon has.**
Q. When you gave this exam to the defendant, you told him it was to determine whether or not he had Asperger's, correct?
A. **I don't think I -- no, I don't think I told him that. No.**
Q. So he answered these questions?
A. **Yes.**
Q. And do you believe that he was being honest with you when he answered this?
A. **Sure.**
Q. So he filled out these answers. And then when you did a one-on-one interview with him, you believe he gave you answers that seems to comport with the idea that he doesn't understand when other people feel fear, grief, distress?
A. **Right. I mean, he didn't with me. He had to ask Dr. Dietz to explain some of those emotional states. They seemed like foreign concepts to him, genuinely foreign concepts. And then**

**he was willing to participate in a definitional or an exchange of what that meant, what those feelings meant. And was willing to --**

Q. But is it fair, Doctor, that if an individual asks you to define a term, it's more so to understand the parameters that you've set in terms of how that word is to be defined? So for example, grief to one person may be different in a different person?

A. **Correct.**

Q. So instances in which the defendant is asking Dr. Dietz to define grief is asking him, How do you define grief in this context?

A. **I don't agree with that. I think that it's a genuine question stemming from somebody who has autism, not that sophisticated level of engagement you're talking about. That's my opinion.**

Q. And that's because you don't think the defendant is high functioning? Do you think he's high functioning?

A. **No, I think he's Level 2. And I think that he does not understand the emotional state in others.**

Q. And, Doctor, your interview with the defendant was one-on-one?

A. **Yes.**

Q. And how long was that interview?

A. **About four hours.**

Q. And you did not record that interview?
A. **No.**
Q. And you would agree, Doctor, that a success of the examination that you've administered is contingent upon the individuals involved giving honest, truthful answers?
03:05
A. **Yes. I mean, part -- yes, partially, yes.**
Q. Because that would result in good data?
A. **Well, look, I mean I work in the criminal world. People aren't honest with me. That's part of what goes along with the job. So it's data. It's all data that you have to synthesize, put everything together, and what -- where the data makes sense. That's my role.**
03:05
Q. How common is it for you to conduct a psychological examination after multiple psychiatric evaluations within a maybe three- to four-month period?
03:06
A. **I mean, with related to competency, it happens quite often.**
Q. This is not a competency case. So excluding competency.
A. **Okay. Typically it depends on who gets hired first. It's common.**
03:06
Q. The basis for your determination that the defendant does not understand the emotional expression in others is based on the fact that he was -- based on his answers to you, correct?
A. **And all the other information.**
Q. And that includes Dr. Dietz's report, Dr. Sahgal's report, both of which disagree with you?
03:06

A. **And his interviews. His interviews, his -- my reading of his interviews with Dr. Dietz, his interviews with the FBI, the school records, how his father discusses -- I mean, it's from everything. It's not just from one piece.**

03:07 Q. Doctor, you talked about fixed interests with this defendant. And a fixed interest can be anything?

A. **Yes.**

Q. Part of having an interest or a fascination, as you described in your report, is that there's some level of

03:07 intentional choice.

A. **Sure.**

Q. The defendant chose serial killers.

A. **Yes?**

Q. And in his FBI interview, you recall that he said he was

03:07 sexual aroused by serial killers?

A. **Yes.**

Q. That he masturbated to images of Aileen Wuornos and Ted Bundy?

A. **Yes.**

03:07 Q. That the defendant had fantasies, a lot of fantasies about Nikolas Cruz?

A. **Yes.**

Q. That he was physically attracted to Nikolas Cruz?

A. **Yes.**

03:07 Q. And he was fascinated by what he did?

A. **Yes.**
Q. So all of this, you've essentially summed down to fascination with serial killers. And that's it in your report?
A. **I don't understand. What do you mean?**
03:08 Q. In your report, you don't expound on the defendant's sexual arousal or his masturbation, anything of that nature associated with the serial killers, correct?
A. **Correct.**
Q. I think the only reference to it in your report is that he
03:08 was fascinated with serial killers and Bullseye?
A. **Okay.**
Q. But, Doctor, you would have to agree to some degree that there is some similarity between the sexual arousal and the images themselves, or at least the messages themselves?
03:08 A. **No, that's not what he -- that's not what Brandon says. The sexual arousal is to the person, it's to the serial killers. And his fantasy is to be dominated by the killers. So it's not -- he -- Brandon did not in any interview acknowledge that he was sexually aroused by sending these**
03:09 **messages.**
Q. He wasn't aroused by aggression in people with violent tendencies, correct?
A. **He was aroused by not aggression, by the people who have engaged in aggression, yes.**
03:09 Q. And, Doctor, again, as we've talked repeatedly, the answers

that he's given on this topic could very well be a reflexion of the fact that he's a criminal defendant, not just an individual who is seeking assistance for an alleged autism spectrum disorder?

03:09 A. **Yes, with a caveat. Is that -- I mean, it would be very sophisticated for someone to -- if someone was that sophisticated, they would not have admitted to the FBI that they're masturbating to serial killers. They would have kept that private. So to ascribe that logic does -- I don't think**

03:10 **relates to Brandon, because if he were that sophisticated, he wouldn't have acknowledged that during the FBI interview because that's not self-serving. That only looks worse.**

Q. So you don't think it was self-serving when the defendant during this post-Miranda interview with the FBI said that he

03:10 could not remember the Teddy kills people messages?

A. **I think he probably sent so many messages, he couldn't remember which was which. It could have been self-serving. Sure.**

Q. You agree that -- you agree that there may or may not have

03:10 been instances in his post-Miranda interview that were self-serving on the criminal aspect?

A. **Right, but when we're talking about this other issue over here, that's a lot more complicated and lot more steps in processing. But saying I don't know or I don't remember,**

03:11 **certainly, yes. It could be absolutely self-serving.**

Q. And in terms of the interview with the FBI, I mean, we can -- I mean, if we were to sit here and talk about it, we'd be here all day. In terms of the interview, though, I mean there was a component talking about the criminal conduct and there was also a component talking the sexual arousal, correct?
03:11
A. **Correct.**
Q. And for the sexual arousal and about the serial killers, Brandon was pretty engaged?
A. **Right.**
03:11
Q. Like this was a topic of great interest to him?
A. **Sure.**
Q. And he was pretty open with the FBI about the sexual arousal and the masturbation, everything of that nature, correct?
03:11
A. **Yes.**
Q. And he also talked about Nikolas Cruz as well in that regard?
A. **Yes. I don't have it in front of me, so I'm trying to be as accurate as possible.**
03:11
Q. No. Of course, Doctor. Now, in terms of the criminal conduct itself, you would agree that it's possible that he minimized in that regard; but in terms of the sexual arousal, it's always possible that he spoke just more openly about that?
A. **I don't understand that question. I'm sorry.**
03:12
Q. The defendant is able to discern when something could hurt

him in a criminal aspect and when something is, in his mind, just a great topic of conversation?
A. **That would be -- it would be really flawed logic to think talking to the FBI about masturbating to serial killers would be just a great topic to talk about. That doesn't make sense. That's in and of itself evidence of a disordered thinking.**
Q. Here's the thing, Doctor. The way the defendant's mind works is different than most people?
A. **Right.**
03:12 Q. In fact, he's unique. Would you say the defendant, as well as any other individual with the autism spectrum disorder, is unique?
A. **Sure.**
Q. So the fact that the defendant is sexual aroused by serial killers, that's not common?
A. **Right.**
Q. So the fact that this is a topic of interest to him or the fact that he's fascinated and enjoys talking about serial killers, Bullseye or whoever, that's maybe exactly what Brandon enjoys doing? You keep talking about what typical people do. I'm saying that in Brandon's world, the serial killers and all this, this is what he enjoys talking about?
A. **But that's a disordered world. And that world all leads back to the autism. That's the point that I'm trying to make.**
Q. I understand, Doctor. You're saying that it's all

connected to the autism, but it's also possible that it's not?
A. **I don't think so. That's not my opinion.**
Q. I'm not asking about your opinion. I'm asking if it's possible that the defendant's fascination and sexual arousal by serial killers is separate from that of the autism?
03:13
A. **No, because it's -- you can't separate it out. It's through his lens. And his brain and his lens is disordered due to the autism spectrum disorder. So no.**
Q. Now, in terms of the sameness, I think you had talked about how the defendant, when he was a child, wore the same green shirt, maybe carried a little stuffed duck?
03:14
A. **Right.**
Q. Who told you that?
A. **His father.**
03:14
Q. Did you see any photographs of that?
A. **I don't think so.**
Q. So it's the father's statement that because this defendant at some age was wearing green shirts and carrying his stuffed duck, that that sameness may very well be indicative of the autism spectrum disorder?
03:14
A. **Yes.**
Q. Now, Doctor, how old was the defendant when he was doing this, the green shirt and stuffed duck?
A. **That's a good question. I don't -- elementary school, I believe.**
03:14

Q. And is it possible that kids in elementary school maybe just generally not really reasonable people?
A. **Sure.**
Q. I mean, there's a lot of elementary school kids who do things crazy, they like to eat the same food every day, they want to wear certain outfits on certain occasions, they want to go sleep in a Superman cave.
A. **Right. But unlike those, Brandon was diagnosed with Asperger's and with ADHD and OCD at age seven.**
Q. Did you speak with the doctor that made that diagnosis?
A. **No, I did not.**
Q. And it's possible that people make mistakes when they make these diagnoses, don't they?
A. **Yes.**
Q. In fact, for example, Doctor, you're aware that the defendant was exhibiting repetitive -- or hyperactivity and ticks when he was younger?
A. **Yes, that's my understanding.**
Q. And that was a result of the Adderall?
A. **That's what his father says.**
Q. And that's actually what Dr. Dietz says as well?
A. **Okay.**
Q. And Adderall is a psychostimulant that if given to an individual who is not actually experiencing ADHD, which is attention deficit hyperactivity disorder, they could very well

be exhibiting those characteristics because they're on Adderall?
A. **That's true.**
Q. So once the Adderall was ceased, the defendant stopped acting that way?
A. **With the ticks?**
Q. Correct.
A. **That's my understanding. But there's also reporting within the -- that he was -- that teachers -- there was teacher reports that -- I don't have it flagged right now. That he was better when he was taking Adderall as well. His behavior was better and he was more focused.**
Q. But you can agree, Doctor, that depending on what a doctor, you know, 10, 15, 20 years ago was thinking at the time, that diagnosis may be contingent upon what they observed at that moment, but it doesn't mean this it didn't -- it's not true today? You would agree that it may not be true today?
A. **Correct, yes.**
Q. Did you review all the messages in this case, Doctor?
A. **I believe so.**
**JUROR**: I have to go to the restroom. I'm so sorry.
**THE COURT**: It's not your fault. This has gone on quite long. Let's go and take a little break.
And I hope when we get back, you'll be wrapping up.
**AUSA ALEXANDER**: Absolutely, Your Honor. Yes.

75 of 99

**THE COURT**: Thank you. Okay. Leave your notepads where they are. Let's use the restroom, please. We'll be bringing you in as soon as you've all had a chance to go to the bathroom. My apologies for keeping you a little long.

03:17 (Thereupon, the jury exited the courtroom.)

**THE COURT**: Everyone please be seated.

Doctor, can you remain there? We'll take a five-minute break.

A. **Can I use the restroom?**

03:17 **THE COURT**: Yes, if you could, please.

(Thereupon, a brief recess was taken.)

**THE COURT**: Please be seated everyone. Please round up our jurors.

(Thereupon, the jury entered the courtroom.)

03:28 **THE COURT**: Please be seated everyone. All right. Ladies and gentlemen, we're going to continue with our cross-examination.

Go ahead, Counsel.

**AUSA ALEXANDER**: Thank you, Your Honor.

03:29 **BY AUSA ALEXANDER**:

Q. Dr. Butts, you testified that you reviewed the messages in this case, correct?

A. **Correct.**

Q. I'm going to show you what's been admitted as Government

03:29 Exhibit 5.

**AUSA ALEXANDER**: Ladies and gentlemen of the jury, can you see it?

**THE JURY**: Yes.

**THE COURT**: Doctor, can you see it?

03:29 A. **Yes, sir.**

**THE COURT**: All right.

**BY AUSA ALEXANDER**:

Q. Dr. Butts, have you seen this message before?

A. **Yes.**

03:29 Q. So you're aware that the defendant sent this message with the user name, Nikolas killed your sister?

A. **Yes.**

Q. And he chose the image of Nikolas Cruz?

A. **Yes.**

03:30 Q. One of the individuals for whom his -- he fanaticizes about?

A. **Yes.**

Q. And the message says, Your grief is my joy. You've seen that?

03:30 A. **Yes.**

Q. Are you testifying that the defendant did not understand what he meant when he sent that message, Your grief is my joy?

A. **My testimony is that he would say that this is -- that he would say that this is an absurdity because there's emojis and**

03:30 **it's -- they're emojis and that was to indicate that there's --**

**that it's annoying and angry and not --**
Q. Doctor, I understand what Brandon Fleury, the defendant in this criminal case, would say. I'm asking you, based on your judgment, the words "your grief is my joy," are you testifying that based on your examination of the defendant, he does not understand what that phrase means?
A. **No. Okay. What I'm -- well, what I'm saying is that that means something different to Brandon Fleury than it does to us who are reading it. That's what I'm saying. Because of his autism. That's what I'm saying.**
Q. Even though he chose the word grief?
A. **Yes.**
Q. And you testified that because -- and that's because Brandon told you that these people who receive it can only feel the words anger and annoyance?
A. **No. That that was his intention, was to cause anger and annoyance. And his -- in -- excuse me. He certainly could be educated as he participated in a discussion with Dr. Dietz about -- I forget the word, one of the emotional words -- cruel. That it could be perceived as cruel. But at the time, that he was not -- he was not considering that.**
Q. So you're saying that the defendant can understand anger but not grief?
A. **He had difficulty comprehending grief. And it was brought to him in different ways. He had difficulty comprehending what**

grief is in himself and grief in other people. He said it was sadness. But no.

Q. He said it was sadness.

A. Yes, he said it was sadness.

03:33 AUSA ALEXANDER: Can you show Government Exhibit 10?

BY AUSA ALEXANDER:

Q. Can you see that on your monitor, Doctor?

A. Yes. It's fuzzy, but I can see it.

Q. And the message, could you read it out loud?

03:33 A. The whole thing?

THE COURT: Yeah, you can read it, ma'am.

A. Bullseye taunts you. Mentioned you in a comment. Yoo hoo. Nikolas took Jamie away from you, so cry for me, please. At Jessie Hockey, at Lexie, Sealy at Fred Guttenberg, 18 4S with a 03:34 smile and a clapping emojis.

BY AUSA ALEXANDER:

Q. And, Dr. Butts, you're testifying that the defendant did not understand what cry for me means when he was directing it at the brother, the best friend, and who he believed to be the 03:34 father of Jamie?

A. I'm not testifying that he didn't know what cry for me meant. What I'm saying is that he did not perceive that this would be received by the victims as devastating and grief-stricken and all the horrible emotions that they felt 03:35 when they received it. That's what I'm saying.

Q. And that's based on what he told you?
A. **Yes. And what he's told everybody in the case.**
Q. I'm going to show you --
A. **And based upon knowing the -- how autism impairs people's ability to understand emotions.**
Q. I'm going to show you Government Exhibit 85 and 86?
**AUSA ALEXANDER**: And Your Honor, I'll end it there.
**BY AUSA ALEXANDER**:
Q. I'm going to show you what's been admitted as Government Exhibit 86. And, Dr. Butts, have you previously seen this?
A. **Yes.**
Q. And this was a tweet that was posted by Cameron Kasky, one of the survivors of the Parkland shooting?
A. **Yes.**
Q. And you're aware that he was re-tweeting messages that he had received from the defendant?
A. **Yes.**
Q. I'm now going to show you Government Exhibit 90. Doctor, I'm showing you an excerpt from the conversation between the defendant and another individual using the user name Poc Liberty. Could you read that message out loud?
A. **LOL. He literally posted some of the shit I sent him via e-mail on his Twitter saying he's going to be offline until after Christmas. Some emojis. I took it way too far with my trolling but oh, well. Oh, and he blocked me on this account**

**too. LOL.**
Q. Doctor, based on the statement from the defendant, it's possible that he understood that there was -- that he had gone too far with what he was doing?
03:38 A. **Yes.**
Q. That he had caused an adverse emotional reaction in Cameron Kasky?
A. **Yes.**
Q. And are you aware of the fact that this message was sent on
03:38 December 22nd?
A. **Yes.**
Q. Prior to the numerous images -- or sorry -- numerous messages that he had sent to the victims in this case?
A. **Yes.**
03:38 Q. That he continued to engage in this type of behavior?
A. **Yes.**
Q. And that would include the messages from Teddy kills people, the threat of kidnapping?
A. **Yes. He discussed this with me and said that he received**
03:38 **feedback from this online person that he hadn't gone too far, so.**

**AUSA ALEXANDER:** Your Honor, may I have one moment?

**THE COURT:** You may.

**AUSA ALEXANDER:** Thank you, Doctor.

03:38 Your Honor, no further questions.

**THE COURT**: Redirect, please.

***REDIRECT EXAMINATION***

**BY AFPD WILCOX:**

03:38 Q. Dr. Butts, with respect to Dr. Sahgal's psychiatrist -- Dr. Sahgal's report and government's psychiatrist Dr. Dietz's report, did anybody say he didn't have autism?

A. **No, sir.**

Q. And based on any other material that you've read, has
03:39 anybody ever opined that Brandon Fleury does not have autism?

A. **No.**

Q. Have you seen any information from anyone who said that Brandon Fleury did not have autism?

A. **No.**

03:39 Q. I'm going to direct your attention -- may I approach -- do you have Dr. Sahgal's report?

A. **Yes, sir.**

Q. I'd like you to go to page 4. And start -- you have it?

A. **Yes.**

03:39 Q. Start right in the middle of the report there.

A. **Indeed?**

Q. Speak up, please.

A. **Indeed, is that where you want me to start?**

Q. Yes.

03:39 A. **Indeed, during my extended interview with Mr. Fleury, it**

**soon became rather obvious that he has autism spectrum disorder. He behaved as if he had a limited ability to interpret and respond to social nuance in real time. He was mostly expressionless. Individuals with autism are similar in category to individuals with color blindness. Compared to the norm, such individuals cannot distinguish nuance or what may be obviously clear differences. While the colorblind person may not be able to perceive blue, green, or red, an individual with autism may very well not be able to detect and process nuances associated with laughter, smiling, jokes, sarcasm, or facial expression.**

Q. You don't have to read the next part. Could you go right to however in that same passage?

A. **However, the internet has become the kind of instrument of relative social freedom for people with mild autism. After all, the online community is completely devoid of the realtime stressors of interpreting facial expressions and interacting with social nuances.**

Q. Now, I'd like you to turn to the next page.

A. **Okay.**

**AUSA ALEXANDER:** Your Honor, I would object. The reading of the material is being introduced for substance rather than for impeachment purposes, so I would ask that it be stricken.

**AFPD WILCOX:** Your Honor, let me just --

**THE COURT:** I'm going to allow you to go ahead and continue. That's fine.

**AFPD WILCOX:** Thank you, Your Honor.

**BY AFPD WILCOX:**

03:41 Q. I'd like you to go to page 5.

A. **Okay.**

Q. And in this passage, I'd like you to start at the sentence -- at the sentence, The defendant opened various internet accounts.

03:41 A. **The defendant opened various internet accounts to post on sites such as Instagram messages that were, by any measure, taunting, cruel, provocative, and possibly threatening towards survivors of the Parkland school mass shooting or relatives of those who were murdered during their shootings. It's**
03:42 **unambiguously terrible behavior with comments and proclamations that are, from a normal perspective, vile and at the best, insensitive.**

**However, to Mr. Fleury, who has a very real DSM 5 diagnosis of autism spectrum disorder, these comments were to**
03:42 **him funny and interesting. He found taunting and writing inappropriate messages using different user names to be entertaining. He even co-authored the shooter's name for some of his identification user names.**

Q. Thank you. Dr. Butts, is it unusual for you to rely on
03:42 school records to help you with your diagnosis?

A. **No.**
Q. Is this something that most people -- most forensic psychologists deal with some -- that forensic psychologists do in the ordinary course of evaluating people?
03:42 A. **Yes.**
Q. How many times have you contacted teachers who -- that were referenced in these records?
A. **That's pretty rare.**
Q. Pretty rare. How about, do you regularly videotape your
03:43 interviews?
A. **That's not my protocol.**
Q. That's not your protocol?
A. **No. Because of using psychological testing, we're not supposed to divulge that information, so.**
03:43 Q. And, in fact, you didn't want to divulge the testing in this case?
A. **Well, I'm ethically and statutorily not supposed to release psychological tests to people other than psychologists.**
Q. I see. But a court order, you divulged this to the
03:43 government; is that correct?
A. **That's correct.**
Q. You don't normally do that, do you?
A. **No. Usually there's another psychologist that you release your testing. There's not in this case.**
03:43 Q. Now, when you --

**AFPD WILCOX:** Can the government put up number 5?
**BY AFPD WILCOX:**
Q. Can you see it?
A. **Yes.**
03:44 Q. Your grief is my joy. Did that convey a threat? Just the plain meaning of the words.
A. **No, that doesn't say I'm going to harm you or kill you. But it's awful.**
Q. Based on your diagnosis and review of all the records with
03:44 respect to Mr. Fleury, how would you interpret that message?
A. **Through his lens?**
Q. Yes, through his lens.
A. **I mean, he said when -- that trolls on the internet use emojis and use shocking things to get attention and to get**
03:45 **people's attention, that it's -- it would be seen as -- we see it as -- what's the word he would use? Not absurd, but a word similar. I'm sorry. I'm having a blank in my head right now. But as ridiculous because of the use of the emojis and all of that. That's through his lens, not my lens.**
03:46 Q. And with respect to -- I just want to go back to not videotaping your interview. Is there some rule or some advice or --
A. **It can change the dynamic. If you're -- videotaping forensic assessment can change the dynamic of the assessment.**
03:46 Q. Is there some general consensus that it's preferable to

videotape --
A. **No.**
Q. -- these interviews?
A. **No.**
03:46 Q. Would it be fair to say it just depends on the style of the person that's doing the interview?
A. **Yes. And it's pretty rare for it to be videotaped and as -- from a psychologist's perspective.**
Q. Dr. Sahgal, the psychiatrist in California, do you have any
03:47 indication that he videotaped his interview?
A. **I don't.**
**AFPD WILCOX:** Thank you. Just a minute, Your Honor.
**THE COURT:** Sure.
**AFPD WILCOX:** Thank you, Your Honor.
03:47 **THE COURT:** Thank you.
Thank you very much, Doctor. You're excused.
A. **Thank you.**

* * * * * * * * * * *
***(Thereupon, proceedings were held but not transcribed.)***
* * * * * * * * * * *

(Thereupon, the above portion of the trial was concluded.)

* * *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

12/06/2019 /s/ [signature]

DATE COMPLETED GIZELLA BAAN-PROULX, RPR, FCRR

## $

**$300** [1] - 29:12
**$9,000** [1] - 29:16

## 0

**01** [1] - 11:1

## 1

**1** [3] - 15:10, 15:11, 15:13
**10** [2] - 74:14, 78:5
**11** [1] - 50:10
**1100** [1] - 1:18
**12/06/2019** [1] - 87:8
**13th** [1] - 28:8
**15** [1] - 74:14
**16** [1] - 61:16
**17** [3] - 4:4, 19:1, 52:12
**18** [1] - 78:14
**19-CR-60056** [1] - 1:2
**1999** [1] - 5:1

## 2

**2** [7] - 14:12, 15:11, 15:12, 15:13, 15:21, 65:19
**20** [1] - 74:14
**20-year-old** [1] - 52:22
**2002** [1] - 4:3
**2019** [2] - 1:5, 28:8
**22** [2] - 15:17, 50:1
**22-year-old** [2] - 48:3, 50:1
**22-year-olds** [2] - 48:5, 49:4
**22nd** [1] - 80:10
**27** [3] - 2:3, 36:10, 36:14

## 3

**3** [2] - 2:3, 15:11
**30** [1] - 29:14
**305** [1] - 1:23
**33128** [1] - 1:23
**33301** [1] - 1:19
**33394** [1] - 1:14
**356-7255** [1] - 1:15
**356-7436** [1] - 1:19
**36** [1] - 31:9

## 4

**4** [2] - 1:8, 81:18
**400** [1] - 1:22
**4S** [1] - 78:14

## 5

**5** [7] - 14:23, 41:18, 41:21, 75:25, 83:5, 83:18, 85:1
**50** [2] - 30:13, 30:14
**500** [2] - 1:14, 6:18
**523-5634** [1] - 1:23

## 6

**6** [3] - 31:5, 41:18, 41:22

## 7

**7** [1] - 1:5
**7-23-19** [1] - 36:15
**7-24-19** [1] - 36:17
**700** [1] - 1:14

## 8

**8-0** [1] - 61:11
**80** [2] - 12:21, 61:11
**81** [1] - 2:3
**85** [1] - 79:6
**86** [2] - 79:6, 79:10
**8th** [1] - 1:22

## 9

**9,000** [2] - 29:19, 29:20
**90** [1] - 79:18
**92** [1] - 23:3
**954** [2] - 1:15, 1:19
**99** [1] - 11:6
**99.9** [1] - 10:24

## A

**ability** [5] - 25:21, 42:9, 42:16, 79:5, 82:2
**able** [18] - 9:2, 10:1, 17:15, 17:16, 17:23, 18:6, 23:3, 23:19, 39:9, 48:21, 50:2, 51:5, 57:7, 58:19, 70:25, 82:8, 82:9
**abnormal** [3] - 17:4, 19:14, 19:15
**abnormality** [1] - 19:16
**above-entitled** [1] - 87:4
**ABS** [1] - 8:3
**absolutely** [11] - 19:24, 45:9, 45:20, 46:20, 52:4, 53:18, 56:21, 60:5, 69:25, 74:25
**absurd** [1] - 85:16
**absurdity** [1] - 76:24
**academics** [1] - 9:16
**access** [2] - 22:3, 42:4
**account** [8] - 49:5, 49:25, 50:2, 52:2, 53:19, 55:7, 55:9, 79:25
**accounts** [2] - 83:9, 83:10
**accumulated** [1] - 52:25
**accurate** [2] - 70:19, 87:3
**acknowledge** [1] - 68:19
**acknowledged** [1] - 69:11
**acquire** [1] - 14:16
**acronyms** [1] - 8:4
**acting** [1] - 74:5
**activities** [1] - 50:15
**acts** [1] - 22:9
**Adaptive** [4] - 8:2, 8:15, 50:7, 55:6
**adaptive** [6] - 11:2, 48:6, 48:7, 50:20, 52:15, 54:10
**Adderall** [5] - 73:19, 73:23, 74:2, 74:4, 74:11
**addition** [1] - 31:21
**address** [1] - 35:13
**ADHD** [2] - 73:9, 73:24
**administer** [6] - 7:19, 7:21, 8:15, 11:8, 12:6, 28:13
**administered** [8] - 7:22, 8:1, 12:24, 50:7, 60:10, 62:6, 62:13, 66:4
**administering** [1] - 13:7
**administration** [2] - 12:11, 51:21
**admit** [1] - 34:3
**admitted** [3] - 69:7, 75:24, 79:9
**adoptive** [1] - 10:25
**adult** [1] - 12:24
**adults** [1] - 12:22
**advent** [1] - 27:24
**adverse** [2] - 63:2, 80:6
**advice** [1] - 85:21
**advise** [1] - 26:12
**affect** [3] - 19:22, 22:11, 23:18
**AFPD** [16] - 1:17, 1:17, 3:16, 6:24, 7:4, 25:24, 56:17, 60:9, 81:4, 82:25, 83:3, 83:4, 85:1, 85:2, 86:12, 86:14
**afternoon** [4] - 3:17, 3:18, 27:6, 27:7
**age** [7] - 10:25, 11:5, 11:7, 15:15, 15:16, 72:18, 73:9
**agency** [1] - 3:23
**agent** [1] - 22:22
**aggression** [4] - 22:6, 68:21, 68:23, 68:24
**ago** [5] - 28:4, 35:8, 36:6, 52:13, 74:14
**agree** [25] - 30:8, 31:13, 32:1, 32:8, 32:11, 38:15, 38:21, 40:22, 41:1, 51:9, 51:22, 52:1, 53:13, 54:21, 55:7, 57:9, 57:12, 65:13, 66:3, 68:12, 69:19, 70:21, 74:13, 74:17
**agreed** [1] - 29:7
**ahead** [10] - 11:10, 12:8, 16:5, 16:15, 17:1, 25:3, 56:19, 60:8, 75:18, 83:1
**Aileen** [1] - 67:17
**AJAY** [1] - 1:13
**ajay.alexander@usdoj.gov** [1] - 1:16
**AJLANI** [1] - 1:17
**ALEXANDER** [25] - 1:13, 7:2, 26:3, 26:8, 26:19, 26:23, 27:2, 27:5, 35:13, 36:1, 36:2, 56:23, 74:25, 75:19, 75:20, 76:1, 76:7, 78:5, 78:6, 78:16, 79:7, 79:8, 80:22, 80:24, 82:21
**alleged** [1] - 69:3
**allow** [2] - 19:19, 83:1
**almost** [2] - 32:12, 51:6
**alphabetical** [1] - 8:1
**alter** [1] - 22:16
**AMERICA** [2] - 1:4, 1:13
**anger** [8] - 43:3, 43:10, 43:12, 43:15, 45:22, 77:15, 77:16, 77:22
**angers** [1] - 44:17
**Angry** [1] - 17:22
**angry** [2] - 17:22, 77:1
**animation** [1] - 52:23
**annoy** [1] - 43:3
**annoyance** [4] - 43:10, 45:23, 77:15, 77:17
**annoyed** [3] - 17:22, 20:9
**annoying** [1] - 77:1
**annoys** [1] - 44:17
**answer** [14] - 6:8, 12:20, 22:24, 23:13, 23:15, 32:5, 32:12, 33:17, 34:18, 38:12, 39:5, 57:24, 58:24
**answered** [3] - 59:5, 64:14, 64:17
**answering** [4] - 34:6, 35:3, 57:14, 58:25
**answers** [17] - 20:18, 23:6, 33:10, 33:16, 39:19, 44:11, 46:13, 52:7, 60:18, 60:24, 60:25, 64:5, 64:19, 64:20, 66:5, 66:22, 68:25
**anxious** [1] - 9:4
**anyways** [1] - 52:7
**apart** [1] - 21:24
**apologies** [1] - 75:4
**apparent** [1] - 64:8
**appeared** [1] - 58:3
**applicable** [1] - 9:19
**appointed** [1] - 6:8
**appreciate** [3] - 19:22, 22:11, 25:15
**appreciates** [1] - 63:1
**approach** [1] - 81:15
**appropriate** [1] - 43:22
**area** [1] - 6:17
**areas** [1] - 16:12
**arousal** [8] - 68:6, 68:13, 68:16, 70:5, 70:7, 70:13, 70:22, 72:4
**aroused** [7] - 22:5, 22:6, 67:15, 68:19, 68:21, 68:23,

71:14
**arrest** [2] - 22:23, 22:24
**articles** [2] - 28:2, 28:6
**articulated** [1] - 58:23
**ascribe** [1] - 69:9
**aspect** [4] - 42:4, 44:19, 69:21, 71:1
**Asperger** [1] - 12:17
**Asperger's** [13] - 12:21, 14:22, 14:25, 15:2, 15:4, 15:5, 15:11, 24:2, 47:14, 47:18, 61:8, 64:12, 73:9
**assess** [3] - 7:9, 8:5, 9:11
**assesses** [1] - 50:10
**assessing** [3] - 12:21, 52:17, 63:21
**Assessment** [9] - 8:3, 8:15, 11:21, 12:10, 50:7, 55:6, 60:6, 60:11, 61:2
**assessment** [5] - 9:9, 30:9, 41:9, 85:24
**assessor** [1] - 50:11
**assist** [2] - 6:9, 44:15
**assistance** [2] - 29:18, 69:3
**assisted** [1] - 24:10
**assists** [1] - 60:13
**associated** [5] - 44:19, 44:20, 51:10, 68:6, 82:10
**Association** [1] - 28:5
**assume** [3] - 23:16, 39:23, 63:14
**assuming** [2] - 64:7
**assumptions** [1] - 8:23
**ATM** [3] - 8:10, 10:12, 50:3
**attend** [1] - 27:13
**attention** [7] - 22:21, 37:5, 37:14, 73:25, 81:15, 85:14, 85:15
**attorney** [5] - 6:7, 13:15, 38:8, 47:8, 47:9
**Attorney's** [1] - 1:13
**attracted** [3] - 21:12, 21:19, 67:23
**attraction** [1] - 21:14
**audio** [7] - 32:20, 33:3, 33:22, 34:24, 36:20, 36:21, 39:2
**August** [1] - 28:7
**AUSA** [26] - 1:12, 1:13, 7:2, 26:3, 26:8, 26:19, 26:23, 27:2, 27:5, 35:13, 36:1, 36:2, 56:23, 74:25, 75:19, 75:20, 76:1, 76:7, 78:5, 78:6, 78:16, 79:7, 79:8, 80:22, 80:24, 82:21
**authored** [1] - 83:22
**authors** [1] - 9:20
**Autism** [2] - 12:17, 61:7
**autism** [56] - 9:10, 12:21, 12:22, 13:4, 14:12, 14:14, 14:16, 14:21, 14:25, 15:3, 15:4, 15:6, 15:21, 15:25, 18:4, 20:21, 21:8, 22:1, 24:14, 24:21, 25:9, 25:20, 27:19, 27:21, 27:23, 28:2, 28:5, 38:18, 38:20, 41:25, 42:3, 44:13, 44:19, 46:17, 47:8, 50:19, 50:22, 53:22, 65:14, 69:3, 71:11, 71:24, 72:1, 72:5, 72:8, 72:20, 77:10, 79:4, 81:7, 81:10, 81:13, 82:1, 82:4, 82:9, 82:15, 83:19
**automatically** [1] - 45:18
**Avenue** [1] - 1:22
**average** [2] - 23:4
**aware** [20] - 26:8, 28:24, 29:2, 31:3, 33:20, 33:22, 34:21, 41:12, 42:11, 44:23, 48:13, 48:15, 49:18, 49:19, 54:21, 62:5, 73:15, 76:10, 79:15, 80:9
**awful** [1] - 85:8


## B


**B-U-T-T-S** [1] - 3:13
**BAAN** [2] - 1:21, 87:9
**BAAN-PROULX** [2] - 1:21, 87:9
**background** [1] - 4:21
**bank** [4] - 49:5, 49:20, 49:25, 50:2
**bar** [3] - 26:4, 26:6, 26:25
**based** [14] - 25:12, 26:11, 28:1, 46:13, 62:5, 66:21, 66:22, 77:3, 77:5, 79:1, 79:4, 80:2, 81:9, 85:9
**basis** [2] - 57:3, 66:20
**bathroom** [1] - 75:4
**Beach** [1] - 5:22
**became** [4] - 5:20, 19:15, 21:3, 82:1
**become** [1] - 82:14
**BEFORE** [1] - 1:9
**beginning** [1] - 41:22
**behalf** [3] - 29:8, 46:12, 46:15
**behaved** [1] - 82:2
**Behavior** [4] - 8:3, 8:15, 50:7, 55:6
**behavior** [22] - 7:17, 16:14, 16:24, 17:20, 18:10, 19:5, 19:23, 20:3, 20:11, 21:21, 25:10, 25:16, 25:22, 42:1, 42:5, 42:6, 42:7, 43:6, 43:7, 74:11, 80:15, 83:15
**behaviors** [9] - 8:11, 9:24, 10:13, 10:19, 16:21, 25:5, 48:3, 50:4
**behind** [1] - 48:6
**beings** [2] - 9:21, 22:8
**believes** [3] - 35:23, 63:3, 64:1
**Bellevue** [1] - 5:10
**beneficial** [1] - 60:18
**benefit** [1] - 44:15
**benefitting** [1] - 60:25
**best** [4] - 11:15, 54:9, 78:19, 83:16
**better** [5] - 41:2, 53:16, 58:4, 74:11, 74:12
**between** [8] - 14:21, 45:11, 47:12, 53:14, 54:18, 59:4, 68:13, 79:19
**bias** [4] - 52:2, 55:7, 55:9, 60:3
**biased** [2] - 52:3, 52:6
**big** [2] - 38:15, 38:17
**bill** [1] - 29:19
**bills** [1] - 49:6
**birth** [1] - 14:18
**bisexual** [1] - 21:18
**bit** [3] - 8:13, 18:15, 38:25
**blank** [1] - 85:17
**blindness** [1] - 82:5
**block** [2] - 21:7, 44:3
**blocked** [1] - 79:25
**blue** [1] - 82:8
**Blvd** [2] - 1:14, 1:18
**book** [1] - 15:12
**born** [1] - 14:19
**bottom** [2] - 36:10, 36:14
**boundaries** [2] - 20:25, 46:19
**brain** [1] - 72:7
**BRANDON** [2] - 1:6, 1:17
**Brandon** [49] - 7:6, 8:2, 8:5, 8:22, 8:23, 10:1, 10:25, 12:20, 15:4, 15:9, 15:17, 17:7, 17:19, 18:20, 19:15, 19:18, 20:2, 20:15, 21:11, 22:22, 23:16, 24:4, 24:5, 24:10, 25:4, 25:12, 25:13, 36:14, 36:19, 38:5, 43:2, 54:12, 55:23, 57:1, 57:3, 59:17, 64:10, 68:15, 68:18, 69:10, 70:8, 71:19, 73:8, 77:2, 77:8, 77:14, 81:10, 81:13
**Brandon's** [6] - 8:4, 8:17, 14:1, 20:23, 57:6, 71:21
**break** [3] - 6:14, 74:23, 75:8
**breaks** [1] - 8:11
**brief** [2] - 26:4, 75:11
**bringing** [1] - 75:3
**broad** [1] - 46:21
**broken** [6] - 9:21, 9:23, 10:14, 16:2, 16:11, 16:25
**brother** [4] - 52:18, 52:19, 54:18, 78:19
**brought** [1] - 77:24
**Broward** [3] - 1:14, 1:18, 5:22
**built** [1] - 12:13
**bullied** [1] - 22:2
**Bullseye** [3] - 68:10, 71:19, 78:12
**Bundy** [1] - 67:18
**BUTTS** [3] - 1:8, 2:3, 3:7
**Butts** [7] - 3:13, 7:5, 27:6, 27:8, 32:15, 36:3, 56:2
**butts** [13] - 3:17, 5:8, 22:10, 25:12, 25:25, 26:9, 42:19, 75:21, 76:8, 78:17, 79:10, 81:5, 83:24
**BY** [15] - 1:21, 3:16, 7:4, 27:5, 36:2, 56:23, 60:9, 75:20, 76:7, 78:6, 78:16, 79:8, 81:4, 83:4, 85:2
**bye** [1] - 10:17


## C


**California** [4] - 13:21, 53:8, 59:19, 86:9
**Cameron** [2] - 79:12, 80:6
**CAMERON** [1] - 1:25
**cannot** [2] - 8:22, 82:6
**capable** [3] - 8:24, 62:18, 64:1
**capacity** [1] - 57:6
**capped** [2] - 29:19, 29:20
**capture** [1] - 40:12
**card** [2] - 10:12, 50:3
**care** [5] - 9:18, 25:4, 25:8, 46:25, 50:16
**carried** [1] - 72:11
**carrying** [1] - 72:18
**case** [25] - 4:15, 4:16, 4:17, 11:17, 26:11, 28:20, 28:22, 29:18, 30:3, 30:22, 37:25, 51:23, 53:3, 54:23, 55:4, 60:19, 60:25, 66:17, 74:19, 75:22, 77:3, 79:2, 80:13, 84:16, 84:24
**CASE** [1] - 1:2
**categories** [1] - 51:5
**category** [1] - 82:5
**caused** [1] - 80:6
**cave** [1] - 73:7
**caveat** [1] - 69:5
**ceased** [1] - 74:4
**cell** [5] - 48:10, 48:15, 48:18, 49:2, 49:4
**Center** [2] - 5:11
**central** [1] - 15:23
**certain** [9] - 19:9, 19:12, 30:18, 53:13, 58:23, 73:6
**certainly** [11] - 23:19, 24:3,

30:16, 43:6, 44:10, 44:21, 47:7, 63:22, 63:25, 69:25, 77:17
**certify** [1] - 87:3
**chance** [1] - 75:3
**change** [2] - 85:23, 85:24
**characteristics** [3] - 38:20, 38:22, 74:1
**characterized** [2] - 43:20, 43:21
**charge** [1] - 29:18
**charged** [1] - 28:20
**charges** [9] - 30:6, 44:23, 44:24, 45:1, 46:1, 54:25, 62:7, 64:5, 64:6
**checklist** [1] - 53:22
**child** [6] - 15:5, 19:11, 53:14, 53:15, 53:17, 72:10
**children** [1] - 12:23
**choice** [2] - 25:6, 67:10
**choose** [1] - 59:12
**chose** [7] - 25:7, 52:20, 53:7, 54:19, 67:12, 76:13, 77:11
**Christmas** [1] - 79:24
**civil** [1] - 4:17
**claims** [1] - 63:22
**clapping** [1] - 78:15
**clear** [3] - 22:4, 23:22, 82:7
**clearly** [1] - 10:17
**Clemson** [1] - 4:23
**client** [11] - 38:2, 38:3, 38:4, 38:5, 38:7, 38:9, 38:10, 38:11, 39:6, 46:13
**client/patient** [1] - 4:18
**clients** [1] - 27:25
**clinical** [8] - 3:21, 3:22, 4:7, 4:10, 5:15, 6:2, 27:8, 27:16
**Clinical** [1] - 3:25
**close** [1] - 37:5
**closed** [1] - 30:21
**co** [2] - 54:6, 83:22
**co-authored** [1] - 83:22
**co-habitate** [1] - 54:6
**Cognitive** [2] - 12:10, 61:2
**cognitive** [1] - 12:14
**cognitively** [1] - 61:5
**cohost** [1] - 47:7
**College** [1] - 4:23
**college** [2] - 50:2, 52:25
**color** [1] - 82:5
**colorblind** [1] - 82:7
**comfortable** [1] - 19:19
**comment** [1] - 78:12
**comments** [4] - 42:10, 42:14, 83:15, 83:19
**commit** [1] - 7:17
**common** [3] - 66:13, 66:19, 71:15
**commonly** [1] - 11:22
**communicate** [2] - 24:13, 48:22
**communicating** [2] - 23:1, 48:18
**communication** [14] - 8:7, 9:15, 16:1, 16:6, 16:8, 16:10, 16:18, 16:23, 18:18, 18:19, 18:20, 18:22, 23:2, 23:17
**communications** [2] - 10:15, 20:6
**community** [7] - 9:16, 10:5, 10:7, 10:8, 11:7, 51:19, 82:16
**company** [1] - 3:23
**compare** [1] - 15:16
**compared** [4] - 11:5, 32:5, 48:5, 82:5
**compassion** [1] - 42:15
**competency** [3] - 66:16, 66:17
**competent** [2] - 6:12
**complete** [2] - 25:13, 30:9
**COMPLETED** [1] - 87:9
**completed** [2] - 8:2, 8:20
**completely** [2] - 18:20, 82:16
**completing** [1] - 55:24
**complicated** [1] - 69:23
**Complies** [1] - 36:11
**component** [2] - 70:4, 70:5
**comport** [1] - 64:21
**comprehending** [2] - 77:24, 77:25
**concepts** [2] - 64:25
**conclude** [1] - 24:20
**concluded** [2] - 26:25, 86:23
**conclusion** [8] - 14:6, 14:9, 24:18, 24:20, 24:23, 24:25, 31:15, 64:3
**condition** [1] - 38:20
**conduct** [9] - 7:5, 29:22, 30:10, 30:18, 42:21, 43:9, 66:13, 70:4, 70:21
**conducted** [2] - 36:19, 41:15
**conducting** [2] - 34:21, 55:3
**conference** [2] - 26:6, 26:25
**confused** [9] - 8:21, 57:13, 57:16, 57:21, 58:2, 58:11, 58:19, 58:20, 58:22
**confusing** [3] - 56:6, 56:8, 57:8
**confusion** [1] - 57:20
**connected** [1] - 72:1
**connection** [2] - 45:11, 53:16
**consensus** [1] - 85:25
**consideration** [1] - 64:4
**considering** [2] - 53:20, 77:21
**consistent** [5] - 20:18, 23:16, 44:22, 44:25, 64:8
**contact** [7] - 34:4, 34:12, 34:20, 35:3, 38:23, 39:9, 40:13
**contacted** [1] - 84:6
**content** [1] - 22:15
**contents** [1] - 44:24
**context** [1] - 65:12
**contingent** [2] - 66:4, 74:15
**continue** [3] - 42:12, 75:16, 83:2
**continued** [1] - 80:15
**continuing** [1] - 27:22
**contract** [1] - 29:10
**contracts** [1] - 5:23
**conversation** [2] - 71:2, 79:19
**conversations** [3] - 8:11, 23:9, 48:24
**convey** [1] - 85:5
**conveying** [1] - 30:2
**copies** [1] - 36:21
**copy** [4] - 31:7, 31:11, 36:4, 62:9
**corners** [1] - 54:6
**correct** [86] - 12:5, 15:8, 26:22, 27:9, 27:10, 27:12, 27:15, 28:12, 28:18, 28:21, 31:2, 31:22, 31:23, 32:7, 32:16, 33:2, 33:4, 33:6, 34:4, 34:5, 34:7, 34:9, 36:8, 37:21, 39:10, 39:11, 39:24, 40:3, 40:4, 41:11, 42:21, 43:12, 45:13, 45:15, 45:16, 46:1, 46:2, 46:5, 46:6, 46:8, 46:13, 46:14, 46:16, 47:2, 47:15, 47:16, 49:3, 49:4, 49:14, 49:18, 49:22, 50:11, 51:16, 52:11, 52:23, 53:10, 53:11, 53:12, 55:8, 55:16, 58:9, 58:14, 59:11, 60:11, 60:12, 60:15, 61:9, 61:11, 61:12, 61:14, 61:17, 64:12, 65:9, 66:22, 68:7, 68:8, 68:22, 70:5, 70:6, 70:14, 74:7, 74:18, 75:22, 75:23, 84:20, 84:21
**Counsel** [1] - 75:18
**counselors** [2] - 41:2, 52:10
**count** [1] - 29:2
**counted** [1] - 50:12
**counties** [1] - 5:22
**counts** [2] - 28:24, 29:5
**couple** [2] - 26:21, 35:8
**course** [7] - 28:4, 29:25, 45:20, 52:5, 63:20, 70:20, 84:4
**Court** [4] - 1:22, 26:8, 26:12, 35:13
**COURT** [27] - 1:1, 1:10, 7:1, 7:3, 26:2, 26:5, 26:17, 26:21, 26:24, 27:1, 35:15, 56:18, 60:7, 74:22, 75:1, 75:6, 75:10, 75:12, 75:15, 76:4, 76:6, 78:11, 80:23, 81:1, 83:1, 86:13, 86:15
**court** [4] - 3:2, 6:8, 6:17, 84:19
**COURTROOM** [1] - 3:11
**courtroom** [4] - 3:8, 56:2, 75:5, 75:14
**crazy** [1] - 73:5
**credit** [1] - 10:12
**credits** [3] - 53:1, 53:2
**crime** [1] - 7:18
**crimes** [1] - 28:1
**criminal** [25] - 4:16, 11:14, 30:2, 30:6, 44:9, 44:15, 44:20, 45:25, 54:22, 54:25, 55:4, 60:18, 60:25, 62:7, 64:4, 64:6, 66:8, 69:2, 69:21, 70:4, 70:20, 71:1, 77:3
**criteria** [14] - 13:3, 15:12, 15:15, 15:25, 16:1, 16:13, 17:11, 17:12, 17:13, 18:9, 19:5, 19:21
**cross** [2] - 2:2, 75:17
**Cross** [1] - 26:2
**CROSS** [1] - 27:4
**cross-examination** [1] - 75:17
**Cross-examination** [1] - 26:2
**CROSS-EXAMINATION** [1] - 27:4
**crossing** [1] - 10:10
**crucial** [1] - 24:24
**cruel** [3] - 77:20, 83:12
**crux** [2] - 18:7, 25:11
**Cruz** [4] - 67:21, 67:23, 70:16, 76:13
**cry** [3] - 78:13, 78:18, 78:21
**cutoff** [1] - 13:3
**cyberstalking** [1] - 29:5

## D

**D-I-E-T-Z** [1] - 31:1
**dad** [1] - 59:12
**daily** [2] - 48:12, 57:3
**DARYL** [1] - 1:17
**daryl_wilcox@fd.org** [1] - 1:20
**dastardly** [1] - 42:1
**data** [7] - 53:25, 63:21, 64:9, 66:7, 66:10, 66:11
**DATE** [1] - 87:9
**date** [3] - 28:10, 28:13, 28:16
**DAY** [1] - 1:8

**days** [3] - 35:8, 36:6, 36:23
**deal** [1] - 84:3
**death** [1] - 45:18
**debit** [1] - 10:12
**December** [1] - 80:10
**decided** [1] - 53:19
**decision** [2] - 30:15, 59:12
**defendant** [76] - 1:6, 28:11, 28:19, 29:7, 29:25, 30:5, 31:22, 32:16, 33:10, 34:4, 34:11, 34:22, 35:3, 37:25, 40:2, 40:11, 40:19, 41:16, 42:20, 43:9, 44:7, 44:9, 44:20, 45:22, 45:25, 47:17, 49:13, 49:21, 49:23, 51:15, 51:17, 51:24, 53:5, 53:21, 53:22, 54:1, 54:18, 55:17, 55:20, 57:10, 60:1, 60:2, 60:23, 61:7, 62:13, 62:24, 64:11, 65:10, 65:17, 65:21, 66:20, 67:6, 67:12, 67:20, 69:2, 69:13, 70:25, 71:10, 71:14, 72:10, 72:17, 72:22, 73:16, 74:4, 76:10, 76:21, 77:2, 77:5, 77:22, 78:17, 79:16, 79:20, 80:2, 83:8, 83:10
**DEFENDANT** [1] - 1:17
**defendant's** [14] - 40:12, 40:18, 54:9, 57:9, 57:12, 57:21, 59:13, 60:3, 61:5, 62:22, 63:15, 68:5, 71:7, 72:4
**defender** [1] - 36:22
**Defender's** [1] - 1:18
**defense** [7] - 6:11, 6:19, 13:22, 28:7, 28:19, 41:12, 46:15
**deficit** [1] - 73:25
**deficits** [11] - 16:1, 16:3, 16:6, 16:8, 16:10, 16:17, 16:22, 16:23, 17:11, 18:23
**define** [4] - 43:7, 65:5, 65:11
**defined** [1] - 65:6
**definition** [1] - 17:25
**definitional** [1] - 65:1
**degree** [11] - 3:22, 4:22, 4:24, 5:1, 5:2, 5:4, 27:16, 51:9, 53:13, 68:12
**delete** [2] - 20:9, 44:3
**demands** [1] - 50:15
**demeanor** [6] - 34:8, 34:10, 35:4, 38:23, 39:9, 40:13
**dementia** [3] - 9:11, 12:12, 50:22
**denied** [1] - 43:18
**denies** [2] - 43:17, 43:18
**deputy** [1] - 3:8
**DEPUTY** [1] - 3:11
**derive** [1] - 33:18
**derived** [1] - 49:13
**describe** [1] - 18:6
**described** [2] - 18:9, 67:9
**deserves** [1] - 6:14
**detail** [2] - 37:9, 62:2
**detailed** [1] - 39:19
**details** [4] - 37:6, 37:7, 37:9, 37:13
**detect** [1] - 82:9
**determination** [2] - 6:10, 66:20
**determine** [3] - 50:20, 55:11, 64:12
**determining** [3] - 7:11, 20:5, 60:13
**devastating** [1] - 78:23
**devastation** [1] - 42:17
**developing** [2] - 16:9, 18:23
**deviant** [1] - 21:25
**devoid** [1] - 82:16
**diagnose** [1] - 15:14
**diagnosed** [5] - 15:4, 15:25, 42:3, 47:17, 73:8
**diagnoses** [1] - 73:13
**diagnosis** [11] - 13:4, 15:1, 15:3, 27:25, 48:2, 48:4, 73:10, 74:15, 83:19, 83:25, 85:9
**Diagnostic** [2] - 12:17, 61:8
**diagnostic** [3] - 14:6, 14:9, 14:23
**Dietz** [22] - 13:14, 20:16, 23:13, 23:18, 24:16, 24:23, 26:9, 31:1, 33:20, 34:9, 34:11, 34:21, 35:18, 39:1, 41:7, 46:7, 64:23, 65:10, 67:2, 73:21, 77:18
**Dietz's** [8] - 13:13, 17:24, 23:14, 31:9, 36:9, 37:19, 66:24, 81:6
**differ** [1] - 24:23
**difference** [1] - 25:11
**differences** [1] - 82:7
**different** [20] - 7:22, 8:6, 8:10, 8:11, 8:12, 9:6, 9:21, 16:11, 18:1, 23:7, 23:10, 37:24, 50:10, 61:13, 65:7, 71:8, 77:8, 77:25, 83:21
**difficult** [2] - 10:11, 46:18
**difficulty** [9] - 9:3, 17:17, 18:4, 22:25, 33:15, 57:6, 57:13, 77:24, 77:25
**digital** [2] - 36:20
**direct** [3] - 2:2, 23:5, 81:15
**DIRECT** [1] - 3:15
**directing** [1] - 78:18
**direction** [1] - 9:18
**director** [1] - 5:21
**disability** [8] - 7:12, 7:15, 7:16, 9:10, 14:14, 21:13, 21:15, 42:13
**disagree** [2] - 34:17, 66:25
**disagreed** [1] - 42:23
**discern** [1] - 70:25
**discerning** [1] - 38:19
**disclose** [2] - 58:2, 62:2
**discovery** [2] - 13:12, 49:15
**discussed** [3] - 55:4, 59:7, 80:19
**discusses** [1] - 67:3
**discussion** [1] - 77:18
**disorder** [38] - 13:4, 14:12, 14:14, 14:16, 14:17, 14:19, 14:22, 14:25, 15:1, 15:2, 15:3, 15:6, 15:21, 18:8, 21:8, 22:1, 24:14, 25:9, 25:21, 27:20, 27:21, 27:23, 28:3, 38:18, 38:21, 41:25, 42:3, 44:13, 44:19, 46:17, 46:19, 69:4, 71:11, 72:8, 72:20, 73:25, 82:2, 83:19
**disordered** [3] - 71:6, 71:23, 72:7
**disparity** [1] - 47:10
**distinctly** [1] - 10:17
**distinguish** [1] - 82:6
**distress** [1] - 64:22
**DISTRICT** [3] - 1:1, 1:1, 1:10
**districted** [1] - 16:24
**divide** [1] - 6:22
**divulge** [2] - 84:14, 84:15
**divulged** [1] - 84:19
**Doctor** [42] - 28:7, 29:12, 30:8, 30:24, 33:16, 34:21, 36:9, 36:25, 38:18, 39:18, 40:11, 41:18, 44:7, 45:2, 45:21, 46:17, 50:6, 51:22, 53:13, 53:23, 56:19, 57:12, 58:17, 63:14, 64:3, 65:4, 65:21, 66:3, 68:12, 68:25, 70:20, 71:7, 71:25, 72:22, 73:15, 74:13, 74:19, 76:4, 78:7, 80:2, 80:24, 86:16
**doctor** [11] - 4:13, 38:12, 47:21, 60:10, 62:9, 67:5, 73:10, 74:13, 75:7, 77:2, 79:18
**doctor/patient** [1] - 4:11
**doctoral** [3] - 5:7, 5:14, 5:17
**doctors** [2] - 31:3, 38:2
**documents** [10] - 26:13, 30:12, 30:18, 30:24, 31:14, 31:21, 49:15, 49:16, 49:19
**domain** [6] - 8:7, 8:8, 10:5, 10:6, 10:8, 10:15
**domains** [9] - 8:6, 8:8, 8:12, 9:6, 9:20, 9:22, 9:23, 11:7, 16:11
**dominance** [1] - 21:21
**dominant** [1] - 22:8
**dominated** [2] - 21:22, 68:17
**dominating** [1] - 22:7
**done** [3] - 21:1, 29:21, 45:7
**down** [8] - 8:11, 9:21, 9:23, 10:14, 16:2, 16:11, 16:25, 68:2
**Dr** [67] - 3:17, 5:8, 5:13, 5:17, 7:5, 13:13, 13:14, 13:19, 17:24, 20:16, 22:10, 23:12, 23:14, 23:18, 24:16, 24:23, 25:12, 25:25, 26:9, 26:10, 27:6, 27:8, 30:25, 31:1, 31:5, 31:9, 32:15, 33:20, 34:9, 34:11, 34:21, 35:18, 36:3, 36:9, 37:19, 37:22, 39:1, 41:5, 41:7, 41:10, 41:12, 41:19, 42:19, 46:5, 46:7, 56:2, 64:23, 65:10, 66:24, 67:2, 73:21, 75:21, 76:8, 77:18, 78:17, 79:10, 81:5, 81:6, 81:16, 83:24, 86:9
**draft** [2] - 39:12, 39:14
**drafted** [1] - 39:20
**draw** [1] - 35:23
**DSM** [1] - 83:18
**duck** [3] - 72:11, 72:19, 72:23
**due** [1] - 72:7
**duly** [1] - 3:8
**during** [10] - 17:23, 29:25, 30:6, 34:12, 39:16, 40:8, 69:11, 69:14, 81:25, 83:14
**dynamic** [3] - 23:10, 85:23, 85:24
**dynamics** [1] - 53:14

## E

**e-mail** [1] - 79:23
**East** [1] - 1:18
**eat** [2] - 19:12, 73:5
**Edition** [3] - 8:3, 8:16, 50:8
**educated** [1] - 77:18
**education** [1] - 27:22
**educational** [1] - 4:21
**effect** [1] - 25:5
**effectively** [1] - 50:16
**eight** [2] - 34:22, 34:24
**either** [2] - 36:25, 38:10
**elaborate** [2] - 6:3, 20:8
**elementary** [3] - 72:24, 73:1, 73:4
**elicit** [1] - 42:9
**emojis** [7] - 43:25, 76:24, 76:25, 78:15, 79:24, 85:14, 85:18
**emotion** [3] - 19:22, 43:12, 43:15
**emotional** [23] - 16:3, 17:11,

17:14, 18:1, 18:2, 18:5, 18:7, 20:2, 20:4, 25:9, 25:15, 25:22, 42:13, 42:16, 43:4, 43:7, 64:24, 65:20, 66:21, 77:19, 80:6
**emotions** [5] - 17:18, 22:11, 63:2, 78:24, 79:5
**employed** [3] - 3:24, 3:25, 5:19
**encourage** [1] - 10:18
**end** [1] - 79:7
**ended** [1] - 32:5
**engage** [1] - 80:15
**engaged** [3] - 19:2, 68:24, 70:8
**engagement** [1] - 65:15
**engaging** [3] - 48:19, 50:4, 63:24
**enjoys** [3] - 71:18, 71:20, 71:22
**enrolled** [1] - 4:23
**enter** [1] - 45:8
**entered** [1] - 75:14
**entertaining** [1] - 83:22
**entire** [1] - 5:20
**entirely** [1] - 51:22
**entirety** [1] - 31:14
**entitled** [1] - 87:4
**environmental** [1] - 50:15
**error** [3] - 61:18, 61:24, 61:25
**essay** [1] - 51:1
**essential** [3] - 15:21, 16:16, 16:20
**essentially** [8] - 33:8, 33:16, 39:9, 39:18, 42:19, 50:24, 54:10, 68:2
**ethically** [1] - 84:17
**evaluated** [2] - 10:20, 23:7
**evaluates** [1] - 4:14
**evaluating** [3] - 4:19, 35:21, 84:4
**evaluation** [6] - 4:18, 25:13, 29:23, 38:11, 39:14, 41:15
**evaluations** [2] - 37:24, 66:14
**evaluators** [1] - 11:24
**everyday** [1] - 50:14
**evidence** [1] - 71:6
**exacerbated** [2] - 24:2, 48:5
**exact** [2] - 33:10, 39:5
**exactly** [7] - 4:8, 6:4, 15:8, 38:1, 47:11, 58:19, 71:19
**exaggerating** [3] - 11:12, 11:18, 12:2
**exam** [27] - 50:14, 50:19, 50:23, 51:1, 51:12, 51:15, 51:17, 51:24, 52:1, 52:11, 53:7, 53:20, 53:23, 55:6, 55:10, 55:18, 55:25, 56:6, 57:23, 58:3, 60:2, 61:11, 61:18, 62:6, 62:9, 62:13, 64:11
**examination** [10] - 7:5, 26:2, 38:21, 50:10, 55:2, 63:16, 66:4, 66:14, 75:17, 77:5
**EXAMINATION** [3] - 3:15, 27:4, 81:3
**examinations** [3] - 28:14, 30:19, 59:15
**examine** [5] - 29:7, 33:8, 33:10, 39:3, 39:5
**examining** [1] - 55:23
**example** [5] - 32:4, 34:12, 35:18, 65:7, 73:15
**exception** [1] - 39:20
**EXCERPT** [1] - 1:8
**excerpt** [1] - 79:19
**excerpts** [2] - 26:14, 35:17
**exchange** [1] - 65:1
**excluding** [1] - 66:17
**excuse** [3] - 17:6, 48:14, 77:17
**excused** [1] - 86:16
**Exhibit** [5] - 75:25, 78:5, 79:6, 79:10, 79:18
**exhibiting** [3] - 38:20, 73:16, 74:1
**exist** [1] - 43:25
**existed** [1] - 36:25
**existence** [1] - 49:20
**existing** [1] - 36:7
**exited** [1] - 75:5
**expect** [1] - 15:17
**expected** [1] - 15:16
**experience** [2] - 5:9, 42:16
**experiencing** [2] - 44:13, 73:24
**expert** [6] - 6:16, 6:24, 20:16, 23:12, 24:15, 47:23
**explain** [10] - 9:7, 14:21, 15:20, 16:16, 17:9, 22:25, 23:14, 56:19, 58:24, 64:24
**explained** [1] - 44:4
**explains** [1] - 22:21
**explanation** [2] - 6:13, 44:24
**explanations** [5] - 43:20, 43:22, 43:23, 43:24
**expound** [3] - 10:23, 19:25, 68:5
**expressed** [1] - 57:18
**expresses** [1] - 18:20
**expressing** [1] - 58:22
**expression** [3] - 18:22, 66:21, 82:11
**expressionless** [1] - 82:4
**expressions** [1] - 82:17
**extended** [1] - 81:25
**extent** [2] - 35:2, 47:1
**external** [1] - 11:14
**extremely** [2] - 10:22, 60:1
**eye** [7] - 34:4, 34:12, 34:20, 35:3, 38:23, 39:9, 40:13

## F

**face** [1] - 18:22
**faces** [1] - 10:18
**facial** [2] - 82:10, 82:17
**facing** [5] - 30:6, 54:25, 62:7, 64:4, 64:6
**fact** [20] - 22:7, 44:8, 44:11, 44:14, 44:17, 44:20, 45:11, 45:14, 59:18, 60:1, 64:5, 66:22, 69:2, 71:10, 71:14, 71:17, 71:18, 73:15, 80:9, 84:15
**facts** [1] - 6:9
**failed** [1] - 25:15
**fair** [11] - 30:13, 46:18, 46:20, 51:23, 54:8, 58:17, 58:25, 59:23, 60:16, 65:4, 86:5
**faking** [1] - 12:4
**fall** [2] - 47:15, 51:2
**familiarity** [1] - 62:5
**family** [1] - 4:16
**fanaticizes** [1] - 76:15
**fantasies** [2] - 67:20
**fantasy** [2] - 21:22, 68:17
**far** [4] - 48:6, 79:24, 80:4, 80:20
**Farshid** [1] - 40:7
**fascinated** [4] - 21:3, 67:25, 68:10, 71:18
**fascination** [3] - 67:8, 68:3, 72:4
**father** [41] - 8:2, 8:4, 8:17, 8:25, 10:21, 11:2, 19:6, 19:11, 24:4, 24:6, 24:7, 31:22, 32:24, 40:2, 49:8, 49:13, 49:24, 51:13, 51:24, 53:4, 53:20, 54:1, 54:8, 54:18, 54:19, 54:21, 55:17, 55:22, 55:23, 55:25, 57:9, 57:12, 57:21, 58:8, 58:13, 59:14, 62:14, 67:3, 72:14, 73:20, 78:20
**father's** [2] - 60:3, 72:17
**fault** [1] - 74:22
**FBI** [23] - 1:25, 14:2, 20:1, 22:22, 37:12, 37:16, 40:5, 40:8, 40:16, 44:22, 44:23, 45:2, 45:3, 45:8, 67:2, 67:14, 69:7, 69:11, 69:14, 70:1, 70:12, 71:4
**FBI's** [2] - 20:13, 45:11
**FCRR** [2] - 1:21, 87:9
**fear** [10] - 20:11, 25:7, 42:8, 43:17, 43:19, 44:18, 45:23, 63:25, 64:22
**feature** [3] - 16:16, 16:20, 18:12
**features** [3] - 15:21, 15:23, 17:7
**federal** [2] - 5:23, 36:22
**Federal** [1] - 1:18
**feedback** [1] - 80:20
**feelings** [1] - 65:2
**feigning** [3] - 11:12, 11:18, 12:2
**felt** [4] - 57:22, 58:2, 59:8, 78:24
**few** [2] - 25:25, 36:6
**files** [1] - 36:21
**filled** [2] - 8:5, 64:19
**findings** [1] - 10:24
**fine** [5] - 12:13, 22:24, 43:1, 61:5, 83:2
**finish** [2] - 5:3, 18:16
**finished** [1] - 5:4
**first** [10] - 5:10, 7:25, 15:25, 16:16, 17:12, 19:5, 36:17, 62:11, 62:20, 66:18
**five** [9] - 12:10, 19:1, 20:23, 20:25, 48:4, 52:12, 52:17, 54:16, 75:8
**five-minute** [1] - 75:8
**fixated** [2] - 19:14, 21:3
**fixation** [5] - 19:17, 20:20, 20:22, 21:16, 21:18
**fixed** [4] - 17:4, 19:15, 67:5, 67:6
**FL** [3] - 1:14, 1:19, 1:23
**flagged** [1] - 74:10
**flat** [2] - 18:21, 23:17
**flawed** [1] - 71:3
**FLEURY** [2] - 1:6, 1:17
**Fleury** [33] - 7:6, 7:21, 8:17, 10:1, 13:8, 17:7, 18:12, 20:15, 24:21, 25:12, 25:13, 35:18, 36:15, 36:19, 38:5, 39:3, 39:6, 39:13, 42:3, 42:14, 42:17, 56:3, 56:15, 57:5, 58:2, 59:3, 77:2, 77:8, 81:10, 81:13, 81:25, 83:18, 85:10
**Fleury's** [1] - 42:1
**flexibility** [1] - 17:3
**Floor** [1] - 1:22
**Florida** [3] - 4:3, 5:13, 28:5
**FLORIDA** [1] - 1:1
**focus** [4] - 19:14, 19:16, 50:14, 56:25
**focused** [1] - 74:12
**follow** [1] - 59:1
**followed** [1] - 24:10
**following** [2] - 3:2, 24:7
**follows** [1] - 3:9
**food** [1] - 73:5

**FOR** [2] - 1:12, 1:17
**Force** [1] - 40:7
**foregoing** [1] - 87:3
**foreign** [2] - 64:25
**forensic** [18] - 3:21, 4:7, 4:9, 4:14, 5:15, 6:2, 6:5, 6:17, 6:25, 7:5, 11:13, 11:24, 11:25, 25:13, 27:8, 84:2, 84:3, 85:24
**Forensic** [5] - 4:1, 5:11, 11:21, 60:6, 60:10
**forget** [1] - 77:19
**form** [3] - 4:11, 4:18, 15:4
**FORT** [1] - 1:2
**Fort** [2] - 1:14, 1:19
**forth** [2] - 17:17, 34:20
**four** [8] - 16:25, 28:24, 50:23, 50:24, 51:5, 61:13, 65:25, 66:15
**four-month** [1] - 66:15
**four-point** [1] - 50:23
**fourth** [1] - 51:7
**Fred** [1] - 78:14
**freedom** [1] - 82:15
**frequency** [1] - 10:2
**friend** [3] - 18:24, 19:2, 78:19
**friends** [3] - 18:24, 23:8, 48:19
**frightened** [1] - 17:21
**front** [3] - 56:8, 62:9, 70:18
**fun** [1] - 45:5
**function** [2] - 9:21, 50:15
**functional** [1] - 9:16
**functionality** [1] - 49:2
**functioning** [15] - 9:6, 9:12, 10:25, 11:1, 11:2, 11:6, 12:14, 15:18, 47:4, 47:9, 47:15, 47:18, 48:9, 65:18
**functions** [1] - 8:5
**funny** [1] - 83:20
**future** [1] - 57:2
**fuzzy** [1] - 78:8

## G

**gaining** [1] - 24:11
**geared** [2] - 12:23, 12:24
**general** [4] - 50:20, 52:15, 54:9, 85:25
**generally** [2] - 37:8, 73:2
**gentlemen** [4] - 23:22, 35:15, 75:16, 76:1
**genuine** [1] - 65:13
**genuinely** [1] - 64:25
**gestures** [2] - 16:7, 18:21
**given** [9] - 12:20, 30:18, 32:13, 51:17, 51:23, 52:1, 52:14, 69:1, 73:23
**GIZELLA** [2] - 1:21, 87:9
**gizella_baan** [1] - 1:24
**gizella_baan-proulx@flsd.uscourts.gov** [1] - 1:24
**good-bye** [1] - 10:17
**government** [9] - 20:15, 23:12, 24:15, 26:10, 35:16, 35:23, 36:22, 84:20, 85:1
**Government** [5] - 75:24, 78:5, 79:6, 79:9, 79:18
**government's** [4] - 13:15, 25:24, 81:6
**governor** [1] - 20:24
**Gracie** [1] - 60:7
**graduate** [4] - 5:3, 27:16, 48:11, 53:1
**grasp** [1] - 17:21
**great** [6] - 47:10, 54:15, 61:19, 70:10, 71:2, 71:5
**greater** [1] - 41:2
**green** [5] - 19:12, 72:10, 72:18, 72:23, 82:8
**grief** [18] - 17:25, 42:16, 44:18, 45:24, 64:22, 65:7, 65:11, 76:18, 76:22, 77:4, 77:11, 77:23, 77:24, 78:1, 78:24, 85:5
**grief-stricken** [1] - 78:24
**grocery** [1] - 50:3
**guess** [1] - 57:1
**Guttenberg** [1] - 78:14

## H

**habitate** [1] - 54:6
**Hahneman** [1] - 4:25
**hallmark** [1] - 18:3
**hand** [2] - 46:23, 47:3
**handwritten** [2] - 39:21, 39:22
**hard** [2] - 40:14, 57:9
**harm** [3] - 42:8, 44:18, 85:7
**Hashenpour** [1] - 40:8
**head** [2] - 58:16, 85:17
**heading** [1] - 14:25
**health** [3] - 9:17, 11:22, 13:17
**Healthy** [1] - 59:19
**heard** [3] - 6:11, 35:16, 35:18
**hearing** [2] - 26:7, 58:15
**held** [3] - 3:2, 3:4, 86:20
**hello** [1] - 10:16
**help** [2] - 24:14, 83:25
**helpful** [1] - 20:5
**helping** [2] - 4:12, 62:14
**hereby** [1] - 87:3
**high** [9] - 40:18, 47:3, 47:9, 47:15, 47:18, 48:11, 52:16, 65:17, 65:18
**high-functioning** [1] - 47:15
**higher** [2] - 11:1, 15:17
**highly** [2] - 17:3, 19:13
**himself** [10] - 18:20, 20:4, 42:15, 52:23, 55:25, 63:4, 63:5, 63:15, 63:18, 78:1
**hired** [11] - 6:7, 13:22, 28:7, 28:19, 29:22, 30:17, 38:6, 38:7, 38:10, 41:12, 66:18
**hit** [1] - 44:3
**Hockey** [1] - 78:14
**home** [8] - 5:12, 9:17, 19:3, 24:2, 45:8, 50:5, 54:2, 54:15
**homes** [1] - 45:4
**honest** [4] - 35:7, 64:16, 66:5, 66:9
**Honor** [17] - 26:3, 26:8, 26:19, 26:20, 27:2, 35:13, 36:1, 74:25, 75:19, 79:7, 80:22, 80:25, 82:21, 82:25, 83:3, 86:12, 86:14
**HONORABLE** [1] - 1:9
**Honors** [1] - 4:22
**hoo** [1] - 78:12
**hope** [1] - 74:24
**horrible** [1] - 78:24
**horrific** [1] - 21:21
**horror** [2] - 20:11, 25:7
**Hospital** [1] - 5:10
**hour** [3] - 22:23, 29:12
**hours** [4] - 29:14, 34:22, 34:24, 65:25
**house** [3] - 21:1, 54:7, 54:17
**HUDA** [1] - 1:17
**huda_ajlani** [1] - 1:20
**huda_ajlani-macri@fd.org** [1] - 1:20
**hugging** [1] - 19:20
**human** [2] - 9:21, 22:8
**hundred** [1] - 30:12
**hurt** [1] - 70:25
**hyperactivity** [2] - 73:16, 73:25
**hypothetically** [1] - 30:12

## I

**idea** [2] - 63:23, 64:21
**identification** [1] - 83:23
**identified** [1] - 22:8
**identifies** [3] - 21:18, 21:20, 21:21
**idiots** [1] - 59:20
**ignored** [1] - 37:1
**II** [1] - 1:9
**illness** [1] - 11:18
**image** [1] - 76:13
**images** [3] - 67:17, 68:14, 80:12
**impact** [8] - 7:17, 20:3, 25:6, 25:10, 25:15, 25:22, 42:13, 43:7
**impaired** [2] - 46:23, 48:12
**impairment** [2] - 14:13, 50:22
**impairments** [1] - 12:12
**impairs** [2] - 25:21, 79:4
**impeach** [1] - 26:11
**impeachment** [5] - 26:13, 26:14, 35:14, 35:20, 82:23
**important** [7] - 7:14, 31:13, 32:11, 35:6, 38:14, 38:23, 58:1
**impression** [1] - 56:20
**inability** [3] - 19:21, 20:4, 22:10
**inappropriate** [4] - 21:5, 21:16, 22:21, 83:21
**incapable** [2] - 46:24, 46:25
**incidences** [1] - 24:6
**incite** [1] - 25:7
**include** [4] - 7:11, 26:15, 44:8, 80:17
**includes** [2] - 44:11, 66:24
**inconsistencies** [1] - 35:24
**inconsistency** [1] - 55:12
**inconsistent** [2] - 36:24, 55:12
**incorporate** [1] - 57:15
**incredibly** [2] - 38:23, 45:7
**indeed** [4] - 42:10, 81:21, 81:23, 81:25
**independent** [1] - 49:9
**independently** [2] - 50:17, 58:8
**indicate** [1] - 76:25
**indication** [1] - 86:10
**indications** [1] - 24:3
**indicative** [1] - 72:19
**indictment** [3] - 13:13, 28:22, 28:25
**individual** [12] - 38:19, 42:5, 52:2, 60:14, 60:17, 64:4, 65:4, 69:2, 71:11, 73:24, 79:20, 82:8
**individual's** [1] - 38:22
**individuals** [12] - 46:23, 46:24, 47:3, 47:14, 50:10, 52:6, 55:10, 66:5, 76:15, 82:4, 82:5, 82:6
**influence** [3] - 30:15, 32:2, 32:9
**influenced** [1] - 60:2
**information** [21] - 9:13, 23:19, 30:1, 30:9, 30:14, 40:23, 40:25, 41:2, 41:3, 43:5, 49:12, 51:18, 53:4, 54:9, 55:10, 57:14, 63:22, 66:23, 81:12, 84:14
**initiate** [1] - 8:11
**initiating** [1] - 23:9
**input** [2] - 17:5, 19:18

**insanity** [1] - 6:11
**insensitive** [1] - 83:17
**inside** [1] - 58:22
**insistence** [2] - 17:3, 19:10
**Instagram** [1] - 83:11
**instance** [1] - 10:4
**instances** [3] - 59:14, 65:10, 69:20
**Institute** [1] - 4:1
**institutionalized** [1] - 47:1
**instruction** [1] - 26:15
**instructions** [2] - 8:19, 8:20
**instrument** [2] - 51:3, 82:14
**intact** [1] - 12:14
**intellectual** [5] - 9:10, 14:13, 42:17, 42:20, 50:21
**intelligence** [1] - 23:4
**intend** [1] - 42:9
**intended** [1] - 20:6
**intensity** [3] - 17:4, 19:14, 19:16
**intention** [1] - 77:16
**intentional** [1] - 67:10
**interact** [6] - 21:14, 50:16, 54:1, 54:3, 54:12
**interacting** [3] - 17:16, 54:16, 82:17
**interaction** [5] - 16:11, 16:17, 16:23, 19:2
**interactions** [8] - 16:2, 23:8, 28:10, 29:25, 30:5, 45:3, 46:25, 58:18
**interest** [7] - 16:15, 16:24, 60:3, 67:6, 67:8, 70:10, 71:17
**interesting** [1] - 83:20
**interests** [4] - 16:22, 17:4, 19:14, 67:5
**internally** [1] - 42:12
**internet** [12] - 20:24, 20:25, 21:2, 22:3, 27:24, 28:1, 48:20, 82:14, 83:9, 83:10, 85:13
**internet-based** [1] - 28:1
**internship** [2] - 5:6, 5:10
**interpret** [2] - 82:3, 85:10
**interpretation** [2] - 33:16, 56:21
**interpreting** [1] - 82:17
**interrogated** [1] - 23:6
**interrogation** [1] - 23:3
**intervention** [3] - 21:4, 24:9, 47:24
**interventions** [2] - 21:9, 24:13
**interview** [48] - 13:5, 14:8, 17:24, 20:13, 20:15, 20:17, 20:18, 23:12, 23:24, 25:12, 30:1, 32:15, 33:20, 33:22, 33:23, 34:12, 34:22, 36:19, 36:23, 37:12, 37:16, 39:1, 39:12, 39:15, 39:16, 39:21, 40:5, 40:9, 40:11, 40:18, 45:4, 58:18, 59:3, 64:20, 65:21, 65:24, 66:1, 67:14, 68:18, 69:11, 69:14, 69:20, 70:1, 70:3, 81:25, 85:21, 86:6, 86:10
**Interview** [1] - 36:14
**interviewed** [9] - 22:22, 31:22, 38:24, 40:2, 46:4, 46:7, 53:11, 58:8
**interviewing** [4] - 13:7, 45:22, 46:1, 46:3
**interviews** [10] - 17:23, 20:1, 31:24, 59:2, 67:1, 67:2, 84:10, 86:3
**introduced** [1] - 82:22
**investigative** [1] - 13:12
**investments** [1] - 49:24
**involved** [2] - 21:10, 66:5
**IQ** [1] - 23:3
**irritant** [1] - 44:2
**irritated** [2] - 20:10, 44:3
**issue** [3] - 6:7, 26:18, 69:22
**issues** [6] - 33:13, 33:14, 59:6, 59:7
**item** [1] - 12:24
**itself** [3] - 55:6, 70:21, 71:6

## J

**Jamie** [2] - 78:13, 78:20
**JARED** [1] - 1:12
**jared.strauss@usdoj.gov** [1] - 1:15
**Jessie** [1] - 78:14
**job** [4] - 9:19, 48:10, 50:1, 66:10
**jobs** [1] - 49:5
**John** [1] - 5:13
**joint** [2] - 4:24, 5:2
**jokes** [1] - 82:10
**joy** [4] - 76:18, 76:22, 77:4, 85:5
**Judge** [1] - 56:17
**JUDGE** [1] - 1:10
**judge** [2] - 6:8, 6:9
**judgment** [1] - 77:4
**jumps** [1] - 64:9
**JUROR** [1] - 74:21
**jurors** [1] - 75:13
**jury** [14] - 3:19, 4:8, 4:20, 5:9, 6:9, 15:20, 23:22, 26:7, 26:12, 35:14, 35:16, 75:5, 75:14, 76:1
**JURY** [2] - 1:8, 76:3

## K

**Kasky** [2] - 79:12, 80:7
**keep** [2] - 15:24, 71:20
**keeping** [1] - 75:4
**kept** [3] - 17:22, 20:9, 69:8
**kidnapping** [1] - 80:18
**Kids** [1] - 59:19
**kids** [2] - 73:1, 73:4
**kill** [1] - 85:7
**killed** [1] - 76:11
**killers** [19] - 19:15, 20:21, 21:3, 21:12, 21:19, 67:12, 67:15, 68:3, 68:7, 68:10, 68:17, 69:8, 70:7, 71:4, 71:15, 71:19, 71:21, 72:5
**killing** [1] - 22:6
**kills** [2] - 69:15, 80:17
**kind** [14] - 7:16, 9:9, 9:22, 10:11, 10:13, 12:12, 17:17, 18:3, 19:19, 21:17, 44:8, 52:6, 54:6, 82:14
**kinds** [1] - 8:10
**Kirby** [1] - 5:11
**knowing** [2] - 43:18, 79:4
**knows** [1] - 9:13

## L

**lack** [5] - 20:2, 47:24, 47:25, 60:3
**ladies** [4] - 23:21, 35:15, 75:16, 76:1
**lagging** [1] - 48:6
**language** [1] - 46:25
**last** [1] - 41:21
**LAUDERDALE** [1] - 1:2
**Lauderdale** [2] - 1:14, 1:19
**laughter** [1] - 82:10
**law** [8] - 3:21, 4:16, 4:24, 5:1, 5:3, 5:4, 6:17, 26:11
**Law** [1] - 4:25
**lawyer** [1] - 27:23
**leading** [1] - 32:4
**leads** [1] - 71:23
**least** [5] - 42:20, 52:14, 55:3, 58:1, 68:14
**leave** [1] - 75:1
**left** [4] - 55:25, 57:16, 57:19, 57:22
**legal** [2] - 4:15, 6:6
**leisure** [1] - 9:17
**lens** [6] - 72:7, 85:11, 85:12, 85:19
**letter** [1] - 42:2
**Level** [11] - 14:12, 15:10, 15:11, 15:12, 15:13, 15:21, 65:19
**level** [3] - 47:9, 65:15, 67:9
**Lexie** [1] - 78:14
**liability** [1] - 61:22
**Liberty** [1] - 79:21
**licensed** [3] - 4:3, 5:5, 5:20
**life** [5] - 9:12, 20:24, 22:4, 24:2, 48:12
**light** [1] - 44:14
**likely** [1] - 47:18
**limit** [1] - 9:4
**limitations** [1] - 57:10
**limited** [3] - 40:22, 40:24, 82:2
**line** [1] - 43:1
**list** [1] - 13:10
**literally** [3] - 21:1, 42:4, 79:22
**lives** [2] - 9:22, 54:10
**living** [3] - 3:20, 9:17, 54:10
**logic** [2] - 69:9, 71:3
**LOL** [2] - 79:22, 80:1
**look** [12] - 8:9, 9:8, 15:14, 15:15, 24:25, 34:18, 34:19, 35:5, 48:2, 52:4, 59:10, 66:8
**looked** [1] - 30:13
**looking** [2] - 21:19, 39:18
**Looks** [1] - 10:10
**looks** [3] - 10:17, 12:11, 69:12
**LORI** [4] - 1:8, 2:3, 3:7, 3:13
**Lori** [1] - 3:13
**loud** [4] - 21:23, 36:18, 78:9, 79:21
**love** [1] - 59:19
**low** [2] - 10:22, 60:1
**lower** [2] - 11:5, 11:6
**ludicrous** [1] - 43:24
**lying** [2] - 56:15, 56:21

## M

**ma'am** [1] - 78:11
**machine** [2] - 8:10, 10:13
**MACRI** [1] - 1:17
**macri@fd.org** [1] - 1:20
**mail** [1] - 79:23
**main** [2] - 15:25, 16:1
**maintaining** [2] - 16:9, 18:23
**malicious** [1] - 42:1
**malingering** [7] - 11:11, 11:12, 11:17, 11:24, 60:14, 60:17, 60:24
**manner** [1] - 38:22
**manual** [1] - 14:23
**mass** [1] - 83:13
**masturbated** [1] - 67:17
**masturbating** [2] - 69:8, 71:4
**masturbation** [2] - 68:6, 70:13
**material** [4] - 14:5, 14:7, 81:9, 82:22
**materials** [5] - 13:8, 13:10, 13:11, 13:12, 18:14
**matter** [3] - 4:15, 26:16, 87:5

**maximum** [1] - 29:14
**McDOWELL** [1] - 1:25
**MCP** [1] - 4:25
**MD** [1] - 27:14
**mean** [35] - 11:3, 17:25, 33:14, 34:16, 37:8, 39:17, 40:21, 40:23, 42:6, 42:7, 42:8, 42:18, 45:2, 45:3, 46:24, 47:6, 48:9, 50:1, 52:9, 54:12, 57:24, 61:20, 64:23, 66:6, 66:8, 66:16, 67:3, 68:4, 69:5, 70:1, 70:2, 70:3, 73:4, 74:16, 85:13
**meaning** [2] - 6:9, 85:6
**means** [9] - 9:7, 27:13, 33:7, 35:21, 45:19, 47:18, 77:6, 77:8, 78:18
**meant** [4] - 65:2, 76:22, 78:22
**measure** [1] - 83:11
**medical** [5] - 27:13, 28:17, 31:3, 38:2, 59:13
**Medical** [1] - 5:11
**meet** [2] - 16:25, 50:15
**meeting** [1] - 13:3
**members** [4] - 3:19, 4:8, 4:20, 5:8
**mental** [8] - 7:9, 7:12, 7:15, 11:22, 12:12, 14:14, 21:13, 21:15
**mentally** [1] - 42:4
**mentioned** [4] - 34:11, 52:5, 59:12, 78:12
**message** [9] - 25:17, 76:8, 76:10, 76:18, 76:22, 78:9, 79:21, 80:9, 85:10
**messages** [16] - 22:13, 22:15, 22:16, 43:14, 45:12, 68:14, 68:20, 69:15, 69:16, 74:19, 75:21, 79:15, 80:13, 80:17, 83:11, 83:21
**Miami** [2] - 1:22, 1:23
**MICHAEL** [2] - 1:6, 1:17
**microphone** [1] - 3:12
**middle** [2] - 15:10, 81:20
**might** [2] - 4:16, 42:18
**mild** [3] - 15:4, 48:4, 82:15
**Miller** [3] - 11:21, 60:6, 60:10
**mind** [2] - 71:1, 71:7
**minimized** [1] - 70:22
**minute** [2] - 75:8, 86:12
**minutes** [2] - 12:10, 26:21
**Miranda** [2] - 69:14, 69:20
**miss** [2] - 31:17, 38:15
**missed** [4] - 37:8, 37:9, 37:13, 38:14
**missing** [1] - 14:3
**misspeak** [1] - 9:9
**mistakes** [1] - 73:12
**misunderstand** [1] - 31:19
**mitigating** [2] - 6:13, 6:14
**mix** [1] - 22:1
**MoCA** [1] - 12:9
**moment** [5] - 39:1, 47:21, 48:8, 74:16, 80:22
**money** [1] - 49:25
**monitor** [3] - 21:7, 39:9, 78:7
**monitoring** [2] - 21:4, 21:10
**month** [1] - 66:15
**Montreal** [2] - 12:9, 61:2
**most** [5] - 49:4, 49:12, 71:8, 84:2
**mostly** [3] - 6:19, 6:20, 82:4
**motivated** [1] - 11:15
**motivation** [1] - 11:14
**motor** [2] - 17:2, 19:6
**moved** [1] - 5:12
**movements** [2] - 17:2, 19:6
**multiple** [5] - 38:1, 44:6, 48:16, 55:10, 66:14
**murdered** [1] - 83:14
**murders** [1] - 22:5
**must** [1] - 37:3

## N

**name** [8] - 3:12, 7:25, 11:19, 11:20, 12:8, 76:11, 79:20, 83:22
**names** [3] - 10:16, 83:21, 83:23
**nature** [7] - 22:19, 39:10, 40:13, 45:1, 52:23, 68:6, 70:13
**near** [1] - 22:22
**necessary** [1] - 40:15
**need** [8] - 26:12, 26:15, 37:25, 47:1, 48:2, 49:25, 59:18, 62:2
**needed** [1] - 51:6
**needs** [1] - 8:21
**neurobiological** [1] - 14:19
**neurodiverse** [1] - 47:7
**neurotypical** [2] - 47:5, 47:6
**never** [7] - 9:19, 10:2, 48:10, 51:6, 53:11, 61:16
**next** [5] - 5:18, 5:25, 11:11, 82:12, 82:19
**Nikolas** [6] - 67:21, 67:23, 70:16, 76:11, 76:13, 78:13
**nine** [1] - 48:4
**NO** [1] - 1:2
**non** [8] - 11:3, 16:6, 16:7, 18:19, 18:21, 23:17
**non-technical** [1] - 11:3
**non-verbal** [7] - 16:6, 16:7, 18:19, 18:21, 23:17
**none** [3] - 2:11, 2:17, 49:6
**norm** [1] - 82:6
**normal** [4] - 17:17, 21:25, 42:4, 83:16
**normally** [1] - 84:22
**normative** [1] - 48:2
**North** [1] - 1:22
**noted** [1] - 23:18
**notepads** [1] - 75:1
**notes** [4] - 39:16, 39:21, 39:22
**nothing** [1] - 50:5
**nuance** [2] - 82:3, 82:6
**nuances** [3] - 42:16, 82:9, 82:18
**number** [7] - 10:9, 10:16, 16:6, 51:5, 52:25, 59:14, 85:1
**Number** [1] - 14:23
**numerous** [2] - 80:12
**NYU** [1] - 5:10

## O

**object** [1] - 82:21
**objection** [3] - 7:1, 7:2, 56:17
**objective** [1] - 4:17
**objects** [1] - 19:6
**observations** [1] - 8:22
**observe** [2] - 17:6, 18:12
**observed** [5] - 40:16, 40:19, 51:19, 56:25, 74:15
**observes** [1] - 57:2
**obtained** [1] - 5:1
**obvious** [1] - 82:1
**obviously** [6] - 11:14, 39:8, 46:11, 50:13, 53:4, 82:7
**occasions** [1] - 73:6
**OCD** [1] - 73:9
**October** [1] - 1:5
**OF** [3] - 1:1, 1:4, 1:13
**offender** [2] - 5:21, 5:24
**offense** [3] - 7:10, 7:12, 7:15
**offered** [1] - 35:22
**office** [2] - 55:24, 57:16
**Office** [2] - 1:13, 1:18
**Officer** [1] - 40:7
**offline** [1] - 79:23
**often** [5] - 54:1, 54:3, 62:6, 63:9, 66:16
**oftentimes** [2] - 53:15, 55:9
**old** [2] - 19:1, 72:22
**once** [3] - 5:2, 5:20, 74:4
**One** [1] - 1:18
**one** [51] - 5:6, 5:7, 7:23, 7:25, 9:15, 9:16, 9:17, 9:19, 10:9, 10:10, 10:16, 11:11, 12:23, 16:3, 17:2, 17:3, 17:5, 17:11, 17:12, 19:2, 24:24, 29:2, 32:5, 33:7, 33:10, 46:23, 50:7, 51:5, 52:2, 53:16, 53:24, 59:4, 59:18, 64:20, 65:7, 65:22, 67:4, 76:15, 77:19, 79:12, 80:22
**one's** [2] - 25:22, 50:16
**one-on-one** [2] - 64:20, 65:22
**ones** [1] - 40:19
**online** [3] - 45:12, 80:20, 82:16
**open** [3] - 3:2, 32:5, 70:12
**open-ended** [1] - 32:5
**opened** [2] - 83:8, 83:10
**openly** [1] - 70:23
**operates** [1] - 44:8
**opined** [1] - 81:10
**opinion** [11] - 8:22, 22:16, 25:8, 25:14, 25:19, 25:20, 47:23, 65:16, 72:2, 72:3
**opportunities** [1] - 24:9
**opposites** [1] - 47:12
**options** [1] - 50:24
**oral** [1] - 51:1
**order** [4] - 5:5, 15:25, 24:12, 84:19
**ordinary** [1] - 84:4
**organization** [2] - 5:14, 5:19
**outfits** [1] - 73:6
**outlet** [1] - 22:3
**outpatient** [1] - 5:24
**outside** [6] - 19:3, 21:25, 26:6, 33:7, 54:16, 59:10
**overall** [1] - 11:2
**overruled** [2] - 56:18
**own** [12] - 15:3, 18:5, 19:22, 20:17, 20:18, 30:19, 41:15, 57:23, 62:14, 62:15, 62:16, 62:18

## P

**packet** [2] - 8:19, 8:20
**page** [9] - 36:10, 36:14, 41:18, 41:21, 41:22, 62:11, 81:18, 82:19, 83:5
**pages** [5] - 30:12, 30:13, 30:14, 31:5, 31:9
**pain** [2] - 43:4
**painful** [1] - 42:9
**Palm** [1] - 5:22
**paragraph** [2] - 36:18, 41:21
**parameters** [1] - 65:5
**paraphrasing** [1] - 50:13
**parent** [2] - 53:14, 53:17
**park** [5] - 23:12, 24:16, 31:1, 41:7, 46:7
**parking** [1] - 10:11
**Parkland** [3] - 22:13, 79:13, 83:13
**part** [8] - 20:22, 22:20, 29:10, 41:9, 66:6, 66:9, 67:8,

82:12
**partially** [1] - 66:6
**participate** [1] - 65:1
**participated** [1] - 77:18
**particular** [1] - 24:1
**passage** [2] - 82:13, 83:7
**past** [3] - 19:1, 20:23, 20:25
**Patrick** [3] - 56:2, 56:15, 58:2
**pattern** [1] - 26:17
**patterns** [5] - 16:21, 16:24, 18:10, 19:4, 19:10
**pause** [1] - 47:21
**pay** [1] - 37:5
**paying** [2] - 37:14, 49:5
**peers** [1] - 15:16
**pendency** [1] - 34:19
**people** [52] - 6:11, 9:10, 10:16, 10:17, 10:25, 11:5, 11:6, 11:15, 17:20, 17:21, 18:1, 18:3, 18:6, 18:8, 18:25, 20:12, 21:8, 21:22, 22:7, 22:13, 23:1, 23:8, 24:14, 25:10, 25:23, 27:21, 43:4, 43:8, 43:10, 44:6, 48:18, 48:22, 48:24, 50:21, 63:1, 63:5, 64:22, 66:8, 68:21, 68:23, 69:15, 71:8, 71:20, 73:2, 73:12, 77:14, 78:1, 80:18, 82:15, 84:2, 84:4, 84:18
**people's** [4] - 45:4, 63:11, 79:4, 85:15
**perceive** [3] - 13:1, 78:22, 82:8
**perceived** [3] - 63:23, 63:24, 77:20
**perceives** [3] - 63:3, 63:5, 63:18
**percent** [2] - 10:24, 11:6
**percentile** [1] - 11:1
**perform** [1] - 6:5
**period** [1] - 66:15
**permit** [1] - 24:6
**persistent** [1] - 16:1
**person** [26] - 4:12, 4:15, 4:19, 7:14, 9:13, 9:24, 9:25, 10:13, 12:25, 17:15, 22:9, 43:25, 44:3, 51:2, 51:20, 54:15, 62:21, 63:22, 65:7, 65:8, 68:16, 80:20, 82:7, 86:6
**person's** [1] - 9:12
**personally** [1] - 49:18
**perspective** [3] - 23:20, 83:16, 86:8
**ph** [1] - 40:8
**Ph.D** [1] - 27:16
**PhD** [4] - 1:8, 2:3, 3:7, 3:22
**Philadelphia** [1] - 4:25
**phone** [7] - 48:10, 48:15, 48:17, 48:18, 49:2, 49:4
**photographs** [1] - 72:15
**photos** [1] - 21:20
**phrase** [2] - 32:4, 77:6
**physical** [1] - 19:19
**physically** [1] - 67:23
**pick** [1] - 10:4
**picture** [1] - 22:20
**pictures** [1] - 22:7
**piece** [3] - 21:24, 67:4
**place** [2] - 20:4, 20:5
**places** [1] - 10:9
**plain** [1] - 85:6
**plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:12
**Poc** [1] - 79:20
**podcast** [2] - 27:22, 47:8
**point** [5] - 28:13, 35:17, 45:10, 50:23, 71:24
**polar** [1] - 47:12
**portion** [2] - 37:2, 86:23
**position** [3] - 5:18, 5:25, 54:22
**possibility** [1] - 25:14
**possible** [23] - 16:25, 37:4, 37:9, 37:11, 45:24, 49:23, 54:13, 57:4, 58:11, 58:15, 59:23, 59:25, 60:23, 61:13, 61:25, 70:19, 70:21, 70:23, 72:1, 72:4, 73:1, 73:12, 80:3
**possibly** [3] - 6:22, 52:11, 83:12
**post** [7] - 5:7, 5:14, 5:17, 14:17, 69:14, 69:20, 83:10
**post-doctoral** [3] - 5:7, 5:14, 5:17
**post-Miranda** [2] - 69:14, 69:20
**post-traumatic** [1] - 14:17
**posted** [2] - 79:12, 79:22
**potential** [1] - 61:24
**potentially** [2] - 7:17, 29:24
**practical** [1] - 50:14
**preferable** [1] - 85:25
**presence** [2] - 26:7, 45:11
**present** [2] - 1:25, 40:8
**president** [2] - 3:25, 5:14
**pretty** [8] - 38:15, 49:24, 52:22, 70:8, 70:12, 84:8, 84:9, 86:7
**previously** [2] - 47:17, 79:10
**prism** [4] - 43:23, 44:7, 44:8
**private** [2] - 48:24, 69:9
**probation** [2] - 5:23
**problem** [1] - 25:23
**problems** [2] - 17:5, 33:15
**proceed** [5] - 6:12, 7:1, 7:3, 27:1, 35:25
**proceeding** [3] - 4:16, 44:15, 55:4
**proceedings** [5] - 3:2, 3:4, 11:15, 86:20, 87:4
**process** [1] - 82:9
**processing** [2] - 43:5, 69:24
**proclamations** [1] - 83:15
**professional** [2] - 5:9, 13:17
**professionals** [3] - 11:23, 35:17, 60:13
**program** [4] - 4:24, 5:2, 5:21, 5:22
**promoted** [1] - 47:25
**promptly** [1] - 36:22
**proper** [1] - 10:6
**prosecution** [1] - 6:20
**protocol** [2] - 84:11, 84:12
**PROULX** [2] - 1:21, 87:9
**proulx@flsd.uscourts.gov** [1] - 1:24
**provide** [3] - 5:24, 55:10, 60:18
**provided** [5] - 36:21, 36:23, 37:24, 61:7, 64:5
**providing** [1] - 60:23
**provocative** [1] - 83:12
**psychiatric** [5] - 11:12, 11:18, 12:2, 41:15, 66:14
**Psychiatric** [1] - 5:11
**psychiatrist** [6] - 13:16, 13:21, 27:11, 81:5, 81:6, 86:9
**psychiatrists** [2] - 30:25, 37:24
**Psychological** [1] - 28:5
**psychological** [8] - 28:14, 39:13, 39:20, 47:4, 51:3, 66:13, 84:13, 84:18
**psychologist** [12] - 3:21, 4:2, 4:9, 4:10, 4:14, 5:5, 5:16, 6:2, 6:5, 13:17, 27:8, 84:23
**psychologist's** [1] - 86:8
**psychologists** [3] - 84:3, 84:18
**psychology** [8] - 3:22, 4:7, 4:22, 4:24, 6:17, 6:25, 11:13, 27:17
**psychostimulant** [1] - 73:23
**Public** [1] - 1:18
**public** [2] - 10:9, 36:22
**published** [2] - 28:2, 28:6
**pull** [1] - 21:24
**purchases** [1] - 10:12
**purpose** [6] - 7:8, 12:19, 12:22, 42:2, 43:2, 50:14
**purposes** [4] - 11:25, 26:13, 35:20, 82:23
**put** [4] - 63:11, 63:25, 66:11, 85:1

**Q**

**questioning** [1] - 35:19
**questions** [19] - 22:24, 23:5, 23:13, 23:14, 25:25, 33:8, 33:11, 33:15, 34:6, 34:18, 35:3, 39:3, 57:13, 57:24, 57:25, 58:12, 59:5, 64:14, 80:25
**quite** [3] - 59:25, 66:16, 74:23

**R**

**R-I-T-V-O** [1] - 61:9
**randomly** [1] - 45:4
**range** [6] - 15:7, 15:9, 15:10, 21:25, 23:4, 47:15
**rare** [3] - 84:8, 84:9, 86:7
**rate** [4] - 11:3, 29:12, 61:18, 61:25
**rated** [1] - 11:2
**rather** [2] - 82:1, 82:23
**rating** [2] - 9:24, 9:25
**re** [2] - 58:24, 79:15
**re-explain** [1] - 58:24
**re-tweeting** [1] - 79:15
**REACH** [1] - 5:21
**reach** [5] - 14:6, 14:8, 40:7, 40:15, 52:10
**reaction** [1] - 80:6
**reactions** [1] - 42:18
**read** [21] - 24:18, 26:14, 26:18, 26:21, 35:19, 36:17, 37:3, 37:15, 37:19, 37:23, 38:13, 38:14, 40:20, 41:21, 42:10, 62:20, 78:9, 78:11, 79:21, 81:9, 82:12
**reading** [5] - 35:16, 62:18, 67:1, 77:9, 82:22
**readings** [1] - 10:3
**ready** [1] - 27:1
**real** [3] - 9:12, 82:3, 83:18
**realize** [1] - 48:21
**realized** [1] - 36:6
**really** [11] - 51:4, 56:6, 57:13, 57:16, 57:21, 58:2, 58:24, 59:21, 59:23, 71:3, 73:2
**realtime** [1] - 82:16
**reason** [5] - 4:19, 21:2, 39:25, 45:24
**reasonable** [2] - 25:14, 73:2
**reasons** [1] - 6:13
**recalled** [1] - 37:3
**receive** [2] - 27:13, 77:14
**received** [7] - 27:19, 31:15, 36:4, 78:23, 78:25, 79:16, 80:19
**recently** [1] - 28:4
**recess** [1] - 75:11

**recipients** [2] - 25:16, 42:18
**reciprocal** [1] - 42:15
**reciprocity** [3] - 16:4, 17:12, 17:14
**recognize** [1] - 18:2
**recognizing** [1] - 18:4
**recollection** [2] - 25:1, 44:5
**recommendations** [1] - 24:7
**record** [6] - 3:12, 32:15, 35:19, 41:23, 59:9, 66:1
**recorded** [3] - 33:22, 34:9, 36:20
**recorder** [2] - 36:20, 36:21
**recording** [4] - 32:20, 33:3, 39:2
**records** [20] - 13:23, 13:24, 13:25, 14:1, 14:7, 24:1, 24:3, 28:17, 40:20, 40:21, 40:25, 49:17, 49:20, 59:13, 59:14, 67:3, 83:25, 84:7, 85:9
**Recross** [1] - 2:2
**red** [1] - 82:8
**redirect** [2] - 2:2, 81:1
**REDIRECT** [1] - 81:3
**refer** [3] - 36:9, 41:18, 45:18
**reference** [1] - 68:9
**referenced** [1] - 84:7
**referral** [2] - 6:6, 11:13
**reflexion** [1] - 69:1
**refresh** [1] - 25:1
**regard** [3] - 42:13, 70:17, 70:22
**regarding** [1] - 6:6
**regressed** [2] - 24:11, 48:1
**regularly** [1] - 84:9
**reiterate** [2] - 30:5, 36:3
**related** [3] - 20:21, 21:13, 66:16
**relates** [1] - 69:10
**relating** [1] - 42:13
**relationship** [4] - 4:11, 4:12, 4:18, 14:21
**relationships** [2] - 16:9, 18:24
**relative** [1] - 82:15
**relatively** [1] - 30:21
**relatives** [1] - 83:13
**release** [2] - 84:17, 84:23
**relevant** [1] - 19:13
**rely** [1] - 83:24
**remain** [1] - 75:7
**remember** [3] - 69:15, 69:17, 69:24
**remorse** [1] - 42:14
**repair** [1] - 10:13
**repeatedly** [1] - 68:25
**repetitive** [10] - 16:14, 16:21, 16:24, 17:2, 18:10, 19:4, 19:5, 19:8, 22:19, 73:16
**report** [33] - 13:13, 13:18, 23:18, 24:15, 24:25, 31:5, 31:9, 34:9, 34:14, 36:9, 37:1, 37:3, 37:4, 37:9, 37:19, 37:22, 39:12, 39:14, 39:20, 41:9, 41:19, 57:15, 62:3, 66:24, 67:9, 68:3, 68:5, 68:9, 81:6, 81:7, 81:16, 81:20
**REPORTED** [1] - 1:21
**Reporter** [1] - 1:22
**reporting** [1] - 74:8
**reports** [12] - 26:9, 26:11, 26:14, 30:18, 30:25, 31:14, 31:21, 37:5, 37:10, 38:13, 38:14, 74:10
**repulsed** [1] - 42:5
**required** [1] - 50:15
**requiring** [3] - 15:13, 15:18
**resemble** [1] - 47:4
**residency** [3] - 5:7, 5:15, 5:17
**resolve** [1] - 55:12
**resolved** [1] - 57:22
**respect** [8] - 10:5, 17:11, 18:9, 22:25, 23:11, 81:5, 85:10, 85:20
**respects** [3] - 30:17, 30:21, 55:3
**respond** [4] - 21:8, 23:5, 38:22, 82:3
**responding** [1] - 12:25
**response** [6] - 32:2, 32:9, 44:5, 56:10, 56:13, 62:22
**responses** [3] - 10:21, 42:10, 61:13
**restricted** [5] - 16:14, 17:4, 18:10, 19:4, 19:13
**restrictive** [1] - 16:21
**restroom** [4] - 10:9, 74:21, 75:2, 75:9
**result** [2] - 66:7, 73:19
**results** [3] - 12:1, 13:2, 14:8
**review** [12] - 13:8, 13:23, 23:21, 23:22, 23:23, 28:16, 31:13, 34:25, 35:2, 38:1, 74:19, 85:9
**reviewed** [19] - 13:12, 13:13, 13:18, 13:24, 14:1, 18:14, 20:13, 23:12, 24:15, 26:9, 28:22, 30:24, 34:1, 35:1, 37:1, 37:4, 41:9, 75:21
**reviewing** [4] - 14:7, 14:8, 31:21
**revised** [1] - 14:24
**Revised** [2] - 12:18, 61:8
**ridiculous** [1] - 85:18
**risk** [1] - 52:2
**ritualized** [1] - 19:10
**Ritvo** [4] - 12:17, 61:7, 61:8, 62:5
**RODOLFO** [1] - 1:9
**role** [1] - 66:12
**roof** [1] - 54:11
**room** [3] - 55:17, 55:20, 55:24
**round** [1] - 75:12
**routines** [1] - 19:12
**RPR** [2] - 1:21, 87:9
**rude** [1] - 63:9
**RUIZ** [1] - 1:9
**rule** [1] - 85:21

## S

**SA** [1] - 1:25
**sadness** [3] - 78:2, 78:3, 78:4
**safety** [1] - 9:17
**SAHGAL** [1] - 31:1
**Sahgal** [9] - 13:19, 26:10, 30:25, 41:5, 41:10, 41:12, 42:19, 46:5, 86:9
**Sahgal's** [7] - 31:5, 37:22, 41:19, 66:24, 81:5, 81:6, 81:16
**sameness** [4] - 17:3, 19:10, 72:9, 72:19
**Sanjay** [3] - 30:25, 41:5, 41:10
**sarcasm** [1] - 82:10
**saw** [1] - 38:24
**Scale** [2] - 12:18, 61:8
**scale** [2] - 50:23, 61:21
**Scale-Revised** [2] - 12:18, 61:8
**scared** [1] - 17:21
**School** [1] - 4:25
**school** [23] - 5:3, 13:24, 13:25, 14:1, 18:25, 19:1, 24:1, 24:3, 24:5, 24:7, 27:13, 40:18, 48:11, 52:12, 52:16, 59:13, 67:3, 72:24, 73:1, 73:4, 83:13, 83:25
**scope** [1] - 57:10
**score** [2] - 10:20, 11:4
**scored** [3] - 12:13, 13:3, 60:1
**screening** [3] - 12:9, 12:11, 61:21
**Sealy** [1] - 78:14
**seated** [4] - 3:11, 75:6, 75:12, 75:15
**second** [4] - 8:9, 16:13, 16:20, 51:5
**see** [18] - 4:12, 11:17, 18:22, 22:19, 24:5, 36:16, 40:14, 53:9, 58:19, 72:15, 76:2, 76:4, 78:7, 78:8, 84:19, 85:3, 85:15
**seeing** [1] - 22:15
**seeking** [1] - 69:3
**self** [12] - 3:24, 3:25, 9:18, 12:24, 46:25, 50:16, 69:12, 69:13, 69:17, 69:21, 69:25
**self-administered** [1] - 12:24
**self-care** [2] - 9:18, 46:25
**self-direction** [1] - 9:18
**self-employed** [2] - 3:24, 3:25
**self-serving** [5] - 69:12, 69:13, 69:17, 69:21, 69:25
**sending** [2] - 45:12, 68:19
**sense** [2] - 66:12, 71:5
**sensitivity** [1] - 61:22
**sensory** [2] - 17:5, 19:18
**sent** [7] - 22:13, 69:16, 76:10, 76:22, 79:22, 80:9, 80:13
**sentence** [3] - 6:15, 83:8
**sentencing** [1] - 6:14
**separate** [10] - 31:24, 39:14, 53:4, 53:23, 54:6, 54:10, 55:24, 60:21, 72:5, 72:6
**serial** [18] - 19:15, 20:20, 21:3, 21:12, 21:19, 67:12, 67:15, 68:3, 68:7, 68:10, 68:16, 69:8, 70:7, 71:4, 71:14, 71:18, 71:21, 72:5
**served** [1] - 49:3
**serves** [1] - 42:2
**serving** [5] - 69:12, 69:13, 69:17, 69:21, 69:25
**set** [1] - 65:6
**seven** [3] - 37:19, 48:4, 73:9
**several** [6] - 8:8, 37:15, 37:17, 37:20, 37:23
**severity** [2] - 15:7, 15:9
**sex** [2] - 5:21, 5:24
**sexual** [11] - 21:14, 67:15, 68:5, 68:13, 68:16, 70:5, 70:7, 70:12, 70:22, 71:14, 72:4
**sexually** [5] - 21:12, 21:19, 22:5, 22:6, 68:19
**shirt** [2] - 72:11, 72:23
**shirts** [1] - 72:18
**shit** [1] - 79:22
**shocking** [1] - 85:14
**shoes** [2] - 63:11, 64:1
**shooter's** [1] - 83:22
**shooting** [2] - 79:13, 83:13
**shootings** [1] - 83:14
**show** [7] - 49:20, 75:24, 78:5, 79:3, 79:6, 79:9, 79:18
**showing** [1] - 79:19
**sibling** [1] - 53:15
**siblings** [1] - 53:15
**side** [3] - 26:4, 26:6, 26:25

**side-bar** [2] - 26:6, 26:25
**similar** [2] - 82:4, 85:17
**similarity** [1] - 68:13
**simple** [1] - 15:24
**simply** [1] - 35:23
**sister** [1] - 76:11
**sit** [3] - 45:17, 55:11, 70:2
**sites** [1] - 83:11
**situation** [4] - 23:7, 45:21, 47:14, 52:5
**sixth** [1] - 63:10
**skewed** [1] - 52:7
**skill** [2] - 48:7, 50:10
**skills** [8] - 8:8, 24:11, 24:12, 48:6, 50:20, 52:15, 52:17, 54:10
**sleep** [1] - 73:7
**small** [1] - 9:24
**smile** [1] - 78:15
**smiles** [1] - 10:18
**smiling** [1] - 82:10
**social** [21] - 8:8, 9:18, 16:1, 16:2, 16:3, 16:10, 16:17, 16:22, 16:23, 17:11, 17:14, 18:18, 19:2, 23:2, 23:7, 25:22, 46:25, 82:3, 82:15, 82:18
**solely** [1] - 26:14
**someone** [7] - 4:11, 11:17, 45:17, 52:9, 62:6, 69:6
**sometimes** [6] - 4:16, 4:17, 6:7, 10:2, 51:6, 53:15
**son's** [1] - 54:21
**soon** [2] - 75:3, 82:1
**sophisticated** [5] - 64:9, 65:15, 69:6, 69:7, 69:10
**sophistication** [1] - 64:7
**sorry** [12] - 10:8, 13:15, 16:15, 18:17, 39:6, 55:19, 59:1, 63:13, 70:24, 74:21, 80:12, 85:17
**sort** [2] - 31:15, 49:9
**sound** [1] - 54:5
**sounds** [1] - 54:5
**source** [3] - 49:12, 53:3, 54:9
**South** [1] - 5:13
**SOUTHERN** [1] - 1:1
**Speaking** [1] - 27:24
**speaking** [1] - 58:3
**speaks** [1] - 10:17
**specialized** [1] - 27:19
**specialty** [1] - 4:6
**specific** [8] - 4:15, 4:19, 6:4, 6:8, 39:12, 45:1, 50:19, 64:5
**specifically** [3] - 29:22, 42:9, 44:25
**specificity** [1] - 61:23
**spectrum** [34] - 13:4, 14:12, 14:14, 14:16, 14:21, 15:1, 15:3, 15:6, 15:21, 21:8, 22:1, 24:14, 25:9, 25:20, 27:20, 27:21, 27:23, 28:2, 38:18, 38:21, 41:25, 42:3, 44:13, 44:19, 46:17, 46:21, 53:22, 69:3, 71:11, 72:8, 72:20, 82:1, 83:19
**Spectrumly** [1] - 27:23
**speech** [3] - 17:2, 19:6, 19:8
**spell** [1] - 3:12
**spelled** [3] - 30:25, 31:1, 61:8
**Spencer** [2] - 5:13, 5:17
**spent** [1] - 34:22
**split** [1] - 6:23
**standalone** [1] - 15:1
**standing** [1] - 54:22
**start** [4] - 81:18, 81:20, 81:23, 83:7
**starting** [1] - 20:1
**state** [3] - 5:23, 7:9, 65:20
**statement** [5] - 56:5, 63:15, 63:19, 72:17, 80:2
**statements** [6] - 12:21, 14:2, 35:19, 35:21, 43:19, 63:24
**STATES** [4] - 1:1, 1:4, 1:10, 1:13
**states** [6] - 18:1, 18:2, 18:5, 18:7, 64:24
**States** [2] - 1:13, 1:22
**stating** [1] - 42:19
**statistical** [1] - 14:23
**status** [1] - 12:12
**statutorily** [1] - 84:17
**stemming** [1] - 65:14
**steps** [1] - 69:23
**stereotype** [1] - 19:5
**stereotyped** [1] - 17:2
**still** [4] - 30:13, 57:22, 58:20, 60:18
**stopped** [1] - 74:4
**store** [1] - 50:3
**STRAUSS** [1] - 1:12
**street** [1] - 10:10
**stress** [1] - 14:17
**stressors** [1] - 82:17
**stricken** [2] - 78:24, 82:24
**stuffed** [3] - 72:11, 72:18, 72:23
**style** [1] - 86:5
**subcategories** [1] - 16:3
**subjectivity** [1] - 51:10
**substance** [2] - 26:15, 82:22
**substantial** [2] - 15:14, 15:18
**subsumed** [1] - 14:25
**subtest** [2] - 9:15
**success** [1] - 66:3
**suffering** [1] - 14:12
**suggest** [1] - 15:7
**Suite** [2] - 1:14, 1:18
**summed** [1] - 68:2
**Superman** [1] - 73:7
**support** [3] - 15:13, 15:14, 15:18
**supportive** [1] - 51:20
**supposed** [2] - 84:14, 84:17
**surprised** [1] - 63:9
**Survey** [1] - 59:19
**survey** [1] - 59:20
**survivors** [2] - 79:13, 83:13
**sworn** [1] - 3:8
**sympathetic** [2] - 62:21, 62:24
**symptoms** [3] - 11:12, 11:18, 12:3
**Symptoms** [3] - 11:21, 60:6, 60:11
**syndrome** [1] - 14:22
**synthesize** [1] - 66:10
**System** [4] - 8:3, 8:16, 50:8, 55:6

## T

**tablet** [4] - 48:13, 48:20, 48:21, 49:3
**tablets** [2] - 48:16, 48:17
**tailored** [1] - 44:12
**talks** [2] - 19:7, 43:2
**targets** [1] - 43:14
**task** [1] - 9:3
**Task** [1] - 40:7
**tasks** [1] - 6:4
**taught** [1] - 28:4
**taunted** [1] - 22:2
**taunting** [2] - 83:12, 83:20
**taunts** [1] - 78:12
**teacher** [1] - 74:9
**teachers** [5] - 40:19, 41:1, 52:10, 74:9, 84:6
**technical** [1] - 11:3
**Ted** [1] - 67:17
**Teddy** [2] - 69:15, 80:17
**ten** [1] - 12:10
**tend** [1] - 12:23
**tendencies** [1] - 68:22
**tender** [1] - 6:24
**term** [5] - 14:24, 15:6, 45:14, 47:5, 65:5
**terms** [10] - 11:3, 35:14, 45:21, 52:9, 65:6, 70:1, 70:3, 70:20, 70:22, 72:9
**terrible** [1] - 83:15
**terribly** [1] - 46:23
**test** [35] - 7:19, 7:21, 8:4, 8:16, 9:20, 10:20, 10:24, 11:11, 11:17, 11:19, 11:20, 11:21, 11:22, 11:25, 12:1, 12:8, 12:9, 12:17, 12:19, 12:22, 13:2, 14:8, 48:7, 48:9, 51:3, 51:4, 60:6, 60:11, 60:16, 60:17, 61:3, 61:21, 61:25
**test/retest** [1] - 61:22
**testified** [15] - 3:8, 6:16, 6:19, 19:7, 22:10, 34:1, 36:3, 50:13, 51:12, 56:3, 56:5, 56:10, 61:2, 75:21, 77:13
**testify** [3] - 29:8, 29:23, 29:24
**testifying** [7] - 46:11, 46:15, 63:6, 76:21, 77:4, 78:17, 78:21
**testimony** [4] - 21:11, 35:24, 58:15, 76:23
**testing** [7] - 9:8, 59:17, 59:21, 59:24, 84:13, 84:15, 84:24
**tests** [9] - 7:22, 11:8, 12:6, 12:16, 12:23, 13:7, 50:6, 60:4, 84:18
**THE** [31] - 1:1, 1:9, 1:12, 1:17, 3:11, 7:1, 7:3, 26:2, 26:5, 26:17, 26:21, 26:24, 27:1, 35:15, 56:18, 60:7, 74:22, 75:1, 75:6, 75:10, 75:12, 75:15, 76:3, 76:4, 76:6, 78:11, 80:23, 81:1, 83:1, 86:13, 86:15
**themselves** [6] - 12:25, 13:1, 40:21, 63:25, 68:14
**theoretically** [1] - 52:6
**therapist** [1] - 24:5
**therapy** [1] - 24:4
**Thereupon** [9] - 3:4, 3:6, 26:6, 26:25, 75:5, 75:11, 75:14, 86:20, 86:23
**thinking** [3] - 17:15, 71:6, 74:14
**thinks** [1] - 57:1
**Third** [3] - 8:3, 8:16, 50:8
**third** [2] - 51:6, 63:8
**thoroughly** [1] - 31:15
**threat** [4] - 29:3, 45:18, 80:18, 85:5
**threatening** [4] - 20:6, 22:12, 63:24, 83:12
**threats** [1] - 63:23
**three** [6] - 16:2, 16:4, 16:10, 16:11, 29:5, 66:15
**throughout** [1] - 64:8
**ticks** [2] - 73:17, 74:6
**to...** [1] - 10:3
**today** [3] - 58:15, 74:17
**together** [2] - 21:24, 66:11
**took** [4] - 39:16, 39:21, 78:13, 79:24

**tool** [1] - 9:9
**topic** [5] - 69:1, 70:10, 71:2, 71:5, 71:17
**total** [1] - 29:16
**touched** [1] - 19:19
**toward** [1] - 12:24
**towards** [2] - 12:23, 83:12
**tracks** [1] - 21:17
**training** [5] - 4:21, 5:6, 5:9, 5:12, 27:19
**transcribed** [3] - 3:4, 35:10, 86:20
**transcript** [14] - 23:24, 32:22, 33:5, 33:23, 33:24, 34:1, 34:3, 35:1, 36:4, 36:23, 38:16, 39:2, 59:2
**transcription** [1] - 87:4
**traumatic** [1] - 14:17
**travel** [1] - 53:8
**treat** [2] - 4:13, 27:21
**treatment** [9] - 5:20, 5:21, 5:24, 21:6, 21:9, 21:10, 24:13, 54:14
**treats** [1] - 4:10
**trial** [1] - 86:23
**TRIAL** [1] - 1:8
**trier** [1] - 6:9
**trolling** [4] - 44:4, 45:14, 45:18, 79:25
**trolls** [2] - 44:1, 85:13
**True** [1] - 63:12
**true** [12] - 29:2, 33:9, 33:12, 49:10, 61:15, 61:16, 62:23, 74:3, 74:16, 74:17
**truth** [1] - 35:22
**truthful** [1] - 66:5
**try** [4] - 8:5, 15:24, 55:12
**trying** [2] - 70:18, 71:24
**turn** [2] - 39:25, 82:19
**turned** [1] - 39:23
**tweet** [1] - 79:12
**tweeting** [1] - 79:15
**Twitter** [1] - 79:23
**two** [12] - 5:5, 15:24, 16:6, 22:23, 30:24, 30:25, 31:24, 37:24, 38:2, 47:12, 59:10, 60:21
**type** [10] - 7:21, 21:10, 23:7, 32:5, 57:14, 59:17, 61:18, 63:25, 80:15
**types** [4] - 10:19, 33:8, 45:12, 60:4
**typical** [4] - 4:13, 51:21, 51:23, 71:20
**typically** [8] - 6:6, 6:7, 12:22, 47:15, 50:21, 51:19, 51:21, 66:18

## U

**ultimate** [1] - 30:15
**ultimately** [2] - 29:8, 30:2
**unable** [3] - 17:21, 18:1, 42:4
**unambiguously** [1] - 83:15
**under** [5] - 5:13, 14:25, 15:3, 44:13, 54:11
**undergraduate** [2] - 4:22, 53:2
**underscore** [1] - 42:2
**understood** [9] - 7:19, 20:22, 45:7, 45:10, 57:19, 58:4, 59:4, 80:3
**unfettered** [1] - 22:2
**unfortunately** [1] - 27:24
**unique** [2] - 71:10, 71:12
**UNITED** [4] - 1:1, 1:4, 1:10, 1:13
**United** [2] - 1:13, 1:22
**universe** [1] - 30:21
**University** [2] - 4:23, 4:25
**unlike** [1] - 73:8
**unusual** [1] - 83:24
**up** [7] - 18:15, 56:8, 59:20, 74:24, 75:13, 81:22, 85:1
**user** [4] - 76:11, 79:20, 83:21, 83:23
**uses** [3] - 10:12, 45:14

## V

**various** [2] - 83:8, 83:10
**verbal** [7] - 16:6, 16:7, 18:19, 18:21, 23:17
**verification** [1] - 49:10
**versions** [1] - 15:2
**via** [1] - 79:22
**victimization** [1] - 21:17
**victims** [3] - 20:3, 78:23, 80:13
**video** [13] - 23:16, 23:21, 34:24, 35:5, 35:11, 36:7, 36:20, 36:21, 36:25, 39:2, 39:8, 40:12, 59:2
**videotape** [4] - 32:18, 33:1, 84:9, 86:1
**videotaped** [5] - 33:20, 35:7, 58:17, 86:7, 86:10
**videotaping** [3] - 58:21, 85:21, 85:23
**view** [1] - 23:15
**viewed** [2] - 19:22, 22:12
**vile** [1] - 83:16
**Villanova** [1] - 4:24
**violence** [1] - 22:6
**violent** [1] - 68:21
**vocabulary** [1] - 23:5
**voice** [1] - 35:4
**vs** [1] - 1:5

## W

**warrant** [1] - 45:8
**waste** [2] - 59:15, 59:17
**watch** [1] - 39:8
**watched** [2] - 37:15
**water** [1] - 60:7
**ways** [3] - 10:10, 16:25, 77:25
**wear** [2] - 19:12, 73:6
**wearing** [1] - 72:18
**week** [1] - 28:4
**whatsoever** [1] - 42:2
**whole** [1] - 78:10
**WILCOX** [15] - 1:17, 3:16, 6:24, 7:4, 25:24, 56:17, 60:9, 81:4, 82:25, 83:3, 83:4, 85:1, 85:2, 86:12, 86:14
**Wilcox's** [1] - 38:9
**willing** [4] - 24:4, 25:6, 65:1, 65:2
**Witness** [1] - 2:2
**witness** [3] - 6:17, 6:24, 35:20
**woman** [1] - 47:7
**word** [7] - 33:13, 59:3, 65:6, 77:11, 77:19, 85:16
**words** [5] - 22:12, 77:4, 77:15, 77:19, 85:6
**wore** [1] - 72:10
**works** [1] - 71:8
**world** [7] - 47:25, 48:1, 54:12, 66:8, 71:21, 71:23
**worse** [2] - 11:16, 69:12
**wrapping** [1] - 74:24
**writing** [2] - 62:18, 83:20
**wrote** [1] - 34:10
**Wuornos** [1] - 67:17

## Y

**year** [6] - 5:6, 5:7, 5:10, 5:12, 5:15, 41:13
**years** [10] - 4:4, 5:5, 19:1, 20:23, 20:25, 52:12, 52:17, 54:16, 74:14
**yoo** [1] - 78:12
**young** [2] - 61:15, 62:23
**younger** [3] - 61:16, 63:12, 73:17