IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**FORT LAUDERDALE**
CASE NO. **19-CR-60056**

---

**UNITED STATES OF AMERICA**,
Plaintiff
vs. **October 7, 2019**

**BRANDON MICHAEL FLEURY**,
Defendant.

---

**JURY TRIAL DAY 4 EXCERPT - PARK DIETZ, MD**

BEFORE THE HONORABLE **RODOLFO A. RUIZ, II**

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF: UNITED STATES OF AMERICA
**JARED M. STRAUSS**, AUSA
**AJAY ALEXANDER**, AUSA
United States Attorney's Office
500 E. Broward Blvd, Suite 700
Fort Lauderdale, FL 33394
(954) 356-7255
Jared.strauss@usdoj.gov
Ajay.alexander@usdoj.gov

FOR THE DEFENDANT: BRANDON MICHAEL FLEURY
**DARYL E. WILCOX**, AFPD
**HUDA AJLANI MACRI**, AFPD
Federal Public Defender's Office
One East Broward Blvd, Suite 1100
Fort Lauderdale, FL 33301
(954) 356-7436
Daryl_wilcox@fd.org
Huda_ajlani-macri@fd.org

REPORTED BY:
**GIZELLA BAAN-PROULX**, RPR, FCRR
United States Court Reporter
400 North Miami Avenue, 8th Floor
Miami FL 33128
(305) 523-5634
gizella_baan-proulx@flsd.uscourts.gov

Also present:
CAMERON McDOWELL, SA FBI

# INDEX



| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PARK DIETZ, MD | 3 | 30 | 42 | |



## GOVERNMENT EXHIBITS

(None)

## DEFENSE EXHIBITS

(None)

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

* * * * * * * * * * *

***(Thereupon, proceedings were held but not transcribed.)***

* * * * * * * * * * *

**AUSA ALEXANDER**: The government calls Dr. Park Dietz.

**THE COURT**: Come on up, Dr. Dietz, we'll swear you in.

Thereupon,

**PARK DIETZ, MD**

having been duly sworn by the courtroom deputy, testified as follows:

A. **I do.**

**THE COURTROOM DEPUTY**: Please be seated. Speak into microphone. Say and spell your name for the record.

A. **I'm Dr. Park Dietz, D-I-E-T-Z.**

***DIRECT EXAMINATION***

**BY AUSA ALEXANDER**:

Q. And what is your occupation, sir?

A. **I'm a physician specializing in psychiatry. And my practice has, for decades, been limited to forensic psychiatry.**

Q. And Dr. Dietz, could you please tell the jury what education you've received to qualify for this position.

A. **I did my undergraduate work at Cornell in psychology and biology, graduating cum laude and with distinction in all**

subjects. I entered medical school and graduated in 1975 with an MD from the Johns Hopkins University School of Medicine in Baltimore.

And at the same time received a master's degree in public health also from Johns Hopkins and had completed all but the dissertation for a Ph.D. in sociology, which I was later awarded when I got to writing the dissertation.

Q. Did you receive any additional training after completing your education?

A. Yes. In psychiatry at that time, it was a three-year program for postgraduate physicians. And I did my first two years at the Johns Hopkins Hospital as a resident in psychiatry, and then my third year as chief fellow and forensic psychiatry at the hospital of the University of Pennsylvania in Philadelphia.

Q. What was your first position you held after completing your training?

A. I was asked to become an assistant professor at the Harvard Medical School and accepted that position, where my job was to try to transform a notoriously awful hospital for the criminally insane into a Harvard teaching hospital; a mission I do not believe we accomplished, but I spent two years trying.

Q. What is the next position you held?

A. Well, I remained at Harvard two more years. Spent a year evaluating John Hinckley through the attempted assassination of

president Reagan. And then had a research grant to study the relationship between mental disorder on the one hand and criminal behavior on the other.

And at that time I was recruited to other universities and accepted a job at the University of Virginia, where I became, after a promotion, professor of law and professor of behavioral medicine and psychiatry; and there I taught law students and medical students and trainees in forensic psychiatry.

04:12

04:12 Q. Did there come a time that you left the University of Virginia?

A. I did. I left in '88, I think, or '89 and moved to California. And had already set up a firm to evaluate workplace violence and help employers to prevent violence in the workplace. And then eventually grew my private practice into another firm that provides forensic expertise to attorneys in courts.

04:13

Q. What was your academic rank at the time you left the University of Virginia?

04:13 A. Professor.

Q. And are you associated with any universities today?

A. Yes. I think for the last 29 years I've been clinical professor of psychiatry in biobehavioral sciences at UCLA School of Medicine.

04:13 Q. And are you currently the head of any organizations?

A. **Just my own companies, the one called Threat Assessment Group and the forensic firm Park Dietz & Associates.**
Q. What kind of organization is Park Dietz & Associates?
A. **That is a group of forensic experts in psychiatry, psychology, neuropsychology, security, criminology, law, nursing, forensic pathology, neurology, who make themselves available to consult on legal matters.**
Q. And, Doctor, what kind of organization is the Threat Assessment Group?
A. **That's the firm that does the workplace violence prevention.**
Q. Are you active in any professional organizations?
A. **I have been over the years, although I've cut back my involvement. I think most significantly I was quite active in the American Academy of Forensic Sciences and chaired their behavioral science section.**
**At the time it was psychiatry, but I expanded it to include psychologists. And I was also quite active in the American Academy of Psychiatry and the Law and served as its president years ago.**
Q. Have you ever received any honors or awards?
A. **A handful here and there, yes.**
Q. Please summarize that.
A. **Well, the ones that have the most meaning to me have been more recent one that was an award for teaching from the**

American Academy of Psychiatry and the Law. And the other was being named one of the 25 most influential people in the security industry by Security magazine.

Q. Do you have any professional publications?

04:15 A. I do.

Q. And what are some of the topics that you've published on?

A. Well, there are actually quite a few. I think it amounts to about a hundred publications, but they are mostly on the field of forensic psychology and how to do it better on violent

04:15 crimes and on sex offenses.

Q. And have you lectured on the mental condition of criminal defendants?

A. Yes.

Q. And where have you done that?

04:15 A. Well, throughout the U.S., but also I've been invited and have delivered lectures in Australia, Mexico, England, Spain, Canada.

Q. And do you have experience evaluating forensic matters?

A. I do.

04:16 Q. What is the nature of your experience?

A. Extensive. So in all those positions I held, I was asked to conduct forensic evaluations. Originally at the hospital for the criminally insane, I was responsible for a thousand evaluations per year and recruited some help so I didn't have

04:16 to do it all by myself after the initial period.

04:17 **And then at Virginia, I directed a clinic that evaluated about 75 defendants a year. And in my private practice I've always done evaluations. And now my firm does perhaps 250 a year -- actually, I don't really know the number. It might be 150, 250 a year. And I continue to do evaluations myself, although only a fraction of that total.**
Q. Have you been involved in cases in which the defendant raised mental issues in defending against criminal charges?
A. **Yes, indeed.**
04:17 Q. And approximately, how many cases have you evaluated where a defendant raised mental issues in defending against criminal charges?
A. **Well, the total would be thousands, but many of those were quick, short things back in the thousand-case-a-year day.**
04:17 Q. Have you been involved in any high profile cases in which the jury may be familiar?
A. **I have.**
Q. Did you testify in the case of Jeffrey Dahmer?
A. **I did.**
04:17 Q. And briefly describe, who is Jeffrey Dahmer?
A. **He was a defendant who killed 17 men in Ohio and Wisconsin.**
Q. Were you also involved in the case of Theodore Kaczynski, also known as the Unabomber?
A. **Yes.**
04:18 Q. What was your role in that case?

A. **Two. Well, I had a very mild brief role in working with FBI profilers before he was arrested. But I was hired after the arrest to evaluate him in connection with the criminal charges.**

04:18 Q. And, Doctor, were you also involved in a case involving an individual by the name of Andrea Yates, which was the woman in Texas who drowned her five children?

A. **I was.**

Q. Now, Doctor, was there a problem with your testimony in
04:18 that case?

A. **There was.**

Q. And can you tell the jury what happened?

A. **Well, the short version of it is that during cross-examination, I was asked a question about the Law and**
04:18 **Order television series. And I had consulted to several different Law and Order franchises, had done about 250 episodes with them at that point.**

**And in answering the question about the TV show, I completely messed up my description of an episode I thought had**
04:19 **aired. And that turned out to be used by the government in their argument about Andrea Yates, which was found to have potentially influenced the jury. And so her conviction was overturned and there was a new trial and I testified again at the new trial.**

04:19 Q. Were you involved in the case of the D.C. snipers?

10 of 56

A. **I was.**
Q. And what was your role in that case?
A. **So I was hired to evaluate both defendants Malvo and Muhammad. The Court decided that that would be a conflict to see them both, so I was only then on the Muhammad case. And he refused to meet with me even after being told by the judge he'd lose all of his defense experts if he refused. So he lost his defense experts and that was the end of my involvement.**
Q. And, Doctor, lastly, have you been involved in the case involving the Boston Marathon bombings?
A. **Yes.**
Q. What was your role in that?
A. **I was a government expert to evaluate Mr. Tsarnaev and attended the trial waiting to rebut defense witnesses, but they dropped one defense witness after another and so I never took the stand.**
Q. Doctor, have you been accepted as an expert in forensic psychiatry on previous occasions?
A. **I have.**
Q. Where?
A. **I think in most, if not all, states in the U.S. and in most federal jurisdictions. The only ones abroad have been in Canada and an Army court in Heidelberg, Germany.**
Q. And, Doctor, roughly, how many times have you testified in a criminal proceeding?

A. **If competency were to count, it would be many hundreds or a thousand. Without competency, I'm not sure. But it's not too many times per year. It's been hundreds over the course of my career.**

**AUSA ALEXANDER:** Your Honor, at this time the government requests to qualify Dr. Park Dietz as an expert in forensic psychiatry.

**THE COURT:** You may proceed. Unless there's any objection from Mr. Wilcox.

**AFPD WILCOX:** No objection, Your Honor.

**THE COURT:** Go ahead.

**BY AUSA ALEXANDER:**

Q. Dr. Park Dietz, have you in the course of your career also worked on behalf of defendants?

A. **Yes.**

Q. And do you have a kind of an idea of the split between how often you do that?

A. **It's varied over time. My original position involved seeing almost exclusively court referrals. Then at Virginia, most of the cases came from defense attorneys. And so I had to work to recruit cases from prosecutors.**

**When I went into private practice, I got a lot of referrals from law enforcement and prosecutors, so I had to work to try to get defense cases. Today, the mix is actually quite balanced. There were a few years recently when I did**

more for the defense than the government, but usually it's 50/50 now.

Q. Doctor, during the course of your involvement in this case, did you conduct an examination of the defendant, Brandon Michael Fleury?

04:22

A. I did.

Q. And did you also review numerous documents to assist you in reaching your diagnosis?

A. Yes.

04:22

Q. Now, could you describe what documents you reviewed in preparation for that diagnosis?

A. Well, their very similar to that list of documents that you just heard. But I looked at school records, the FBI interviews, the postings that had been made by Mr. Fleury, the indictment, a lot of photographs of the Fleury home including the interior of the home, some of Mr. Fleury's internet activity other than the postings, but I think not all of it and -- because I didn't receive it. And then, of course, my own examination of the defendant, which I had transcribed.

04:23

04:23

Q. Now, Doctor, your interview with the defendant, how long was that?

A. Over the course of two days, I think we totalled about eight hours of actual interview time.

Q. And did you videotape that interview?

04:23

A. I did.

Q. And did you audio record it?
A. Yes.
Q. As a matter of practice, is there a reason that you videotape your interviews?
04:23 A. Yes, there is. In 1982 at Virginia, I inherited a clinic that already had video cameras installed. And my predecessor had thought this was a good idea for teaching purposes. I discovered in using them that it was not only good for teaching, it also helped me improve my interviewing because by 04:24 watching my own interviews and having law students watch them, I could learn how to do a better job.
So I would assign a students the role of catching me asking a leading question or a suggestive question, which is taboo, it misleads the evaluee and taints the evidence. And 04:24 that persuaded me that it should be routine practice to videotape or at least audio tape interviews so that one can be completely transparent about the process, improve one's own technique, be found out if one's done something that affects the defendant and changes the evidence. Since we're after the 04:25 truth, we should all want the same thing there. And it protects the examiner against false accusations of misconduct. And it is the best possible documentation of mental state. It's technology that's been around for a long time, it's gotten cheaper and more portable. And it makes no sense to me not to.
04:25 And I've been an a committee or task force that I had

hoped would make it mandatory for forensic psychiatry, but it stopped short in making it mandatory and simply said it's an acceptable practice. I have on several occasions worked with attorney's general to get them to pass legislation making it mandatory for all examiners, but legislators have not passed those laws. I believe one state has since then.

Q. And, Doctor, as you had testified, the way a question is asked could influence the evaluee?

A. Yes.

Q. And that's what you referenced is if a question is poorly asked or it was a bad question, it could taint the evidence?

A. Correct.

Q. Now, Doctor, based on your interactions with the defendant during the course of the eight hours of videotaped interview, could you describe his demeanor and how he presented himself?

A. Well, at the outset, he had difficulty finding the examining room, which I would have, too, had I not been taken there because it was behind the elevators. It was a strange location. So there was a bit of awkwardness when I first encountered him in the hallway and tried to make sure that he knew that the exam really was on and he was in the right place. Took him to the room and so on.

He did not respond with the usual kinds of greetings. And during the day, at times when there were breaks or at the end of the day, he didn't say good-bye or have the usual social

**graces one might expect. But he was completely cooperative. He made good eye contact. He listened to my questions and answered my questions, sometimes asking questions of his own if he wasn't certain of the meaning of something. And he was polite throughout.**

Q. And, Doctor, to what extent can the rapport between the evaluator and the evaluee have on whether or not the evaluee is going to be forthcoming with information?

A. **It can have an effect. Sometimes evaluees become so defensive or so angry that useful communication stops. That didn't occur.**

Q. What was the purpose of conducting the examination of the defendant this way, where it was eight hours of straight interviewing?

A. **Well, it wasn't eight hours of straight interviewing. I told him at the beginning that he could have a break whenever he wanted, that he could call his father or his lawyer whenever he wanted. He could get food any time he wanted and so on. And we did take breaks approximately every hour, including at lunchtime. He didn't seem to have money, so I bought him candy bars and a soft drink when he wanted that.**

**And it was over the course of two days and not even an eight-hour day at that. So the purpose of doing continuous, lengthy interviews for me is primarily the efficiency of it. I do see how there could be advantages to doing an hour at a time**

16 of 56

**over the course of weeks, but the logistics of that become expensive to the client. And I haven't found much reason not to do it as close to all at once as is reasonable.**

Q. And what were some of the things you were looking at during the course of the interview?

04:29

A. **Well, I think of interviews as an opportunity to learn more than can be learned from the record. And typically I spend the first portion of the interview, as I did here, talking about his life story, his history, his background. And I paid special attention to areas that from the records I realized might have significance, such as his interactions with other people and his experience with having been bullied particularly in high school. And although he had a few occasions, wanted to jump ahead to talk about the current charges, I put the brakes on that and said, We will get to that later, because I like to get the life story before we get too much into what he's charged with.**

04:29

04:30

Q. So there were moments when he wanted to move forward to the criminal charges rather than talk about the life story?

A. **A few, but he wasn't impatient about it.**

04:30

Q. Now, Doctor, in terms of the defendant during high school, did he provide any information regarding bullying that he had been the recipient of?

A. **Yes, indeed.**

Q. And did he describe how he responded and what was the means

04:30

that he responded?
A. **Well, there were several episodes of bullying by people who he had associated with voluntarily, whom he and I agreed might be described as the wild delinquents, the kids who were troublemakers, the drug dealer, a thief, a class clown. And he had been beaten up twice by people from that group. And his response to some of the mistreatment from that group was to retaliate against one of them by posting Bullseye comments on that young man's adult sister's Instagram page.**
04:31 Q. You used the word retaliate, Dr. Dietz. What did you mean by that?
A. **Get revenge, get even.**
Q. Was that what you were able to derive from the defendant was the purpose of this?
04:31 A. **Yes.**
Q. In terms of --
A. **I should add he acknowledges that it was revenge, but at the same time he says, as he often does, I thought it was funny.**
04:32 Q. Now, Doctor, the constant reiteration of the defendant's statement of that this was funny or it was a joke, what did you construe from that?
A. **Well, I think both things may be true. In his mind it's funny, but it's also revenge. The fact that it's funny doesn't stop it from being revenge.**
04:32

Q. So is it fair to say, Doctor, that based on your assessment, that the defendant found humor in the revenge?

A. **Yes.**

Q. And, Doctor, could you briefly describe what is the autism spectrum disorder?

04:32

A. **Well, that is a neurodevelopmental disorder that has attracted a great deal of attention in recent decades and was really little known to the public and even to medicine before quite recently. It is a disorder that occurs from birth, is largely genetic in origin. We think of it as a biological condition that has to do with the development of brain and mind. But there's a lot we don't know about it. And the autism spectrum is broad and includes people who are profoundly impaired and disabled on the one extreme and people who are very high functioning and successful at the other extreme.**

04:33

04:33

Q. Where do individuals who have been diagnosed with Asperger's fall within the spectrum?

A. **Asperger's is at the milder, higher functioning end of the spectrum.**

04:33

Q. Based on your examination, Doctor, did you rely on the DSM-5 to determine what diagnosis to appropriate to the defendant?

A. **Yes.**

Q. And what conclusion did you reach?

04:34

A. **So I reached the conclusion after considering other**

diagnoses that looked similar that it was correct to classify this defendant's condition as an autism spectrum disorder, though I assigned it Level 1 as opposed to Level 2, which is a judgment about severity, how impaired, how much support would be needed. And that's one area of disagreement.

Q. And we'll talk a little bit more about the disagreement between you and what disagreements you saw in Dr. Butts's testimony. But in reaching the determination that the defendant is autistic spectrum disorder Level 1, first can you describe what is Level 1 and what that entails?

A. Well, really, this is just a difference of opinion about how severe the defendant's impairment is, how severe his adaptive difficulties are. And I rely in part in my assessment of it on a consultant I turn to who specializes in the treatment of people with autism spectrum disorder and their evaluation.

I had her watch the video of my exam the whole way through, the FBI interview of the defendant, and read a factual summary of the case so that she could advise me of how to properly assign level of severity. And it made sense to me what the DSM-5 criteria and her input to assign Level 1.

Q. And just for purposes of the record, Level 1 is less severe than Level 2?

A. Yes, but still the same diagnosis and still needing support.

Q. In terms of the characteristic that warranted this diagnosis that you saw or learned about the defendant, what were those characteristics?
A. **I'm sorry. I didn't understand.**
04:36 Q. Essentially, let me rephrase it this way, Doctor. What about the defendant convinced you that he was on the autism spectrum disorder?
A. **May I refer to my report?**
**AUSA ALEXANDER**: With the Court's permission.
04:36 **BY AUSA ALEXANDER**:
Q. Would that refresh your recollections?
A. **Yes, it would.**
**THE COURT**: Go ahead and look at it. And once it's refreshed, you may go ahead and answer the question.
04:36 A. **(Complies.) Actually, I'm at risk of repeating the testimony of Dr. Butts because we rely on the same criteria, of course, and find the same examples of what supports a diagnosis of autism spectrum disorder.**
**It's the deficits in social reciprocity. His 04:37 difficulty in social interaction. His lack of non-verbal communication, for example, not using gestures, and not using non-verbal body language to communicate. So all of that goes to one of the criteria.**
**He also has clearly had the stereotyped or repetitive 04:37 movements. He's had some degree of inflexible adherence to**

routines. He's got obvious fixated interests on very narrow areas, so he's not interested in the world as a whole but only in very specific topics that he spends lots and lots of time on. I did not know about his not liking to be hugged, so I didn't find that one present. But having heard it here in court, then he would also have the last of the features of the disorder; and that one is thought of as being overly reactive or underreactive to sensory input. And he's overreactive to it, which is why he doesn't like to be touched.

Q. And, Doctor, to what degree does the autism spectrum disorder in the defendant influence his ability to appreciate the emotions of others?

A. That's the big issue. So I do see this as a matter of degree. In other words, despite having autism spectrum disorder, I believe there is evidence that the defendant knew, as he said at least eight times in my exam, that his communications would anger and annoy the recipients. But I think he understood more than that. That he also understand, as shown in his postings, that it would aggravate grief, that it could cause someone to cry, and knew that he had gone too far while he's still in the midst of doing it yet continued to go. So I don't think it's the case that he could not appreciate the emotional impact on victims.

I do think it's the case that his capacity to fully appreciate that is affected by his condition, that he does not

have the average degree of understanding of others emotions. But it is a continuum of how much appreciation, not a circumstance in which he has no appreciation. If he had no appreciation, he wouldn't know it could anger and annoy. And I don't think he'd be talking about grief or crying or going too far.

04:40

Q. And, Doctor, you stated that the defendant would tell you that the recipients of these messages could feel anger and annoyance, but denied anything further than that?

04:40

A. Yes. And this happened from the first time I asked him about the effects on others. He said they could -- it could make them angry and annoy them. And then every time I asked him about the effects of other messages, he used exactly the same words, angry and annoyance. That's all.

04:41

Q. In your training and experience and understanding, that response from the defendant and your conclusion of the defendant does understand that his actions could cause grief and suffering in other individuals, is there a way to dichotomize or cut it in half saying that, yes, he can understand anger in other people, that it would cause anger, but not anything else?

04:41

A. I don't think so.

Q. And, Doctor, did you review the psychiatric report by Dr. Sanjay Sahgal?

A. Yes.

04:41

Q. And based upon your assessment of that or your review of that report and your own personal assessment, did you agree, disagree? What did you derive from Dr. Sahgal?
A. **Well, we have somewhat different writing styles. But with respect to the actual opinions, I thought we were in agreement.**
Q. And could you expound on that?
A. **I don't remember all the detail, but I do remember advising your office after receiving it that I didn't know that you needed me to rebut him.**
Q. Now, Doctor, did the defendant, during the course of the interview, discuss with you his sexual arousal to serial killers?
A. **He did.**
Q. Did he also talk about the masturbation?
A. **Yes.**
Q. Did he also talk about his fascination with individuals who exhibited aggression and violent tendencies?
A. **Yes.**
Q. And from that information, what were you able to derive about the defendant?
A. **Well, the way in which he presented this to me was that it began with the character Bullseye in the Daredevil movie and that what he found sexually arousing wasn't just the way Colin Farrell looked in that movie, it was what the character Bullseye did in that movie, which was fighting, impaling a**

woman, Electra, in her hand and then elsewhere, killing her father, killing her. That his dominance, control, power and the things he did were so exciting to him, that it caused him to ejaculate. And that that became a favorite theme of masturbation for him.

04:43

And as we discussed other characters and other things he found sexy, the same sort of story proved true for his interest in Nikolas Cruz and Ted Bundy and in an Ohio school shooter. That in all of these instances, he focused on both the physical attractiveness of the person and also on what they had done. So in describing two of the others he was interested in, Klebold and Harris, he was able to make a nuance distinction between what he found appealing about Eric Harris and what he liked but found less appealing about Dylan Klebold. But both of them had killed multiple students. And this power was important to him.

04:44 04:44

My understanding of what he was telling me -- and I questioned him about this in some detail, about what he found sexy -- was that he found it arousing that they were so domineering and had done so much harm to others. He didn't care if they strangled or used bombs or shot people or how they did harm, it was that they did it and that they were so domineering. And taunting of their victims was another of his themes that he found sexy. And specifically, he pointed to the taunting done by the character Bullseye in the film Daredevil.

04:44 04:45

**And also the taunting that the Ohio school shooter had done toward victims by turning to them and taunting them in the courtroom.**

Q. The Ohio shooter, is that TJ Lane?

04:45 A. **Yes.**

Q. And the Eric Harris and Dylan Klebold, that's in reference to the Columbine shooters?

A. **Correct.**

Q. In terms of the theme of dominance that sexually aroused

04:45 the defendant, do you know where that attraction came from? Why dominance?

A. **Well, I know he discovered it in himself while watching the Daredevil movie. That was his first awareness of it. I don't think anyone could tell you where it came from, but it is not**

04:46 **an uncommon phenomenon for someone to discover what arouses them sexually through something in the media.**

Q. And, Doctor, based on your familiarity with the a autism spectrum disorder, as well as this defendant's sexual arousal of dominance and individuals with violent tendencies, is there

04:46 a connection between the two?

A. **So the way I would frame that question as a general intellectual puzzle to my field is, is there a relationship between what are called the paraphilias, that is sexual deviations in which someone has an unusual pattern of sexual**

04:47 **arousal, on the one hand and autism spectrum disorder is on the**

04:47 04:47 04:48 04:48 04:48

**other. And so far the answer to that is that we don't know. There have been a few suggestions in the research literature that people with autistic disorders may be more prone to sex offenses, but this cannot be conclusively stated.**

**And there are explanations for it other than having these paraphilias or deviations, which is that it's pretty sexually frustrating to have no real world social contacts and not to know how to achieve them. And often people with autism spectrum disorders get little or no sex education, so they may not know how to behave appropriately. So I think these are two separate things, the paraphilias on the one hand and autism spectrum on the other.**

Q. Doctor, do you see any similarity between what sexually arouses the defendant and the messages that he sent in this case?

A. **I do.**

Q. And can you expand on that?

A. **I think that what he was doing in this case was taunting victims and that he had found it sexually arousing for the villains he admires and identifies with to taunt their victims.**

Q. And would that include in the language that he included to threaten other individuals, did that -- let me take a step back. In terms of what sexually aroused the defendant and the messages that he sent, did he admit that there was a connection between the two?

A. **He certainly did not acknowledge having any sexual arousal from posting his comments.**
Q. But in spite of that denial, you find that there may be a connection between the two?
04:49 A. **It's certainly a question that I consider important. It seems so obvious a pattern, that he's aroused by victim taunting and then engages in victim taunting, that I question whether that was an underlying motive for him and whether he knew it at the time.**
04:49 Q. Doctor, you heard the defense expert, Dr. Lori Butts, testify; is that correct?
A. **Yes.**
Q. Did you agree or disagree with the statements that she made?
04:49 A. **I thought there were three areas of disagreement and really only three. One addressed that has to do with how serious his general impairment is. Is it Level 1? Level 2? Does he need support or substantial support? I could be wrong on this. I'm not sure we've got any great weight to measure this. I think**
04:50 **it's a judgment call.**
**The second issue is, is he completely unable to appreciate the reaction the victim would have to the kinds of taunting he was doing, or does he have some but perhaps not perfect appreciation? I had the impression -- and I don't mean**
04:50 **to speak for her -- that Dr. Butts thought he did not**

**appreciate; whereas, my view is that he appreciated quite a bit about it, that it would anger and annoy and exacerbate grief and cause tears, and that it's not an all or nothing thing. That he may not have had complete understanding the way most of us would, but that he understood enough to know how bad this was.**

04:51

**And then the third area where I thought there was disagreement between Dr. Butts and me is the understanding of what it was that the defendant was sexually aroused by. I understood her to say that he was aroused by certain villains but not their acts, and that his fantasy to be dominated by them. My understanding based on my exam was that he was aroused by the people but also by their bad acts, including victim taunting. And that he wanted to be like them, and that's why he chose the persona of Nikolas Cruz or Ted Bundy to present himself to the world in these anonymous communications.**

04:51 04:52

**AUSA ALEXANDER:** Your Honor, may I have a moment?

**THE COURT:** You may.

**BY AUSA ALEXANDER:**

Q. And, Doctor, in discerning that the defendant was autistic spectrum disorder type 1, what did you rely on to come to that conclusion? Essentially, why did you come to that conclusion?

04:52

A. **Why I rated it a Level 1 rather than Level 2?**

Q. Yes, sir.

A. **My reading of the DSM-5 and the defendant's functionality.**

04:53

**As I say, it's a judgment call.**

Q. Now, in terms of the source of the sexual arousal, there's a disagreement between you and Dr. Butts. Why did you come to your conclusion as to what was the source of the defendant's sexual arousal?

A. **That's based entirely on the content of my examination. And the transcript of that exam shows the statements he made about what he found sexy. And my reading of what he told me is that he found the dominance, the control, the power, and the acts they engaged in against victims to be arousing as well as their taunting of victims.**

Q. And, Doctor, what are you relying on in order for the defendant to appreciate quite a bit about the emotional capacity of his victims, that they could feel grief and fear from his conduct? What exactly are you relying that on?

A. **Well, he readily acknowledged knowing it would cause annoyance and anger. That he says repeatedly to me and to others. He denied to me that he could even understand the word grief or that it could cause distress, and he denied that it could cause fear to other people. And yet his other postings show that he does have at least some of these concepts of grief and making people cry and of having gone too far.**

Q. And, Doctor, during the course of your interview with the defendant, he was aware that was facing criminal charges?

A. **Yes.**

Q. Thank you, Dr. Dietz.

**AUSA ALEXANDER**: Your Honor, I have no further questions.

**THE COURT**: Cross-examination, please.

04:55

***CROSS-EXAMINATION***

**BY AFPD WILCOX**:

Q. Good afternoon, Dr. Dietz. How are you?

A. **Good afternoon.**

04:55 Q. Good. Would it be fair to say that you're one of the country's foremost forensic psychiatrists?

A. **I hope so, but it's not for me to say.**

Q. I mean, that wouldn't be an unreasonable statement by me, would it, I mean?

04:56 A. **It wouldn't annoy me.**

Q. It wouldn't. (Laughter.) Fair enough. Now, on direct examination the prosecutor mentioned a lot of high profile cases that you had been involved in; is that correct?

A. **Yes.**

04:56 Q. Joel Rifkin, I don't think he mentioned that one. But you had been involved in that one; is that right?

A. **Yes.**

Q. Who was Joel Rifkin?

A. **Joel Rifkin was a serial killer on Long Island, New York, mostly of prostitutes.** 04:56

04:56 04:57 04:57 04:57 04:58

Q. Arthur Shellcross?
A. **He was a serial killer of prostitutes in Rochester, New York.**
Q. You did -- the prosecutor did mention Jeffrey Dahmer. The prosecutor did mention the Unabomber, also known as Ted Kaczynski. How about Richard Kuklinski?
A. **Kuklinski was not a case of mine. HBO hired me to interview him for a TV series.**
Q. I see. All right. And the Beltway snipers?
A. **Yes. We talked about that.**
Q. Yes, you did. You consulted -- with respect to all those serial killers now, did you always testify for the prosecution in those cases?
A. **Well, I didn't testify in all of those cases.**
Q. Well, you were hired by them, right?
A. **So in the serial murder cases, there's one named Gerald Gallego where I was hired by the defense. And I was hired by the defense on Richard Ramirez, the Night Stalker. There are probably a few others, but it's mostly the government.**
Q. And the serial killer -- and that's all I was trying to get at. In the serial killer cases, you mostly testify on behalf of the government. And the government has hired you with an -- and in this cyberstalking case, I mean, is that right?
A. **The government hired me in this case.**
Q. In this case, right? And I hate to just harp on the

obvious, but this isn't a serial killer case, right?
A. **No, it isn't.**
Q. Okay. Now, you have an interest in serial killers, or at least I believe you have like a series of trading cards of all the serial killers or something?
04:58 A. **Yeah. There was a surprise party given for me at the FBI academy for my 44th birthday, and one of the agents gave me a set of serial killers trading cards. It was mentioned in a New Yorker article. I'm sure that's where you found this.**
04:58 Q. And you still have them?
A. **They are probably somewhere.**
Q. Now, I want to -- now, this Andrea Yates case, you talked about that a little bit. The government brought it up. There was a little problem with that now. What actually happened is
04:59 that during your testimony you suggested that Andrea Yates may have gotten the idea of drowning her three children from some episode that was on Law and Order where the defendant in the episode drowned her children and then pled insanity; is that right?
04:59 A. **I wouldn't put it that way. I don't think that's right, but I see how you could interpret it that way. What I said was that there was an episode of Law and Order in which a woman drowned her children and pleaded insanity, and it aired shortly before this crime.**
04:59 Q. How did I say it wrong? How did I say it different from

the way you just said it?
A. **Well, I didn't mean to suggest she got her idea from it because I consider that preposterous. And when the prosecutor had asked me about that episode, I told him that's not why she did it. She did it because she was mentally ill.**
Q. But because of that testimony, it was -- the testimony, it was false, right? There was no Law and Order episode where somebody drowned their children is what I'm saying, right?
A. **Well, there wasn't an episode that was just like what I had described. I can't tell you about all of the episodes of Law and Order, but my description was wrong.**
Q. Your description was wrong about the episode?
A. **Correct.**
Q. That you testified to?
A. **That's right.**
Q. Okay. And because your description was wrong about the episode that you testified to -- well, first of all, that's when the case was -- the case ended, Andrea Yates was sentenced to death, right? Initially, right?
A. **I think you started with one question and --**
Q. I'm sorry. Let me -- I did, you know. She was sentenced to death initially, right?
A. **After the first trial, she was sentenced to death.**
Q. Right. And that was based on your -- an appellate court said that -- reversed that decision because they thought that

that false testimony may have had something to do with her being sentenced to death?
A. **I believe what the appellate court said was that the jury may have relied on the prosecutor's argument that Andrea Yates got her idea from this false testimony about the TV show.**
Q. Okay. But the prosecutor's argument was based on your testimony?
A. **Yes. And my testimony was based on his having told me of such an episode incorrectly.**
Q. You were a consultant on the show at that time, though, right?
A. **I'm sorry.**
Q. You had been consultant on Law and Order, right?
A. **Consultant to about 150 episodes of Law and Order and 100 of Law and Order Criminal Intent at that time.**
Q. Now, with respect to your bill on this case, so far, I mean, the invoice is about $50,000 that the government owes you, right?
A. **That's probably right. I don't know if they've paid it or not.**
Q. But so far, they owe you close to $50,000. Now, after you finish testifying, they are probably going to owe you more; is that right?
A. **I hope so.**
Q. And would it be fair to say that in most of the cases where

you're asked to render an opinion either for the government or the defense, you're asked to render an opinion as to whether the defendant was insane at the time of the commission of the offense; is that right?
A. **No. That's one of the common questions.**
Q. Well, that's not what you're mostly asked to testify to? I mean, mostly asked to render an opinion on insanity?
A. **I suppose if we looked back on my entire career, that might be the single most common, that of competence. But in recent years, I don't think that's been the most common. I think sentence mitigation issues are more commonly asked.**
Q. Well, aside from sentence mitigation issues, when you're asked to testify in a trial like we're doing here today, most of the time you're asked to opine as to the defendant's insanity?
A. **It is one of the common questions I'm asked, yes.**
Q. Now, you understand that the defense in this case is not alleging insanity?
A. **I do understand that.**
Q. How much experience do you have in determining whether someone is autistic?
A. **Probably about the same as any other forensic psychiatrist, so I would --**
Q. Go ahead. Finish.
A. **I've never specialized in it, haven't taken special courses**

**in it, but do maybe a case or two a year or oversee a case.**
Q. Would it be fair to say that autism isn't your strong suit?
A. **It is. That's why I consulted someone.**
Q. I don't want to say it's your strong suit. Are you saying that it's fair -- is it fair to say that it's not your strong suit?
A. **It's fair to say that. My experience with schizophrenia is massively more than autism.**
Q. Now, you suggest that you and Dr. Butts's conclusion as to the severity of Brandon Fleury's autism are somewhat inconsistent. But not really; is that correct?
A. **It's the difference between needs support and needs substantial support.**
Q. Is that the difference between -- well, what's Level 3?
A. **That's much more impaired.**
Q. Needs support and needs substantial support. But you've already admitted that it's kind of like a judgment call?
A. **Yes.**
Q. There's no clear way to say it. You're not saying her position is completely unreasonable, are you?
A. **Not at all.**
Q. So her position that it's Level 2 is reasonable?
A. **Yes.**
Q. Now, the government -- and you were here for when the government cross-examined Dr. Butts about the video. Is it

unusual for a forensic psychologist not to video during their examinations?
A. **It's not unusual. I wish it were, but I haven't been able to make that --**
05:06 Q. Would it be fair to say it's a common practice of forensic psychologist not to video?
A. **It is.**
Q. Okay. Now, would it be fair to say when you compare your examination with Dr. Butts's examination, the only thing
05:06 that -- basically, the only thing you did different was video record your interview?
A. **Well, we know mine was twice as long. We know I videotaped and audio taped. But we have no way to know what she did; whereas we can know everything I did.**
05:07 Q. Well, she reviewed the same material that you reviewed, right?
A. **Yes.**
Q. You didn't call any teachers, did you?
A. **No.**
05:07 Q. You didn't call Mr. Fleury's father to try to ask him any questions, did you?
A. **No.**
Q. In fact, you didn't give any tests to determine whether he was autistic?
05:07 A. **Correct.**

Q. You gave no -- I mean, you didn't get any information, you didn't give any tests, and you consulted with somebody in your office to confirm your diagnosing that he was autistic; is that right?
05:07 A. **Yes. And to confirm that it remained the state of affairs that there is no diagnostic test for autism in adults.**
Q. They have no diagnostic tests?
A. **Correct.**
Q. So you're saying that the tests on this ABS 3 is not a
05:08 diagnostic test for autism?
A. **It is not a diagnostic test for autism in adults. It is, however, an accepted screening measure of adaptive function, just as the Ritvo is an accepted screening measure. That's the difference from a diagnostic test.**
05:08 Q. I'm sorry. This is very technical to me. But you didn't give any -- you didn't do any screening; is that right?
A. **Sure, I did. I did it by looking.**
Q. By interviewing, right?
A. **And the records.**
05:08 Q. But you didn't have you nor your -- the person that you consulted with actually had -- used any written screening material that Mr. Fleury would have had to complete or that his father would have had to complete or anyone else; is that right?
05:08 A. **That's right.**

Q. Now, you characterized Dr. Butts's assessment as to whether or not Mr. Brandon Fleury could appreciate -- could appreciate anger but not appreciate grief as all or nothing. You think that's a fair characterization? Is that what she really said?
05:09 A. **I could look up what I wrote in my notes.**
Q. Okay.
A. **I believe that she indicated that he does not understand the emotional state of others.**
Q. And you think and you believe that he does understand some emotion. 05:10 He certainly understands that other people can get angry, right?
A. **Yes.**
Q. But I think when you were testifying, you indicated that at some times it's a matter of degree that when you say that he 05:11 doesn't understand emotions of others, he just may not understand it to the degree as a normal person. Is that a fair statement? As somebody without autism. How about that?
A. **My point is that it's not a complete absence of understanding, that it may be an impaired depth of 05:11 understanding. And certainly, an impaired ability to feel it as they would. That's sometimes referred to as the emotional or affect of component of empathy. But the cognitive or thinking component of empathy I believe he has to some degree. And we know he had it with respect to anger and annoyance and 05:11 grief and crying.**

Q. Cognitive?
A. **Yes.**
Q. But there's still a question as to whether or not he appreciates it to a degree as -- if he -- as someone who didn't have the disorder?
A. **Yes.**
Q. Okay. So it's really hard to -- I mean, respectfully, it's really difficult for you to determine to what degree he appreciates someone's fear, right? I mean, it's almost impossible to determine that; is that right?
A. **These are very difficult.**
Q. These are very difficult questions. It's almost impossible to determine because of his disorder whether or not he intended to frighten someone?
05:12 A. **I think that we have problems in trying to determine it.**
Q. Right. I mean --
A. **And the way I would view it is if he doesn't admit it -- and he doesn't -- then we have to learn it from his behavior and other things he's done, like his choice of serial killer photos to put next to his comments. And we have to decide it based on everything we know about him as an individual and whether he took steps to hide this behavior or whether he shouted it from the rooftops and bragged to his dad about it.**
**We know he hid it. He didn't brag to his dad. He didn't even share it with his dad. So he's hiding this**

41 of 56

**behavior. That's informative. And what we can't do -- and really, the central issue is we can't assume that because he gets this label of a condition that he's got complete impairment in understanding how others feel.**

05:14 Q. Fair enough. But the flip side of that is because he had the label you called it or the disorder, it's difficult to determine exactly what he meant by those messages? I mean, it's difficult to take those messages at face value, would you agree?

05:14 A. **Well, I think it's difficult to take anybody's communications at face value, but he is pretty clear in taunting these people.**

Q. And you don't think --

A. **And it's clear with me that he was taunting, knew it was**
05:14 **cruel, knew it was mean, and thinks that villains who taunt are sexy.**

Q. I understand that. But even if he knew it was mean, he knew it was cruel, we still can't determine with any degree of certainty -- and it may be because of his disorder -- was he
05:15 intended these people to be frightened or scared?

A. **I can't.**

Q. Okay.

**AFPD WILCOX:** One moment.

**THE COURT:** Sure.

05:15 **AFPD WILCOX:** No further questions.

42 of 56

THE COURT: Thank you. Redirect?

***REDIRECT EXAMINATION***

**BY AUSA ALEXANDER:**

Q. Dr. Dietz, you were aware that Dr. Butts had given the ABAS-3, the assessment behavioral test to Mr. Fleury, correct?

A. **Yes.**

Q. And that she had given the exam to him and put him off into a different room for him to fill out by himself?

A. **Yes.**

Q. By you sitting down with the defendant one-on-one for the recorded eight hours or the approximately eight hours, were you able to discern whether or not he understood the questions and able to ask follow-up questions to ensure that the information you had was thorough?

A. **Yes.**

Q. And that's different than giving someone a written exam and telling them to mark -- essentially rate it from zero to 4?

**AFPD WILCOX:** Objection, Judge, to the leading.

**THE COURT:** Overruled.

**BY AUSA ALEXANDER:**

Q. The interview you conducted is different than just giving someone a paper exam and asking them to answer questions from zero to 4?

A. **It is, but both can have value.**

Q. And you made -- and what determination did you make in terms of the value of a in-person interview rather than the psychological paper exams?

A. **I think it depends on what one's trying to measure and what one's standards of proof are. I think a great many paper and pencil tests that have not been normed on the appropriate population aren't very informative for forensic work in terms.**

Q. In terms of the exams that have not been properly normed, are you referring to validity tests or the idea of taking into consideration different biases?

A. **Well, there are many different measures that would be nice to have for psychological tests. Some of the best known, most widely accepted tests are known to have test/retest reliability are known to be valid through a variety of definitions of validity and measures of it, are known to have certain sensitivities and specificities, have a known error rate.**

**And the point I was making is none of those. It's, do we know what normal is for criminal defendants as opposed to general population.**

Q. Doctor, you briefly talked about on cross-examination about the cognitive and emotional impact. Do you recall that?

A. **Yes.**

Q. Can you describe a little bit further in detail what that means and how intellectual capacity comes into play?

A. **Well, the distinction I was making was about two components**

**of empathy that don't necessarily correspond. People can have the ability to recognize intellectually, cognitively that someone else feels a certain way, but may or may not be able to emotionally resonate with it.**

05:19 **And specifically with respect to the defendant, I was acknowledging that he may not have the ability to resonate emotionally with how a victim would necessarily feel while still knowing that this is something that would get them or upset them or taunt them or bother them or have some unwanted impact on them.**

05:19

Q. That would include the grief, fear, and those kind of feelings?

A. **Yes.**

Q. Now, Doctor, you recall on cross-examination where counsel

05:19 asked you whether there's any means of measuring the degree of the emotional understanding that an individual would have in another person? Do you recall being asked those types of questions?

A. **Yes.**

05:19 Q. And you testified that besides the defendant's statement, all you can look at is just different details, behavior, the documents he's written and everything, correct?

A. **Yes.**

Q. Wouldn't that be the case for anyone, not just the

05:20 defendant, but for any person? Is there a mechanism for

05:20 measuring someone's ability in that regard besides verbal admission?
A. **Well, one could design laboratory tests that hook people up to electrodes and see how the brain is responding, maybe see their emotional response from physiological measures.**
Q. But besides that?
A. **But short of that, I think we're limited to the kind of things we're talking about here.**
Q. So based on the examination you did, you relied on the
05:20 defendant's statement, the documents that you had discussed, as well as his behavior and the messages that he had sent?
A. **Yes.**
Q. And beyond attaching him to electrodes, there wouldn't really be a means of determining the degree of understanding he
05:21 would have; is that fair?
A. **If there is, I don't know it.**
Q. And, Doctor, based on your assessment of the defendant and the examination that you have conducted, the one that has been recorded and transcribed, what is your assessment as to whether
05:21 or not this defendant can understand that his messages, when sent to these specific victims, was meant to cause fear, anger, and those kinds of emotions? Grief?
A. **It's my belief that they were intended to cause such emotions.**
05:21 **AUSA ALEXANDER:** Your Honor, may I have a moment?

46 of 56

**THE COURT**: Yes.

**AUSA ALEXANDER**: Thank you, Dr. Dietz.

Your Honor, no further questions.

**THE COURT**: Thank you, Doctor. You are excused.

* * * * * * * * * * *

***(Thereupon, proceedings were held but not transcribed.)***

* * * * * * * * * * *

(Thereupon, the above portion of the trial was concluded.)

* * *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

12/06/2019 ______________________________

DATE COMPLETED GIZELLA BAAN-PROULX, RPR, FCRR

## $

**$50,000** [2] - 34:17, 34:21

## '

**'88** [1] - 5:12
**'89** [1] - 5:12

## 1

**1** [8] - 19:3, 19:9, 19:10, 19:21, 19:22, 27:17, 28:21, 28:23
**100** [1] - 34:14
**1100** [1] - 1:18
**12/06/2019** [1] - 47:8
**150** [2] - 8:5, 34:14
**17** [1] - 8:21
**19-CR-60056** [1] - 1:2
**1975** [1] - 4:1
**1982** [1] - 13:5

## 2

**2** [5] - 19:3, 19:23, 27:17, 28:23, 36:22
**2019** [1] - 1:5
**25** [1] - 7:2
**250** [3] - 8:4, 8:5, 9:16
**29** [1] - 5:22

## 3

**3** [3] - 2:3, 36:14, 38:9
**30** [1] - 2:3
**305** [1] - 1:23
**33128** [1] - 1:23
**33301** [1] - 1:19
**33394** [1] - 1:14
**356-7255** [1] - 1:15
**356-7436** [1] - 1:19

## 4

**4** [3] - 1:8, 42:18, 42:24
**400** [1] - 1:22
**42** [1] - 2:3
**44th** [1] - 32:7

## 5

**50/50** [1] - 12:2
**500** [1] - 1:14
**523-5634** [1] - 1:23

## 7

**7** [1] - 1:5
**700** [1] - 1:14
**75** [1] - 8:2

## 8

**8th** [1] - 1:22

## 9

**954** [2] - 1:15, 1:19

## A

**ABAS-3** [1] - 42:6
**ability** [5] - 21:11, 39:20, 44:2, 44:6, 45:1
**able** [7] - 17:13, 23:19, 24:12, 37:3, 42:13, 42:14, 44:3
**above-entitled** [1] - 47:4
**abroad** [1] - 10:22
**ABS** [1] - 38:9
**absence** [1] - 39:18
**academic** [1] - 5:18
**academy** [1] - 32:7
**Academy** [3] - 6:15, 6:19, 7:1
**acceptable** [1] - 14:3
**accepted** [6] - 4:19, 5:5, 10:17, 38:12, 38:13, 43:13
**accomplished** [1] - 4:22
**accurate** [1] - 47:3
**accusations** [1] - 13:21
**achieve** [1] - 26:8
**acknowledge** [1] - 27:1
**acknowledged** [1] - 29:16
**acknowledges** [1] - 17:17
**acknowledging** [1] - 44:6
**actions** [1] - 22:17
**active** [3] - 6:12, 6:14, 6:18
**activity** [1] - 12:17
**acts** [3] - 28:11, 28:13, 29:10
**actual** [2] - 12:23, 23:5
**adaptive** [2] - 19:13, 38:12
**add** [1] - 17:17
**additional** [1] - 4:8
**addressed** [1] - 27:16
**adherence** [1] - 20:25
**admires** [1] - 26:20
**admission** [1] - 45:2
**admit** [2] - 26:24, 40:17
**admitted** [1] - 36:17
**adult** [1] - 17:9
**adults** [2] - 38:6, 38:11
**advantages** [1] - 15:25
**advise** [1] - 19:19
**advising** [1] - 23:7
**affairs** [1] - 38:5
**affect** [1] - 39:22
**affected** [1] - 21:25
**affects** [1] - 13:18
**AFPD** [7] - 1:17, 1:17, 11:10, 30:7, 41:23, 41:25, 42:19
**afternoon** [2] - 30:8, 30:9
**agents** [1] - 32:7
**aggravate** [1] - 21:19
**aggression** [1] - 23:17
**ago** [1] - 6:20
**agree** [3] - 23:2, 27:13, 41:9
**agreed** [1] - 17:3
**agreement** [1] - 23:5
**ahead** [5] - 11:11, 16:14, 20:13, 20:14, 35:24
**aired** [2] - 9:20, 32:23
**AJAY** [1] - 1:13
**ajay.alexander@usdoj.gov** [1] - 1:16
**AJLANI** [1] - 1:17
**ALEXANDER** [14] - 1:13, 3:6, 3:18, 11:5, 11:12, 20:9, 20:10, 28:17, 28:19, 30:2, 42:4, 42:21, 45:25, 46:2
**alleging** [1] - 35:18
**almost** [3] - 11:19, 40:9, 40:12
**AMERICA** [2] - 1:4, 1:13
**American** [3] - 6:15, 6:19, 7:1
**amounts** [1] - 7:7
**Andrea** [6] - 9:6, 9:21, 32:12, 32:15, 33:18, 34:4
**anger** [10] - 21:17, 22:4, 22:8, 22:20, 28:2, 29:17, 39:3, 39:24, 45:21
**angry** [4] - 15:10, 22:12, 22:14, 39:11
**annoy** [5] - 21:17, 22:4, 22:12, 28:2, 30:15
**annoyance** [4] - 22:9, 22:14, 29:17, 39:24
**anonymous** [1] - 28:16
**answer** [3] - 20:14, 26:1, 42:23
**answered** [1] - 15:3
**answering** [1] - 9:18
**appealing** [2] - 24:13, 24:14
**appellate** [2] - 33:24, 34:3
**appreciate** [9] - 21:11, 21:23, 21:25, 27:22, 28:1, 29:13, 39:2, 39:3
**appreciated** [1] - 28:1
**appreciates** [2] - 40:4, 40:9
**appreciation** [4] - 22:2, 22:3, 22:4, 27:24
**appropriate** [2] - 18:21, 43:6
**appropriately** [1] - 26:10
**area** [2] - 19:5, 28:7
**areas** [3] - 16:10, 21:2, 27:15
**argument** [3] - 9:21, 34:4, 34:6
**Army** [1] - 10:23
**arousal** [6] - 23:11, 25:18, 25:25, 27:1, 29:2, 29:5
**aroused** [6] - 25:9, 26:23, 27:6, 28:9, 28:10, 28:13
**arouses** [2] - 25:15, 26:14
**arousing** [4] - 23:23, 24:19, 26:19, 29:10
**arrest** [1] - 9:3
**arrested** [1] - 9:2
**Arthur** [1] - 31:1
**article** [1] - 32:9
**aside** [1] - 35:12
**Asperger's** [2] - 18:17, 18:18
**assassination** [1] - 4:25
**assessment** [8] - 18:2, 19:13, 23:1, 23:2, 39:1, 42:6, 45:17, 45:19
**Assessment** [2] - 6:1, 6:9
**assign** [3] - 13:12, 19:20, 19:21
**assigned** [1] - 19:3
**assist** [1] - 12:7
**assistant** [1] - 4:18
**associated** [2] - 5:21, 17:3
**Associates** [2] - 6:2, 6:3
**assume** [1] - 41:2
**attaching** [1] - 45:13
**attempted** [1] - 4:25
**attended** [1] - 10:14
**attention** [2] - 16:10, 18:7
**attorney's** [1] - 14:4
**Attorney's** [1] - 1:13
**attorneys** [2] - 5:16, 11:20
**attracted** [1] - 18:7
**attraction** [1] - 25:10
**attractiveness** [1] - 24:10
**audio** [3] - 13:1, 13:16, 37:13
**AUSA** [15] - 1:12, 1:13, 3:6, 3:18, 11:5, 11:12, 20:9, 20:10, 28:17, 28:19, 30:2, 42:4, 42:21, 45:25, 46:2
**Australia** [1] - 7:16
**autism** [19] - 18:4, 18:13, 19:2, 19:15, 20:6, 20:18, 21:10, 21:14, 25:17, 25:25, 26:8, 26:11, 36:2, 36:8, 36:10, 38:6, 38:10, 38:11, 39:17
**autistic** [6] - 19:9, 26:3, 28:20, 35:21, 37:24, 38:3
**available** [1] - 6:7
**Avenue** [1] - 1:22
**average** [1] - 22:1
**award** [1] - 6:25
**awarded** [1] - 4:7
**awards** [1] - 6:21
**aware** [2] - 29:24, 42:5
**awareness** [1] - 25:13
**awful** [1] - 4:20
**awkwardness** [1] - 14:19

## B

**BAAN** [2] - 1:21, 47:9

**BAAN-PROULX** [2] - 1:21, 47:9
**background** [1] - 16:9
**bad** [3] - 14:11, 28:5, 28:13
**balanced** [1] - 11:25
**Baltimore** [1] - 4:3
**bars** [1] - 15:21
**based** [13] - 14:13, 18:1, 18:20, 23:1, 25:17, 28:12, 29:6, 33:24, 34:6, 34:8, 40:21, 45:9, 45:17
**beaten** [1] - 17:6
**became** [2] - 5:6, 24:4
**become** [3] - 4:18, 15:9, 16:1
**BEFORE** [1] - 1:9
**began** [1] - 23:22
**beginning** [1] - 15:16
**behalf** [2] - 11:14, 31:21
**behave** [1] - 26:10
**behavior** [6] - 5:3, 40:18, 40:22, 41:1, 44:21, 45:11
**behavioral** [3] - 5:7, 6:16, 42:6
**behind** [1] - 14:18
**belief** [1] - 45:23
**Beltway** [1] - 31:9
**best** [2] - 13:22, 43:12
**better** [2] - 7:9, 13:11
**between** [14] - 5:2, 11:16, 15:6, 19:7, 24:13, 25:20, 25:23, 26:13, 26:25, 27:4, 28:8, 29:3, 36:12, 36:14
**beyond** [1] - 45:13
**biases** [1] - 43:10
**big** [1] - 21:13
**bill** [1] - 34:16
**biobehavioral** [1] - 5:23
**biological** [1] - 18:10
**biology** [1] - 3:25
**birth** [1] - 18:9
**birthday** [1] - 32:7
**bit** [6] - 14:19, 19:6, 28:1, 29:13, 32:13, 43:23
**Blvd** [2] - 1:14, 1:18
**body** [1] - 20:22
**bombings** [1] - 10:10
**bombs** [1] - 24:21
**Boston** [1] - 10:10
**bother** [1] - 44:9
**bought** [1] - 15:20
**brag** [1] - 40:24
**bragged** [1] - 40:23
**brain** [2] - 18:11, 45:4
**brakes** [1] - 16:14
**BRANDON** [2] - 1:6, 1:17
**Brandon** [3] - 12:4, 36:10, 39:2
**break** [1] - 15:16
**breaks** [2] - 14:24, 15:19
**brief** [1] - 9:1
**briefly** [3] - 8:20, 18:4, 43:20
**broad** [1] - 18:13
**brought** [1] - 32:13
**Broward** [2] - 1:14, 1:18
**bullied** [1] - 16:12
**Bullseye** [4] - 17:8, 23:22, 23:25, 24:25
**bullying** [2] - 16:22, 17:2
**Bundy** [2] - 24:8, 28:15
**Butts** [2] - 27:10, 29:3
**butts** [5] - 20:16, 27:25, 28:8, 36:25, 42:5
**butts's** [4] - 19:7, 36:9, 37:9, 39:1
**BY** [8] - 1:21, 3:18, 11:12, 20:10, 28:19, 30:7, 42:4, 42:21
**bye** [1] - 14:25

## C

**California** [1] - 5:13
**cameras** [1] - 13:6
**CAMERON** [1] - 1:25
**Canada** [2] - 7:17, 10:23
**candy** [1] - 15:20
**cannot** [1] - 26:4
**capacity** [3] - 21:24, 29:14, 43:24
**cards** [2] - 32:4, 32:8
**care** [1] - 24:21
**career** [3] - 11:4, 11:13, 35:8
**CASE** [1] - 1:2
**case** [29] - 8:14, 8:18, 8:22, 8:25, 9:5, 9:10, 9:25, 10:2, 10:5, 10:9, 12:3, 19:19, 21:22, 21:24, 26:15, 26:18, 31:7, 31:23, 31:24, 31:25, 32:1, 32:12, 33:18, 34:16, 35:17, 36:1, 44:24
**cases** [12] - 8:7, 8:10, 8:15, 11:20, 11:21, 11:24, 30:18, 31:13, 31:14, 31:16, 31:21, 34:25
**catching** [1] - 13:12
**caused** [1] - 24:3
**central** [1] - 41:2
**certain** [4] - 15:4, 28:10, 43:15, 44:3
**certainly** [4] - 27:1, 27:5, 39:10, 39:20
**certainty** [1] - 41:19
**certify** [1] - 47:3
**chaired** [1] - 6:15
**changes** [1] - 13:19
**character** [3] - 23:22, 23:24, 24:25
**characteristic** [1] - 20:1
**characteristics** [1] - 20:3
**characterization** [1] - 39:4
**characterized** [1] - 39:1
**characters** [1] - 24:6
**charged** [1] - 16:17
**charges** [6] - 8:8, 8:12, 9:4, 16:14, 16:19, 29:24
**cheaper** [1] - 13:24
**chief** [1] - 4:13
**children** [5] - 9:7, 32:16, 32:18, 32:23, 33:8
**choice** [1] - 40:19
**chose** [1] - 28:15
**circumstance** [1] - 22:3
**class** [1] - 17:5
**classify** [1] - 19:1
**clear** [3] - 36:19, 41:11, 41:14
**clearly** [1] - 20:24
**client** [1] - 16:2
**clinic** [2] - 8:1, 13:5
**clinical** [1] - 5:22
**close** [2] - 16:3, 34:21
**clown** [1] - 17:5
**cognitive** [3] - 39:22, 40:1, 43:21
**cognitively** [1] - 44:2
**Colin** [1] - 23:23
**Columbine** [1] - 25:7
**comments** [3] - 17:8, 27:2, 40:20
**commission** [1] - 35:3
**committee** [1] - 13:25
**common** [5] - 35:5, 35:9, 35:10, 35:16, 37:5
**commonly** [1] - 35:11
**communicate** [1] - 20:22
**communication** [2] - 15:10, 20:21
**communications** [3] - 21:17, 28:16, 41:11
**companies** [1] - 6:1
**compare** [1] - 37:8
**competence** [1] - 35:9
**competency** [2] - 11:1, 11:2
**complete** [5] - 28:4, 38:22, 38:23, 39:18, 41:3
**COMPLETED** [1] - 47:9
**completed** [1] - 4:5
**completely** [5] - 9:19, 13:17, 15:1, 27:21, 36:20
**completing** [2] - 4:8, 4:16
**Complies** [1] - 20:15
**component** [2] - 39:22, 39:23
**components** [1] - 43:25
**concepts** [1] - 29:21
**concluded** [1] - 46:12
**conclusion** [7] - 18:24, 18:25, 22:16, 28:22, 29:4, 36:9
**conclusively** [1] - 26:4
**condition** [5] - 7:11, 18:11, 19:2, 21:25, 41:3
**conduct** [3] - 7:22, 12:4, 29:15
**conducted** [2] - 42:22, 45:18
**conducting** [1] - 15:12
**confirm** [2] - 38:3, 38:5
**conflict** [1] - 10:4
**connection** [4] - 9:3, 25:20, 26:24, 27:4
**consider** [2] - 27:5, 33:3
**consideration** [1] - 43:10
**considering** [1] - 18:25
**constant** [1] - 17:20
**construe** [1] - 17:22
**consult** [1] - 6:7
**consultant** [4] - 19:14, 34:10, 34:13, 34:14
**consulted** [5] - 9:15, 31:11, 36:3, 38:2, 38:21
**contact** [1] - 15:2
**contacts** [1] - 26:7
**content** [1] - 29:6
**continue** [1] - 8:5
**continued** [1] - 21:21
**continuous** [1] - 15:23
**continuum** [1] - 22:2
**control** [2] - 24:2, 29:9
**conviction** [1] - 9:22
**convinced** [1] - 20:6
**cooperative** [1] - 15:1
**Cornell** [1] - 3:24
**correct** [11] - 14:12, 19:1, 25:8, 27:11, 30:18, 33:13, 36:11, 37:25, 38:8, 42:6, 44:22
**correspond** [1] - 44:1
**counsel** [1] - 44:14
**count** [1] - 11:1
**country's** [1] - 30:11
**course** [12] - 11:3, 11:13, 12:3, 12:18, 12:22, 14:14, 15:22, 16:1, 16:5, 20:17, 23:10, 29:23
**courses** [1] - 35:25
**Court** [2] - 1:22, 10:4
**COURT** [13] - 1:1, 1:10, 3:7, 11:8, 11:11, 20:13, 28:18, 30:4, 41:24, 42:1, 42:20, 46:1, 46:4
**court** [6] - 3:2, 10:23, 11:19, 21:6, 33:24, 34:3
**Court's** [1] - 20:9
**courtroom** [2] - 3:10, 25:3
**COURTROOM** [1] - 3:13
**courts** [1] - 5:17
**crime** [1] - 32:24

**crimes** [1] - 7:10
**criminal** [9] - 5:3, 7:11, 8:8, 8:11, 9:3, 10:25, 16:19, 29:24, 43:18
**Criminal** [1] - 34:15
**criminally** [2] - 4:21, 7:23
**criminology** [1] - 6:5
**criteria** [3] - 19:21, 20:16, 20:23
**cross** [5] - 2:2, 9:14, 36:25, 43:20, 44:14
**Cross** [1] - 30:4
**CROSS** [1] - 30:6
**cross-examination** [3] - 9:14, 43:20, 44:14
**Cross-examination** [1] - 30:4
**CROSS-EXAMINATION** [1] - 30:6
**cross-examined** [1] - 36:25
**cruel** [2] - 41:15, 41:18
**Cruz** [2] - 24:8, 28:15
**cry** [2] - 21:20, 29:22
**crying** [2] - 22:5, 39:25
**cum** [1] - 3:25
**current** [1] - 16:14
**cut** [2] - 6:13, 22:19
**cyberstalking** [1] - 31:23

## D

**D-I-E-T-Z** [1] - 3:15
**D.C** [1] - 9:25
**dad** [3] - 40:23, 40:24, 40:25
**Dahmer** [3] - 8:18, 8:20, 31:4
**Daredevil** [3] - 23:22, 24:25, 25:13
**DARYL** [1] - 1:17
**daryl_wilcox@fd.org** [1] - 1:20
**DATE** [1] - 47:9
**DAY** [1] - 1:8
**days** [2] - 12:22, 15:22
**deal** [1] - 18:7
**dealer** [1] - 17:5
**death** [4] - 33:19, 33:22, 33:23, 34:2
**decades** [2] - 3:21, 18:7
**decide** [1] - 40:20
**decided** [1] - 10:4
**decision** [1] - 33:25
**defendant** [39] - 1:6, 8:7, 8:11, 8:21, 12:4, 12:19, 12:20, 13:19, 14:13, 15:13, 16:21, 17:13, 18:2, 18:22, 19:9, 19:18, 20:2, 20:6, 21:11, 21:15, 22:7, 22:16, 22:17, 23:10, 23:20, 25:10, 26:14, 26:23, 28:9, 28:20, 29:13, 29:24, 32:17, 35:3, 42:11, 44:5, 44:25, 45:17, 45:20
**DEFENDANT** [1] - 1:17
**defendant's** [9] - 17:20, 19:2, 19:12, 25:18, 28:25, 29:4, 35:14, 44:20, 45:10
**defendants** [5] - 7:12, 8:2, 10:3, 11:14, 43:18
**Defender's** [1] - 1:18
**defending** [2] - 8:8, 8:11
**defense** [12] - 10:7, 10:8, 10:14, 10:15, 11:20, 11:24, 12:1, 27:10, 31:17, 31:18, 35:2, 35:17
**defensive** [1] - 15:10
**deficits** [1] - 20:19
**definitions** [1] - 43:14
**degree** [13] - 4:4, 20:25, 21:10, 21:14, 22:1, 39:14, 39:16, 39:23, 40:4, 40:8, 41:18, 44:15, 45:14
**delinquents** [1] - 17:4
**delivered** [1] - 7:16
**demeanor** [1] - 14:15
**denial** [1] - 27:3
**denied** [3] - 22:9, 29:18, 29:19
**depth** [1] - 39:19
**deputy** [1] - 3:10
**DEPUTY** [1] - 3:13
**derive** [3] - 17:13, 23:3, 23:19
**describe** [7] - 8:20, 12:10, 14:15, 16:25, 18:4, 19:10, 43:23
**described** [2] - 17:4, 33:10
**describing** [1] - 24:11
**description** [4] - 9:19, 33:11, 33:12, 33:16
**design** [1] - 45:3
**despite** [1] - 21:14
**detail** [3] - 23:7, 24:18, 43:23
**details** [1] - 44:21
**determination** [2] - 19:8, 43:1
**determine** [8] - 18:21, 37:23, 40:8, 40:10, 40:13, 40:15, 41:7, 41:18
**determining** [2] - 35:20, 45:14
**development** [1] - 18:11
**deviations** [2] - 25:24, 26:6
**diagnosed** [1] - 18:16
**diagnoses** [1] - 19:1
**diagnosing** [1] - 38:3
**diagnosis** [6] - 12:8, 12:11, 18:21, 19:24, 20:2, 20:17
**diagnostic** [5] - 38:6, 38:7, 38:10, 38:11, 38:14
**dichotomize** [1] - 22:19
**Dietz** [13] - 3:6, 3:7, 3:15, 3:22, 6:2, 6:3, 11:6, 11:13, 17:10, 30:1, 30:8, 42:5, 46:2
**DIETZ** [3] - 1:8, 2:3, 3:9
**difference** [4] - 19:11, 36:12, 36:14, 38:14
**different** [10] - 9:16, 23:4, 32:25, 37:10, 42:9, 42:17, 42:22, 43:10, 43:11, 44:21
**difficult** [6] - 40:8, 40:11, 40:12, 41:6, 41:8, 41:10
**difficulties** [1] - 19:13
**difficulty** [2] - 14:16, 20:20
**DIRECT** [1] - 3:17
**direct** [2] - 2:2, 30:16
**directed** [1] - 8:1
**disabled** [1] - 18:14
**disagree** [2] - 23:3, 27:13
**disagreement** [5] - 19:5, 19:6, 27:15, 28:8, 29:3
**disagreements** [1] - 19:7
**discern** [1] - 42:13
**discerning** [1] - 28:20
**discover** [1] - 25:15
**discovered** [2] - 13:8, 25:12
**discuss** [1] - 23:11
**discussed** [2] - 24:6, 45:10
**disorder** [19] - 5:2, 18:5, 18:6, 18:9, 19:2, 19:9, 19:15, 20:7, 20:18, 21:7, 21:11, 21:15, 25:18, 25:25, 28:21, 40:5, 40:13, 41:6, 41:19
**disorders** [2] - 26:3, 26:9
**dissertation** [2] - 4:6, 4:7
**distinction** [3] - 3:25, 24:13, 43:25
**distress** [1] - 29:19
**DISTRICT** [3] - 1:1, 1:1, 1:10
**doctor** [4] - 10:17, 26:13, 27:10, 43:20
**Doctor** [27] - 6:8, 9:5, 9:9, 10:9, 10:24, 12:3, 12:20, 14:7, 14:13, 15:6, 16:21, 17:20, 18:1, 18:4, 18:20, 20:5, 21:10, 22:7, 22:23, 23:10, 25:17, 28:20, 29:12, 29:23, 44:14, 45:17, 46:4
**documentation** [1] - 13:22
**documents** [5] - 12:7, 12:10, 12:12, 44:22, 45:10
**dominance** [5] - 24:2, 25:9, 25:11, 25:19, 29:9
**dominated** [1] - 28:11
**domineering** [2] - 24:20, 24:23
**done** [9] - 7:14, 8:3, 9:16, 13:18, 24:11, 24:20, 24:25, 25:1, 40:19
**down** [1] - 42:11
**Dr** [24] - 3:6, 3:7, 3:15, 3:22, 11:6, 11:13, 17:10, 19:7, 20:16, 22:24, 23:3, 27:10, 27:25, 28:8, 29:3, 30:1, 30:8, 36:9, 36:25, 37:9, 39:1, 42:5, 46:2
**drink** [1] - 15:21
**dropped** [1] - 10:15
**drowned** [4] - 9:7, 32:18, 32:23, 33:8
**drowning** [1] - 32:16
**drug** [1] - 17:5
**DSM-5** [3] - 18:21, 19:21, 28:25
**duly** [1] - 3:10
**during** [10] - 9:13, 12:3, 14:14, 14:24, 16:4, 16:21, 23:10, 29:23, 32:15, 37:1
**Dylan** [2] - 24:14, 25:6

## E

**East** [1] - 1:18
**education** [3] - 3:23, 4:9, 26:9
**effect** [1] - 15:9
**effects** [2] - 22:11, 22:13
**efficiency** [1] - 15:24
**eight** [8] - 12:23, 14:14, 15:13, 15:15, 15:23, 21:16, 42:12
**eight-hour** [1] - 15:23
**either** [1] - 35:1
**ejaculate** [1] - 24:4
**Electra** [1] - 24:1
**electrodes** [2] - 45:4, 45:13
**elevators** [1] - 14:18
**elsewhere** [1] - 24:1
**emotion** [1] - 39:10
**emotional** [7] - 21:23, 29:13, 39:8, 39:21, 43:21, 44:16, 45:5
**emotionally** [2] - 44:4, 44:7
**emotions** [5] - 21:12, 22:1, 39:15, 45:22, 45:24
**empathy** [3] - 39:22, 39:23, 44:1
**employers** [1] - 5:14
**encountered** [1] - 14:20
**end** [3] - 10:8, 14:25, 18:18
**ended** [1] - 33:18
**enforcement** [1] - 11:23
**engaged** [1] - 29:10
**engages** [1] - 27:7
**England** [1] - 7:16
**ensure** [1] - 42:14
**entails** [1] - 19:10
**entered** [1] - 4:1
**entire** [1] - 35:8

**entirely** [1] - 29:6
**entitled** [1] - 47:4
**episode** [10] - 9:19, 32:17, 32:18, 32:22, 33:4, 33:7, 33:9, 33:12, 33:17, 34:9
**episodes** [4] - 9:16, 17:2, 33:10, 34:14
**Eric** [2] - 24:13, 25:6
**error** [1] - 43:16
**essentially** [3] - 20:5, 28:22, 42:18
**evaluate** [4] - 5:13, 9:3, 10:3, 10:13
**evaluated** [2] - 8:2, 8:10
**evaluating** [2] - 4:25, 7:18
**evaluation** [1] - 19:16
**evaluations** [4] - 7:22, 7:24, 8:3, 8:5
**evaluator** [1] - 15:7
**evaluee** [4] - 13:14, 14:8, 15:7
**evaluees** [1] - 15:9
**eventually** [1] - 5:15
**evidence** [4] - 13:14, 13:19, 14:11, 21:15
**exacerbate** [1] - 28:2
**exactly** [3] - 22:13, 29:15, 41:7
**exam** [8] - 14:21, 19:17, 21:16, 28:12, 29:7, 42:8, 42:17, 42:23
**examination** [14] - 9:14, 12:4, 12:19, 15:12, 18:20, 29:6, 30:4, 30:17, 37:9, 43:20, 44:14, 45:9, 45:18
**EXAMINATION** [3] - 3:17, 30:6, 42:3
**examinations** [1] - 37:2
**examined** [1] - 36:25
**examiner** [1] - 13:21
**examiners** [1] - 14:5
**examining** [1] - 14:17
**example** [1] - 20:21
**examples** [1] - 20:17
**exams** [2] - 43:3, 43:8
**EXCERPT** [1] - 1:8
**exciting** [1] - 24:3
**exclusively** [1] - 11:19
**excused** [1] - 46:4
**exhibited** [1] - 23:17
**expand** [1] - 26:17
**expanded** [1] - 6:17
**expect** [1] - 15:1
**expensive** [1] - 16:2
**experience** [6] - 7:18, 7:20, 16:12, 22:15, 35:20, 36:7
**expert** [4] - 10:13, 10:17, 11:6, 27:10
**expertise** [1] - 5:16
**experts** [3] - 6:4, 10:7, 10:8
**explanations** [1] - 26:5
**expound** [1] - 23:6
**extensive** [1] - 7:21
**extent** [1] - 15:6
**extreme** [2] - 18:14, 18:15
**eye** [1] - 15:2

## F

**face** [2] - 41:8, 41:11
**facing** [1] - 29:24
**fact** [2] - 17:24, 37:23
**factual** [1] - 19:18
**fair** [14] - 18:1, 30:10, 30:16, 34:25, 36:2, 36:5, 36:7, 37:5, 37:8, 39:4, 39:16, 41:5, 45:15
**fall** [1] - 18:17
**false** [4] - 13:21, 33:7, 34:1, 34:5
**familiar** [1] - 8:16
**familiarity** [1] - 25:17
**fantasy** [1] - 28:11
**far** [6] - 21:21, 22:6, 26:1, 29:22, 34:16, 34:21
**Farrell** [1] - 23:24
**fascination** [1] - 23:16
**father** [4] - 15:17, 24:2, 37:20, 38:23
**favorite** [1] - 24:4
**FBI** [5] - 1:25, 9:2, 12:13, 19:18, 32:6
**FCRR** [2] - 1:21, 47:9
**fear** [5] - 29:14, 29:20, 40:9, 44:11, 45:21
**features** [1] - 21:6
**federal** [1] - 10:22
**Federal** [1] - 1:18
**feelings** [1] - 44:12
**fellow** [1] - 4:13
**few** [6] - 7:7, 11:25, 16:13, 16:20, 26:2, 31:19
**field** [2] - 7:9, 25:22
**fighting** [1] - 23:25
**fill** [1] - 42:9
**film** [1] - 24:25
**finish** [2] - 34:22, 35:24
**firm** [5] - 5:13, 5:16, 6:2, 6:10, 8:3
**first** [9] - 4:11, 4:16, 14:19, 16:8, 19:9, 22:10, 25:13, 33:17, 33:23
**five** [1] - 9:7
**fixated** [1] - 21:1
**FL** [3] - 1:14, 1:19, 1:23
**Fleury** [6] - 12:5, 12:14, 12:15, 38:22, 39:2, 42:6
**FLEURY** [2] - 1:6, 1:17
**Fleury's** [3] - 12:16, 36:10, 37:20
**flip** [1] - 41:5
**Floor** [1] - 1:22
**FLORIDA** [1] - 1:1
**focused** [1] - 24:9
**follow** [1] - 42:14
**follow-up** [1] - 42:14
**following** [1] - 3:2
**follows** [1] - 3:11
**food** [1] - 15:18
**FOR** [2] - 1:12, 1:17
**force** [1] - 13:25
**foregoing** [1] - 47:3
**foremost** [1] - 30:11
**Forensic** [1] - 6:15
**forensic** [18] - 3:21, 4:13, 5:8, 5:16, 6:2, 6:4, 6:6, 7:9, 7:18, 7:22, 10:17, 11:7, 14:1, 30:11, 35:22, 37:1, 37:5, 43:7
**FORT** [1] - 1:2
**Fort** [2] - 1:14, 1:19
**forthcoming** [1] - 15:8
**forward** [1] - 16:18
**fraction** [1] - 8:6
**frame** [1] - 25:21
**franchises** [1] - 9:16
**frighten** [1] - 40:14
**frightened** [1] - 41:20
**frustrating** [1] - 26:7
**fully** [1] - 21:24
**function** [1] - 38:12
**functionality** [1] - 28:25
**functioning** [2] - 18:15, 18:18
**funny** [4] - 17:19, 17:21, 17:24

## G

**Gallego** [1] - 31:17
**general** [4] - 14:4, 25:21, 27:17, 43:19
**genetic** [1] - 18:10
**Gerald** [1] - 31:16
**Germany** [1] - 10:23
**gestures** [1] - 20:21
**given** [3] - 32:6, 42:5, 42:8
**GIZELLA** [2] - 1:21, 47:9
**gizella_baan** [1] - 1:24
**gizella_baan-proulx@flsd.uscourts.gov** [1] - 1:24
**good-bye** [1] - 14:25
**government** [14] - 3:6, 9:20, 10:13, 11:6, 12:1, 31:19, 31:22, 31:24, 32:13, 34:17, 35:1, 36:24, 36:25
**graces** [1] - 15:1
**graduated** [1] - 4:1
**graduating** [1] - 3:25
**grant** [1] - 5:1
**great** [3] - 18:7, 27:19, 43:5
**greetings** [1] - 14:23
**grew** [1] - 5:15
**grief** [11] - 21:19, 22:5, 22:17, 28:2, 29:14, 29:19, 29:21, 39:3, 39:25, 44:11, 45:22
**Group** [2] - 6:2, 6:9
**group** [3] - 6:4, 17:6, 17:7

## H

**half** [1] - 22:19
**hallway** [1] - 14:20
**hand** [4] - 5:2, 24:1, 25:25, 26:11
**handful** [1] - 6:22
**hard** [1] - 40:7
**harm** [2] - 24:20, 24:22
**harp** [1] - 31:25
**Harris** [3] - 24:12, 24:13, 25:6
**Harvard** [3] - 4:18, 4:21, 4:24
**hate** [1] - 31:25
**HBO** [1] - 31:7
**head** [1] - 5:25
**health** [1] - 4:5
**heard** [3] - 12:13, 21:5, 27:10
**Heidelberg** [1] - 10:23
**held** [6] - 3:2, 3:4, 4:16, 4:23, 7:21, 46:7
**help** [2] - 5:14, 7:24
**helped** [1] - 13:9
**hereby** [1] - 47:3
**hid** [1] - 40:24
**hide** [1] - 40:22
**hiding** [1] - 40:25
**high** [5] - 8:15, 16:13, 16:21, 18:15, 30:17
**higher** [1] - 18:18
**himself** [4] - 14:15, 25:12, 28:16, 42:9
**Hinckley** [1] - 4:25
**hired** [8] - 9:2, 10:3, 31:7, 31:15, 31:17, 31:22, 31:24
**history** [1] - 16:9
**home** [2] - 12:15, 12:16
**Honor** [6] - 11:5, 11:10, 28:17, 30:2, 45:25, 46:3
**HONORABLE** [1] - 1:9
**honors** [1] - 6:21
**hook** [1] - 45:3
**hope** [2] - 30:12, 34:24
**hoped** [1] - 14:1
**Hopkins** [3] - 4:2, 4:5, 4:12
**Hospital** [1] - 4:12
**hospital** [4] - 4:14, 4:20, 4:21, 7:22
**hour** [3] - 15:19, 15:23, 15:25

**hours** [6] - 12:23, 14:14, 15:13, 15:15, 42:12
**HUDA** [1] - 1:17
**huda_ajlani** [1] - 1:20
**huda_ajlani-macri@fd.org** [1] - 1:20
**hugged** [1] - 21:4
**humor** [1] - 18:2
**hundred** [1] - 7:8
**hundreds** [2] - 11:1, 11:3

## I

**idea** [6] - 11:16, 13:7, 32:16, 33:2, 34:5, 43:9
**identifies** [1] - 26:20
**II** [1] - 1:9
**ill** [1] - 33:5
**impact** [3] - 21:23, 43:21, 44:10
**impaired** [5] - 18:14, 19:4, 36:15, 39:19, 39:20
**impairment** [3] - 19:12, 27:17, 41:4
**impaling** [1] - 23:25
**impatient** [1] - 16:20
**important** [2] - 24:16, 27:5
**impossible** [2] - 40:10, 40:12
**impression** [1] - 27:24
**improve** [2] - 13:9, 13:17
**in-person** [1] - 43:2
**include** [3] - 6:18, 26:21, 44:11
**included** [1] - 26:21
**includes** [1] - 18:13
**including** [3] - 12:15, 15:19, 28:13
**inconsistent** [1] - 36:11
**incorrectly** [1] - 34:9
**indeed** [2] - 8:9, 16:24
**indicated** [2] - 39:7, 39:13
**indictment** [1] - 12:15
**individual** [3] - 9:6, 40:21, 44:16
**individuals** [5] - 18:16, 22:18, 23:16, 25:19, 26:22
**industry** [1] - 7:3
**inflexible** [1] - 20:25
**influence** [2] - 14:8, 21:11
**influenced** [1] - 9:22
**influential** [1] - 7:2
**information** [5] - 15:8, 16:22, 23:19, 38:1, 42:14
**informative** [2] - 41:1, 43:7
**inherited** [1] - 13:5
**initial** [1] - 7:25
**input** [2] - 19:21, 21:8
**insane** [3] - 4:21, 7:23, 35:3
**insanity** [5] - 32:18, 32:23, 35:7, 35:15, 35:18
**Instagram** [1] - 17:9
**installed** [1] - 13:6
**instances** [1] - 24:9
**intellectual** [2] - 25:22, 43:24
**intellectually** [1] - 44:2
**intended** [3] - 40:13, 41:20, 45:23
**Intent** [1] - 34:15
**interaction** [1] - 20:20
**interactions** [2] - 14:13, 16:11
**interest** [2] - 24:8, 32:3
**interested** [2] - 21:2, 24:11
**interests** [1] - 21:1
**interior** [1] - 12:16
**internet** [1] - 12:16
**interpret** [1] - 32:21
**interview** [13] - 12:20, 12:23, 12:24, 14:14, 16:5, 16:8, 19:18, 23:11, 29:23, 31:8, 37:11, 42:22, 43:2
**interviewing** [4] - 13:9, 15:14, 15:15, 38:18
**interviews** [6] - 12:14, 13:4, 13:10, 13:16, 15:24, 16:6
**invited** [1] - 7:15
**invoice** [1] - 34:17
**involved** [9] - 8:7, 8:15, 8:22, 9:5, 9:25, 10:9, 11:18, 30:18, 30:21
**involvement** [3] - 6:14, 10:8, 12:3
**involving** [2] - 9:5, 10:10
**Island** [1] - 30:24
**issue** [3] - 21:13, 27:21, 41:2
**issues** [4] - 8:8, 8:11, 35:11, 35:12

## J

**JARED** [1] - 1:12
**jared.strauss@usdoj.gov** [1] - 1:15
**Jeffrey** [3] - 8:18, 8:20, 31:4
**job** [3] - 4:19, 5:5, 13:11
**Joel** [3] - 30:20, 30:23, 30:24
**John** [1] - 4:25
**Johns** [3] - 4:2, 4:5, 4:12
**joke** [1] - 17:21
**judge** [1] - 10:6
**JUDGE** [1] - 1:10
**Judge** [1] - 42:19
**judgment** [4] - 19:4, 27:20, 29:1, 36:17
**jump** [1] - 16:14
**jurisdictions** [1] - 10:22
**JURY** [1] - 1:8
**jury** [5] - 3:22, 8:16, 9:12, 9:22, 34:3

## K

**Kaczynski** [2] - 8:22, 31:6
**kids** [1] - 17:4
**killed** [2] - 8:21, 24:15
**killer** [6] - 30:24, 31:2, 31:20, 31:21, 32:1, 40:19
**killers** [5] - 23:12, 31:12, 32:3, 32:5, 32:8
**killing** [2] - 24:1, 24:2
**kind** [6] - 6:3, 6:8, 11:16, 36:17, 44:11, 45:7
**kinds** [3] - 14:23, 27:22, 45:22
**Klebold** [3] - 24:12, 24:14, 25:6
**knowing** [2] - 29:16, 44:8
**known** [8] - 8:23, 18:8, 31:5, 43:12, 43:13, 43:14, 43:15, 43:16
**Kuklinski** [2] - 31:6, 31:7

## L

**label** [2] - 41:3, 41:6
**laboratory** [1] - 45:3
**lack** [1] - 20:20
**Lane** [1] - 25:4
**language** [2] - 20:22, 26:21
**largely** [1] - 18:10
**last** [2] - 5:22, 21:6
**lastly** [1] - 10:9
**laude** [1] - 3:25
**LAUDERDALE** [1] - 1:2
**Lauderdale** [2] - 1:14, 1:19
**laughter** [1] - 30:16
**Law** [11] - 6:19, 7:1, 9:14, 9:16, 32:17, 32:22, 33:7, 33:10, 34:13, 34:14, 34:15
**law** [5] - 5:6, 5:7, 6:5, 11:23, 13:10
**laws** [1] - 14:6
**lawyer** [1] - 15:17
**leading** [2] - 13:13, 42:19
**learn** [3] - 13:11, 16:6, 40:18
**learned** [2] - 16:7, 20:2
**least** [4] - 13:16, 21:16, 29:21, 32:4
**lectured** [1] - 7:11
**lectures** [1] - 7:16
**left** [3] - 5:10, 5:12, 5:18
**legal** [1] - 6:7
**legislation** [1] - 14:4
**legislators** [1] - 14:5
**lengthy** [1] - 15:24
**less** [2] - 19:22, 24:14
**Level** [13] - 19:3, 19:9, 19:10, 19:21, 19:22, 19:23, 27:17, 28:23, 36:14, 36:22
**level** [1] - 19:20
**life** [3] - 16:9, 16:16, 16:19
**limited** [2] - 3:21, 45:7
**list** [1] - 12:12
**listened** [1] - 15:2
**literature** [1] - 26:2
**location** [1] - 14:19
**logistics** [1] - 16:1
**look** [3] - 20:13, 39:5, 44:21
**looked** [4] - 12:13, 19:1, 23:24, 35:8
**looking** [2] - 16:4, 38:17
**Lori** [1] - 27:10
**lose** [1] - 10:7
**lost** [1] - 10:7
**lunchtime** [1] - 15:20

## M

**MACRI** [1] - 1:17
**macri@fd.org** [1] - 1:20
**magazine** [1] - 7:3
**Malvo** [1] - 10:3
**man's** [1] - 17:9
**mandatory** [3] - 14:1, 14:2, 14:5
**Marathon** [1] - 10:10
**mark** [1] - 42:18
**massively** [1] - 36:8
**master's** [1] - 4:4
**masturbation** [2] - 23:14, 24:5
**material** [2] - 37:15, 38:22
**matter** [4] - 13:3, 21:13, 39:14, 47:5
**matters** [2] - 6:7, 7:18
**McDOWELL** [1] - 1:25
**MD** [2] - 3:9, 4:2
**mean** [15] - 17:10, 27:24, 30:13, 30:14, 31:23, 33:2, 34:17, 35:7, 38:1, 40:7, 40:9, 40:16, 41:7, 41:15, 41:17
**meaning** [2] - 6:24, 15:4
**means** [4] - 16:25, 43:24, 44:15, 45:14
**meant** [2] - 41:7, 45:21
**measure** [4] - 27:19, 38:12, 38:13, 43:4
**measures** [3] - 43:11, 43:15, 45:5
**measuring** [2] - 44:15, 45:1
**mechanism** [1] - 44:25
**media** [1] - 25:16
**Medical** [1] - 4:19
**medical** [2] - 4:1, 5:8
**medicine** [2] - 5:7, 18:8
**Medicine** [2] - 4:2, 5:24
**meet** [1] - 10:6
**men** [1] - 8:21
**mental** [5] - 5:2, 7:11, 8:8,

8:11, 13:22
**mentally** [1] - 33:5
**mention** [2] - 31:4, 31:5
**mentioned** [3] - 30:17, 30:20, 32:8
**messages** [8] - 22:8, 22:13, 26:14, 26:24, 41:7, 41:8, 45:11, 45:20
**messed** [1] - 9:19
**Mexico** [1] - 7:16
**Miami** [2] - 1:22, 1:23
**MICHAEL** [2] - 1:6, 1:17
**Michael** [1] - 12:5
**microphone** [1] - 3:14
**midst** [1] - 21:21
**might** [5] - 8:5, 15:1, 16:11, 17:3, 35:8
**mild** [1] - 9:1
**milder** [1] - 18:18
**mind** [2] - 17:23, 18:12
**mine** [2] - 31:7, 37:12
**misconduct** [1] - 13:21
**misleads** [1] - 13:14
**mission** [1] - 4:21
**mistreatment** [1] - 17:7
**mitigation** [2] - 35:11, 35:12
**mix** [1] - 11:24
**moment** [3] - 28:17, 41:23, 45:25
**moments** [1] - 16:18
**money** [1] - 15:20
**most** [12] - 6:14, 6:24, 7:2, 10:21, 11:20, 28:4, 34:25, 35:9, 35:10, 35:13, 43:12
**mostly** [6] - 7:8, 30:25, 31:19, 31:21, 35:6, 35:7
**motive** [1] - 27:8
**move** [1] - 16:18
**moved** [1] - 5:12
**movements** [1] - 20:25
**movie** [4] - 23:22, 23:24, 23:25, 25:13
**Muhammad** [2] - 10:4, 10:5
**multiple** [1] - 24:15
**murder** [1] - 31:16

**N**

**name** [2] - 3:14, 9:6
**named** [2] - 7:2, 31:16
**narrow** [1] - 21:1
**nature** [1] - 7:20
**necessarily** [2] - 44:1, 44:7
**need** [1] - 27:17
**needed** [2] - 19:5, 23:9
**needing** [1] - 19:24
**needs** [4] - 36:12, 36:16
**neurodevelopmental** [1] - 18:6
**neurology** [1] - 6:6
**neuropsychology** [1] - 6:5
**never** [2] - 10:15, 35:25
**New** [3] - 30:24, 31:2, 32:8
**new** [2] - 9:23, 9:24
**next** [2] - 4:23, 40:20
**nice** [1] - 43:11
**Night** [1] - 31:18
**Nikolas** [2] - 24:8, 28:15
**NO** [1] - 1:2
**non** [2] - 20:20, 20:22
**non-verbal** [2] - 20:20, 20:22
**none** [3] - 2:11, 2:17, 43:17
**normal** [2] - 39:16, 43:18
**normed** [2] - 43:6, 43:8
**North** [1] - 1:22
**notes** [1] - 39:5
**nothing** [2] - 28:3, 39:3
**notoriously** [1] - 4:20
**nuance** [1] - 24:12
**number** [1] - 8:4
**numerous** [1] - 12:7
**nursing** [1] - 6:6

**O**

**objection** [3] - 11:9, 11:10, 42:19
**obvious** [3] - 21:1, 27:6, 32:1
**occasions** [3] - 10:18, 14:3, 16:13
**occupation** [1] - 3:19
**occur** [1] - 15:11
**occurs** [1] - 18:9
**October** [1] - 1:5
**OF** [3] - 1:1, 1:4, 1:13
**offense** [1] - 35:4
**offenses** [2] - 7:10, 26:4
**office** [2] - 23:8, 38:3
**Office** [2] - 1:13, 1:18
**often** [3] - 11:17, 17:18, 26:8
**Ohio** [4] - 8:21, 24:8, 25:1, 25:4
**once** [2] - 16:3, 20:13
**One** [1] - 1:18
**one** [30] - 5:2, 6:1, 6:25, 7:2, 10:15, 13:16, 14:6, 15:1, 17:8, 18:14, 19:5, 20:23, 21:5, 21:7, 25:25, 26:11, 27:16, 30:10, 30:20, 30:21, 31:16, 32:7, 33:20, 35:5, 35:16, 41:23, 42:11, 45:3, 45:18
**one's** [4] - 13:17, 13:18, 43:4, 43:5
**one-on-one** [1] - 42:11
**ones** [2] - 6:24, 10:22
**open** [1] - 3:2
**opine** [1] - 35:14
**opinion** [4] - 19:11, 35:1, 35:2, 35:7
**opinions** [1] - 23:5
**opportunity** [1] - 16:6
**opposed** [2] - 19:3, 43:18
**order** [1] - 29:12
**Order** [9] - 9:15, 9:16, 32:17, 32:22, 33:7, 33:11, 34:13, 34:14, 34:15
**organization** [2] - 6:3, 6:8
**organizations** [2] - 5:25, 6:12
**origin** [1] - 18:10
**original** [1] - 11:18
**originally** [1] - 7:22
**outset** [1] - 14:16
**overly** [1] - 21:7
**overreactive** [1] - 21:8
**overruled** [1] - 42:20
**oversee** [1] - 36:1
**overturned** [1] - 9:23
**owe** [2] - 34:21, 34:22
**owes** [1] - 34:17
**own** [6] - 6:1, 12:19, 13:10, 13:17, 15:3, 23:2

**P**

**page** [1] - 17:9
**paid** [2] - 16:9, 34:19
**paper** [3] - 42:23, 43:3, 43:5
**paraphilias** [3] - 25:23, 26:6, 26:11
**park** [2] - 3:15, 11:13
**Park** [4] - 3:6, 6:2, 6:3, 11:6
**PARK** [3] - 1:8, 2:3, 3:9
**part** [1] - 19:13
**particularly** [1] - 16:12
**party** [1] - 32:6
**pass** [1] - 14:4
**passed** [1] - 14:5
**pathology** [1] - 6:6
**pattern** [2] - 25:24, 27:6
**pencil** [1] - 43:6
**Pennsylvania** [1] - 4:14
**people** [19] - 7:2, 16:12, 17:2, 17:6, 18:13, 18:14, 19:15, 22:20, 24:21, 26:3, 26:8, 28:13, 29:20, 29:22, 39:10, 41:12, 41:20, 44:1, 45:3
**per** [2] - 7:24, 11:3
**perfect** [1] - 27:24
**perhaps** [2] - 8:4, 27:23
**period** [1] - 7:25
**permission** [1] - 20:9
**person** [6] - 24:10, 38:20, 39:16, 43:2, 44:17, 44:25
**persona** [1] - 28:15
**personal** [1] - 23:2
**persuaded** [1] - 13:15
**Ph.D** [1] - 4:6
**phenomenon** [1] - 25:15
**Philadelphia** [1] - 4:15
**photographs** [1] - 12:15
**photos** [1] - 40:20
**physical** [1] - 24:10
**physician** [1] - 3:20
**physicians** [1] - 4:11
**physiological** [1] - 45:5
**place** [1] - 14:21
**plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:12
**play** [1] - 43:24
**pleaded** [1] - 32:23
**pled** [1] - 32:18
**point** [3] - 9:17, 39:18, 43:17
**pointed** [1] - 24:24
**polite** [1] - 15:5
**poorly** [1] - 14:10
**population** [2] - 43:7, 43:19
**portable** [1] - 13:24
**portion** [2] - 16:8, 46:12
**position** [7] - 3:23, 4:16, 4:19, 4:23, 11:18, 36:20, 36:22
**positions** [1] - 7:21
**possible** [1] - 13:22
**postgraduate** [1] - 4:11
**posting** [2] - 17:8, 27:2
**postings** [4] - 12:14, 12:17, 21:19, 29:20
**potentially** [1] - 9:22
**power** [3] - 24:2, 24:15, 29:9
**practice** [8] - 3:21, 5:15, 8:3, 11:22, 13:3, 13:15, 14:3, 37:5
**predecessor** [1] - 13:6
**preparation** [1] - 12:11
**preposterous** [1] - 33:3
**present** [3] - 1:25, 21:5, 28:16
**presented** [2] - 14:15, 23:21
**president** [2] - 5:1, 6:20
**pretty** [2] - 26:6, 41:11
**prevent** [1] - 5:14
**prevention** [1] - 6:11
**previous** [1] - 10:18
**primarily** [1] - 15:24
**private** [3] - 5:15, 8:2, 11:22
**problem** [2] - 9:9, 32:14
**problems** [1] - 40:15
**proceed** [1] - 11:8
**proceeding** [1] - 10:25
**proceedings** [4] - 3:2, 3:4, 46:7, 47:4
**process** [1] - 13:17
**professional** [2] - 6:12, 7:4
**professor** [5] - 4:18, 5:6, 5:20, 5:23
**profile** [2] - 8:15, 30:17

**profilers** [1] - 9:2
**profoundly** [1] - 18:13
**program** [1] - 4:11
**promotion** [1] - 5:6
**prone** [1] - 26:3
**proof** [1] - 43:5
**properly** [2] - 19:20, 43:8
**prosecution** [1] - 31:12
**prosecutor** [4] - 30:17, 31:4, 31:5, 33:3
**prosecutor's** [2] - 34:4, 34:6
**prosecutors** [2] - 11:21, 11:23
**prostitutes** [2] - 30:25, 31:2
**protects** [1] - 13:21
**PROULX** [2] - 1:21, 47:9
**proulx@flsd.uscourts.gov** [1] - 1:24
**proved** [1] - 24:7
**provide** [1] - 16:22
**provides** [1] - 5:16
**psychiatric** [1] - 22:23
**psychiatrist** [1] - 35:22
**psychiatrists** [1] - 30:11
**Psychiatry** [2] - 6:19, 7:1
**psychiatry** [13] - 3:20, 3:21, 4:10, 4:13, 4:14, 5:7, 5:9, 5:23, 6:4, 6:17, 10:18, 11:7, 14:1
**psychological** [2] - 43:3, 43:12
**psychologist** [2] - 37:1, 37:6
**psychologists** [1] - 6:18
**psychology** [3] - 3:24, 6:5, 7:9
**Public** [1] - 1:18
**public** [2] - 4:5, 18:8
**publications** [2] - 7:4, 7:8
**published** [1] - 7:6
**purpose** [3] - 15:12, 15:23, 17:14
**purposes** [2] - 13:7, 19:22
**put** [4] - 16:14, 32:20, 40:20, 42:8
**puzzle** [1] - 25:22

## Q

**qualify** [2] - 3:23, 11:6
**questioned** [1] - 24:18
**questions** [14] - 15:2, 15:3, 30:3, 35:5, 35:16, 37:21, 40:12, 41:25, 42:13, 42:14, 42:23, 44:18, 46:3
**quick** [1] - 8:14
**quite** [7] - 6:14, 6:18, 7:7, 11:25, 18:9, 28:1, 29:13

## R

**raised** [2] - 8:8, 8:11
**Ramirez** [1] - 31:18
**rank** [1] - 5:18
**rapport** [1] - 15:6
**rate** [2] - 42:18, 43:16
**rated** [1] - 28:23
**rather** [3] - 16:19, 28:23, 43:2
**reach** [1] - 18:24
**reached** [1] - 18:25
**reaching** [2] - 12:8, 19:8
**reaction** [1] - 27:22
**reactive** [1] - 21:7
**read** [1] - 19:18
**readily** [1] - 29:16
**reading** [2] - 28:25, 29:8
**Reagan** [1] - 5:1
**real** [1] - 26:7
**realized** [1] - 16:10
**really** [11] - 8:4, 14:21, 18:8, 19:11, 27:15, 36:11, 39:4, 40:7, 40:8, 41:2, 45:14
**reason** [2] - 13:3, 16:2
**reasonable** [2] - 16:3, 36:22
**rebut** [2] - 10:14, 23:9
**receive** [2] - 4:8, 12:18
**received** [3] - 3:23, 4:4, 6:21
**receiving** [1] - 23:8
**recent** [3] - 6:25, 18:7, 35:9
**recently** [2] - 11:25, 18:9
**recipient** [1] - 16:23
**recipients** [2] - 21:17, 22:8
**reciprocity** [1] - 20:19
**recognize** [1] - 44:2
**recollections** [1] - 20:11
**record** [5] - 3:14, 13:1, 16:7, 19:22, 37:11
**recorded** [2] - 42:12, 45:19
**records** [3] - 12:13, 16:10, 38:19
**Recross** [1] - 2:2
**recruit** [1] - 11:21
**recruited** [2] - 5:4, 7:24
**REDIRECT** [1] - 42:3
**redirect** [2] - 2:2, 42:1
**refer** [1] - 20:8
**reference** [1] - 25:6
**referenced** [1] - 14:10
**referrals** [2] - 11:19, 11:23
**referred** [1] - 39:21
**referring** [1] - 43:9
**refresh** [1] - 20:11
**refreshed** [1] - 20:14
**refused** [2] - 10:6, 10:7
**regard** [1] - 45:1
**regarding** [1] - 16:22
**reiteration** [1] - 17:20
**relationship** [2] - 5:2, 25:22
**reliability** [1] - 43:13
**relied** [2] - 34:4, 45:9
**rely** [4] - 18:20, 19:13, 20:16, 28:21
**relying** [2] - 29:12, 29:15
**remained** [2] - 4:24, 38:5
**remember** [2] - 23:7
**render** [3] - 35:1, 35:2, 35:7
**repeatedly** [1] - 29:17
**repeating** [1] - 20:15
**repetitive** [1] - 20:24
**rephrase** [1] - 20:5
**report** [3] - 20:8, 22:23, 23:2
**REPORTED** [1] - 1:21
**Reporter** [1] - 1:22
**requests** [1] - 11:6
**research** [2] - 5:1, 26:2
**resident** [1] - 4:12
**resonate** [2] - 44:4, 44:6
**respect** [5] - 23:5, 31:11, 34:16, 39:24, 44:5
**respectfully** [1] - 40:7
**respond** [1] - 14:23
**responded** [2] - 16:25, 17:1
**responding** [1] - 45:4
**response** [3] - 17:7, 22:16, 45:5
**responsible** [1] - 7:23
**retaliate** [2] - 17:8, 17:10
**revenge** [5] - 17:12, 17:17, 17:24, 17:25, 18:2
**reversed** [1] - 33:25
**review** [3] - 12:7, 22:23, 23:1
**reviewed** [3] - 12:10, 37:15
**Richard** [2] - 31:6, 31:18
**Rifkin** [3] - 30:20, 30:23, 30:24
**risk** [1] - 20:15
**Ritvo** [1] - 38:13
**Rochester** [1] - 31:2
**RODOLFO** [1] - 1:9
**role** [5] - 8:25, 9:1, 10:2, 10:12, 13:12
**rooftops** [1] - 40:23
**room** [3] - 14:17, 14:22, 42:9
**roughly** [1] - 10:24
**routine** [1] - 13:15
**routines** [1] - 21:1
**RPR** [2] - 1:21, 47:9
**RUIZ** [1] - 1:9

## S

**SA** [1] - 1:25
**Sahgal** [2] - 22:24, 23:3
**Sanjay** [1] - 22:24
**saw** [2] - 19:7, 20:2
**scared** [1] - 41:20
**schizophrenia** [1] - 36:7
**school** [6] - 4:1, 12:13, 16:13, 16:21, 24:8, 25:1
**School** [3] - 4:2, 4:19, 5:24
**science** [1] - 6:16
**sciences** [1] - 5:23
**Sciences** [1] - 6:15
**screening** [4] - 38:12, 38:13, 38:16, 38:21
**seated** [1] - 3:13
**second** [1] - 27:21
**section** [1] - 6:16
**security** [2] - 6:5, 7:3
**Security** [1] - 7:3
**see** [8] - 10:5, 15:25, 21:13, 26:13, 31:9, 32:21, 45:4
**seeing** [1] - 11:19
**seem** [1] - 15:20
**sense** [2] - 13:24, 19:20
**sensitivities** [1] - 43:16
**sensory** [1] - 21:8
**sent** [4] - 26:14, 26:24, 45:11, 45:21
**sentence** [2] - 35:11, 35:12
**sentenced** [4] - 33:18, 33:21, 33:23, 34:2
**separate** [1] - 26:11
**serial** [12] - 23:11, 30:24, 31:2, 31:12, 31:16, 31:20, 31:21, 32:1, 32:3, 32:5, 32:8, 40:19
**series** [3] - 9:15, 31:8, 32:4
**serious** [1] - 27:16
**served** [1] - 6:19
**set** [2] - 5:13, 32:8
**several** [3] - 9:15, 14:3, 17:2
**severe** [3] - 19:12, 19:22
**severity** [3] - 19:4, 19:20, 36:10
**sex** [3] - 7:10, 26:3, 26:9
**sexual** [7] - 23:11, 25:18, 25:23, 25:24, 27:1, 29:2, 29:5
**sexually** [8] - 23:23, 25:9, 25:16, 26:7, 26:13, 26:19, 26:23, 28:9
**sexy** [5] - 24:7, 24:19, 24:24, 29:8, 41:16
**share** [1] - 40:25
**Shellcross** [1] - 31:1
**shooter** [3] - 24:9, 25:1, 25:4
**shooters** [1] - 25:7
**short** [4] - 8:14, 9:13, 14:2, 45:7
**shortly** [1] - 32:23
**shot** [1] - 24:21
**shouted** [1] - 40:23
**show** [4] - 9:18, 29:21, 34:5, 34:10
**shown** [1] - 21:19

**shows** [1] - 29:7
**side** [1] - 41:5
**significance** [1] - 16:11
**significantly** [1] - 6:14
**similar** [2] - 12:12, 19:1
**similarity** [1] - 26:13
**simply** [1] - 14:2
**single** [1] - 35:9
**sister's** [1] - 17:9
**sitting** [1] - 42:11
**snipers** [2] - 9:25, 31:9
**social** [4] - 14:25, 20:19, 20:20, 26:7
**sociology** [1] - 4:6
**soft** [1] - 15:21
**someone** [10] - 21:20, 25:15, 25:24, 35:21, 36:3, 40:4, 40:14, 42:17, 42:23, 44:3
**sometimes** [3] - 15:3, 15:9, 39:21
**somewhat** [2] - 23:4, 36:10
**somewhere** [1] - 32:11
**sorry** [4] - 20:4, 33:21, 34:12, 38:15
**sort** [1] - 24:7
**source** [2] - 29:2, 29:4
**SOUTHERN** [1] - 1:1
**Spain** [1] - 7:16
**special** [2] - 16:10, 35:25
**specialized** [1] - 35:25
**specializes** [1] - 19:14
**specializing** [1] - 3:20
**specific** [2] - 21:3, 45:21
**specifically** [2] - 24:24, 44:5
**specificities** [1] - 43:16
**spectrum** [16] - 18:5, 18:13, 18:17, 18:19, 19:2, 19:9, 19:15, 20:7, 20:18, 21:10, 21:14, 25:18, 25:25, 26:9, 26:12, 28:21
**spell** [1] - 3:14
**spend** [1] - 16:7
**spends** [1] - 21:3
**spent** [2] - 4:22, 4:24
**spite** [1] - 27:3
**split** [1] - 11:16
**Stalker** [1] - 31:18
**stand** [1] - 10:16
**standards** [1] - 43:5
**started** [1] - 33:20
**state** [4] - 13:22, 14:6, 38:5, 39:8
**statement** [5] - 17:21, 30:13, 39:17, 44:20, 45:10
**statements** [2] - 27:13, 29:7
**STATES** [4] - 1:1, 1:4, 1:10, 1:13
**states** [1] - 10:21
**States** [2] - 1:13, 1:22
**step** [1] - 26:22
**steps** [1] - 40:22
**stereotyped** [1] - 20:24
**still** [7] - 19:24, 21:21, 32:10, 40:3, 41:18, 44:8
**stop** [1] - 17:25
**stopped** [1] - 14:2
**stops** [1] - 15:10
**story** [4] - 16:9, 16:16, 16:19, 24:7
**straight** [2] - 15:13, 15:15
**strange** [1] - 14:18
**strangled** [1] - 24:21
**STRAUSS** [1] - 1:12
**strong** [3] - 36:2, 36:4, 36:5
**students** [5] - 5:8, 13:10, 13:12, 24:15
**study** [1] - 5:1
**styles** [1] - 23:4
**subjects** [1] - 4:1
**substantial** [3] - 27:18, 36:13, 36:16
**successful** [1] - 18:15
**suffering** [1] - 22:18
**suggest** [2] - 33:2, 36:9
**suggested** [1] - 32:15
**suggestions** [1] - 26:2
**suggestive** [1] - 13:13
**suit** [3] - 36:2, 36:4, 36:6
**Suite** [2] - 1:14, 1:18
**summarize** [1] - 6:23
**summary** [1] - 19:19
**support** [8] - 19:4, 19:25, 27:18, 36:12, 36:13, 36:16
**supports** [1] - 20:17
**suppose** [1] - 35:8
**surprise** [1] - 32:6
**swear** [1] - 3:7
**sworn** [1] - 3:10

## T

**taboo** [1] - 13:14
**taint** [1] - 14:11
**taints** [1] - 13:14
**tape** [1] - 13:16
**taped** [1] - 37:13
**task** [1] - 13:25
**taught** [1] - 5:7
**taunt** [3] - 26:20, 41:15, 44:9
**taunting** [12] - 24:23, 24:25, 25:1, 25:2, 26:18, 27:7, 27:23, 28:14, 29:11, 41:12, 41:14
**teachers** [1] - 37:18
**teaching** [4] - 4:21, 6:25, 13:7, 13:9
**tears** [1] - 28:3
**technical** [1] - 38:15
**technique** [1] - 13:18
**technology** [1] - 13:23
**Ted** [3] - 24:8, 28:15, 31:5
**television** [1] - 9:15
**tendencies** [2] - 23:17, 25:19
**terms** [9] - 16:21, 17:16, 20:1, 25:9, 26:23, 29:2, 43:2, 43:7, 43:8
**test** [5] - 38:6, 38:10, 38:11, 38:14, 42:6
**test/retest** [1] - 43:13
**testified** [7] - 3:10, 9:23, 10:24, 14:7, 33:14, 33:17, 44:20
**testify** [7] - 8:18, 27:11, 31:12, 31:14, 31:21, 35:6, 35:13
**testifying** [2] - 34:22, 39:13
**testimony** [10] - 9:9, 19:8, 20:16, 32:15, 33:6, 34:1, 34:5, 34:7, 34:8
**tests** [9] - 37:23, 38:2, 38:7, 38:9, 43:6, 43:9, 43:12, 43:13, 45:3
**Texas** [1] - 9:7
**THE** [16] - 1:1, 1:9, 1:12, 1:17, 3:7, 3:13, 11:8, 11:11, 20:13, 28:18, 30:4, 41:24, 42:1, 42:20, 46:1, 46:4
**theme** [2] - 24:4, 25:9
**themes** [1] - 24:24
**themselves** [1] - 6:6
**Theodore** [1] - 8:22
**Thereupon** [4] - 3:4, 3:8, 46:7, 46:12
**they've** [1] - 34:19
**thief** [1] - 17:5
**thinking** [1] - 39:23
**thinks** [1] - 41:15
**third** [2] - 4:13, 28:7
**thorough** [1] - 42:15
**thousand** [3] - 7:23, 8:14, 11:2
**thousand-case-a-year** [1] - 8:14
**thousands** [1] - 8:13
**Threat** [2] - 6:1, 6:8
**threaten** [1] - 26:22
**three** [4] - 4:10, 27:15, 27:16, 32:16
**three-year** [1] - 4:10
**throughout** [2] - 7:15, 15:5
**TJ** [1] - 25:4
**today** [3] - 5:21, 11:24, 35:13
**took** [3] - 10:15, 14:22, 40:22
**topics** [2] - 7:6, 21:3
**total** [2] - 8:6, 8:13
**totalled** [1] - 12:22
**touched** [1] - 21:9
**toward** [1] - 25:2
**trading** [2] - 32:4, 32:8
**trainees** [1] - 5:8
**training** [3] - 4:8, 4:17, 22:15
**transcribed** [4] - 3:4, 12:19, 45:19, 46:7
**transcript** [1] - 29:7
**transcription** [1] - 47:4
**transform** [1] - 4:20
**transparent** [1] - 13:17
**treatment** [1] - 19:15
**trial** [6] - 9:23, 9:24, 10:14, 33:23, 35:13, 46:12
**TRIAL** [1] - 1:8
**tried** [1] - 14:20
**troublemakers** [1] - 17:5
**true** [2] - 17:23, 24:7
**truth** [1] - 13:20
**try** [3] - 4:20, 11:24, 37:20
**trying** [4] - 4:22, 31:20, 40:15, 43:4
**Tsarnaev** [1] - 10:13
**turn** [1] - 19:14
**turned** [1] - 9:20
**turning** [1] - 25:2
**TV** [3] - 9:18, 31:8, 34:5
**twice** [2] - 17:6, 37:12
**two** [13] - 4:11, 4:22, 4:24, 9:1, 12:22, 15:22, 24:11, 25:20, 26:10, 26:25, 27:4, 36:1, 43:25
**type** [1] - 28:21
**types** [1] - 44:17
**typically** [1] - 16:7

## U

**U.S** [2] - 7:15, 10:21
**UCLA** [1] - 5:23
**unable** [1] - 27:21
**Unabomber** [2] - 8:23, 31:5
**uncommon** [1] - 25:15
**undergraduate** [1] - 3:24
**underlying** [1] - 27:8
**underreactive** [1] - 21:8
**understood** [4] - 21:18, 28:5, 28:10, 42:13
**UNITED** [4] - 1:1, 1:4, 1:10, 1:13
**United** [2] - 1:13, 1:22
**universities** [2] - 5:4, 5:21
**University** [5] - 4:2, 4:14, 5:5, 5:10, 5:19
**unless** [1] - 11:8
**unreasonable** [2] - 30:13, 36:20
**unusual** [3] - 25:24, 37:1, 37:3
**unwanted** [1] - 44:9
**up** [8] - 3:7, 5:13, 9:19, 17:6,

32:13, 39:5, 42:14, 45:3
**upset** [1] - 44:9
**useful** [1] - 15:10
**usual** [2] - 14:23, 14:25

## V

**valid** [1] - 43:14
**validity** [2] - 43:9, 43:15
**value** [4] - 41:8, 41:11, 42:25, 43:2
**varied** [1] - 11:18
**variety** [1] - 43:14
**verbal** [3] - 20:20, 20:22, 45:1
**version** [1] - 9:13
**victim** [5] - 27:6, 27:7, 27:22, 28:14, 44:7
**victims** [9] - 21:23, 24:23, 25:2, 26:19, 26:20, 29:10, 29:11, 29:14, 45:21
**video** [6] - 13:6, 19:17, 36:25, 37:1, 37:6, 37:10
**videotape** [3] - 12:24, 13:4, 13:16
**videotaped** [2] - 14:14, 37:12
**view** [2] - 28:1, 40:17
**villains** [3] - 26:20, 28:10, 41:15
**violence** [3] - 5:14, 6:10
**violent** [3] - 7:9, 23:17, 25:19
**Virginia** [6] - 5:5, 5:11, 5:19, 8:1, 11:19, 13:5
**voluntarily** [1] - 17:3
**vs** [1] - 1:5

## W

**waiting** [1] - 10:14
**warranted** [1] - 20:1
**watch** [2] - 13:10, 19:17
**watching** [2] - 13:10, 25:12
**weeks** [1] - 16:1
**weight** [1] - 27:19
**whereas** [2] - 28:1, 37:14
**whole** [2] - 19:17, 21:2
**widely** [1] - 43:13
**WILCOX** [6] - 1:17, 11:10, 30:7, 41:23, 41:25, 42:19
**Wilcox** [1] - 11:9
**wild** [1] - 17:4
**Wisconsin** [1] - 8:21
**wish** [1] - 37:3
**Witness** [1] - 2:2
**witness** [1] - 10:15
**witnesses** [1] - 10:14
**woman** [3] - 9:6, 24:1, 32:22
**word** [2] - 17:10, 29:18
**words** [2] - 21:14, 22:14
**workplace** [3] - 5:14, 5:15, 6:10
**world** [3] - 21:2, 26:7, 28:16
**writing** [2] - 4:7, 23:4
**written** [3] - 38:21, 42:17, 44:22
**wrote** [1] - 39:5

## Y

**Yates** [6] - 9:6, 9:21, 32:12, 32:15, 33:18, 34:4
**year** [10] - 4:10, 4:13, 4:24, 7:24, 8:2, 8:4, 8:5, 8:14, 11:3, 36:1
**years** [8] - 4:12, 4:22, 4:24, 5:22, 6:13, 6:20, 11:25, 35:10
**York** [2] - 30:24, 31:3
**Yorker** [1] - 32:9
**young** [1] - 17:9

## Z

**zero** [2] - 42:18, 42:24