IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**FORT LAUDERDALE**
CASE NO. **19-CR-60056**

---

**UNITED STATES OF AMERICA**,
Plaintiff
vs. **March 2, 2020**

**BRANDON MICHAEL FLEURY**,
Defendant.

---

**SENTENCING HEARING**

BEFORE THE HONORABLE **RODOLFO A. RUIZ, II**

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF: UNITED STATES OF AMERICA
**AJAY ALEXANDER**, AUSA
**BERTHA R. MITRANI**, AUSA
United States Attorney's Office
500 E. Broward Blvd, Suite 700
Fort Lauderdale, FL 33394
(954) 356-7255
Ajay.alexander@usdoj.gov
Bertha.mitrani@usdoj.gov

FOR THE DEFENDANT: BRANDON MICHAEL FLEURY
**SABRINA D. VORA-PUGLISI**, AFPD
Puglisi Law
40 NW 3rd Street, PH1
Miami, FL 33128
(305) 403-8063
Puglisilawfirm@gmail.com

REPORTED BY:
**GIZELLA BAAN-PROULX**, RPR, FCRR
United States Court Reporter
400 North Miami Avenue, 8th Floor
Miami FL 33128
(305) 523-5634
gizella_baan-proulx@flsd.uscourts.gov

Also present:
**CAMERON McDOWELL**, SA FBI; **BOEMAN WONG**, SA FBI

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DR. LYNDA GELLER, | 66 | 87 | 96 | |

**G O V E R N M E N T E X H I B I T S**

(None)

**D E F E N S E E X H I B I T S**

(None)

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

**THE COURT**: Good morning, everyone, please be seated. We're here this morning in case number 19-60056. This is the matter of the United States of America versus Brandon Michael Fleury. If I could get everyone's appearance for the record, please, on behalf of the government.

**AUSA ALEXANDER**: Good morning, Your Honor, Assistant United States Attorney Ajay Alexander, on behalf of the United States. With me at the government's table is FBI Special Agent Cameron McDowell, Assistant US Attorney Bertha Mitrani, and FBI Special Agent Boeman Wong.

**THE COURT**: Good morning to you all.

And on behalf of Mr. Fleury?

**MS. VORA-PUGLISI**: Good morning, Your Honor, Sabrina Puglisi on behalf of Brandon Fleury, who is present.

**THE COURT**: Good morning to you and, good morning, Mr. Fleury.

So we are here this morning for the sentencing of Mr. Fleury. I've had an opportunity to review the numerous reports that have been filed, the motions that have been filed, the video that has been submitted as well as all other materials, namely all of the evaluations that were done of Mr. Fleury, if my count is correct, I believe it's somewhere along the lines of five in total.

What I think we should begin with is the calculations and we will move first through the criminal history category which my understanding has no objection, and then we will talk about objections to the Presentence Investigation Report that ascertained the total offense level of 25.

10:15

So, again, the total offense level is 25, the criminal history category is one. That brings the advisory guideline range to 57 to 71 months. As we know, the statutory provisions for each of the counts is zero to five years. There is also the potential for supervised release of one to three years, a potential fine of 20,000 to $200,000, the issue of restitution, which we will address later, and special assessments of $100 per count.

10:15

So the first thing on the history category, am I correct that the government does not have any objection to the criminal history category of one, given that Mr. Fleury really has had no contacts with the criminal justice system?

10:16

**AUSA ALEXANDER**: That's correct, Your Honor.

**THE COURT**: And am I correct also that the defense has no issue with that calculation?

10:16

**MS. VORA-PUGLISI**: Correct.

**THE COURT**: So let's talk a little bit about the total offense level and, more particularly, the objections. So the objections to the Presentence Investigation Report are

10:16

as follows: The majority of the objections relate to offense conduct, specifically paragraphs 4, 8, 23, 24, 26, 35, 36, 40, 41, and 43.

Now my understanding, Ms. Puglisi, is that the majority, again, of those objections deal with language that's used by probation and characteristics of the offense conduct and the words that were used whether to be threatening, harassing, intimidating. For instance, paragraph 43 took issue with the term "boasted."

Am I correct that that's really the thrust of all of those objections?

**MS. VORA-PUGLISI:** That's correct, Judge, it doesn't affect the guideline calculations in any way, but, yes, it's more to the use of those conclusory type words.

**THE COURT:** Mr. Alexander, any brief response as to that? I suspect that one of the main concerns, and probation raised this in their response, is that this accurately depicts or summarizes not only the terminology used during trial, but some of the language that has characterized this case from its inception; is that correct?

**AUSA ALEXANDER:** That's correct, Your Honor.

**THE COURT:** So I tend to degree to agree that this should not be affecting any calculations or, really, specifically, this should not have -- these issues should not have any impact on sentencing. They're not going to be taken

into account at sentencing, so no finding is really necessary as to these terms because it's not going to impact the offense level.

That being said, I do want to note for the record that I believe that these terms do accurately depict the conduct in this case. My memory of the trial, and what the testimony was, not only that, but some of the language I think in the initial FBI interviews with Mr. Fleury were properly captured in these paragraphs. So I do not believe that a formal resolution of them is necessary.

I don't need to formally rule in favor of the government because they're not going to impact the calculations, but I do want the record to reflect that I don't think that they are in any way editorializing, if you will, what happened. And before I continue, just to make sure the record is clear, who do we have here on behalf probation.

**PROBATION:** Good morning, Your Honor, Shannon Culberson on behalf of probation office.

**THE COURT:** Thank you, Ms. Culberson.

So that being the first set of objections that we resolved, brings us then to paragraph 42, which I noted is, as a specific objection, different from those we just discussed. Those were comments made by the defendant to case agents regarding key evidence as to his motivation and, to

10:19 me, it does seem that that is an accurate statement of what was going on, the mental state and the motivation. It was probative of that. It was a comment regarding the sexuality behind some of what happened in this case.

Ms. Puglisi, is that just really a characterization issue on 42 that you don't believe impacts sentencing as well?

**MS. VORA-PUGLISI**: Yes, Your Honor.

**THE COURT**: I don't know if there's any response from the government on that one.

**AUSA ALEXANDER**: For the reasons you've just outlined, Your Honor.

**THE COURT**: Again, I do not believe it will impact sentencing, but to the extent it even has any consideration, I want the record to reflect, as I have done with every one of the objections, that I would find that properly characterizing his statements, Mr. Fleury's statements to the FBI. And I would rule in favor of the government to the extent that it even had an impact to play.

Again, I do not believe that any of these objections, and that, again, is 4, 8, 23, 24, 26, 35, 36, 40, 41, 42, and 43, will ultimately affect sentencing. These disputed issues aren't going really to be taken into account.

So that brings us then to the next subset of objections, and these objections really are encompassed in

paragraphs 52, 58, 64, 74, and 117. And this deals with the two-level enhancement under 3A1.1(b)(1) for vulnerable victim, specifically, we know under comment number two of 3A1.1. We're talking about folks that are otherwise particularly susceptible to the criminal conduct.

10:21

Now, I understand we need to make a record on this and I want to address it. Ms. Puglisi, I would just share with you that I find it almost incomprehensible how we could make an argument that this is not the textbook of a vulnerable victim. These individuals were specifically chosen due to the tragic loss of their children at the Marjory Stoneman Douglas shooting.

10:21

So I know that there may be an argument made here that he didn't understand, and I think that's really what the thrust is, that there's been a common thread here about his intent, much of which was rejected by the jury, but there has been an argument here about his inability to empathize and the fact this has been -- and the defense, as you described, is mere trolling, and I disagree with that. I think this is far beyond what a troll would do on the internet.

10:21 10:21

But, be that as it may, am I correct that this really is about his mental state and intent, that he could not have foreseen them to be vulnerable? Can you address that?

10:22

**MS. VORA-PUGLISI:** Correct, Judge. And as you can

see from what I wrote, I didn't really focus on that first element. I put it in there, but I really focused on the second portion of it, which is the requirement that he knew or should have known.

10:22 And what I'd like to do, Judge, is present testimony in the form of Dr. Lynda Geller here this morning, because I do believe that the doctors that presented testimony in the trial got it wrong. The defense doctors were not qualified to give testimony about autism and neither 10:22 was the government doctor, and so I do believe it's important that we be able to lay the record to show this Court, to explain to the Court, really what we believe is the correct thrust of autism and the arguments surrounding it so that the Court can make what I think would be a more informed decision 10:22 than just what the Court heard during the trial.

**THE COURT**: Okay. Now, you would agree with me that we have Dr. Segall (ph.), Dr. Dietz, Dr. Gutierrez, and Dr. Butts. I know that you've brought forth the fifth doctor, Dr. Geller, and my understanding, correct me if I'm 10:23 wrong, is that Segall, Dietz, Gutierrez, and Butts, all have, in one way or another, stated that Mr. Fleury, although perhaps does not -- he does not have the empathy due to his autism spectrum disorder, he does not suffer from accompanying intellectual impairment or an accompanying 10:23 language impairment.

10:23

There's been some dispute over the severity level, whether it's a two or a one, but my understanding is that all of the doctors, prior to Dr. Geller, have at least agreed that he understood the wrongful nature of his conduct, am I correct in that? He may not have had, in your view, the empathy, but he knew it was wrong, and I think the record supports that he collected information about every single one of these victims, arguably laid in wait until the first holiday, the Christmas holiday they would spend without their children for the first time since the shooting, and then decided to engage in the stalking behavior and the intimidation behavior during that range of time.

10:24

So I understand the argument that Dr. Geller may talk a little bit about empathy, but from a standard of proof and what the government must show by a preponderance of the evidence, how would anything Dr. Geller shares with me affect me finding these victims vulnerable?

10:24

Can you tell me because I just don't see how anything she can share with me would change that? Now, you can talk to me about variance. You can talk to me about guideline issues because of his mental state and his autism spectrum disorder, but to be able to find them actually vulnerable, do I not have enough in the record for that.

10:24

**MS. VORA-PUGLISI:** Well, Judge, she's not going to speak about whether they're vulnerable, because they're

10:24

vulnerable. We're not addressing that. The Court has found that they are vulnerable.

**THE COURT**: I want to make sure before I make a ruling on that. I didn't know if you thought that there was going to be testimony from Dr. Geller that would support a finding that they are not.

**MS. VORA-PUGLISI**: We will not be addressing that. She is only going to be speaking about whether Brandon had the knowledge, and I will say that all of the doctors that testified, with the exception of Dr. Butts, said that he could appreciate it.

What I will point out, though, is that none of those doctors have the specialty of autism and that's the problem. It is undisputed that everybody has said that Brandon has autism spectrum disorder. There's no question about that. But these are not specialists who could really explain how autism affects any particular individual, especially with Brandon, and I am not trying to have Dr. Geller get up there and say that what he said to Dr. Dietz, let's say in his interview, is not what he told me. In fact, she's going to say he told me the same things. I just elaborated upon them.

The problem is that these doctors took the information that they received and they misinterpreted it. And that's the problem that we have, and I think that it is

imperative that the Court can really understand that it's not about his intellectual ability or his ability with language, but it's about that social understanding and to know that somebody else is a victim, you have to appreciate that they're a victim. You have to appreciate emotions, and their understanding of that, and that is what he lacked.

He lacked the ability to appreciate the emotions of other people, and that's what's important here when determining that second element which is whether he knew or should have known.

**THE COURT:** Okay. Mr. Alexander, do you want to respond to this and we can go from there? Go ahead.

**AUSA ALEXANDER:** Your Honor, the government strongly disagrees with the representation made by the defense in this case. I was there during the course of the trial, as you were as well, Your Honor.

As the Court can see, I'm one of the only four attorneys that were actually trying the case that are still here. And the reality is this: The evidence was more than overwhelming that this defendant knew.

The whole point of this case was that he was targeting the victims because of the loss. He was sexually aroused by Nikolas Cruz, had been studying the Marjory Stoneman Douglas shooting since it transpired on February 14, 2018.

10:27 He waits until Christmas before he actually attacks them, and during that period of time, as you noted, Your Honor, he's saving photographs of the victims. He's cropping out one of the victims who ended up being the recipient of the majority of the messages.

He is then saving social media posts where they're talking about how much they miss their loved ones. He's saving it onto his tablet. He's saving comments by other people talking about how much they miss their loved ones and 10:28 how they sympathize with the victims in the case, and yet, all of a sudden, for what appears to be an attempt to relitigate the very issues that were tried at trial, this is just an attempt to give the defense an opportunity to say, well, he was oblivious, he had no idea. That's not taking 10:28 responsibility, Your Honor.

The jury came back and made it very clear he knew what he was doing. The evidence was overwhelming that fact, and I looked at Dr. Geller's report and it's also very clear that she operated within a closed universe, based on what she looked at.

She didn't look at any of the trial testimony. Nothing in her report suggests she looked at the exhibits themselves. She didn't interview the victims in the case. So, essentially, it was just give her a closed universe and 10:28 allow her to go ahead and testify.

10:29 And what's even more important, Your Honor, is Dr. Dietz, he recorded his entire interview. So you have a transcript, we all do, and I'm not sure -- and we gave a copy of the actual video to the defense. I watched the whole 8-hour video.

I can tell you, Your Honor, you can see exactly how this defendant is responding. It's his own words. It's not as if these are leading questions and someone is feeding him these answers. This is him.

10:29 Dr. Geller, for whatever reason, decides she's not going to record her interview. And I understand the defense, and I asked about a video recording and said, "Well, it happened at the jail," except we do know that there was a video allocution that was done, arrangements were made for 10:29 the defendant to be at the courthouse and for him to have a video recording so he doesn't have to speak in court.

How come the same wasn't done for this interview? I have some notes that a lot of it has unfinished sentences and are not a complete recitation of all the facts, but yet, 10:29 we're going to take her word that she's the expert at the eleventh hour. And I was present at the calendar call, Your Honor, and I apologize if my recollection is incorrect.

I don't recall that the defendant said that their expert is was going to -- they said reevaluate the defendant 10:29 on everything. I thought it was more focusing on the

mitigation aspect as these are alternatives to incarceration.

That's the whole point of getting this expert, the fifth expert, the third defense expert. Because as you noted, Your Honor, Dr. Segall, Dr. Dietz both say that this defendant knew exactly what he was doing. He just didn't care. Dr. Segall was the defense expert and the difference between Dr. Segall and Dr. Dietz is that they're both medical doctors.

The defense then hires two psychologists because, let's be candid, they're not going to hire another psychiatrist at the risk that it's going to end up being just like Segall and Dietz.

So we now have two psychologists, and this idea that Dr. Dietz is wrong because he's not a specialist, if you read his report, Your Honor, he consulted with a psychologist who was an expert in the autism spectrum disorder, so he's not oblivious to exactly what a psychologist will say and do. That psychologist reviewed the entirety of Dr. Dietz's interview and looked at the record as well.

So with that being the case, it seems like we're just wasting time here relitigating an issue that had already been presented to the jury.

The vulnerable victim enhancement it sounds like it's going to apply, or at least the defendant is pulling back. So they want to make argument on the variance motion,

let them argue on the variance, but to have her testify here and for us to do cross-examination and direct, Your Honor, you remember my cross-examination, I'm pretty sure you know how long-winded that was. I'm going to end up doing the exact same thing here on a matter that is not going to be pertinent to the ultimate disposition of his case, and, quite frankly, it is a waste of time.

So I would ask the Court to make a determination that the enhancement applies and if the defense wants to argue orally about this applying for a variance, that's fine. The witness testimony is not necessary.

**MS. VORA-PUGLISI**: Judge, can I respond, please?

**THE COURT**: Yeah, briefly.

**MS. VORA-PUGLISI**: First of all, it's not a waste of time when the government is seeking a 20-year sentence.

**THE COURT**: We'll get to that a moment.

**MS. VORA-PUGLISI**: So it's not a waste of time. And I didn't bring Dr. Geller to repeat the same things or to give us a second bite at the apple. I brought somebody whose qualifications are completely different than the people that testified and previously evaluated Brandon.

This is a person who spent 30 years studying autism. Studying all aspects of it. How the field has changed over those years. Yet, none of those other people did and the government says that Dr. Dietz, he admitted he

didn't have expertise, but he consulted with somebody.

He just said that the person looked at the entirety of the record. That is not true. Dr. Dietz did not say that in his report. He said he consulted with somebody, but he doesn't say what he showed that person, did that person watch the whole 8-hour interview? It doesn't say that. It just said they consulted with somebody who was a specialist in the field.

And, you know, Dr. Segall, I mean, that report is ridiculous. It's five and a half pages long. That's it. He doesn't say he performed any testing on Brandon. He doesn't say -- he says he gave him a long interview. But we don't know how long the interview was. We don't know what he reviewed before he did the interview and conducted his analysis. It's the worst report I've ever seen from a doctor, I mean, honestly.

**THE COURT**: Well, here is what's going to happen on this point. I have to agree that we are essentially relitigating things that were proven in front of a jury. I understand we can sit here now and, in hindsight, try to look at the veracity of some of these medical opinions, but we are here on a very narrow issue at this point in the sentencing and that is whether or not vulnerable victim has been properly applied.

If you look at all the case law on this point, and

I'll just cite a few for the record from my 11th Circuit, the case of United States versus Birge, 830 F.3d 1229, which, again, just reminds us that we don't even look at the word "targeted," we just have to make sure that the vulnerable victim enhancement applies so long as the defendant knew or should have known that a victim of the offense was a vulnerable victim, and that's citing straight to the 3A1.1(b)(1).

The Franks case also discusses this, and that's United States versus Franks, 247 F.3d 1257. The Frohlich case, which was also brought up in the 8th Circuit, talks about it, and that's 737 F.3d 527, and the Malone case from the 11th Circuit, 780 F.3d 518.

The bottom line is I don't think there's a universe under which any testimony from any psychiatrist, psychologist or anybody would change the application of vulnerable victim. The record at trial and the statements made by defendant himself indicate that these individuals were not targeted at random. They were not selected at random.

In fact, it would make no sense just based upon the defendant's conduct. He impersonated Nikolas Cruz knowing what had happened at Marjory Stoneman Douglas. He made sure to reference, I reviewed all of the Instagram messages at trial, it's very clear he knew who had been -- who had passed away, who had been a victim. He knew these were parents of

10:35 10:35 10:35 10:36 10:36

those individuals, or sisters or siblings. To me, it just -- it is the very definition of an individual who's been selected for this type of cyberstalking and threat because they have suffered a loss.

I mean, that is the thrust of it. The testimony at trial showed it. The statements to different psychiatric evaluators have shown it. There's just not a universe where the preponderance of the evidence standard has not been met to apply vulnerable victim.

Now, I agree, we can hear some of Ms. Geller's views and how that may impact his emotional range, his diagnoses from other doctors, his ability to understand what his actions did to these individuals. All of that can be argued under the rubric of 3553(a). That is a variance argument to be made. But this is a more technical issue as to whether or not this has been a properly applied enhancement of the two points.

I think the evidence at trial made that very clear and, quite honestly, to relitigate that through an expert at this point would turn the application of that enhancement on its head, and it was established at trial.

So, I mean, in fact, the entire modus operandi of Mr. Fleury was to seek these victims out because of their suffering. There is no other way to interpret the evidence. That was very clear to the Court.

20 of 160

So I am going to, to the extent there is a formal objection to the application of vulnerable victim, I will be resolving that objection in favor of the government finding that the vulnerable victim enhancement of two points is properly applied. That would resolve paragraphs 52, 58, 64, 74 and 117, which were the remaining objections to the PSI.

10:36

So with that being said, I think I have resolved all of the outstanding objections made by the defense by my count.

10:36

Any other paragraphs I may have missed, Ms. Puglisi, and those are the technical objections?

**MS. VORA-PUGLISI:** Yes, Judge, one -- and before I get there, Judge, very briefly I just want to make it clear that I understand the Court's ruling. And while I didn't focus on the first portion of the person being a vulnerable victim because I understand the Court's ruling, I am not saying that the defense agrees that these were vulnerable victims.

10:37

So just for appellate purposes, and I want to make sure it's clear that we would be arguing both of those two elements to the enhancement.

10:37

**THE COURT:** Okay. That's fair. So was there another paragraph I may have missed?

**MS. VORA-PUGLISI:** Yes, Judge, it was paragraph 3, it is the very first one. And while I understand that this

10:37

doesn't affect the guideline, again, we would -- I think it could make an effect of the Court if Your Honor were to think that Mr. Fleury's father wouldn't be willing to comply with conditions of the Court or anything in the future, and so, you know, he says that at no time did he make the statement that he wants to give his son a laptop so he can listen to music and go on social media. I just want to make that clear for the record.

**THE COURT**: Okay, and I will say this, I mean, again, it will not impact sentencing, it's not going to impact any type of conclusion when it comes to Mr. Fleury's -- his father being able to play a role here in rehabilitation. But that's noted. I don't know if you want to address that, Mr. Alexander. Again, it will not play a role, though, in the Court's ultimate sentence.

**AUSA ALEXANDER**: No, we're fine.

**THE COURT**: So with that being said, the Court has now disposed of all objections for the record, the Court has received no objections as to criminal history category 1. So we do find ourselves now properly calculated in the range of 57 to 71 months.

Now, we should address what are competing variance motions. Now let me ask briefly, because I don't know necessarily if it was done under a formal departure ground of 5K1.1. My understanding, Ms. Puglisi, is you are truly

seeking a variance, you don't have -- correct me if I'm wrong -- there's not a formal departure motion that has been filed, am I right in that?

**MS. VORA-PUGLISI**: I didn't, Judge, and in looking at it, the conditions are much stricter --

**THE COURT**: They are.

**MS. VORA-PUGLISI**: -- under that. So because it doesn't matter at the end of the day, I could get a downward variance without that, and I've seen cases that actually talk about both and say, but, you know, under a variance you can argue it this way. I'm not even going to, you know, waste the Court's time.

**THE COURT**: And I appreciate that. I will, for the record, note that I don't believe departure is authorized under these facts. Even if it were, I would exercise my discretion not to depart, but I suspect that as much as Ms. Puglisi really was going to focus on 3553(a), but so the record is clear there is no departure ground.

So that now leaves us with what I expected to be the fundamental focus of today's sentencing, and that is two very, very disparate recommendations. We are looking at a recommendation for a variance from the defense of something along the lines of probation with no incarceration. Conversely, we're looking at a government motion for upward variance for the statutory maximum of 20 years.

10:40 I think the easiest way to go about doing it, because I think from the defense end there will be more testimony they may want to put forward, whereas the government is going to perhaps focus just on the conduct established at trial, is to handle the government's motion first. I can make a ruling on that and then hear the defense's motion. Then we can get into any more formal allocution. I can hear from any victims during the government's presentation during the variance that they're arguing for, I can do that. 10:40 I know that some individuals I think have submitted letters, Mr. Alexander, where some may want to testify.

But let us handle what I believe is docket entry 160, which is pending motion for upward variance. So I will 10:40 tell you this before you begin, Mr. Alexander, I know that you are arguing passionately for a sentence that maxes five years, I believe, per count, which would make the four counts 20 years; am I right in that?

**AUSA ALEXANDER**: That's correct, Your Honor.

10:41 **THE COURT**: So you can understand that I find that to be a difficult proposition, and I want you to tell me a little bit how you want to navigate this knowing at least where the Court's coming from. This is, in my opinion, a very serious offense and there are major factors here that 10:41 I'm looking at, especially not only for the individual

defendant, but when it comes to deterrence, general deterrence. I think we have come to a point in our society where this kind of crime not only is unacceptable, but to simply argue that no one was physically impacted when they were clearly emotionally manipulated, haunted or tortured, would be inappropriate.

So I want to start out by saying I take this very seriously. I also want to start off by -- on this point, by saying this is not the trial of Nikolas Cruz, and that's important. And I say that because that trial is going on down the street, and this is probably the first chance that these victims, vulnerable victims without a doubt, in the Court's mind, are seeking closure. It's not the closure they ultimately will seek in the criminal case that's ongoing in state court, but it is closure for what has been, no doubt, repeated torment for a while, that put them in serious fear. I was here, I listened to every single one of those victims testify.

But as you know under 3553(a), I have to look at not only the nature and circumstances of the offense, but the history and characteristics of the individual, and I have an individual with a criminal history category 1, with well-documented issues regarding, you know, autism spectrum disorder, and that is not an excuse for all the behavior, but it is a consideration.

And looking at the nature and circumstances of the offense, it is difficult for me to find that a statutory maximum sentence, which I think you would agree, would probably be the highest sentence given in the United States in any sort of crime for this offense. I don't know if I've found another one, I know the defense provided some statistics. It would be difficult for the Court to get my hands around such a heavy sentence for this individual.

I'm not saying that I'm sold by the defense's proposition for a non-incarceration term. Don't get me wrong. But you're asking me to go from 71 months, which, ballpark, is six years or seven years or so, to 20 years.

So with that being said, walk me through some of your argument on that. Go ahead.

**AUSA ALEXANDER**: And, Your Honor, before I begin, I would note to the Court that I do have one victim impact letter and I have two witnesses who are here, two victims who are here who would like to give statements.

**THE COURT**: I want to hear from both victims and I want to hear the letter as well. You decide how you want to proceed, if you want to read them first or after your presentation.

Go ahead.

**AUSA ALEXANDER**: But it will be at least right now.

**THE COURT**: Yes, absolutely.

**AUSA ALEXANDER:** We'll be doing that at the very end, Your Honor.

**THE COURT:** Okay, go ahead.

**AUSA ALEXANDER:** One of the most difficult things about this trial was wrapping our heads around everything, all the minute details and everything, and this is the reality, Your Honor. What happens today will forever change what happens for these victims. And the question to ask is where do we stand. Where do we stand as a district? Where do we stand as a community? Where do we stand as a nation? Where do we stand as human beings? The outright depravity that was exhibited in this case cannot be ignored.

Now, I looked at statistics that the defense cited and I have a lot of issues with that because the reality is, Your Honor, you can't quantify these types of cases. You know that. Certain cases are going to be run-of-the-mill basic cases. Drug cases, you can pretty much summarize them by quantity. Robbery cases, you can look at the loss amount, and whether or not a firearm was also used.

How do you quantify this? Well, Your Honor, let's look at some of the factors that are not quantified in the defense's statistics.

Number one) we look at the victims in this case. You can't quantify victims. You want to put a number on them, sure. You want to put the number seven, you want to

put eight, nine, ten? But look at what's -- what makes them the victims. In this particular case, Your Honor, we looked at the charged and uncharged victims, and there are four victims that stood out to me in this case. Lexie Sealy, Jesse Guttenberg, Cameron Kasky and John Doolan. What was important about these four people? They were in school. They were in high school when the Marjory Stoneman Douglas shooting occurred. They were survivors. And at the time the defendant hacked them they were in high school. How many of the victims in these cases that the defense cites are high school victims? The defendant knew they were in high school, Your Honor. That's clear as day. He was stalking them. He was stalking high schoolers.

And in addition to that, he's attacking the parents who lost high school students. That's what changes this. These are kids. And no child should have to go through what transpired on February 14th, 2018. The trauma, the counseling, the horror of knowing that their loved ones will never come back. And that the school that they attended will forever be the place where it transpired. That the deranged psychopath walked in with an AR-15 and gunned down 17 people.

The rest of us who are not there, who were not present, who did not know anyone at Parkland, we know what Parkland is. But unless you lived through it, you don't really know what it is.

At trial, Your Honor, you saw the victims take that stand and testify. How many of these individuals in these statistics went to trial? That's what sets it apart as well. You have high school victims. And you have some of them who testified. Lexie was 16 years old when she took that stand. You have a high school kid who was forced to face the defendant, someone she genuinely believed aspired to be the next school shooter, and I will get into that in a moment, Your Honor, but as the record will show, these victims were absolutely right, and that's what makes this so dangerous, is that we have an individual who aspires to be, who fantasizes about the harm that was inflicted. This defendant is sexually aroused by school shooters. He's sexually aroused by serial killers. His own words. His own words, Your Honor.

Your Honor, I had submitted Government's Exhibit 6A, 6B. I just want to confirm the Court has had an opportunity to review them.

**THE COURT**: I have.

**AUSA ALEXANDER**: If it will save the victims, I won't play them, but as you can tell, Your Honor, they are clips of Dr. Dietz's interviews. It's the defendant's own words, the way he's talking about the masturbation, the ejaculation. This is him. He's sexually aroused by these killers, and the ones that stand out are T.J. Lane, Eric

Harris, Dylan Klebold, both of whom are the Columbine shooters, and Nikolas Cruz. Your Honor, these four, what unites them? They are high school shooters. He's sexually aroused by those who murder high schoolers. The FBI even asked him, "Well, what about Adam Lanza, the Sandy Hook shooter?

"He's boring. Elementary kids don't really intrigue me.

"How about Stephen Paddock, the old man that shot 50 people in Las Vegas?

"Oh, he's boring.

"What about Elliot Rodger who went on this rampage because he's sexually frustrated in California and he killed college students?

"He's boring."

That's what stands out, Your Honor. And we know what's the motivation of this defendant because we know that he was bullied in high school. And Dr. Dietz pinpointed this to the point where the obvious parallel between Eric Harris, Dylan Klebold, these high school shooters, T.J. Lane, they were all bullied in high school. This is the defendant displacing the anger and animosity he feels towards what transpired in high school and it's risen to a level of sexual arousal. That's what changes the analysis. That's what changes the arguments. That's what changes the reason we are

here today.

The government doesn't ignore the reality that the stat max is a very heavy sentence. In my career, Your Honor, I've only ask stat max one other time. In that case, it was granted, but this one is a serious one. This is a very serious request. And I'm not blind about that reality. I'm not blind about my responsibility representing the United States of America, but I'm also very cognizant of my responsibility to represent the United States of America who, in this case, is versus Brandon Michael Fleury.

**THE COURT**: Can I ask you something, Mr. Alexander? Are we focusing on this sentence on what could have been, because I agree with you. An argument could be made that if you hear the defendant's family and friends and the psychologists that they have retained say it, this is a gentleman that would not hurt a fly, right, but as you pointed out, there are some very disturbing trends by what was seen, what arouses him, what could have been had the FBI not decided to go into that house that fateful day and take him into custody.

But one of the things that causes me concern is there is a parade of horribles that I think would have absolutely been a possibility had this gentleman not been taken in, given the bullying, given all the patterns that we see here, but at the same time, we averted what the

government believes would have been some sort of a disaster, whether another school shooting or otherwise.

Do you believe that we are at a level where having stopped short of that kind of trauma, having another tragedy in this country with another unjustified school shooting, that we can take this case and turn it into one of those cases, because that's my concern is we are seemingly given him or asking for a statutory maximum for events that, fortunately, were, in my view, averted.

Isn't that something that is at least some concern to the government, that we are going to go that heavy-handed on someone that we have, I believe, stopped from committing further crimes?

What do you think about that?

**AUSA ALEXANDER:** Well, the question becomes, Your Honor, how do you define "stopped"? We stopped him to the extent that he was taken into custody. The question is, at some point in the future, the shackles will be removed. He will be released. He will be somewhere. And based on what motivates him, based on what aspires him, the fact that sexual arousal is a physiological response, this isn't someone who enjoys reading about serial killers and that's it, and that's the extent and that's one thing. But a sexual arousal is something more.

Do you remember the tablets, Your Honor? Two

thousand images of Ted Bundy were found, over 2,000 images. He also had images of Jeffrey Dahmer, who murdered 17 people. He had the Columbine shooters. He had Nikolas Cruz. That's who we're dealing with.

10:52 So the question really is how do you stop? And when you look at general deterrence and specific deterrence, that's really the heart of it. How do you deter that, and that's the biggest argument with these school shootings and how come no one stopped the shooter before he became the

10:53 shooter?

**THE COURT:** Correct.

**AUSA ALEXANDER:** Well, Your Honor, here we are. We stopped the shooter before he became the shooter.

**THE COURT:** Let me ask you something. That's a

10:53 good point, but my question to you, and I think I know the answer, do you believe that given this gentleman's, this young man's profile and who he is, I get the sense that if there was a lifetime sentence, you would ask me to give it, that you have found that there is no hope for rehabilitation.

10:53 And I would venture a guess that we -- maybe had we gotten to help this young man sooner, maybe we wouldn't have gotten the threats we got.

Same thing with a litany, as you know, of all the other school shooters, whether it be Cruz or someone else,

10:53 until it's too late, the red flags are there. We have --

10:53
10:54
10:54
10:54
10:55

this young man had a litany of school complaints and we decide, instead of getting therapy, to put him in a basement, for lack of a better word, with a computer. Literally, like a powder keg, which is what happened here.

What I'm concerned about is something you were saying there about the deterrence. I get the impression that you believe that the signs we have seen here, the obsessions, the sexual fantasies, make this a gentleman, make this a young man who is beyond the hope for rehabilitation.

You would agree with me that a 20-year sentence, he would be out in his mid-40s, let's say, or somewhere thereabout, he would still be back in the community. The question is, would we be getting someone rehabilitated? Someone possibly worse than the one who went in? Would it fix anything?

A lot of argument has been made that although there needs to be some deterrence and punishment, that there could be some sort of rehabilitation so that we don't just throw him into incarceration and throw away the key. That's -- and I get the sense that the government's main concern is there really is -- I don't want to say no hope for this young man, but that we're in a situation here where there's too many warning signs that if we do not go the statutory max, this gentleman will pose a threat to our community at some point.

Am I summarizing that right? That may be the

position but I just want to understand.

**AUSA ALEXANDER**: You're correct, Your Honor, and I think that is the reality, but also, Your Honor, don't forget, this defendant was sent to the BOP in Butner to be examined to see if there was a place where he could be hospitalized and then treated, and the BOP said, no, they don't have anything. They can give him some skill set.

**THE COURT**: I mean, the skill set program, it's not the best, but we have, I think Coleman offers it, Danbury in Connecticut offers it. But there is seemingly some -- at least some program that he could be recommended to. I don't know that it would cure, there's no really cure. I mean, it's an emotional development that is very difficult to overcome due to his diagnosis.

So your point is, Judge, there really isn't a program that will help him turn a corner.

I mean, what about studies regarding, you know, maturity, development? I understand that this isn't like you age out of autism spectrum disorder. He will deal with this his whole life. Is that something we should look at because he is, I think, extremely young, right? Twenty-two. I mean, what do you think about that? There's no hope to try to get this young man -- I'm not saying he doesn't need to go in. Don't get me wrong.

But what you're asking for is, essentially, let's

10:56 give up on him now, and I just need to understand why the government thinks we can't come up with something to try to salvage another human being before we lose another child to this entire horrible thing that happened in Parkland, because that's what is going to happen here.

And again, I'm concerned about not even having a glimmer of hope for some sort of sentence that would fashion the opportunity, understanding we would have him on supervised release, understanding that this gentleman is
10:56 never, as far as I'm on the bench, going to have access to any computers as long as I can control it, things of that nature, access to firearms, I mean, all these other things.

What do you think about any of those conditions? You don't think we can do that and keep our community safe;
10:56 is that right?

**AUSA ALEXANDER**: The first question you asked, Your Honor, is do we essentially give up on this defendant? What I'm asking the Court to do is not give up on the victims in this case. I mean, that's my primary focus.

10:56 In terms of what to do with this defendant, Your Honor, you can impose all the conditions you want. The real question is, is he going to follow those conditions? And I think that's the reality.

You look at the gun laws in this country. Felons
10:57 can't possess guns. Those who are drug users cannot possess

guns. Those who are in the country illegally cannot possess guns, but --

**THE COURT**: We have it all the time.

**AUSA ALEXANDER**: Yeah, absolutely. So the question is, it's really just on the individual. I mean, one of the arguments the defense makes is, "Listen, if you meet one person with autism, you've met one person with autism, but, by the way, all people who are autistic are rule followers." We know that's not true.

**THE COURT**: Well, I think we can say to the autistic community and those parents that deal with autistic children that not only is every case very unique, but having autism and Asperger's, or now not known as Asperger's but autism spectrum disorder, that does not come with an everyday fascination over serial killers. This is not your average autism spectrum disorder. This is more than that.

Now I know Dietz did not want to take that step because he said this could manifest in certain things and I'm cognizant of we're not there yet, so let's not sentence someone with a diagnosis that is not supported by science, but there are trouble signs there that this is beyond the average case of someone with any sort of cognitive issue. There is more to this individual that may be problematic, now some of that can come with his youth.

You know, you have heard a little bit about that,

you just said it, that rule following. There is a belief by Dr. Geller and others that he could abide by certain conditions. But I get the impression that you disagree that that's really a real possibility; is that fair.

10:58 **AUSA ALEXANDER:** That's correct, Your Honor. Primarily, because if we look at Dr. Geller, as I pointed out the many flaws in her examinations, number one. She doesn't look at the exhibits in this case. She wasn't here during the trial.

10:58 I know the defense counsel says, well, we have no idea what Dr. Dietz's reference or his colleague looked at. No, actually, we do know because of the trial testimony, a copy of which I provided to the defense and the Court about a week and a half ago.

10:58 Dr. Dietz's colleague, who looked at the -- who is an expert in autism spectrum disorder, looked at -- reviewed Dr. Dietz's entire video, looked at the transcript and looked at a summary of the case.

So let's not pretend that Dr. Dietz didn't do due 10:59 diligence, but the defense themselves at the time of trial, Mr. Wilcox referred to Dr. Dietz as the foremost forensic psychiatrist. Let's not ignore that reality.

He has remarkable credentials there, but nonetheless, Your Honor, when we circle back to why the 10:59 statutory maximum is appropriate is because this is our

community.

We have someone who understood the pain that was being experienced by not just the children, but also the parents, and he waited until Christmas. He's been studying them. Saving photographs of them. Saving their social media profile. He was stalking them every step of the way. And waited until Christmas when they were most vulnerable, and then he just started bombarding them.

When I read the letter, Your Honor, of the mother of Lexie Sealy, you'll see that on Christmas Day her family was at the Broward Sheriff's Office believing that this was going to happen again.

This is a child who at that time was living through the horror that she was now being targeting, that someone had messed up, because let's not forget Nikolas Cruz wanted to kill 20 people, he killed 17.

Now, all of a sudden the question is, is this someone who wants to pick up where he left off? That's what these kids are thinking of. That's what these parents are thinking of. That's why we're here.

And let's not forget how we sent these messages, Your Honor. It's not just the messages and the words, "I'm Nikolas Cruz." They were very vulgar. "I took a shit on her grave. With the power of my AR-15, you all die. With the power of my AR-15, I take your loved ones away from you

permanently," every time that image of Nikolas Cruz flashing forward and he changes that image multiple times, changes the user name multiple times. It creates the impression that it's more than one person. Multiple people.

11:01 Nikolas Cruz's face popping up on the phone every single time, a bombardment of the messages. He never revealed himself, Your Honor. He never said, "I'm just a kid in California," or, "This is my real identity." He wanted them to feel fear.

11:01 He wanted them to suffer, and he's admitted it's the power, the control, the dominance, the very things that attracts him to these school shooters, T.J. Lane, the Columbine shooters, Nikolas Cruz. That's what it all circles back to. He's exerting his dominance over the victim because 11:01 it's sexual gratification.

To hide behind the mask of autism is an insult to autism. People who have autism, they have very unique limitations. Everyone is different, but to come here and say his sexual arousal of serial killers is because he's 11:01 autistic. That's a stretch of the imagination.

Dr. Segall and Dr. Dietz are both medical doctors. We can sit here and criticize the number of pages that Dr. Segall put forth, but he was the defense expert. He was retained by the defense to do a psychiatric evaluation of 11:02 their client. And he says, no, he understood exactly what he

was doing. He just doesn't care.

And Dr. Dietz practically told the government if the defense calls Dr. Segall, I don't know see why you'd call me as a witness. But Dr. Dietz did a very thorough examination and touched on certain things that he's concerned about, about this defendant, but as you know, Your Honor, there's always going to be a limitation as to the amount of information we're able to provide because all of it is if the defendant divulges the information.

We also know, Your Honor, that based upon his interview with Dr. Dietz, he's told them that back in the day when the bullying occurred in high school, when he realized that they had pinpointed it was him or some other person, he tried to run up to the bullies to tell them, "Hey, it's the other guy."

So he's very cognizant that when push comes to shove, how to lie for himself, how to protect himself. That's in the transcript. I didn't see that in Dr. Geller's report, by the way, but at the same time, Your Honor, this is a defendant that's very cognizant of that reality.

Five experts, I don't think I have ever had a case where we have had five different evaluations. This is the most evaluations we have had. We had Dr. Butts take that stand and testify. We saw the deficiencies in her testimony. I was very concerned about a lot of deficiencies in her

testimony, especially when she took the stand and said she was oblivious that Dr. Dietz's interview was video taped. It's right in his report. It's in the transcript.

And over and over again, Your Honor, he was very clear that the defense had retained people to push this narrative that this defendant has no idea of what he was doing. We know that's not true. You saw the messages. You saw what he did. He took a family photo of the Guttenbergs. He cropped out Jesse Guttenberg, saves it separately and Jesse became the recipient of the majority of those messages. That's not autism. That's Brandon Fleury.

And the greatest danger we have here, Your Honor, is the uncertainty. The greatest danger we have is what we do know about it, but we also don't know what he was unwilling to reveal. He's very cognizant, Your Honor, he's not completely oblivious to what's going on. This defendant is very cognizant of what's going on.

He dropped out of high school after 72 demerits. He also had this group of delinquents because the delinquency was intriguing to him. He partied with them. He did alcohol, drugs, and other experimentation with them. This is a person who eventually got booted from that group, and why? Well, one, he started doing those Bullseye eye comments, and we know how Bullseye circled back to this. We also know that he started sending rude text messages to one of the members.

So this is a person who is antagonistic, loses his friendship and now, all of a sudden, decides to spread the antagonism elsewhere.

This is a defendant, Your Honor, who is clearly aware of what's going on. The danger cannot be ignored. And he took this case to trial. Every victim took that stand. And as part of their grieving process they were subject to cross-examination. How is that part of the grieving process? He injected himself into their lives, interfered with their ability to grieve. And had them all testify.

Now, today's the day where their voices can finally be heard, where they can take this podium, if they choose, and convey to you their thoughts, the words, the impact that this has all had on them. And, you're right, Your Honor, this is not the trial of Nikolas Cruz. I am confident justice will prevail in that case. But this is the trial of Brandon Fleury. The difference with Nikolas Cruz and Brandon Fleury is, if all works well, Cruz will never get out, but Brandon Fleury will. And that's the danger they live with every day.

These parents, they think about their kids. The ones they've lost and the ones that they still have. And they worry because on February 14th, 2018, when they woke up that day, they did not think this is the last time I will ever see Alex. This is the last time I will ever see Jamie.

11:06
11:06
11:07
11:07
11:07

But they live with that reality every single day. And this defendant knew that. And for sexual gratification decided to bombard them with harassment, intimidation and threats. And the best that the defense can muster is, "He had no idea." If he says the words, "I'm sorry," Your Honor, it's because it's his sentencing. But you saw the interview with Dr. Dietz. He asked him, "Do you feel sorry for the victims?

"No, not really.

"What about the effect that it had on them?

"Pissing them off, no."

Those are his words. But now we're at sentencing and all of a sudden maybe we'll get an apology. But, Your Honor, I can tell you right now I'm sorry. I'm sure everyone in this courtroom can say the words, "I'm sorry." But there's a difference between actually meaning it. This defendant understands the impact that this case had on him, his father, his brother, so he understands. He just doesn't care. And when we take into consideration the evidence in its totality, Your Honor, this is where we stand. Where do we stand as a community? Where do we stand as a district court? Where do we stand as human beings?

I can tell you that on behalf of the United States, we stand with Fred Guttenberg, Jesse Guttenberg, Max Schachter, Lexie Sealy. We stand with every single person that this defendant victimized. We stand with Parkland, and

that's the reason we stand for the statutory maximum.

And I understand, Your Honor, it's a hard ask. It's a huge request. But, Your Honor, I wouldn't be here if I didn't believe this is what justice requires. And the reality is, Your Honor, I've been through the trial, I was there during trial prep of all these witnesses. What you saw at trial was the witnesses taking that stand after a long time. The anxiety of wondering what was going to happen, and now the anxiety of wondering what will happen. That's not something anyone should have to go through. They certainly, of all people, should not have to go through that, but he knew that and he didn't care.

**THE COURT**: Thank you, Mr. Alexander. If we want to hear from the victims, I don't know if you want to read the letter first or have them come up. I'm more than happy to do whichever way is easiest.

**AUSA ALEXANDER**: With the Court's permission, I will read the letter from Aaron Sealy, this is the mother of Lexie Sealy.

**THE COURT**: Sure, go ahead.

**AUSA ALEXANDER**: "February 14th will never be the same in our house again. The day that is supposed to be filled with love, balloons, friendships, teddy bears, is nothing more than a reminder of the worst day of our lives. Lexie was supposed to celebrate Valentine's that day with her

friends after school. Instead of a text telling me she was on her way with friends to get frozen yogurt, I received a text about 15 minutes before the school bell was supposed to ring telling me there was a shooter at the school.

"'You mean they found someone with a gun in their backpack?

"'No,' she replied, 'there's an actual shooter and we are on lockdown.' I could never have imagined the anxiety, fear and eventual loss and pain the remainder of that day would bring. Lexie lost two of her best friends and a teacher that day, all of whom she had just seen earlier that same day, along with several other classmates. She had to remain on lockdown for close to three hours, huddled and scared with the other students wondering if they were going to get out safely, all while hearing gunshots and sirens, helicopters and ambulances.

"The trauma that day caused for her and for us is tremendous. Loud noises, sirens, news crews parked outside the school grounds and helicopters would all bring back the terrible reminders of that day. Months of grief and trauma counseling for Lexie would follow.

"Fast forward to winter break 2018, Lexie was savoring some time away from school relaxing at home and trying to enjoy the Christmas holidays with friends and family. Mr. Brandon Fleury had other ideas for how the

victims of that terrible tragedy were going to be spending their winter holiday. You see, Mr. Fleury, all the way in California, unbeknownst to us, had been, for months, obsessed with the tragedy in Parkland, Florida. He repeatedly and unrelentlessly began to send hundreds of vile and threatening messages meant to taunt, scare and harass us. His messages left us not only in a state of shock, but also confused and fearful as to who could exhibit such appalling behavior. Was it someone we knew? Was someone really coming to kidnap Lexie the night that she was present?

"We spent the night of Christmas 2018 at the sheriff's office instead of at home with family. We even had to consider not having Lexie return to school after winter break until we knew the threat was not someone in our own hometown.

"After hearing all the evidence at trial, it became clear that Mr. Fleury is not only obsessed with the tragedy at Parkland, but he's obsessed with serial killers and mass murderers. I'm convinced, beyond a shadow of a doubt, that one day he would have acted on his murder fantasy had we not filed charges and had him convicted. I'm also shaking to think he very well likely may have been the next school shooter.

"I'm writing this letter because I decided that Lexie, she is not going to have to face Mr. Fleury again in

person. She is not going to have to miss school again because of Mr. Fleury, and she is not going to give Mr. Fleury anymore satisfaction. I've seen her shaken and upset by his actions and that is what a monster, like he is, truly craves.

"I implore the Court to please apply the maximum penalty allowed for Mr. Fleury's sentence. The only way we and the other victims can begin to feel safe and heal is to know that Mr. Fleury is locked away for many years with no access to technology, internet or social media. I also hope that Mr. Fleury can be transferred back to his home state of California and live out his sentence, so his father will have no reason to visit South Florida again. I also hope a condition of Mr. Fleury's release upon serving his sentence is that he is to have no further contact, ever, with my daughter and my family, or any of the families affected by the February 14th, 2018, tragedy in Parkland.

"I ask these things because I'm not sure someone as disturbed as Mr. Fleury can ever be rehabilitated and expected to live a normal life free of the evil behavior that he has already shown. Mr. Fleury has a level of depravity that I have only witnessed one other time, and that is on February 14th, 2018, at the hands of Nikolas Cruz who, coincidentally, Mr. Fleury idolized, proven by the facts he created social media accounts using Nikolas Cruz's name.

"I respectfully thank the Court for the consideration."

We have two victims who would like to make statements, Your Honor.

11:13 **THE COURT**: Absolutely. They may come forward.

**MR. SCHACHTER**: I apologize.

**THE COURT**: Take your time, sir.

**MR. SCHACHTER**: February 14th, I was out to lunch with my fiancée. We were having a great lunch and when I came back to the house, my phone started going -- going off. And they said that there was a school shooting at Marjory Stoneman Douglas, and the first thing that goes through my head is, "Well, I'm sure it's a mistake, that even if it's true, I'm sure Alex is okay."

11:14 So I go to the school, and as I'm there, you know, it's blocked off, it was SWAT everywhere and I couldn't get close so I walked away and my fiancée calls me, and she says, "Max, you've got to get to the school."

I said, "I can't, it's closed and I can't get close."

She goes, "No, Alex has been shot." And I said, "What are you talking about?"

She says, our friend, who was in Alex's class, called her and said that Alex has been shot. "You have got to get there, you've got to help him." I tried. I couldn't

get there.

And, you know, living through that horrible tragedy, staying at the Marriott from five o'clock all the way until one o'clock in the morning to receive the worst news in my life, going to every hospital, not being able to find him and looking at his -- at the Life360, and his phone was still at school, I knew that Alex would never be without his phone.

You know, you send your child off to school, you never think that they're not going to come home again. It's just inconceivable.

And after that happened, I put my life on hold, I forgot about my old life, and I committed to making sure that this never happened again. As I'm trying to, you know, grieve and go through this process with my fiancée, and my three other children, you know, we went to New York for the first Christmas that we have ever done. My fiancee's family has relatives up there and we never go up there. And this was the first Christmas that we were there, and that's why it was so upsetting to receive these messages during Christmas.

You know, I don't celebrate Christmas, but my fiancee's children do. And when I started getting these messages I said, oh, my God, number one, it looks like the murderer is sending these messages. I thought, is he out of jail? Is he coming after us? And then I thought, he knows

we're here. I just -- I couldn't believe it. It was extremely terrifying, and to hear and then go through the trial here and to hear that he was obsessed with the serial killers, I thought he knew where I was. I was scared for my family, and after just a short period of time after losing Alex, the behavior of this person, he's not a child. He's an adult. His behavior escalated from just viewing serial killer pictures online to coming after my family and myself, and I was afraid of what he was going to do next if we didn't do something and notify the authority.

We know that the murderer that murdered my son, I won't mention his name, I never will, but people had notified the FBI on two different occasions, and there were multiple tips that came to the Broward Sheriff's Office, and nothing was done and I could not take that chance. I had already lost one little boy, I could not afford to lose anyone else in my family.

The messages says, "How's Alex? Haha. Oh, that's right, I killed him. I shot Alex dead @MaxSchachter. I killed your little boy, Max Schachter, haha. With the power of my AR-15, I take your loved ones away from you permanently. With the power of my AR-15, you all die. Little Alex will never play music again."

That was the one thing that I loved. Alex played that trombone, and was in the Marjory Stoneman Douglas band

and for him to use that and put that in these horrible messages was the cruelest thing anyone could ever do to me, and to use the murderer's name, just made it absolutely worse. "I'm kidnapping you, fool." I thought he was coming after me. I thought that he was outside my house. I was so nervous. I reached out to law enforcement and I had to have them come over to protect me. I didn't know that he was in California. I didn't know any of that. I thought that he could have been local.

11:19 Dr. Dietz, when he testified, he even said that he didn't care about hurting us, considering the degree to which Fleury lacked empathy and the role models with whom he has identified, it would be important, regardless of the legal disposition of this case, that all possible steps to be taken to bar him from purchasing or possessing a firearm, but we know in today's society there's 400 million guns out there, 11 million AR-15s, and I certainly hope the Court is not under any misbelief that if somebody is determined to get a gun, he can do it.

11:19 The danger that Fleury possesses is clear, and given the opportunity, there's a real danger that he will attempt to follow in the footsteps of the very mass murderers and serial killers that he idolized. And I agree with the government and the seriousness of this case, that sexual arousal of a mass murderer, his decision to stalk us, and to

use the murder of my son in the messages and his ability to intellectually understand his conduct can elicit adverse feelings to others, he understands that. Clearly, it is not his autism to blame, it is him.

11:20 You know, if you look at the latest United States Secret Service report, the Secret Service protects the president and they just did a study, they analyzed the last 41 attacks, school attacks, targeted violence in schools, and what their latest report said is that, if you look through 11:21 it, all the red flags that this individual portrayed, also those attackers had. You know, ten percent of those attackers that the Secret Service studied were motivated by a desire for fame or notoriety. Each of those students expressed desire to emulate previous mass attackers, 11:21 including the ones at Columbine. Twelve percent conducted research of prior incidents of targeted violence, including past school attacks. The research usually conducted through online searches or watching videos. 57 percent displayed behavioral symptoms, including defiance towards authority, 11:21 poor impulse control, and other violations of social norms. Also, included here are attackers who exhibited symptoms of or were diagnosed with ADHD or ADD. 49 percent of the attackers that the Secret Service studied, had an unusual or concerning interest in violence. For example, some of the 11:22 attackers researched past incidents of mass violence,

consumed violent or graphic media. Two specific interests emerged as common, particularly concerning amongst these attackers.

Number one) there was a fascination with Columbine, which we saw here. 23 percent of the attackers concerning had an interest in Columbine. This was demonstrated by having photos of the Columbine attackers, which we also saw here. 80 percent had experienced school stressors related to academic or disciplinary actions, including failing grades, suspensions. 60 percent had both academic and disciplinary issues. 20 percent had disciplinary issues at school. And that's the same thing that happened here.

The Marjory Stoneman Douglas murderer had 55 different disciplinary incidents in school. And we had -- this individual had even more demerits than the Marjory Stoneman Douglas murderer. So 71 percent received some form of school disciplinary action in the five years prior to the attack.

Every attack that the Secret Service studied exhibited concerning behaviors prior to their attack. I really believe, as you heard in the previous testimony, that because of the FBI's good work and your work and the Court's, that we have averted another attack, but we should not have to wait until people are murdered to take action. And that's why I'm so happy and glad that there was a conviction here.

11:24 11:24 11:24 11:29 11:29

But this case needs to set an example to all of the people around this country that are doing the same things that are threatening and stalking and tormenting people online. It should not be allowed, and this Court can set an example in that direction. Please don't let this individual out. Six years will go by very quickly. You know, I'm concerned about the kids, the minors, and Jesse and Lexie that need to live their lives, and having him out in a short period of time, that's why I support the government's position.

So thank you very much, Judge.

**THE COURT**: Thank you very much for your words. I know how difficult this is.

I would ask, Mr. Guttenberg, can you do me a favor, I'd like to take just a brief recess, and if anyone needs to use the restroom before we speak, sir, I want to be very focused on it. This will only take two minutes. I'll be right back and then I want to hear from you, sir.

(Thereupon, a brief recess was taken.)

**THE COURT**: Please be seated, everyone. We'll call the proceedings back to order. We went ahead and took a brief break, but at this time I would like to hear from the --

**AUSA ALEXANDER**: Your Honor, if I may, just to make it clear on the record, the individual who spoke before Mr.

Fred Guttenberg was Max Schachter. I'm not sure if he said his name, but I just wanted to make that clear for the record.

**THE COURT**: And do me a favor, sir, state your name for the record.

**MR. GUTTENBERG**: I'm Fred Guttenberg, and before I speak for myself, I want to read a statement from Jeff Kasky.

**THE COURT**: Of course, go ahead, sir.

**MR. GUTTENBERG**: So Jeff writes:

"I'll never forget the day I saw the horrible and disgusting messages which the defendant has been convicted of sending. Horrible as they were, my first thought wasn't anything along the lines of boo-hoo for me, I'm a victim. Cameron and I were concerned with how they would impact Fred, Jennifer, Jesse, the Olivers, and all the others who lost their kids on 2-14. I notified the FBI immediately and, to the best of my knowledge, they got it right. Cameron and I are extraordinarily appreciative of the FBI's efforts and communications. What we found most offensive about this case, and the defendant's behavior, and that of his father, is the attempt to use the defendant's alleged autism diagnosis as an excuse for a mitigating factor for the defendant's criminal and terroristic behavior.

"By way of background, aside from being a lawyer, Jeff is the president of a streaming television channel

11:31 called The Autism Channel. As the name suggests, the focus of the channel is autism and developmental disability-related content. Over half the hosts of the shows on the channel are on the autism spectrum, and they run a financial tip program for ASD college students. Furthermore, Jeff's son, Holton, who was present at Marjory Stoneman Douglas High School on February 14th, is on the autism spectrum. As such, Jeff is surrounded by autistic people of all ages at all times and here's what he notes: Although they are different, generally speaking, autistic people are kinder and more compassionate than the so-called neuro typical community. Autistic people, generally speaking, are not looking for trouble and know the difference between right and wrong.

"Brandon Fleury, you are indeed autistic or otherwise developmentally disabled. And it is cowardly, disgraceful and inaccurate to blame your behavior on these factors. In fact, your soul would have to be extra dark to overcome the goodness and grace with which most autistic people approach the world.

"Lastly, Jeff wants to respectfully assert to the Court his belief 20 years of prison would be a steep punishment for these offenses. With that said, whatever happens to Brandon Fleury he hopes he gets help with whatever his actual problem is."

And now I, Fred Guttenberg, want to speak on behalf

of myself, and I want to start off by saying thank you for everything you've done and thank you over here for everything that you guys have done to bring this to this point today. My family and I, we fear Brandon Fleury to this day. What he did to our family caused that reaction. This morning, while in the parking garage, I was approached by Brandon's dad. My fear level went even higher. I don't know what made him think that was a correct thing to do. But not only do I want Brandon to receive the 20 year maximum, for what he did to my family and others, I want no -- I want it to be clear to every member of that family you are never ever ever to approach me or anyone in my family ever again.

With that, I want to talk about what happened to my family. On February 14th, I think we all know the story. My daughter was one of the victims of the Marjory Stoneman Douglas school shooting. She was an amazing 14-year-old girl. My family went through months of torture following that. The emotional sorrow that goes with losing my child or for my son losing his sister, and as his dad, I would every day talk about let's find new things to do with a new normal. Let's find a way to go do something so we can smile again. And for my wife, and my son, they always were like, "We're not ready."

But then there was that one day, the day before Christmas, where my wife woke up in the morning and said,

"I'm ready to have a normal day." And I was excited. And here we are. We're planning our normal day, finally just something we can do as a family, we're going to get the dogs in the car, we are going to go up to Delray, we're going to have a family day until my son walked down the stairs and said, "Dad, I think you might want to see this." And that was the start of Brandon Fleury terrorizing my family.

You can't tell me he didn't know what he was doing. The nature of his messages were clear. The torment where he sends my son messages talking in the voice of Nikolas Cruz, which I hate using that name, but his user name did, saying, "Your sister died a virgin. I took her life," and laughing about it.

But what terrorized my family even worse, and this is what people must understand when we say he didn't know what he was doing. Not only did he know, he planned it out. He went out of his way to get my family to believe he was local. That he lived near us. That is why he brought Lexie Sealy in this. Lexie was my daughter's best friend. He went far enough to find out who Lexie's ex-boyfriend was and brought him into this. He had a plan to convince my son, my wife, and I that he knew about our family making us think he was local.

So you know how we spent Christmas, Christmas break and then the weeks into January back into school until we

knew there was an arrest? With BSO protection. My son was followed everywhere he went, and that included in the hallways of the school because, honestly, we were thinking it was probably a student in the school. The person knew too much. So when we say he didn't know what he was doing, yes, he did and he planned out his terror on our family in such a strategic, dramatic way, and that is something that my family has yet to recover from.

You know, my daughter the day she died, that should have been the kind of thing that breaks our family's feeling of security. But that wasn't what did it. Because a school shooting, it's such a random event, my son was graduating, that won't happen to us again. You know what breached our feeling of security? The reality that there are people who can target us and will continue to try to do so. Brandon Fleury did that.

And so, if you want to know why I am here today, not having them read a statement for me, it's because we feel terror because of him.

I also want to tell you a little bit about my family. Because my wife is a pediatric occupational therapist, she spends her entire professional life working with kids with autism disorder. My daughter, before she was killed, volunteered her time for kids with autism disorder. My son, to this day, still does that. He coaches sports

teams for kids with special needs.

So I live my life around special needs kids and kids with autism disorder and Jeff Kasky had it right. This is the most amazing, wonderful group of people I have had the honor and pleasure of being around. What is criminal is trying to criminalize this disorder. That's what they did. It's not because of autism disorder that he did what he did to my family and the other families. It's because of a sociopathic behavior, the idea that he was aroused and sexually, you know what to himself, over mass shooters with my son's image, we all saw the photo, it wasn't the normal photo. He blew it up. He targeted my son. The idea that he was doing that, he knew exactly what he was doing.

And, unfortunately, we didn't know where he was. We really, really believed he was local, that he was following us, that he was watching us. And his never-ending stream of messages created a terror that we have never been able to move on from.

Judge, my wife has never come to me again and said, "I want to have a normal day." That's gone. We know in our family now, we can't do that. What I do know is this person had intent. What I do know is, I believe, because of what happened in this courtroom, we did stop the next mass shooter. All the evidence is there.

Now the only question is how long do we get to keep

him away from being able to terrorize our families again? I'm hoping that you do the maximum of 20 years.

Thank you.

**THE COURT**: Thank you, Mr. Guttenberg.

11:39 Mr. Alexander, is there anyone else that you want the Court to hear from on behalf of the government?

**AUSA ALEXANDER**: No, Your Honor.

**THE COURT**: All right. Before I turn to the defense for their presentation, and so everyone understands, 11:39 my intent is to hear from both sides and upon sentencing pronounce ruling on the request for a variance and the forthcoming request for not only upward variance from the government, but the downward variance from the defense.

I do feel that it is incumbent upon me to tell all 11:40 of the -- both gentlemen who have testified here today, and the letters that have been written, that the Court is unbelievably sorry for your loss, and as a parent I cannot imagine not only having to go through that, but having to relive it as you have done again here today, which no one 11:40 wants you to do and knowing that you still have the original proceeding that led to this ongoing.

So I am acutely aware of your suffering and I've taken it to heart and I do appreciate you all, both of you gentlemen, coming and sharing your feelings with the Court.

11:40 I do also think it would be incumbent upon me to

11:40 thank you for what you did in this case. Again, we will never know what the future holds, although I think we can all say that there are many very, very troubling signs, but the one thing if we have learned anything from what happened at Parkland, is we cannot ignore the signs. We cannot ignore the signs. Federal agencies can't ignore them. Schools can't ignore them. This had all the hallmarks of what we saw with Nikolas Cruz, and I do not believe for a second that if it were not for all of you being vigilant and reporting this 11:41 and urging someone to look into it, I think we may have averted, at the very least, further torment to you and your families, but perhaps something much, much worse. So a debt of gratitude, I think, is incumbent from the system to all of you because I know you continue to engage in efforts with 11:41 regard to awareness for these kinds of things and, again, I don't think we'd be here if you didn't take this seriously, and you needed to.

But I do -- my heart goes out to your families and I do thank you for sharing your thoughts here today.

11:41 Now, with that being said, Ms. Puglisi, I will turn to you. I want to, obviously, want to hear argument from the defense on this. I will say that I read the entire 55-page report by Dr. Geller. So I'm very aware of her position. If she wishes, similar to what we did with the victims, to come 11:42 to the podium and maybe share something extra, that's fine

with me if you want to do it that way. I want to hear from her and hear -- really, I think what would be the best thing to do is hear her response, if you will, to the government's position because I know that she has strong thoughts regarding the empathy issues that are part of Mr. Fleury's diagnosis. We have heard a lot about the government's view that this cannot be something that is hidden behind autism spectrum disorder, and I know Dr. Geller has shared some insight as to why not every case is the same and why, for example, we have some science supporting a belief, a rule following that is capable, and so anything she wishes to share, especially in response to the idea that this individual, Mr. Fleury, must be taken out of society and you've heard my concerns which is, is there a sentence that, as the guidelines tell us, is sufficient but not greater than necessary to accomplish the purposes of sentencing, which is always, of course, to reflect the seriousness of this crime, which my statements make clear I take very seriously, to promote just punishment for this offense, which I think is very important, and deter criminal conduct, and as you can hear from the government's view, protect the public from future crime, which I think is the thrust, if you will, of the government's request for the statutory maximum, but that, again, cannot be divorced from the needs to promote rehabilitation, which is what the guidelines tell us to do.

So I will allow you at this point to present how you deem fit. Either you want to go first and then have Dr. Geller go, whatever is easiest for you.

Go ahead, Ms. Puglisi.

11:43 **MS. VORA-PUGLISI**: Thank you, Judge. What I was thinking was I would like to start with the video, the sentencing mitigation video we have prepared to show to the victims, and Brandon hasn't seen it as well, so I'd like to present that first, then I'll have Dr. Geller go, and maybe I 11:44 will just direct some questions to her so that we can make sure we focus on what the Court, I think, is most interested in, but as Your Honor knows, I think the history and characteristics, seriousness of the offense, it is important to understand Brandon as a person and the underlying -- his 11:44 ASD and how that affects, for the Court to get the best understanding of what would be the appropriate sentence.

She will then also speak to the difference between psychopaths and individuals with ASD because I think that has been a big part of this, whether he's the next serial killer, 11:44 and we want to make sure the Court has information on that, and we will go into the need for treatment and the possible sentencing options and her recommendation.

**THE COURT**: That works for me. We can start with the video. I have seen it so I know what we're about to play 11:45 and I have no problem with doing that first. The one thing I

11:45 will just urge you is you steer Dr. Geller to those areas, be cognizant of the fact the Court read literally every single -- I must have consumed 300 to 400 pages of material over the weekend, so I am very aware. So I just want you to kind of focus, as you stated.

**MS. VORA-PUGLISI**: And if at any point you find, as I do it, you find that it's repetitive --

**THE COURT**: Thank you.

**MS. VORA-PUGLISI**: -- or you already understand it, 11:45 please feel free to let me know. I just want to make sure, and I have no doubt, I know that Your Honor reads everything. Not all judges do, but I knew you would.

**THE COURT**: But we need to make a record so it's important to me, too. So I will give you that leeway.

11:45 Did you get a chance -- I think I heard you testing it so it's ready to go?

**MS. VORA-PUGLISI**: Yes, it's all ready to go.

**THE COURT**: So at this time, let's go ahead and play that video, please.

11:45 (VIDEO PLAYING)

**THE COURT**: All right. That concludes the movie, and, Ms. Puglisi, if you want to proceed at this time.

**MS. VORA-PUGLISI**: Thank you, I would like to have Dr. Geller come on up.

12:09 **THE COURT**: Sure. Dr. Geller, you can go ahead and

take the stand, it might be the easier thing to do, so Ms. Puglisi can ask you some followup questions.

**MS. VORA-PUGLISI:** And is it okay if I stand here so I can use my laptop?

12:09 **THE COURT:** That's fine.

Thereupon,

**DR. LYNDA GELLER,**

having been duly sworn by the courtroom deputy, testified as follows:

12:10 A. **I do.**

**THE COURTROOM DEPUTY:** Please be seated, speak into the microphone state, and spell your name for the microphone.

**MS. VORA-PUGLISI:** Can you tell us your name and spell it for the record, please?

12:10 A. **My name is Lynda Geller, L-Y-N-D-A, G-E-L-L-E-R.**

***DIRECT EXAMINATION***

**BY MS. VORA-PUGLISI:**

Q. Dr. Geller, as you heard the Judge, I'm not going to ask
12:10 you to reiterate every point that you made in your very lengthy and detailed report, so I'm going to try to focus in on some certain points. I'm going to just ask you, really briefly I want to ask you, is it true that you have lectured in courses on autism?

12:10 A. **Many, yes.**

Q. You have written articles on autism?
A. **Yes. I have written many.**
Q. You have studied autism as a focus?
A. **For over 25 years, developmental disabilities and autism for 35 years.**
Q. You have trained others in autism?
A. **That was my primary role at university hospitals, to do that.**
Q. And you taught what type of professionals?
A. **Psychiatrists, psychologists, social workers, nurses, and other hospital personnel.**
Q. You testified in court, both civil and criminal, previously?
A. **Since the 1980s, I have many times.**
Q. And you have been found to be an expert in the field of autism in court?
A. **Yes, I have.**
Q. Now you performed numerous tests and interview type questions for Brandon Fleury; is that right?
A. **I did.**
Q. And I'm not going to go through each one, but I do want to focus on a few of them. The first one was the Adult Asperger Assessment Test. You gave him that one?
A. **The Adult Asperger's Test is a structured diagnostic interview that encompasses all of the characteristics of**

**autism, but how they manifest in adults, which is often quite different than how they manifest in young children and adolescents.**

Q. Now, what about the results of that test told you about Brandon's repetitive behavior?

A. **Well, repetitive and stereotyped interests are one of the main characteristics of autistic in general and what qualifies someone for the diagnosis. He has a long, long history of such repetitive interests and behaviors. You saw the video of his obsession with ducks. He's been obsessed with cartoon characters and superheroes and many things in his life and talks about them incessantly, repetitively over and over and over and over until people in his -- people who live with him, you know, just don't want to hear it anymore, it's so repetitive. That's the kind of thing that is a signal characteristic of autism.**

Q. Now, mimicking is also another characteristic of autism?

A. **I'm sorry, I didn't hear you.**

Q. Mimicking.

A. **Yes. Yes.**

Q. And what about specifically with respect to these messages that -- and you were able to review the messages that Brandon sent to the victims in this case?

A. **I did.**

Q. So what can you tell us about sending those messages and

how, if at all, mimicking plays a role in that?
A. **So Brandon has found the content of most of those messages online already. The types of things that other people were saying, many of them he would just memorize and take full swaths out of and post them himself. And he did it in a very few number of days. It wasn't that long period of time that he did it. But he did it intensely over and over and over and over. So I'm sure that these people felt just horribly bombarded with these horrific messages. But, to him, he was doing a repetitive autistic behavior over and over and over again, something he does all the time, and is one of the reasons that children in school didn't much like him.**
**So he had this obnoxious behavior of saying things over and over and over.**
Q. I want to move over to the next type of social attribution tasks that you performed. And I know that you particularly found Brandon's comments on this interesting. I'm going to play -- this video that we're watching, this was shown to Brandon. And this is from what's called the Clynn, Clynn (ph.) Test, is that what they call it?
A. **McLean (ph.). He's the person who wrote about it.**
Q. And looking at this, can you tell us what somebody with no cognitive disabilities, what they think when they see this versus Brandon?

A. **What most people see when they view this is a story of perhaps a bully, some friends. Somebody who rescues his friend. The bully gets angry. Normal people make judgments about something that has absolutely no anthropomorphic features themselves, just figures, but we cannot help because of the way typical brains are put together, we cannot but help to attribute social meaning to the movements in this video. And what Clynn studied about was how's that different than what people with autism see when they see something that all of the rest of us attribute meaning to.**

Q. So what does Brandon -- in this situation, what did he see?

A. **So Brandon was unable to attribute social motivation or social meaning to this, and, Judge, is it all right if I read his response?**

**THE COURT**: Sure.

A. **Okay. So Brandon's response to this was, "Don't know. So random. Not really sure. Kind of looks like a wall with an opening and it looks like it might be opening and closing. Shapes go in and around."**

**Now, a typical respondent would have made a story about it, as I mentioned before, something about maybe there was a bully, they were friends, they went in and out of the house. I mean, they would make something human about it. Brandon is incapable of seeing the human element because his**

**understanding of social interaction is so very basic that his brain simply does not attribute social meaning, just like he often doesn't attribute the right social and emotional meaning to faces, to people, to things that are happening.**

12:17 **BY MS. VORA-PUGLISI:**

Q. What do these results or the comments by Brandon, how does that translate to the facts in this case, though, to what was done?

A. **So my feeling is that he found many of the statements** 12:17 **that he used online, and I am not diminishing the horror that people felt in receiving them, but what we found is happening with people with autism is, as I said in the video, they used to be considered the most law-abiding rule-following people you would ever meet and the wild west of the internet has** 12:18 **been opened to them, and they don't know how to deal with it. They don't properly attribute the social and emotional meaning of things they read on the internet. And things they send on the internet. They don't really understand it.**

**It doesn't mean he can't be intelligent about** 12:18 **finding things or collecting things or finding relevant information, but his understanding of the social and emotional meaning someone might take from what he writes is very difficult for him to appreciate.**

**THE COURT:** Let me interrupt for a second, Doctor.

12:18 **MS. VORA-PUGLISI:** Yes, Judge.

**THE COURT**: Here is the issue so that everyone understands really what value you present to the defense here. The crime has been committed. The jury has rejected autism or Asperger's or autism spectrum disorder as a defense for him. They believed he understood what he did and I'm standing by those findings. So really what I care about is you've heard the presentation from the government. The government believes that this individual is beyond rehabilitation.

12:19 In your video, you pointed out something that I wrote down last night when I reviewed it myself that you can teach someone like Mr. Fleury emotional states of others. You can have them understand. But what concerns me is not that. It is, can you teach him empathy for those emotional states? So simply because someone knows that this is making someone upset doesn't make them care, and the concern from -- you heard the victims, you heard the government, there is no method of rehabilitation.

There is no method of training whereby we can put him in, let's say, Bureau of Prisons' skills program or some other therapy. I know multiple different alternative remedies have been offered to the Court that would allow him to get to the point where he understands that not only is this behavior going to cause angst in others, but that he needs to care enough about doing it.

So my concern is, do I have an individual here that, if given a sentence less than the statutory maximum, will come out and be able to be given the tools so that we don't have to worry that he can be successfully reintegrated into society, and as you answer that, I think you're going to want to touch on what you said in the video and your very detailed report, which I do appreciate and I read, is this idea of what Dr. Dietz had indicated as concerns for future behavior.

You seem to believe strongly that some of the sexual fantasy behavior, some of the deviant behavior and the obsession with serial killers is not something that will manifest itself to the point of a new psychosis or some sort of new diagnosis, above and beyond what he already has, from the ASD, and that's what I'm worried about, because we can talk I think a lot about how his father said he wet himself with a gun and you had said in your video he would never, in a million years, hurt anybody, he's a very gentle person.

But I look at his bio, his track record, and what worries me is, as the Judge, is I have an individual that seemed to start off being picked on at school. He gets a lot of demerits. He gets in a lot of trouble. Suddenly we decide, for better or for worse, circumstances being difficult for his father, we're going to take this child out of school. We're going to put him at home. We're going to

give him unfettered access because he's a, quote-unquote, adult, although at the same time they're telling me he's 12 years old, but we're going to put him in front of a computer and give him unfettered access to the wild wild west that is the internet.

12:21

Suddenly we get from someone bullied, to someone who is threatening, and I start getting these sexual fantasies. I see, at least to me, the layperson, an escalation. We may have stopped it, but what assurances can you give the Court that this individual, through some sort of rehabilitation, will not exit and find himself doing the exact same behavior he's going in for? That's what I need to hear from you as an expert in this arena.

12:22

Go ahead. Whatever covers that, please.

12:22

A. **All right. So there are a number of points that you bring up. To me, one of the most important things was his blurting out how he masturbates to serial killers and he wasn't asked who else does he masturbate to.**

**The serial killer people make up two or three percent of the people he's interested in, and he only likes the ones that are sort of attractive, edgy people. So he's not -- there is not a sexual motive to what he did.**

12:22

**THE COURT:** Correct.

A. **That's a completely separate thing.**

**THE COURT:** Agreed.

12:22

A. He got himself interested in serial killers and many people are. That's why SUV and all these television shows are so popular, many people are interested in this. If you look on Amazon, you'll see 70 pages of books for sale on serial killers. So it's not an uncommon interest.

12:23

He, of course, because he's autistic, took that interest to a higher degree than you or I might, reading about it online and reading things about all of these people. But the only ones that have a sexual interest to him were people who happen to be cute guys.

12:23

Dr. Dietz also was concerned about, you know, like, well, why is he liking looking at things where people get hurt? And I would say to that that he's not liking the hurting, he's liking that a powerful person did it because he likes powerful people.

12:23

What's his sexual interest in powerful people? That's S&M. That's people with sadistic interest in sex and people who want to be dominated in sex, and he's not the one who wants to become the sadist, he's the one who wants to be dominated by a person who is domineering, and that's another thing that's all over the internet, the S&M stuff that people are interested with role-playing.

12:24

So the kind of things that he sees, again, I feel like if everyone here found out a 7-year-old child wrote the things Brandon wrote, they would have a different response as

12:24

to what should be the punishment. And I just think our response should be more like that, more understanding of his childish mentality.

Now, the very important thing about empathy is, as I said in the video, there's two different kinds of empathy. There's cognitive empathy which I'm looking at you and you're like this and I'm watching your eyes, I'm noticing what you might be thinking and feeling, so that's cognitive empathy. And emotional empathy is that caring. When Brandon first heard about the killings at Parkland he cried.

THE COURT: Right, I read that.

A. He cried. So, I mean, he was -- he has feeling. If something is obvious to him, you know, people being killed is obvious to him. Some of this more subtle stuff on the internet is not obvious to him. So if an emotion is obvious, like pain and anger and happiness, he is able to see those things.

Dr. Dietz was asking was he trying to cause anguish in the victims. He said, "What's anguish? It's not something I know what it is."

So when he kept saying, "I wasn't trying to cause anguish, I was trying to cause annoyance and anger, that's what trolls do." That's a very rigid way to be fixed.

Now I think your point is critical, what can be done?

I wish some things had been done by his school district.

THE COURT: I agree with that.

A. And they certainly existed in those years. There's no excuse for this school district. But now what could be done? So there's a whole kind of learning called cognitive behavior therapy and social learning theory which are ways that we teach people how to respond socially and emotionally.

Michelle Garcia Winner has written an entire curriculum on how to teach people how to, as I say, recognize emotions and think about what might they mean, and the reason that people have a poor -- people with autism have a poor understanding of emotions is when you go through all of your life not picking them up, and with nobody playing with you, because you don't have any friends, none of any give and take experiences in junior high. That's how the rest of us got civilized. That's how we learn how to behave with other people is our experiences.

So people with autism often don't have any experiences. They're often rejected. They have no friends. He's never really had any friends. He doesn't have the social experiences and he didn't have the social cognition, and the school didn't recognize it, and the school did nothing, and, truthfully, perhaps his father could have done more, but he didn't know and many parents don't know what to

**do. They just see their children miserable at school and they keep that from happening.**

**THE COURT:** Do you believe, and I get the sense that the answer to this is in the negative, but do you believe this is an individual that would be able to execute on these types of threats or actually carry out any kinds of threats because there's a lot being told about him kind of hiding behind the internet, hiding behind the personality of someone else, causing this terror, et cetera, but the question I have is, and you saw how the government portrayed him, and I've concerns about this from the beginning, that this was an individual that the bullying had become too much, the fact that he was shunned in a way socially had become too much.

12:27

12:27

12:28

12:28

12:28

And I can only imagine that in your studies there is a breaking point in this kind of behavior where someone might feel compelled to act on urges, especially if they are attracted to the domineering portion of what they see in society and what they see in movies.

What's your genuine belief when it comes to his ability, per se, to have gone to the next step? Because there's a concern that he would have ultimately become, and you heard it, in no uncertain terms, the next school shooter, and I am curious what you would say to that.

A. **I think that when we -- we say, yes, he's attracted to**

the dominating. He's attracted to someone who is powerful. It's his sex interest, it's not his role model. He doesn't want to be like that. He's attracted to somebody who's able to be like that. He's afraid of violence. He was beaten up. He was teased. He had quite a bad time. Did he ever try to do -- did he ever try to hit back? No, he ran away and cried.

So he doesn't have that kind of a response in his history ever, and the kinds of things that he was saying online are mimicking maybe powerful people he had seen say things, mimicking even --

**THE COURT:** You said one of the other trolls for Columbine, another personality, I believe, was Lynn Ann.

A. **Lynn Ann is a Columbine troll.**

**THE COURT:** And you said that some of this was mimicking behavior of hers.

A. **He said exactly those things to people and he read things that she said and he internalized them. I mean, as a little child, if you could read a book to him once, he would know every word and be able to say it over and over again. If he saw a movie, he would say it over and over again. He has a tremendous capacity to memorize things, large amounts of things, and then have them come out of his mouth.**

**That's not -- that is not him creating those mean things. It hurts just as much to the victims, I'm not**

**minimizing that at all. But he is not the one who invented it.**

**THE COURT:** Any followup on this? Obviously, this is the kind of questioning that concerns the Court, I'll give you a little bit of followup.

**MS. VORA-PUGLISI:** Yes, Judge, and I think you answered it.

**BY MS. VORA-PUGLISI:**

Q. The government had said that Brandon's sexual interest in serial killers, you know, he was hiding behind being autistic.

My question is, is his interest in serial killers because he's autistic or it's a separate matter? I think you answered that.

A. **It's more -- he has lots of those kinds of interests, that's been one of them, you know, so superheroes and Scooby-Doo and a lot of things.**

Q. And I think you did differentiate between interest in a serial killer psychopath and Brandon with autism. What I want to make sure, though, to answer the Judge's question, with empathy. Are there programs out there that would allow Brandon to be able to learn that empathy or is this a lost -- is all hope lost?

A. **No. I mean, it's somewhat harder for him than it is for the average person, but one of the reasons that he lacks**

**cognitive empathy is a very limited experiential background with socialization because of his complete lack of friends as a child. So he didn't have the opportunity to learn cognitive empathy and he's not very good at it. But it is something that there are lots of programs to teach people cognitive empathy. It's a learned school.**

Q. Let's talk about the different treatment options and what your recommendation is.

A. **All right. So you want me to talk about Aloft?**

Q. Yeah, go ahead with your recommendation for what you think -- what you think would be the right placement for Brandon.

A. **So I was recommending a residential treatment facility where he could learn more of these types of skills, where he could be supervised, and the reason that I mention one specifically is because I had another client who did trolling and has gotten in trouble for trolling as well, and also didn't understand the horrors of it to the victims.**

**So they have someone there right now who has gotten in trouble with trolling and sexuality on the internet. And they have been able to supervise him, keep him away from the internet, he actually doesn't need to be kept away from the internet because, like Brandon, he's an excessive rule follower, he would never touch one again because he's been told not to, just like Brandon, his father called him into a**

room once and said, "Oh, look, this is funny," and he went, "I can't, I can't, I'm not allowed to touch computers."

Q. That was during the pretrial release?

A. That was during the pretrial. So, I mean, he now understands what the rules are and he is an excessive rule follower. And so this other young man who was at a law office and did the same. So they're able to satisfy all the requests of the Court or our legal system to handle clients like this.

12:33 And they also are expert at handling people and training them in vocational things, things to keep them busy. Part of the reason that people do things online often is they have no other life, they don't have a job, they haven't been taught job skills, they have nothing to do with their time.

12:34 I don't think you or I would like a life like that either where we just sit in our basements with a computer. What trouble might we get into?

Part of it is there's nothing else going on in his life and that needs to change. He hasn't learned the skills and that needs to change. He hadn't learned the rules and that has changed. And he's a person who's experienced in a little bit -- I mean, in the 11 months he's been in jail, has been nothing but a torture beyond what even we would like prison to be.

12:34 I mean, prison is not supposed to be nice, but you

shouldn't be sexually accosted constantly and have no defense and you shouldn't have to be so scared that you can't function.

He told me that -- he said, "Other people in prison, you know, are -- have the comforts of keeping themselves busy, they play games with each other, they do things, I don't have that. Other people in prison aren't being threatened every day by the other inmates. I don't have that." And he has been sexually accosted and penetrated and there's no denying that that's cruel and unusual punishment for someone with autism.

So back to the program. The program is certainly -- would be able to teach him the things that he needs to be taught and give father some time to begin to develop those things at home and, I have, again, talked to another program in Los Angeles that does outpatient treatment that would have the ability to help him with job skills, help him perhaps get a job or volunteer somewhere, help him learn social skills, help him meet other people in the autism spectrum with whom he could interact, and learn how to handle himself better in society.

So is he rehabilitation a potential? I think tremendously. I think tremendously. I feel that he, like most people his age, are perfectly capable of learning social skills, they just never had the opportunity, and to have --

12:36 to make him into something more threatening and more frightening than he is, despite the terrible behavior he did, is probably not accurate. And to say he's certainly capable of being rehabilitated. In fact, he needs to be habilitated. Rehabilitated --

THE COURT: Would indicate --

A. He was okay once. He never was okay, ever. So habilitated is what he needs. And he could certainly -- he is a good and kind person, despite what he did in many other ways. And so I think that rehabilitation is something that we should be thinking strongly about. It shouldn't just be punishment.

12:37 Can you imagine how he'll come out of prison if he's raped all the time and threatened all the time? He told me he can't even speak to the corrections officers because his heart beats so fast with fear. I don't think we need to do that to him.

BY MS. VORA-PUGLISI:

Q. And, Doctor, that was one of my questions: Do you have an opinion on what would happen or could happen if Brandon is sentenced to a further lengthy period of incarceration?

AUSA ALEXANDER: I would object as to speculation, Your Honor.

THE COURT: I would agree, and I have read the report already, whether it's Brandon or anybody else, prison

is no vacation for anyone. So let's not -- let's -- he clearly has susceptibility due to his stature, age, I understand all of those things, but I don't think we need to belabor it.

I did read in the report and we saw on the video he's, unfortunately, already been the victim of the conduct that is absolutely unacceptable within prison, and my hope is, obviously, knowing his classification, knowing his background, that something will be done to make sure that he -- and I understand also that many times we do have solitary issues with folks who have ASD because they have problems interacting with others and they are at risk. So trust me, I'm well aware of that.

12:38

**MS. VORA-PUGLISI:** Very good, Judge.

12:38

**BY MS. VORA-PUGLISI:**

Q. And, my last question to you is, you know, obviously you were hired by the defense, and his father and even Brandon, he just wants to go home right now, but your recommendation is that he should go for a period of time to residential placement.

12:38

Can you explain why you think, versus just sending him home, you think that's the better place for him?

A. **I think he lacks so many experiences that other people have that he could have some real social experiences, but in a very controlled environment that would help him learn some**

12:39

of these skills. And also, we would have some feeling that he was under supervision at all times and that he was not -- would not have access to computers or guns or anything because he would be under that kind of control, and that then could be a time when his father could prepare for all of the treatments that need to be rounded up at home, for him to have an equal program but in the home setting, eventually.

12:39 Now, I would say that it's -- he hasn't had that opportunity, the school district didn't give it to him and he hasn't, and he's, as you see, not an unintelligent person, so somewhat capable of learning, but someone whose social or emotional intelligence is like a small child and, to me, should be taken into consideration when we think of what could we do with someone if he were a child or a juvenile.

12:40 **MS. VORA-PUGLISI**: Very good, Judge. I don't have anything further.

**THE COURT**: Mr. Alexander, I'm sure, do you want to ask a few questions of Dr. Geller?

**AUSA ALEXANDER**: Yes, Your Honor.

12:40 **THE COURT**: Let's take just a brief break and when we come back, here is what I intend on doing. When we come back, we'll allow the government to ask a few questions and if Ms. Puglisi has anything to follow up, we'll do that. I'll hear some argument from Ms. Puglisi to wrap up her position. I'll see if Mr. Fleury, the father, wishes to

speak, or the son, and I intend on pronouncing sentence.

So let's take another three-minute break.

**MS. VORA-PUGLISI:** Judge, I just want to let Your Honor know, if you do want to speak, whether in chambers or out here, if you want to speak to the person from the residential program he is available on the phone, he's in Idaho, but he's available by phone to answer any of the Court's questions.

**THE COURT:** Thank you, and I don't. I read the materials attached, so I am comfortable that I understand the parameters of the program.

We'll be back in a few minutes. Thank you.

(Thereupon, a brief recess was taken.)

**THE COURT:** Please be seated, everyone. At this time we'll resume with our sentencing. And I will turn to the government who wishes to ask a few follow-up questions of Dr. Geller.

Go ahead, Mr. Alexander.

**AUSA ALEXANDER:** Thank you, Your Honor.

***CROSS EXAMINATION***

**BY AUSA ALEXANDER:**

Q. Dr. Geller, one of the reports or one of the documents you provided the defendant was an Adult Self-Report Inventory-4?

A. **Yes.**
Q. So these are a series of questions that are asked of the defendant, and he has to rate it between never, sometimes, often and very often?
A. **Correct.**
Q. One of the questions that was asked, or one of the statements that was posed is, "I blame others for my own mistakes," and he answers, "Sometimes." Do you recall that?
A. **No, I don't recall every item.**
Q. But you don't recall that one specifically?
A. **I don't know if what you're saying is that that's the accurate response. If you have it, that I said it, then I'll take your word for it.**
Q. "I try to get even when people make me angry." He marks it, "Sometimes."
A. **Uh-huh. (Nodding.)**
Q. Do you remember that?
A. **It's in my report, yeah.**
Q. And then, "I don't care if what I do hurts other people.
"Sometimes." Do you remember that response?
A. **What page are you on?**
Q. Page 6 of -- I'm looking at 5 and 6, actually. And, again, this is the examination that you had provided him.
A. **I'm sorry. Would you -- you're not on my report, you're on something else?**

Q. This is the examination that you had provided the defendant. It's like a questionnaire.
A. **Oh, that. Oh, I'm sorry. I thought you were looking at my report.**
12:53 Q. These are the responses that the defendant had made?
A. **Uh-huh. (Nodding.)**
Q. But I notice that none of these are in your report?
A. **My report talked about what I thought were the most important ones.**
12:53 Q. You didn't think, "I don't care if what I do hurts other people," you didn't think that response was important to mention?
A. **Obviously, that's a response that I didn't think were as important as the ones I put in as example.**
12:53 Q. And you didn't think it was important --
A. **I didn't say not important. I said I put in a few examples of ones I felt were somewhat more important.**
Q. Now, Doctor, this exam was not included as an attachment to your report, correct?
12:54 A. **No.**
Q. Now the only reason I got it was because I asked defense counsel for a copy of this.
A. **Yes, you can have it because you asked for it.**
Q. But for whatever reason in your examination you didn't
12:54 feel that this was necessary to pinpoint, at least advise the

Court and the parties about this defendant's responses?
A. **It's not typically to put raw data in reports because those are supposed to be protected, that's supposed to be protected information for the test manufacturers. We are not supposed to put them out unless we need to, unless we are asked specifically for it.**
Q. Well, Doctor, isn't it true that you actually put certain responses by --
A. **Yes, but not the whole test.**
Q. I didn't ask you about the whole test.
A. **Right. There was some illustrative examples.**
Q. We'll move on, Dr. Geller.
Dr. Geller, you reviewed the transcript of Dr. Dietz's interview, correct?
A. **Yes.**
Q. You didn't review the video?
A. **I saw -- I did see -- I have the video as well, but I used mostly responses when I was writing my report.**
Q. Okay, but did you watch the entire video?
A. **No, I did not watch every minute of it, I watched some of it.**
Q. Do you have a copy of the transcript in front of you?
A. **No.**
Q. I'm going to read you a response from Mr. Fleury that's on page 58. He was asked about whether the group of

delinquents in high school was the first group that pulled him in. His response, "Actually, no. I had -- I did have a similar group like that freshman year, but it was totally different because they were more real friends. They weren't like the fake ones like this group." Do you remember that response?

A. **Yes.**

Q. And the whole position that the defendant has kind of taken up is this defendant never had any real friends?

A. **Yes.**

Q. But, in his own words, he did have real friends.

A. **That's a typical response by people with autism who considered anyone who would be in their vicinity or let them be on the fringes of their group to be their friends. Those people were never at his house. He was never at their house. There was no friendship. He was on the edges of a group that tolerated him.**

Q. So you have a better sense of who his friends are than Mr. Fleury does?

A. **Yes, a few, yes. If you ask people with autism who their friends are, you'll find that someone who sat next to them in English was their friend or someone that they were nearby was their friend. That's what they will say, yes.**

Q. And you don't think that's normal for people who associated with someone on a day-to-day basis to think of

them as friends?
A. **That's not what we would think of as friendship.**
Q. Dr. Geller, I saw the allocution video and one of the examples you had given was that the defendant is attracted to edgy killers.
12:56
A. **No, edgy people.**
Q. Edgy people. And one of them was not John Wayne Gacy. You actually put a photo of John Wayne Gacy on the video, correct?
12:57
A. **I didn't.**
Q. But it was part of the video?
A. **Uh-huh. (Nodding.)**
Q. And you're aware that in the interview between the defendant's father and the FBI, he actually stated that
12:57
Brandon has mentioned serial killers such as John Wayne Gacy and Ted Bundy to him?
A. **Yes.**
Q. But you are saying that the attraction to John Wayne Gacy is not --
12:57
A. **I'm saying that he has an obsessive interest, a perseverating interest in serial killers and people who do things like that, and is that is completely separate from who he has as a sexual interest. Those are the not same thing at all.**
12:57
Q. Let me ask you this, Doctor, you presented yourself as an

expert in autism spectrum disorder, correct?
A. **Yes.**
Q. You're not an expert in what makes a serial killer or a mass murderer tick, correct?
12:57 A. **Correct.**
Q. You have not interviewed or been involved in cases of serial killers and mass murderers to the degree of Dr. Dietz?
A. **No, I have not.**
Q. And one of the things in your report is you said that
12:58 Dr. Dietz, his knowledge of autism spectrum disorder is limited?
A. **Yes.**
Q. And the same would be said of you when it comes to the workings of serial killers and mass murderers?
12:58 A. **I would say that I am not ignorant in the difference between psychopathology and sociopath and people with autism. I am not ignorant of that. I have not been a witness about serial killers.**
Q. In terms of these messages that you kept stating were
12:58 just the defendant repeating them because he saw them online, what is your factual basis for that?
A. **My basis for that is actually some of my own, looking at when I heard about what he had done, I went online and looked for other people saying things. I read about Lynn Ann who is**
12:58 **a known troller of Columbine people. And the sort of thing**

**that Brandon has done his whole life, which is expropriate phrases from movies and videos and things that he's heard and used them himself word for word repetitively.**
Q. One of the comments that he had sent in this case was to the father of Alex Schachter, the father being Max Schachter. His son was a musician in the marching band. The defendant saved a photograph of Max and his son at a high school marching band championship and sends a message to Max saying, "Little Alex will never play music again."
Is that something that he found online?
A. **I don't know. I don't know that he found every word, I'm just saying that the majority what he said are things that he found online that were being sent by others.**
Q. And, Dr. Geller, did you review every single message that this defendant sent?
A. **No, I did not.**
Q. So how you can you sit there and say that he copied the majority of them from other sources when you haven't actually looked at the actual images?
A. **I'm giving you a general description of his behavior, kind of behaviors that he does.**
Q. But you did not even look at the specific messages that he sent to understand his general behavior?
A. **I was not provided with those, no.**
Q. You know it's public record?

A. **No, I didn't know it was public record.**
Q. There was a trial, Dr. Geller, you could have looked it up or even asked defense counsel for a copy.
**THE COURT**: Let's move on, Mr. Alexander.
01:00 **BY AUSA ALEXANDER:**
Q. Okay. And, Dr. Geller, you said that the defendant cried when he heard about the Marjory Stoneman Douglas shooting?
A. **Yes.**
Q. But then, ultimately, he develops a sexual arousal for
01:00 the killer?
A. **Because the criminal was online so much and so -- in the public eye that he saw him and was attracted to his appearance.**
Q. So whatever caused him to cry was no longer important, it
01:00 was now the sexual arousal?
A. **No, I don't think that's an accurate thing to say.**
Q. And then after being sexually aroused or developing sexual arousal, he then targets the victims, including high school kids, with these messages?
01:01 A. **I think that those victims, those were not -- I think those victims were targeted because they became public figures. They, themselves, I feel, are heroes to me for the things that they were doing, that they became public figures, and so then he became aware of them.**
01:01 Q. You think every single high school kid that survived the

Marjory Stoneman Douglas is a public figure?

A. **No, I don't. I think that some people that he saw online became public figures to him.**

Q. Some became public figures, but was every single person a victim in this case a public figure?

01:01 **THE COURT**: I think she's answered that in the negative. Anything else?

**AUSA ALEXANDER**: Nothing further, Your Honor.

**THE COURT**: Ms. Puglisi, any follow up with Dr. Geller?

01:01 **MS. VORA-PUGLISI**: Thank you.

***REDIRECT EXAMINATION***

**BY MS. VORA-PUGLISI**:

01:02 Q. I have one question about remorse, because this was something that the government talked about, which was Brandon's statement he wanted to only cause anger. He said that he wanted to cause anger and annoyance. Dr. Dietz says it was invoked so quickly and repeated so often that the 01:02 responses seemed rehearsed and, at same time, he said he understood the negative effect to his father, brother, himself, but adamantly refused to show even an ounce of remorse towards the victims.

Can you explain that?

01:02 A. **So he was -- after his initial pretrial he was home with**

his family. He would see his father weeping with grief over what had happened. He would see his brother being visibly upset, and over time he understood how upset they were because it was demonstrated to him on a day-to-day basis.

01:03 Emotions need to be quite dramatic for him to take them in. What you're referring to then is a conversation that he had with Dr. Dietz where Dr. Dietz said, "Were you trying to create anguish or grief or were you trying to create" -- and he named a number of emotions, some of which he -- many of which he did not know, and what he kept saying was, "No, no, no. I wasn't trying to do that." Basically he was saying, "My intent was just to cause annoyance and anger, because that's what trolls do."

Now the fact that he may have caused much more than that, which he obviously did in the victims, was not his intent and the reason he kept repeating over and over again is because what he meant is that wasn't what I was trying to do.

Q. Now you met with him after the trial, right?

A. Yes.

Q. And after the trial where he was able to watch the victims come in and testify?

A. Yes. That made him finally more aware because it was alive and real people and saying things that were pretty dramatic. That made him then aware of what had been caused.

Q. And when you see Brandon in the video when he gives his apology to the victims, he has what many ASD people do, which call a flat affect, right?

A. **So his affect is quite flat and it doesn't belie what may be inside, but he does have a rather flat affect and people have a negative opinion of people who don't display emotions. He doesn't display emotions.**

**He says the words, now that he's aware of how the victims felt, that he's sorry, but until it was really demonstrated to him by them, he didn't understand it before then.**

**MS. VORA-PUGLISI:** I have nothing further.

**THE COURT:** Thank you very much, Doctor, you're free to rejoin the gallery.

A. **Thank you.**

**THE COURT:** Thank you. Ms. Puglisi, at this time, I don't know if there's any additional argument you wish to make or if there's anyone else you wish for me to hear from.

**MS. VORA-PUGLISI:** Yes, Judge, thank you. Can I get the video, please?

Judge, this is a chart that you haven't seen before because it wasn't until Friday afternoon that I saw the government's motion where they're asking for 20 years and had no idea that this is where they were going.

**THE COURT:** I will note you did give me comparators

01:06 01:06 01:07 01:07 01:07

for guideline sentences, though, which I did get a chance to review to show where this would fall in the guidelines. The Court recognizes that a sentence within the guideline range would, in your view, statistically speaking, be higher than most sentences giving for the cyberstalking crime. I am aware of that.

Go ahead on this one then.

**MS. VORA-PUGLISI**: So now let's look at this chart because this is really telling of -- you know, the government files this motion, but it's really based own emotion. They didn't cite one case, no case law. There was not one case where somebody was sentenced to this that compared and contrasted so you could see the disparity, and all it says was you can't quantify emotion.

Well, there are stalking cases and you can look to those cases and they ask the Court, they ask Judges to look and compare and that's done for a reason. That's what the 3553(a) factors say. They ask the Court to look at all these various factors and, one of them, in fact, is disparity amongst similarly situated defendants.

So what we have done here is show you, the government's asking for a 240-month sentence recommendation. Now, if you look at this, and looking at the one far to the right, 62, Judge. That is 62 months. That is the average that anybody has gotten with this criminal history category

6. That is the average amount that they have been sentenced to, okay, 62 months for somebody who has a criminal history that is extensive, as we know, to get up into a criminal history category of 6.

01:08 Now, we know that 2A6.2, the maximum sentence that anyone has ever gotten for this guideline of 2A6.2 in a criminal history category of 1, where Brandon falls, without objection, is 137 months. That's the most anyone's ever gotten for this.

01:08 You see robbery, which is a violent crime. You see kidnapping which is a violent crime, sexual abuse, child pornography possession, sexual abuse in a criminal history category of 5, Judge. The government believes that Brandon should be sentenced to more than individuals who have raped 01:09 people. That's what we see from this chart, and it's very telling. The most that we see here under 2A.2, the overall max was 235 months, and that's based on high criminal history categories. It's not criminal history category 1, we know, because the maximum for that is 137. So it is the overall 01:09 max for other cases not in a criminal history category of 1.

And this is important because what does it tell us? Well, it tells us a sentence of 240 months is greater than the average sentence for sexual abuse in category 5. Greater than the average sentence for possession or distribution of 01:09 child pornography in a category of 6, would be the highest

sentence ever imposed under 2A6.2 for any criminal history category. It would be the highest upward variance ever imposed under 2A6.2, by far. It would be nearly twice the current record under 2A6.2 and a criminal history category of 1, and it would be nearly four times greater than the average sentence imposed on those sentenced for stalking or harassment for even a category of 6.

Now we know from 2006 through 2018, there have been approximately 988,407 individuals sentenced under the U.S. sentencing guidelines. And these statistics come from the U.S. Sentencing Commission, Judge. So we know that a sentence of 240 months is in the 97.6 percentile, which means that 97.6 percent of the nearly one million individuals sentenced under the guidelines received a sentence less than that. And a sentence of 240 months is equivalent to a 12-level terrorism enhancement.

Again, why is all this important? It's important because Your Honor does need to know these numbers. We can quantify certain things. And, you know, what happened to their families is horrible. There's no question. And we are not here today. The guilt phase is done. We're not talking about that. Now we're talking about what is the appropriate sentence.

We do not sit here and say to anybody in this courtroom that these were okay, that it was okay to send

01:11 01:12 01:12 01:12 01:13

these messages. It was not and they were horrible messages but, you know, in these stalking cases, do you think any victim in those doesn't feel emotion? They each feel it very personally and to the same degree than anybody else. We cannot minimize what other victims feel who are victims of stalking harassment. There are many cases, most of them, honestly, had to do with, you know, relationship, people who are former spouses. I mean, we have seen that also in state court. That's a normal thing. That's usually how these stalking cases happen. And you don't think that that person whose ex-spouse is stalking them and threatening them, sending them pictures of dead bodies and saying, "I'm going to do this to you, I'm going to mutilate you," you don't think that that person feels that just as emotionally as anybody else? And those courts have varied in those cases. They vary downward and they have done it because of the defendant's history and characteristics.

And that's why I think it's very important that we go through it and, you know, I'm sorry, Judge, again, I -- and you know me, I'm not like this, but to ask for 20 years, I find it to be abhorrent that the U.S. Attorney's Office would approve for anybody, let alone somebody who has autism, for any defendant, for stalking with nothing more than words. Again, terrible words. I'm not justifying the words. But words unaccompanied by acts of violence or something more

that they think 20 years. That is not a general deterrent. That does not send a message. That is completely unreasonable to even ask that number.

And it seems as if it was based on emotion because, 01:13 again, we have no case law and we have no statistics, but I want to go through the government's statements in their motion for upward variance because they're not supported by the evidence.

On page 10, he says, "Only after all of the 01:13 evidence in the case had come forth did the victim realize they were right, that the person targeting them aspired to be the next mass murderer."

Judge, there was no evidence he aspired to be the next mass murderer. And I understand the concerns that the 01:13 Court has. But the Court should not sentence based on what-ifs. Imagine what our society would be like if judges started sentencing based on what-ifs. You're supposed to sentence based on what's in front of you. What this individual did and what he was found guilty of, and he wasn't 01:14 found guilty of planning anything further than words. They didn't find he went out to buy a gun or that he had interest in a gun. They didn't find that he made plans to travel to Florida to carry out anything. There was nothing more than just words in this case.

01:14 So we can't assume, based upon his fascinations

with serial killers or anything else, we can't assume that he's the next mass murderer. I mean, this is insulting.

The next one, "Fleury's criminal conduct clearly stems from his insatiable desire to live out his darkest fantasies." Again, there's no evidence to support that in the record. The manner in which he conducted himself clearly stemmed from his sexual depravity and the connection that he feels to these murderers. These are two separate things, and he has said throughout, in his interview with Dietz and with everybody, that the reason was because these were activists, these people were in the public eye.

Again, we're not saying it's okay, but he chose them because they were in the public eye. And so, because of that, that is what we know as being the reason for these people that he chose. It's not that he has a sexual fascination with these people and that has now, with this connection with the murderers so that led him to do that. There was no statement that he ever made that said that. And don't take my word for it, take Dr. Dietz's. Nowhere in his report does he say that there's a connection to those two things. That's the government's expert witness.

Dr. Segall, I already talked to you about this but I don't -- he says he conducted a thorough examination. I'll let Your Honor make a conclusion as to whether you think that or not.

"Fleury's criminal conduct clearly stemmed from his insatiable desire to live out his darkest fantasies." And I pulled this, this is from the transcript, this is what I just mentioned. "The more people can see it, it said it's public, it's not just between me and the recipient. The other people can read the nonsense."

Dr. Dietz: "How did that help you achieve your goal?

"There's not much of a goal, it's just nonsense."

And Dr. Dietz: "Well, was there a goal to influence their activism?

"No.

"Was there a goal to get attention?

"Not exactly, not attention to me personally, attention to the comments, perhaps, and I know the comments did get attention because Cameron reposted them and I think that maybe other people did, too."

So, again, Dr. Dietz even doesn't put in his report there's a connection. "His primary motivation was to replicate the behavior of the mass murderers and serial killers that aroused him and assert his dominant power and control." The behavior? He replicated the behavior?

He is not Nikolas Cruz. He did not horribly take away their children. And for the government to put this in there, that is just offensive. It is so wrong because there

was no evidence to support that. And it seems like he's just putting things in there.

"He consciously minimized the full extent of his culpability. He repeatedly denied any recollection of sending certain messages or operation or using certain user names, particularly the messages conveying a threat."

Well, there were, like, between two and three hundred messages. Is it believable that somebody doesn't remember every single message he sent? He didn't really deny it. What he said is, "I don't recall that," when he was asked by the FBI, they said, "Do you recall saying this?" And he would say, "You said this," and he goes, "I don't recall that." He wasn't saying that he didn't. He agreed that he used many user names. He had many messages. This was not a question of he didn't make all of these comments. That's never been a question in this case. He made these comments and it's not him denying it.

He gave a very long interview with the FBI. He gave an almost two-day interview with Dr. Dietz. He answered all the questions. I think there was only one that he said he didn't want to talk about which he said it was embarrassing to him. But he was pretty honest in answering the questions.

**THE COURT**: We can move on from their motion.

**MS. VORA-PUGLISI**: The video taped allocution

includes a half-hearted apology, Judge. I already spoke to you about this, and Dr. Geller also mentioned it.

Judge, I have sat with him a lot of time now since he's been back, and I can tell you this was not half-hearted. 01:19 He did the best he could, you know. And it wasn't an Oscar-worthy performance. If he was as manipulative as the government seems to think he is, the plotter and the planner, then wouldn't he have done something more? Wouldn't he have cried and said more? He didn't because he can't, because 01:19 it's the best he can do, you know?

And he just wrote this to me and I just want to read it so you can see. He said, "The reason I said I didn't feel sorry for the victims in Dietz's interview is because I thought the comments only angered them. It was before I 01:19 heard them testify. I feel terrible about what the comments actually did. This is a million miles away from what I intended.

What they're saying about me right now is so untrue and I've never felt this sick before. I never said I 01:20 idolized killers. I may be interested in them and attracted to them, but I do not condone what they do and I do not idolize them." This is what he just wrote right here, Judge. He really does mean it, and when he knew the victims would be the most vulnerable he attacked for what felt like an 01:20 eternity, and I know that they will feel an eternity of pain,

obviously. But that eternity, obviously, is Nikolas Cruz who took their family member away from them.

01:20 When you look at the cases, and I put this in here specifically because we're going to transition into the disparity. And they talk about length of time as being a factor the Courts look to. And they say it felt like an eternity, I'm not saying that it didn't feel like that, but it was two weeks. Admittedly, according to the government's own motion, it says it's two weeks.

01:21 And so when you look at the case law, that is not considered, you know, an eternity. And, again, the government's upward variance, not one case that's cited never compares or distinguishes this case from others charged with the offense, not one statistic to show an upward variance of 01:21 20 years is warranted. It appears to be completely based upon emotion.

So let's talk about what we believe are the factors supporting the downward variance, Judge, because I think that hopefully you see an upward variance to any amount of time is 01:21 unreasonable, but what I want to show you, Judge, is even a sentence within the guideline is unreasonable, and that's why we're asking for a motion for downward variance.

The history and characteristics of Brandon, I laid that out in my motion, so I'm not going to go over that 01:22 again. The seriousness of the offense, and this is also

going to tie into the disparity, but no actions other than words. We have the quantity of messages. And when you see, Judge, as I tried to lay out as much as I could, the facts of the few cases I cited for the downward variance, they talk about, like, a thousand messages being sent over 13 months or two years or three years. You see that -- and even in those situations, the Court still thinks that downward variances. Those don't even -- in those cases, that didn't even warrant an upward variance. The one that was the 137 months, and I think this is important, too, because that's the highest --

**THE COURT**: The only -- right, that's the highest.

**MS. VORA-PUGLISI**: In category 1, when I looked it up, Judge, it was a woman for her ex-spouse who it was the internet threats and the stalking, which is the same charges as this case, but it also -- she forced her spouse to have sex with her. And so we're talking about rape, adding a violent contact to it, and the Judge said that is completely -- and it needs an upward variance in that situation because we're not talking about just words. We're talking about something way more than that. So in a case which was the highest of 137 months, that person was sexually assaulted.

So this is a chart I did provide you which shows you, Judge, if you are going to give incarceration, if you do believe that that is necessary, you can see that in these cases with a criminal history category 1, the average

sentence is 29.7 months, it's 30 months, that's the average. And that even doesn't take into consideration Brandon's autism. Some of those people did have some mental illness and the judges took those into consideration, and those ones I showed you even received less than the 30 months, they got probation or ten months that they had for time served.

But I just wanted you to see that the average for this, you know, is 30 months and, you know, with the skills program we know that Dr. Gutierrez says it's 12 to 18 months that it could take to complete it. And so, you know, there's no reason, really, in the numbers, the statistics, the case law it just doesn't justify doing a long period of time. And what's important I think here is the need for treatment, looking at even the doctors from the BOP and the government, they do not say that Brandon is without hope.

You asked that question of the government and can he not be rehabilitated, is he without hope? Well, you know what, their own doctors -- doctor didn't say that.

Now Dr. Gutierrez, the government mentioned, he found he didn't qualify for hospitalization. As Your Honor knows, that's more for sanity --

**THE COURT**: Correct.

**MS. VORA-PUGLISI**: -- and schizophrenia and those are some severe mental illnesses, so I honestly didn't believe he would qualify for that, anyway. But what he says

01:25 01:26 01:26 01:26 01:27

in his opinion is that, "Although he does not need hospitalization, it is strongly recommended he receive appropriate management and specialized treatment, if the defendant is sentenced to a term of incarceration" -- and the important word is if -- "then it is recommended that the Court request BOP designate him to the skills program, but if the Court ultimately sentences Mr. Fleury to a period of home confinement, it was still recommended that he receive appropriate therapeutic services."

And this is an important one, this is their own doctor, Judge, right here. "Dispositional considerations. Ideally he would be monitored and supervised in a residential setting and without unchaperoned internet access. He needs ongoing cognitive behavior therapy and a series of mind skills. I do not know one way or another whether such therapy is available in the BOP.

If in his home or in the community he needs applied behavior analysis therapy to work on his social skills, communication, limited adaptive behavior skills to work on more appropriate recreational activities and to decrease the inappropriate behaviors." This is their doctor, Judge. He's not saying throw away the key, this guy is not without redemption. He is not saying that. And it doesn't even say he deserves a period of time in incarceration.

So I think it's important that you can see that

01:27 their own doctors. And, you know, Judge, I didn't bring a doctor here who told you just send him home. I know that's what his family would like. But, honestly, Dr. Geller is very well- known in the field of autism. She's been doing this many years. And she believes that the appropriate placement for Brandon is in a residential.

And I think we must take into consideration the fact that Brandon was sexually assaulted, and, I mean, he has reported it. I don't know where BOP is with their investigation. It's not something they like to share with other people. So I do know that he did report it but he is scared to death. He called me on Saturday night just to let me know, make sure I told you that you knew that this man is in a low security prison. Atlanta was low and he's now in Kentucky at a low, and that this is the kind of person, even though, you know, it's not like he's a maximum security prisoner. This is somebody at a low.

So Brandon has severe anxiety every time he moves to a different jail and he has to get a different roommate and he has to be -- it is traumatizing to him. Traumatizing. He's been in for five months, Judge, and I think that, you know, that five months is -- it's not been easy time and you talk about general deterrence, and I understand the Court's need for general deterrence, it is important. You know, it's really sad the way the internet is right today. The amount

of people that go on and they say horrible things to others. It's not right. Shouldn't happen. And I can understand the Court's desire to send some kind of message of general deterrence, but I think you have to temper that with who Brandon is. Brandon did not do anything other than words. Terrible words. But no additional conduct other than words.

So we should only sentence him based on what he did and on his particular situation, keeping in mind that for him, you know, having been assaulted and who he is and his demeanor and his stature, you know, I would just ask the Court that if -- he basically is like a 22-year-old boy. He's like a child. I think we see that with the fact that he walks around with a stuffed duck. That's not normal for people who are adults. And his intellectual or his social maturity is that of a juvenile.

So the Court and Your Honor has had cases where you've had to sentence juveniles. So I know that you take it very seriously and you always think about, you know, what is the appropriate sentence? I think Brandon is like a juvenile. So we have to think about what that would mean in an appropriate setting and he can follow the rules because he was nine months on house arrest and he followed all the rules. He had no violations.

And just to be clear with the program in Idaho, Aloft, the individual that Dr. Geller was speaking about,

01:30 01:31 01:31 01:31 01:31

it's a federal case. He's on pretrial release so it's not a sentence, but it's pretrial release, he's on home confinement with electronic monitor, and he's been there for two years, which he's been successful. The program has done everything the Court asked it to do. They kept him on the electronic monitoring, he hasn't violated that, and they have a camera set up where the computers are so he's, you know -- I spoke to the director, he said that they can make sure that he's not having access to computers. That definitely they can comply with all the rules that the Court deems appropriate to make sure that, you know, punishment is there but at the same time that Brandon gets the services that he needs so that we can make sure that nothing like this ever happens again.

And I just want to make sure I didn't forget anything, Judge.

**THE COURT**: And I don't know, I mean, with the video I would assume that that was their ability to kind of discuss their feelings with the Court, but does Mr. Fleury want to say anything or is he comfortable relying on the video? It's okay.

**MS. VORA-PUGLISI**: His father would like to say something, Judge.

**THE COURT**: If you have any other final points, let's make them because --

**MS. VORA-PUGLISI**: That's it, Judge. We'll finish

with Patrick Fleury.

**THE COURT**: And just to be clear, Mr. Fleury, do you want to share anything with me? You don't have to if you don't want to, sir.

**THE DEFENDANT**: No.

**THE COURT**: You do not. Okay. It's all right, I just want to make sure.

So, dad, if you want to come up, you can address the Court and then the Court will proceed in pronouncing sentence. Okay.

State your name.

**THE WITNESS**: My name is Patrick Fleury. I'm Brandon Fleury's father. I apologize. I have a hoarse voice pretty much my whole life. So the last 12 months hasn't made it better.

I'm going to apologize immediately for maybe going off script a little bit, even though I'm not one for script. But I mean, first and foremost, I have to apologize to everybody. My son spent a handful of days that encompassed a couple of months, but really only a handful of days, because it was the end of December carried into January, and prior to the FBI coming with their SWAT team of 30, you know, coming to the house, that was an experience that prior to that my son had stopped doing this trolling kind of stuff, lack of response. So I appreciate the victims not responding back to

Brandon.

Over and over again Brandon just kept saying, "I can't believe they consider me a criminal. The judge is not going to think that, is he?" Yet, we talked almost is single day via the phone while he was in prison. And even though some days I missed the conversations with him, it was really hard to not hear his voice because I can't imagine him being in prison to start with.

And I did finally go visit him recently for the first time in a prison. Something out of a cartoon or a weird comedy, a skinny little kid. I know he's a man. I don't look at him as a man ever, I never have and probably never will. But all these guys that surrounded him were like giants. Scary. Very scary to see him like that. But he caused his own problems.

I just think just like when my younger son got in a car accident with a drunken driver who had five offenses driving a monster truck and he ran into our car, I never thought of that guy. I didn't even know his name. Five months later all I cared about was my son. And I promise you if something bad would have happened to my son, I'd probably be doing the same thing these guys are doing. Honest, I'm just human.

But I didn't and I stood by son's bed and put superhero stuff around the room that we got free from Marvel

and I didn't let doctors come in unless he was awake, I gave him all his medicine, I can't even imagine now thinking about that, they allowed me to do that, but they did, and my son woke up on Easter afternoon when Brandon came in, and I got to think Brandon is his good luck charm, Brandon's not a good luck charm for himself, maybe, but there's a connection there.

Unfortunately, when my wife died Brandon was in bed with my wife as a five-year-old, so there's another thing. With Brandon everything seems to be coming around, when it comes to Brandon, in dramatic fashion, and I apologize for parking my car this morning and having Mr. -- excuse me if I mispronounce -- Mr. Guttenberg pulling up next to me and coming out of the car simultaneously. I didn't confront him, I apologize to him because he happened to get out of a very nice-looking car and our eyes met like it was scripted in a movie. That's the only reason why and I apologized for Brandon. I just said, "I'm sorry." So again, coincidence, why and how I don't know how that happened. But it will add to my book of coincidences which I have many, just like my unexpected passing of my wife and the car accident, and it's a lot of dramatic things, even my brother who died when I was ten years old from a drunk driver, a lot of dramatic things and deaths that have come. I could imagine my own dying, other than my wife. That was -- if I didn't have those two

little boys to take care of, I don't know what I would have done. They were the only thing that kept me going. And we're a unique family. We can be considered weird because we are so closely knit. We do everything together, and, yes, like a helicopter, or whatever they call it, parent, I stay close. Every day I've spent with both my boys. One's got Asperger's and other mental illnesses, another we had a serious brain injury -- actually, a normal brain injury, but literally his entire brain had damage. So when they told me that he wasn't going to potentially live or he was going to be not able to walk for a year or more, I literally, I apologize to them, I misquoted the movie, it was less than 12 days, it was ten days I had my son walking. I swore 12 days because that was when our insurance kicked into the hospital and I wanted to go back to the Children's Hospital. In ten days, I had my son walking.

Brandon might have been a miracle and it might have been coincidental that he came in on Easter 2020, was going to do a show as well as some other shows about it, and I decided, no, I didn't want to jinx Nathan's recovery, so we didn't do any of that. They were going to do a show called, "Siblings." I couldn't imagine with Brandon and Nathan, they were just too quirky and weird, but that's still who they are and they're very good people. Eleven days or whatever amount of days Brandon messed up, he did mess up and he deserves

some punishment, but to be totally honest, if I had to sit on a bus for 50 hours and go back and forth to Butner, North Carolina from Miami and stop to multiple prisons on the way and be what he had to be, deal with in all those different locations and being molested like he did and being strapped five different ways like a monster or a creature in a bus, I couldn't imagine it. I couldn't even imagine Brandon going through it. Nathan couldn't imagine it, either. He's wimpy as heck, too. Lucky for me I am only wimpy when I talk.

01:38

01:39 I never cried or felt so much pain in my life but for Brandon it must a million times worse, I guarantee you, and I promise that whatever is going to happen with Brandon, I'm going to be there every single day e-mailing him, talking to him, or if we get the opportunity to have him come home, he'll be better than -- maybe not the federal judge, but he'll be better in most respects, I'll make his brain become amazing. I'll make him become a better human being. There's no way I'm going to give up on my son, and I guarantee you, I can promise you, I can write a dozen books about it, articles about it, I can document everything, Brandon is going to become more special than you can imagine if he's given the opportunity. That's all I'm asking for.

01:39

01:40

I apologize, again, to everybody for what Brandon said in those 11 days, but it doesn't define him and, you know what? He's told me some profound things that I won't

01:40

say. Maybe you'll read about them some day. But he's come a long way, he's evolved like you can't imagine.

Thank you, everybody. I apologize for what Brandon did and I apologize for confronting Mr. Guttenberg. If he wouldn't have parked next to me I might not have done that, even though I wanted to say that I'm sorry for what my son did.

Thank you.

**THE COURT**: Thank you, Mr. Fleury.

Anything else, Ms. Puglisi?

**MS. VORA-PUGLISI**: No, Your Honor, thank you.

**THE COURT**: Let me begin, just as I addressed the victims, by addressing you, Mr. Fleury. Thank you for sharing your thoughts with the Court on behalf of your son. And although your son, I think it is well-documented, has issues with empathy and emotion, I can tell you for the record that he showed emotion there listening to you. So I know that he can be reached. He is not someone who cannot be reached. Perhaps the method to get to him will have to be customized, will have to tailored, but he definitely is someone who can be rehabilitated, in the Court's view.

I also know, because I can only imagine knowing your history, Mr. Fleury, I want to let you know that the Court understands the circumstances under which you were pushed and forced to raise two young children, and they are

01:42 01:42 01:42 01:43 01:43

tragic, to say the least, the loss of your wife in bed from the embolisms with the children nearby, having them at five and three, having the horrific DUI crash affecting Nathan, having your son try and overcome autism, I think Dr. Geller said it, that you could not possibly be equipped to handle everything that's happened here. I know that you were hoping that taking him out of school would prevent bullying and, unfortunately, we find ourselves in today's situation where he was with the internet out and about with these threats and causing this harm. But I cannot imagine that no matter what the sentence is today, you will, and this is why I wanted to address it, you will at some point perhaps blame yourself, you will look at yourself and what you have done, and I want you to understand that you shouldn't put this on yourself. You've done the best you can. As a father, I don't believe for a minute that you were really neglectful. I think you were really faced with a litany of circumstances that made it overwhelming for you to comprehend the nature of your son's disability with everything else that was going on, especially with that horrific accident.

So I know that today's sentence will leave you really no solace, but I do hope that you walk away from it knowing that at least the Court understands that you have done what you can, and, for what it's worth, he needs you more than ever, regardless of the sentence. Whatever the

Court ultimately decides this afternoon, it is crucial that you maintain the relationship you've had with him from the beginning that has only been strengthened through this trial, that you continue to communicate with him and provide him with the safety net and the environment and the resources he's going to need from family, along with his brother Nathan, who I think has been a support system for him, because he's going to need family during this period of his life more than ever.

01:43 That being said, let's start off with the government's request for 20 years. The motion for the variance, I think is docket entry 160, is denied. I want to be very clear that I understand the request to max out and sentence Mr. Fleury to 20 years, the statutory maximum per count. We cannot sentence Mr. Fleury for what could have been. We cannot sentence the defendant for what might have been. We must sentence the defendant for what he has done.

For the government to come to the Court and ask for a 20-year sentence, in my view, with all respect to the families who have gone through terrible suffering since that fateful February 14th, I believe is excessive. It would literally be the opposite of what the guidelines call for, which is a sentence sufficient but not greater than necessary to comply with the purposes of sentencing. The reality is 20 years, guideline sentence, whatever it may be, nothing is

going to fully heal those of you that came to testify, those of you who lost family here. This is not a sentence that gives me joy because it's going to disrupt a family and it's not necessarily going to satisfy or close the hole in the lives of those who lost children and family members on that day at the hands of Nikolas Cruz, but, as I started, that path to healing is still ongoing. This cannot serve as a substitute to heal that wound.

There is a lot of pain in this room today. It's very clear to me that it is far from being relieved, far from being fully rehabilitated, but when I look at a sentence of 20 years, it is essentially tantamount to me saying that this gentleman, Mr. Fleury, this young man of 22 years old, has no future, cannot be rehabilitated. That says he should not exit the doors of prison until in his mid-forties.

Dr. Dietz, the government's own expert, made it clear, yes, we had some, what could only be described as extremely disturbing testimony, disturbing fantasies, sexual proclivities but he is not a psychopath. He was not ever deemed one by any expert. In fact, my recollection from Dr. Dietz is he spoke about some of the possible things that could happen. He said that maybe in his report there could be some prodromal schizophrenia not yet become manifest. But, again, not yet become manifest. There's nothing here that we can look at and say that this gentleman, Mr. Fleury,

this young man, will invariably, if released from custody any sooner than 20 years will, God forbid, shoot up a school, will commit this crime again.

Again, I have an obligation to protect the public from future crime of the defendant, but I also have to have it commiserate with the offense. Twenty years would be unbelievably disparate treatment when looked at with other similarly situated defendants in the United States when it comes to sentencing data.

And, again, I think we would be sentencing him for what we believe he could commit, and that I think is absolutely inappropriate and I say that with respect to the government understanding the position they're in. Understanding, more importantly, the position that the victims are in. Ms. Schachter and Mr. Guttenberg, I understand because the fear is very real.

You know, I have children, I understand the concept, the idea that you have someone here that you, in your view, and respectfully, I think there's part of you that's very right, that you saved or stopped a future crime. I think there is some truth to that and so it's natural that you would come to the Court and say, "He's going to do this if you let him out at any point. You've got to put him away for as long as possible." But that, I think, would really somehow distort the nature of the crime. As pointed out by

defense counsel, had I had some indicator of firearms, planning, visiting, maybe we could talk about an upward variance. If I had him actually acting on some of this.

01:47 You may say to me, "Judge, it's only because we got him in the nick of time." That may very well be true, but, thankfully, because of your reporting, we have him here now facing what justice requires, and I just do not believe that anything above the guidelines, quite honestly, any variance, let alone 20 years, is appropriate. By the same token, this 01:48 is a crime that, to me, was truly despicable in the sense of it preyed on the most vulnerable in our society and our community. It preyed on bereaving parents, it preyed on bereaving siblings at or around the holidays, a very sensitive time, the first holiday these families spent 01:48 without their children, and, as Mr. Guttenberg put it, they were hoping to have a normal day and they weren't even able to have that. Yes, it is two weeks of conduct by Mr. Fleury, but it is an absolute bombardment of messages throughout that time.

01:48 As stated by the victims, they felt that he might even be out of prison and Mr. Cruz might have somehow escaped or have access to the internet. They knew that this person had really delved into their lives, and so I can't look at this and say there wasn't that kind of buildup, that 01:49 analysis. The evidence indicates he uniquely chose these

individuals. You may think they're in the public eye, but they're in the public eye because they are survivors and those who had losses at Parkland.

01:49 So when I look at this conduct, when I look at the nature and circumstances of the offense, I really focus on how depraved those messages were. They were egregious. They were haunting for the family. I listened to the testimony at trial and today. They made them fear for their lives and the lives of their families.

01:49 So this is not your run-of-the-mill cyberstalking case. This is not the average threat. This is truly making them, once again, live in fear. So I do not find that there is any realm of possibility for a downward variance.

01:50 I do believe that there will be a sentence that I'm going to issue today that is within the guideline range of 57 to 71 months, and I think that sentence is appropriate because that sentence will also mirror and prevent some of the disparity we talked about.

01:50 For example, this is the above average case. We had a 62-month average case with a criminal history category of 6. We also had the one outlier sentence of 137 month with a criminal history category of 1. And these are sentences under 2A6.2.

01:50 So, again, we should be less than the 137 months, given that in that particular outlier, with a similar

01:50 01:51 01:51 01:51 01:52

category, we had actual violence. We had sexual violence. We had rape. We do not have that here. So there needs to be something in the range that would mirror these things. But one of the overarching things that I want to be clear on today is that there is not only specific deterrence in that I think that Mr. Fleury would benefit from the skills program while incarcerated, would also benefit from anything else that the Bureau of Prisons can afford him while he is incarcerated. But I think that that would truly mirror and address the specific nature of this offense.

I do believe that this offense is awful enough, if you will, if that is the word, to warrant a sentence within the guideline range, and I think that in addition to specific deterrence, he will come out of the sentence still in his 20s with an entire life left to live, but hopefully with the skill set he needs. I will be imposing every condition imaginable so that I protect the community once he is out, but this is not a situation where we can lock him up and throw away the key. We have a gentleman that has no criminal history. We have a serious offense, but they are words, fortunately, that did not get to the level of actions, and I really need to emphasize that there is a serious general deterrence factor here for the Court.

You know, we heard a lot about the internet being the wild wild west, the term keeps coming out here. Not in

this courtroom. I am tired of hearing that term. We cannot act this way on social media without impunity. This must end.

To the extent a sentence pronounced today sends a message to any would-be trolls, and I use that term, quite honestly, loosely. This is not your average internet troll. We have tried to turn this crime into just simple trolling. We have to, in some way, shape or form, minimize its nature by calling it trolling. It is far and away more serious than trolling to target the victims of gun violence and their families. It's not even the same universe. This is much more serious than the average troll, if you will, but I hope, my sincere hope is that today's sentence will send a message to the rest of the individuals in our country that we are going to patrol to the extent we can on the internet, that we are going to take these threats seriously, and that we are not going to allow people to be on social media and act without impunity and have people fear for their lives. That is unacceptable and there is a very strong need for general deterrence which further motivates a guideline sentence and, to me, cautions against any sort of variance downward from the sentencing range.

So I have carefully considered the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted

sentencing disparities among similarly situated defendants. I believe this sentence that I will pronounce will promote rehabilitation. It will protect the public from future crime by the defendant. Again, I know it's not the 240-months sought by the government, but it will incapacitate and take the defendant out of society until we can attempt to rehabilitate him and give him the tools he needs, as Dr. Geller said it best, to habilitate him because he never even got to rehabilitation, and it will defer his own criminal conduct. I think a lesson has been learned, but I do not think that letting him go home or varying downward would promote respect for the law and represent the seriousness of these events.

He's going be given a sentence smack in the middle of the guidelines of 66 months. He's going to get five and a years for this crime. I believe that is the appropriate sentence in this case. No one is going to be satisfied. We're looking at defense counsel and the family that wanted him to go home, or at least get outpatient treatment. We are looking at a government and victims that wanted 20 years. But I didn't sign up for this job to make easy calls, and this is the way it's got to be. And I welcome any critiques of this sentence, other than to tell you I have very carefully reviewed every medical report by every doctor. I have listened intently to the testimony of both the victims,

the government's argument, the defense's argument. I watched the video last night. I watched it again today. I listened to Patrick Fleury's words. I really internalize as much as I can. It is a difficult sentence, I make no bones about it, 01:54 to figure out how to give someone a sentence for just words, but at the same time understanding that it is much more than just words, it is terrorizing families and innocent people who suffered at the hands of a mass murderer who is yet to be brought to justice.

01:55 It is a very difficult sentence, but I think this strikes the balance between giving Mr. Brandon Michael Fleury a chance to rehabilitate, promoting respect for the law, and hopefully deterring individuals out in society who may, when they see this sentence, think twice about threatening anybody 01:55 on the internet, especially the most vulnerable in our community.

So, again, the Court has considered the statements of all parties, the Presentence Report which contains the advisory guidelines, and the statutory factors as set forth 01:55 in 18 USC 3553(a). It is the finding of the Court that the defendant is not able to pay a fine. It is the judgment of the Court that the defendant, Brandon Michael Fleury, is committed to the Bureau of Prisons to be imprisoned for 66 months. This sentence consists of terms of 60 months as to 01:55 each of Counts 1 through 3, to be served concurrently, and

six months as to Count 4, to be served consecutively to Counts 1 through 3.

Now, Mr. Alexander, I am not certain at this point if restitution is sought. After conferring with probation, my understand is it's ongoing, but is there any update on the restitution concern?

**AUSA ALEXANDER**: We would need additional time, Your Honor.

**THE COURT**: So it is further ordered that pursuant to 18 USC 3664(d)(5), the victims' losses are not yet ascertainable. Therefore, the Court shall set a date for the final determination of the victims' losses, not to exceed 90 days after sentencing.

Now, upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years as to each of Counts 1 through 4. All such terms to run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report, in person, to the probation office in the district to which the defendant is released. While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervised release which include, not committing any crimes, being prohibited from possessing a firearm or other dangerous device, not unlawfully possessing a controlled substance and cooperating in the collection of

DNA.

The defendant shall also comply with the following special conditions: Data encryption restriction. Computer possession restriction. Employer computer restriction disclosure. Mental health treatment. Disclosure of telephone records. As requested, and I will emphasize it, no contact whatsoever with the victims. Permissible search. Unpaid restitution, fines and special assessments as noted in Part F of the Presentence Report.

It is further ordered the defendant shall pay immediately to the United States a special assessment of $100 as to each of Counts 1 through 4, for a total of $400. That brings the total sentence to 66 months of imprisonment, followed by three years of supervised release, and a $400 special assessment.

Now, before I proceed to discuss recommendations to the Bureau of Prisons, you know, I understand, Mr. Fleury, that there has been difficulty, and I want to look at you because one of the things we have had an issue with is trying to break through your diagnosis. I know that it makes it difficult for you to empathize and connect. I want you to understand that this sentence, despite the request of the government, is being given to you because I believe, and I hope that you will prove me right, that you will be able to be reintegrated into society. There is a debt to pay for

your crimes, but I do believe if you get the tools, with the family support you have, that you will make it on the other side a better person. I am not interested in sentencing you to only have you come out worse or a threat. It's a very real concern by the victims here in court, but I want you to understand that I'm not letting this define you. I know it sounds like a lot of time, but it needs to be done, but I do believe that you have the skill and the ability, with the support of your family, to get through this time.

01:58 But I want to implore you and let you know and hope these words ring in your head when you do your time. Remember that when you get out, the restrictions are very real and it is a concern of myself and the victims that should you get to a computer, should you get to a telephone, should you make any contact with any of these individuals in any way, shape or form, when you get out, I'm still going to be here. I'm going to be here for a very long time and I will be monitoring this case when you get out. And I hope you come out a better person. I hope you are not even tempted, but I caution you do not put me in a position while you are on supervised release to find out that you violated any of these conditions because my biggest concern is protecting the community.

But I believe you are not going to be a threat when you get out. I really do truly believe that. I do not want

01:59 this to define you, but you do not have the skills you need right now to get through the issues you're dealing with, and I'm prepared to recommend you to the skills program in the Bureau of Prisons in the hopes that we will learn what we need to try to turn the corner.

Do you understand?

**THE DEFENDANT**: Yes, I do.

**THE COURT**: So, Ms. Puglisi, I would assume that we want to try to have family close, but the programs are not on 01:59 the west coast. They are not in Santa Ana. They are in Connecticut and they are in Coleman near Orlando.

I'm prepared to recommend them and I strongly want him to be in one of those programs. What say you on that?

**MS. VORA-PUGLISI**: I'm going to ask for the one 01:59 in --

**THE COURT**: Danbury?

**MS. VORA-PUGLISI**: Yeah, because he was there before with Dr. Gutierrez who already knows him and that is a low versus Coleman is a medium. So I think because of the 02:00 type of case, that he would end up being designated to a low, but he definitely liked Coleman -- or not Coleman --

**THE COURT**: Danbury.

**MS. VORA-PUGLISI**: He liked Danbury better than the other ones, right, Brandon?

02:00 **THE COURT**: Danbury is kind of close to Butner. My

concern is, obviously, the Bureau of Prisons knows what's going on. I don't want you to be accessibly at risk. My feeling is if we go Butner, and we go closer, it will help you not only for a skills program, but also to minimize any risk while you do your time, but it's going to be the Danbury program that I'm going to recommend. So that's where you will be. It's near Connecticut is my understanding, it's not Butner, North Carolina, so it's not right there, but that is where the skills program is offered, and it's very important to me, as Dr. Gutierrez said, that we put you in that program to help you in your rehabilitation, and that's what I'm going to recommend.

**MS. VORA-PUGLISI**: Thank you, Judge. And then, also, and I know this is the marshals so I'm kind of talking to them, too, if he could try -- I know they do move him usually on Thursdays, if they could try to take him back to FDC. I know usually there's a list and all that, but him being in the local jails --

**THE COURT**: It's the toughest.

**MS. VORA-PUGLISI**: Yeah, the toughest. So if at all possible to try to get back to FDC as soon as possible, we'd appreciate it.

**THE COURT**: And for the record, I will make the recommendation and I reach out to them and see if we can put him on the very next transport to get him there, just to

minimize any risk.

Any other requests being made on behalf of Mr. Fleury when it comes to the judgment of sentence? I think I covered all of it.

02:01 **MS. VORA-PUGLISI**: No, I think that covers it.

**THE COURT**: Anything else from the government?

**AUSA ALEXANDER**: No, Your Honor.

**THE COURT**: So now that sentence has been imposed, does the defendant or his counsel object to the Court's 02:01 findings of fact or to the manner in which the sentence was pronounced?

**MS. VORA-PUGLISI**: Judge, we would object to the Court's objection to the vulnerable victim enhancement and then also to our motion for downward variance, based upon all 02:01 the arguments made and our pleadings filed.

**THE COURT**: Understood. You have the right to appeal the conviction and sentence imposed. Notice of appeal must be filed within 14 days after the entry of the judgment.

If you are unable to pay the cost of an appeal, you may apply for leave to appeal in forma pauperis.

That should conclude today's sentencing. I thank everyone for sharing your thoughts. This is not an easy task for anyone and this gives me no joy, but it is, again, the sentence I believe to be just and appropriate considering all 02:02 the factors in the 3553(a), and I can only hope that for the

victims of this crime, we still have, unfortunately, a long way to go, that this will give you some solace, at least this chapter is done, and I wish you all the best as you try to navigate and rebuild your lives and continue to wait justice in the other case.

**MS. VORA-PUGLISI**: Judge, a logistical thing because I didn't file my motion for variance yet and I had only asked for certain exhibits to be under seal, but then I realized that I do speak about certain things in the motion.

**THE COURT**: You want me to seal the motion?

**MS. VORA-PUGLISI**: That's what I'm thinking, and then all the exhibits that go with it, because it doesn't make sense, you can't file only a couple. So I waited until I came, I brought a copy, I can take it down to the clerk's office now with everything.

**THE COURT**: Yes.

**MS. VORA-PUGLISI**: I just wanted to ask, Your Honor, your advice on that, if I should do it that way.

**THE COURT**: Yes, do it that way and then when the motion comes through, we'll immediately seal everything.

**MS. VORA-PUGLISI**: Thank you.

**THE COURT**: Thank you all very much. We are in recess.

(Thereupon, the above hearing was concluded.)

* * *

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

05/28/2020

DATE COMPLETED

GIZELLA BAAN-PROULX, RPR, FCRR

## $

**$100** [2] - 4:14, 132:11
**$200,000** [1] - 4:12
**$400** [2] - 132:12, 132:14

## '

**'no** [1] - 45:7
**'you** [1] - 45:5

## 0

**05/11/2020** [1] - 138:8

## 1

**1** [13] - 21:19, 24:22, 100:7, 100:18, 100:20, 101:5, 109:12, 109:25, 126:22, 130:25, 131:2, 131:16, 132:12
**10** [1] - 103:9
**11** [3] - 51:17, 82:22, 119:24
**117** [2] - 8:1, 20:6
**11th** [2] - 18:1, 18:13
**12** [5] - 74:2, 110:9, 115:14, 118:12, 118:13
**12-level** [1] - 101:16
**1229** [1] - 18:2
**1257** [1] - 18:10
**13** [1] - 109:5
**137** [6] - 100:8, 100:19, 109:9, 109:21, 126:21, 126:24
**14** [2] - 12:24, 136:18
**14-year-old** [1] - 57:16
**14th** [9] - 27:17, 42:23, 44:21, 47:17, 47:23, 48:8, 56:7, 57:14, 122:21
**15** [1] - 45:3
**16** [1] - 28:5
**160** [2] - 23:14, 122:12
**17** [3] - 27:21, 32:2, 38:16
**18** [3] - 110:9, 130:20, 131:10
**19-60056** [1] - 3:4
**19-CR-60056** [1] - 1:2
**1980s** [1] - 67:14

## 2

**2** [1] - 1:5
**2,000** [1] - 32:1
**2-14** [1] - 55:16
**20** [19] - 22:25, 23:18, 25:12, 38:16, 53:11, 56:21, 57:9, 61:2, 98:23, 102:20, 103:1, 108:15, 122:11, 122:14, 122:24, 123:12, 124:2, 125:9, 129:20
**20,000** [1] - 4:12
**20-year** [3] - 16:15, 33:10, 122:19
**2006** [1] - 101:8
**2018** [8] - 12:25, 27:17, 42:23, 45:22, 46:11, 47:17, 47:23, 101:8
**2020** [2] - 1:5, 118:18
**20s** [1] - 127:14
**22** [1] - 123:13
**22-year-old** [1] - 113:11
**23** [3] - 5:2, 7:21, 53:5
**235** [1] - 100:17
**24** [2] - 5:2, 7:21
**240** [3] - 100:22, 101:12, 101:15
**240-month** [1] - 99:22
**240-months** [1] - 129:4
**247** [1] - 18:10
**25** [3] - 4:6, 4:7, 67:4
**26** [2] - 5:2, 7:21
**29.7** [1] - 110:1
**2A.2** [1] - 100:16
**2A6.2** [6] - 100:5, 100:6, 101:1, 101:3, 101:4, 126:23

## 3

**3** [3] - 20:24, 130:25, 131:2
**30** [5] - 16:22, 110:1, 110:5, 110:8, 115:22
**300** [1] - 65:3
**305** [2] - 1:19, 1:22
**33128** [2] - 1:18, 1:22
**33394** [1] - 1:14
**35** [3] - 5:2, 7:21, 67:5
**3553(a** [4] - 22:17, 24:19, 99:18, 136:25
**3553(a)** [2] - 19:14, 130:20
**356-7255** [1] - 1:15
**36** [2] - 5:2, 7:21
**3664(d)(5** [1] - 131:10
**3A1.1** [1] - 8:4
**3A1.1(b)(1** [1] - 8:2
**3A1.1(b)(1)** [1] - 18:8
**3rd** [1] - 1:18

## 4

**4** [5] - 5:2, 7:21, 131:1, 131:16, 132:12
**40** [3] - 1:18, 5:3, 7:21
**400** [3] - 1:21, 51:16, 65:3
**403-8063** [1] - 1:19
**41** [3] - 5:3, 7:22, 52:8
**42** [3] - 6:22, 7:6, 7:22
**43** [3] - 5:3, 5:9, 7:22
**49** [1] - 52:22

## 5

**5** [3] - 88:22, 100:13, 100:23
**50** [2] - 29:10, 119:2
**500** [1] - 1:14
**518** [1] - 18:13
**52** [2] - 8:1, 20:5
**523-5634** [1] - 1:22
**527** [1] - 18:12
**55** [1] - 53:13
**55-page** [1] - 62:22
**57** [4] - 4:9, 21:21, 52:18, 126:15
**58** [3] - 8:1, 20:5, 90:25
**5K1.1** [1] - 21:25

## 6

**6** [7] - 88:22, 100:1, 100:4, 100:25, 101:7, 126:21
**60** [2] - 53:10, 130:24
**62** [3] - 99:24, 100:2
**62-month** [1] - 126:20
**64** [2] - 8:1, 20:5
**66** [4] - 2:3, 129:15, 130:23, 132:13
**6A** [1] - 28:17
**6B** [1] - 28:17

## 7

**7-year-old** [1] - 75:24
**70** [1] - 75:4
**700** [1] - 1:14
**71** [5] - 4:9, 21:21, 25:11, 53:16, 126:16
**72** [2] - 41:18, 131:17
**737** [1] - 18:12
**74** [2] - 8:1, 20:6
**780** [1] - 18:13

## 8

**8** [2] - 5:2, 7:21
**8-hour** [2] - 14:5, 17:6
**80** [1] - 53:8
**830** [1] - 18:2
**87** [1] - 2:3
**8th** [2] - 1:21, 18:11

## 9

**90** [1] - 131:12
**954** [1] - 1:15
**96** [1] - 2:3
**97.6** [2] - 101:12, 101:13
**988,407** [1] - 101:9

## A

**Aaron** [1] - 44:18
**abhorrent** [1] - 102:21
**abide** [1] - 37:2
**abiding** [1] - 71:13
**ability** [10] - 12:2, 12:7, 19:12, 42:10, 52:1, 78:21, 83:17, 114:17, 133:8
**able** [22] - 9:11, 10:22, 21:12, 40:8, 49:5, 60:18, 61:1, 68:22, 73:3, 76:16, 78:5, 79:3, 79:20, 80:22, 81:21, 82:7, 83:13, 97:21, 118:11, 125:16, 130:21, 132:24
**above-entitled** [1] - 138:4
**absolute** [1] - 125:18
**absolutely** [9] - 25:25, 28:10, 30:23, 36:4, 48:5, 51:3, 70:4, 85:7, 124:12
**abuse** [3] - 100:11, 100:12, 100:23
**academic** [2] - 53:9, 53:10
**access** [9] - 35:10, 35:12, 47:10, 74:1, 74:4, 86:3, 111:13, 114:9, 125:22
**accessibly** [1] - 135:2
**accident** [3] - 116:17, 117:21, 121:20
**accompanying** [2] - 9:24
**accomplish** [1] - 63:16
**according** [1] - 108:8
**accosted** [2] - 83:1, 83:9
**account** [2] - 6:1, 7:23
**accounts** [1] - 47:25
**accurate** [5] - 7:1, 84:3, 88:12, 95:16, 138:3
**accurately** [2] - 5:17, 6:5
**achieve** [1] - 105:7
**act** [3] - 78:17, 128:2, 128:17
**acted** [1] - 46:20
**acting** [1] - 125:3
**action** [2] - 53:17, 53:24
**actions** [5] - 19:13, 47:4, 53:9, 109:1, 127:21
**activism** [1] - 105:11
**activists** [1] - 104:10
**activities** [1] - 111:20
**acts** [1] - 102:25
**actual** [5] - 14:4, 45:7, 56:24, 94:19, 127:1
**acutely** [1] - 61:22
**Adam** [1] - 29:5
**adamantly** [1] - 96:22
**adaptive** [1] - 111:19
**add** [1] - 117:19
**ADD** [1] - 52:22
**adding** [1] - 109:16

**addition** [2] - 27:14, 127:13
**additional** [3] - 98:17, 113:6, 131:7
**address** [8] - 4:13, 8:7, 8:23, 21:14, 21:22, 115:8, 121:12, 127:10
**addressed** [1] - 120:12
**addressing** [3] - 11:1, 11:7, 120:13
**ADHD** [1] - 52:22
**admitted** [2] - 16:25, 39:10
**admittedly** [1] - 108:8
**adolescents** [1] - 68:3
**adult** [2] - 50:7, 74:2
**Adult** [3] - 67:22, 67:24, 87:24
**adults** [2] - 68:1, 113:14
**adverse** [1] - 52:2
**advice** [1] - 137:18
**advise** [1] - 89:25
**advisory** [2] - 4:8, 130:19
**affect** [7] - 5:13, 7:22, 10:16, 21:1, 98:3, 98:4, 98:5
**affected** [1] - 47:16
**affecting** [2] - 5:23, 121:3
**affects** [2] - 11:17, 64:15
**afford** [2] - 50:16, 127:8
**AFPD** [1] - 1:17
**afraid** [2] - 50:9, 79:4
**afternoon** [3] - 98:22, 117:4, 122:1
**age** [3] - 34:19, 83:24, 85:2
**agencies** [1] - 62:6
**Agent** [2] - 3:11, 3:12
**agents** [1] - 6:25
**ages** [1] - 56:8
**ago** [1] - 37:14
**agree** [10] - 5:22, 9:16, 17:18, 19:10, 25:3, 30:13, 33:10, 51:23, 77:3, 84:24
**agreed** [3] - 10:3, 74:25, 106:13
**agrees** [1] - 20:17
**ahead** [15] - 12:12, 13:25, 25:14, 25:23, 26:3, 44:20, 54:21, 55:8, 64:4, 65:18, 65:25, 74:14, 81:10, 87:18, 99:7
**AJAY** [1] - 1:12
**Ajay** [1] - 3:9
**ajay.alexander@usdoj.gov** [1] - 1:15
**alcohol** [1] - 41:21
**Alex** [12] - 42:25, 48:14, 48:21, 48:24, 49:7, 50:6, 50:18, 50:19, 50:23, 50:24, 94:5, 94:9
**Alex's** [1] - 48:23
**ALEXANDER** [31] - 1:12, 3:8, 4:19, 5:21, 7:11, 12:13, 21:16, 23:19, 25:15, 25:24, 26:1, 26:4, 28:20, 31:15, 32:12, 34:2, 35:16, 36:4, 37:5, 44:17, 44:21, 54:24, 61:7, 84:22, 86:19, 87:19, 87:22, 95:5, 96:8, 131:7, 136:7
**Alexander** [13] - 3:9, 5:15, 12:11, 21:14, 23:11, 23:15, 30:11, 44:13, 61:5, 86:17, 87:18, 95:4, 131:3
**alive** [1] - 97:24
**alleged** [1] - 55:21
**allocution** [4] - 14:14, 23:8, 92:3, 106:25
**allow** [6] - 13:25, 64:1, 72:22, 80:21, 86:22, 128:17
**allowed** [4] - 47:7, 54:4, 82:2, 117:3
**almost** [3] - 8:8, 106:19, 116:4
**Aloft** [2] - 81:9, 113:25
**alone** [2] - 102:22, 125:9
**alternative** [1] - 72:21
**alternatives** [1] - 15:1
**amazing** [3] - 57:16, 60:4, 119:17
**Amazon** [1] - 75:4
**ambulances** [1] - 45:16
**America** [3] - 3:5, 30:8, 30:9
**AMERICA** [2] - 1:4, 1:13
**amount** [6] - 26:18, 40:7, 100:1, 108:19, 112:25, 118:24
**amounts** [1] - 79:22
**Ana** [1] - 134:10
**analysis** [4] - 17:15, 29:24, 111:18, 125:25
**analyzed** [1] - 52:7
**Angeles** [1] - 83:16
**anger** [6] - 29:22, 76:16, 76:22, 96:17, 96:18, 97:12
**angered** [1] - 107:14
**angry** [2] - 70:3, 88:14
**angst** [1] - 72:24
**anguish** [4] - 76:18, 76:19, 76:22, 97:8
**animosity** [1] - 29:22
**Ann** [3] - 79:13, 79:14, 93:24
**annoyance** [3] - 76:22, 96:18, 97:12
**answer** [5] - 32:16, 73:5, 78:4, 80:20, 87:7
**answered** [4] - 80:7, 80:14, 96:6, 106:19
**answering** [1] - 106:22
**answers** [2] - 14:9, 88:8
**antagonism** [1] - 42:2
**antagonistic** [1] - 42:1
**anthropomorphic** [1] - 70:4
**anxiety** [4] - 44:8, 44:9, 45:9, 112:18
**anyway** [1] - 110:25
**apart** [1] - 28:3
**apologize** [11] - 14:22, 48:6, 115:13, 115:16, 115:18, 117:11, 117:15, 118:12, 119:23, 120:3, 120:4
**apologized** [1] - 117:17
**apology** [3] - 43:12, 98:2, 107:1
**appalling** [1] - 46:8
**appeal** [4] - 136:17, 136:19, 136:20
**appearance** [2] - 3:6, 95:13
**appellate** [1] - 20:19
**apple** [1] - 16:19
**application** [3] - 18:16, 19:20, 20:2
**applied** [4] - 17:24, 19:16, 20:5, 111:17
**applies** [2] - 16:9, 18:5
**apply** [4] - 15:24, 19:9, 47:6, 136:20
**applying** [1] - 16:10
**appreciate** [10] - 11:11, 12:4, 12:5, 12:7, 22:13, 61:23, 71:23, 73:7, 115:25, 135:22
**appreciative** [1] - 55:18
**approach** [2] - 56:19, 57:12
**approached** [1] - 57:6
**appropriate** [14] - 37:25, 64:16, 101:22, 111:3, 111:9, 111:20, 112:5, 113:19, 113:21, 114:10, 125:9, 126:16, 129:16, 136:24
**approve** [1] - 102:22
**AR-15** [5] - 27:21, 38:24, 38:25, 50:21, 50:22
**AR-15s** [1] - 51:17
**areas** [1] - 65:1
**arena** [1] - 74:13
**arguably** [1] - 10:8
**argue** [4] - 16:1, 16:10, 22:11, 24:4
**argued** [1] - 19:14
**arguing** [3] - 20:20, 23:10, 23:16
**argument** [15] - 8:9, 8:13, 8:17, 10:13, 15:25, 19:15, 25:14, 30:13, 32:8, 33:16, 62:21, 86:24, 98:17, 130:1
**arguments** [4] - 9:13, 29:25, 36:6, 136:15
**arousal** [8] - 29:24, 31:21, 31:24, 39:19, 51:25, 95:9, 95:15, 95:18
**aroused** [8] - 12:23, 28:13, 28:24, 29:4, 60:9, 95:17, 105:21
**arouses** [1] - 30:18
**arrangements** [1] - 14:14
**arrest** [2] - 59:1, 113:22
**articles** [2] - 67:1, 119:19
**ascertainable** [1] - 131:11
**ascertained** [1] - 4:5
**ASD** [6] - 56:5, 64:15, 64:18, 73:15, 85:11, 98:2
**aside** [1] - 55:24
**aspect** [1] - 15:1
**aspects** [1] - 16:23
**Asperger** [1] - 67:23
**Asperger's** [5] - 36:13, 67:24, 72:4, 118:7
**aspired** [3] - 28:7, 103:11, 103:13
**aspires** [2] - 28:11, 31:20
**assaulted** [3] - 109:21, 112:8, 113:9
**assert** [2] - 56:20, 105:21
**Assessment** [1] - 67:23
**assessment** [2] - 132:11, 132:15
**assessments** [2] - 4:14, 132:8
**Assistant** [2] - 3:9, 3:11
**associated** [1] - 91:25
**assume** [4] - 103:25, 104:1, 114:17, 134:8
**assurances** [1] - 74:9
**Atlanta** [1] - 112:14
**attached** [1] - 87:10
**attachment** [1] - 89:18
**attack** [4] - 53:18, 53:19, 53:20, 53:23
**attacked** [1] - 107:24
**attackers** [9] - 52:11, 52:12, 52:14, 52:21, 52:23, 52:25, 53:3, 53:5, 53:7
**attacking** [1] - 27:14
**attacks** [4] - 13:1, 52:8, 52:17
**attempt** [5] - 13:11, 13:13, 51:22, 55:21, 129:6
**attended** [1] - 27:19
**attention** [4] - 105:13, 105:14, 105:15, 105:16
**Attorney** [2] - 3:9, 3:11
**Attorney's** [2] - 1:13, 102:21
**attorneys** [1] - 12:18
**attracted** [7] - 78:18, 78:25, 79:1, 79:3, 92:4, 95:12, 107:20
**attraction** [1] - 92:18

**attractive** [1] - 74:21
**attracts** [1] - 39:12
**attribute** [6] - 70:7, 70:10, 70:13, 71:2, 71:3, 71:16
**attribution** [1] - 69:17
**AUSA** [32] - 1:12, 1:13, 3:8, 4:19, 5:21, 7:11, 12:13, 21:16, 23:19, 25:15, 25:24, 26:1, 26:4, 28:20, 31:15, 32:12, 34:2, 35:16, 36:4, 37:5, 44:17, 44:21, 54:24, 61:7, 84:22, 86:19, 87:19, 87:22, 95:5, 96:8, 131:7, 136:7
**authority** [2] - 50:10, 52:19
**authorized** [1] - 22:14
**autism** [58] - 9:9, 9:13, 9:23, 10:21, 11:13, 11:15, 11:17, 15:16, 16:23, 24:23, 34:19, 36:7, 36:13, 36:14, 36:16, 37:16, 39:16, 39:17, 41:11, 52:4, 55:21, 56:2, 56:4, 56:7, 59:23, 59:24, 60:3, 60:7, 63:7, 66:24, 67:1, 67:3, 67:4, 67:6, 67:16, 68:1, 68:16, 68:17, 70:9, 71:12, 72:4, 77:12, 77:19, 80:19, 83:11, 83:19, 91:12, 91:20, 93:1, 93:10, 93:16, 102:22, 110:3, 112:4, 121:4
**Autism** [1] - 56:1
**autistic** [14] - 36:8, 36:11, 39:20, 56:8, 56:10, 56:11, 56:14, 56:18, 68:7, 69:10, 75:6, 80:11, 80:13
**available** [3] - 87:6, 87:7, 111:16
**Avenue** [1] - 1:21
**average** [16] - 36:15, 36:22, 80:25, 99:24, 100:1, 100:23, 100:24, 101:5, 109:25, 110:1, 110:7, 126:11, 126:19, 126:20, 128:6, 128:12
**averted** [4] - 30:25, 31:9, 53:23, 62:11
**avoid** [1] - 128:25
**awake** [1] - 117:1
**aware** [11] - 42:5, 61:22, 62:23, 65:4, 85:13, 92:13, 95:24, 97:23, 97:25, 98:8, 99:6
**awareness** [1] - 62:15
**awful** [1] - 127:11

## B

**BAAN** [2] - 1:20, 138:9
**BAAN-PROULX** [2] - 1:20, 138:9
**background** [3] - 55:24, 81:1, 85:9
**backpack** [1] - 45:6
**bad** [2] - 79:5, 116:21
**balance** [1] - 130:11
**balloons** [1] - 44:23
**ballpark** [1] - 25:12
**band** [3] - 50:25, 94:6, 94:8
**bar** [1] - 51:15
**based** [15] - 13:19, 18:20, 31:19, 31:20, 40:10, 99:10, 100:17, 103:4, 103:15, 103:17, 103:18, 103:25, 108:15, 113:7, 136:14
**basement** [1] - 33:2
**basements** [1] - 82:16
**basic** [2] - 26:17, 71:1
**basis** [4] - 91:25, 93:21, 93:22, 97:4
**bears** [1] - 44:23
**beaten** [1] - 79:4
**beats** [1] - 84:16
**became** [9] - 32:9, 32:13, 41:10, 46:16, 95:21, 95:23, 95:24, 96:3, 96:4
**become** [9] - 75:19, 78:12, 78:13, 78:22, 119:16, 119:17, 119:21, 123:23, 123:24
**becomes** [1] - 31:15
**bed** [3] - 116:24, 117:8, 121:1
**BEFORE** [1] - 1:9
**began** [1] - 46:5
**begin** [6] - 4:1, 23:15, 25:15, 47:8, 83:14, 120:12
**beginning** [2] - 78:11, 122:3
**behalf** [11] - 3:7, 3:9, 3:14, 3:16, 6:16, 6:19, 43:22, 56:25, 61:6, 120:14, 136:2
**behave** [1] - 77:17
**behavior** [31] - 10:11, 10:12, 24:24, 46:8, 47:20, 50:6, 50:7, 55:20, 55:23, 56:16, 60:9, 68:5, 69:10, 69:14, 72:24, 73:9, 73:11, 74:12, 77:6, 78:16, 79:16, 84:2, 94:20, 94:23, 105:20, 105:22, 111:14, 111:18, 111:19
**behavioral** [1] - 52:19
**behaviors** [4] - 53:20, 68:9, 94:21, 111:21
**behind** [6] - 7:4, 39:16, 63:7, 78:8, 80:10
**beings** [2] - 26:11, 43:21
**belabor** [1] - 85:4
**belie** [1] - 98:4
**belief** [4] - 37:1, 56:21, 63:10, 78:20
**believable** [1] - 106:8
**believes** [4] - 31:1, 72:8, 100:13, 112:5
**bell** [1] - 45:3
**bench** [1] - 35:10
**benefit** [2] - 127:6, 127:7
**bereaving** [2] - 125:12, 125:13
**BERTHA** [1] - 1:13
**Bertha** [1] - 3:11
**Bertha.mitrani@usdoj.gov** [1] - 1:16
**best** [12] - 34:9, 43:4, 45:10, 55:17, 58:19, 63:2, 64:15, 107:5, 107:10, 121:15, 129:8, 137:3
**better** [12] - 33:3, 73:23, 83:20, 85:22, 91:18, 115:15, 119:15, 119:16, 119:17, 133:3, 133:19, 134:23
**between** [12] - 15:7, 29:19, 43:15, 56:13, 64:17, 80:18, 88:3, 92:13, 93:16, 105:5, 106:7, 130:11
**beyond** [7] - 8:20, 33:9, 36:21, 46:19, 72:8, 73:14, 82:23
**big** [1] - 64:19
**biggest** [2] - 32:8, 133:22
**bio** [1] - 73:19
**Birge** [1] - 18:2
**bit** [8] - 4:23, 10:14, 23:22, 36:25, 59:20, 80:5, 82:22, 115:17
**bite** [1] - 16:19
**blame** [4] - 52:4, 56:16, 88:7, 121:12
**blew** [1] - 60:12
**blind** [2] - 30:6, 30:7
**blocked** [1] - 48:16
**blurting** [1] - 74:17
**Blvd** [1] - 1:14
**boasted** [1] - 5:9
**bodies** [1] - 102:12
**Boeman** [1] - 3:12
**BOEMAN** [1] - 1:25
**bombard** [1] - 43:3
**bombarded** [1] - 69:9
**bombarding** [1] - 38:8
**bombardment** [2] - 39:6, 125:18
**bones** [1] - 130:4
**boo** [1] - 55:13
**boo-hoo** [1] - 55:13
**book** [2] - 79:19, 117:20
**books** [2] - 75:4, 119:19
**booted** [1] - 41:22
**BOP** [6] - 34:4, 34:6, 110:14, 111:6, 111:16, 112:9
**boring** [3] - 29:7, 29:11, 29:15
**bottom** [1] - 18:14
**boy** [3] - 50:16, 50:20, 113:11
**boyfriend** [1] - 58:20
**boys** [2] - 118:1, 118:6
**brain** [5] - 71:2, 118:8, 118:9, 119:16
**brains** [1] - 70:6
**BRANDON** [2] - 1:6, 1:17
**Brandon** [75] - 3:6, 3:16, 11:8, 11:15, 11:18, 16:21, 17:11, 30:10, 41:11, 42:17, 42:19, 45:25, 56:14, 56:23, 57:4, 57:9, 58:7, 59:15, 64:8, 64:14, 67:19, 68:23, 69:2, 69:20, 69:25, 70:11, 70:13, 70:25, 71:6, 75:25, 76:9, 80:19, 80:22, 81:12, 81:23, 81:25, 84:20, 84:25, 85:17, 92:15, 94:1, 98:1, 100:7, 100:13, 108:23, 110:15, 112:6, 112:8, 112:18, 113:5, 113:19, 114:12, 115:13, 116:1, 116:2, 117:4, 117:5, 117:8, 117:10, 117:11, 117:18, 118:17, 118:22, 118:25, 119:7, 119:11, 119:12, 119:20, 119:23, 120:3, 130:11, 130:22, 134:24
**Brandon's** [8] - 57:6, 68:5, 69:18, 70:17, 80:9, 96:17, 110:2, 117:5
**breached** [1] - 59:13
**break** [7] - 45:22, 46:14, 54:22, 58:24, 86:20, 87:2, 132:20
**breaking** [1] - 78:16
**breaks** [1] - 59:10
**brief** [6] - 5:15, 54:15, 54:19, 54:22, 86:20, 87:13
**briefly** [4] - 16:13, 20:13, 21:23, 66:23
**bring** [6] - 16:18, 45:10, 45:19, 57:3, 74:16, 112:1
**brings** [4] - 4:8, 6:22, 7:24, 132:13
**brother** [5] - 43:17, 96:21, 97:2, 117:22, 122:6
**brought** [7] - 9:18, 16:19, 18:11, 58:18, 58:21, 130:9, 137:14
**Broward** [3] - 1:14, 38:11, 50:14
**BSO** [1] - 59:1
**buildup** [1] - 125:24
**bullied** [3] - 29:18, 29:21,

74:6
**bullies** [1] - 40:14
**Bullseye** [2] - 41:23, 41:24
**bully** [3] - 70:2, 70:3, 70:23
**bullying** [4] - 30:24, 40:12, 78:12, 121:7
**Bundy** [2] - 32:1, 92:16
**Bureau** [7] - 72:20, 127:8, 130:23, 131:18, 132:17, 134:4, 135:1
**bus** [2] - 119:2, 119:6
**busy** [2] - 82:11, 83:6
**Butner** [5] - 34:4, 119:2, 134:25, 135:3, 135:8
**butts** [3] - 9:18, 11:10, 40:23
**Butts** [1] - 9:20
**buy** [1] - 103:21
**BY** [9] - 1:20, 66:18, 71:5, 80:8, 84:18, 85:15, 87:22, 95:5, 96:14

## C

**calculated** [1] - 21:20
**calculation** [1] - 4:21
**calculations** [4] - 4:2, 5:13, 5:23, 6:13
**calendar** [1] - 14:21
**California** [5] - 29:13, 39:8, 46:3, 47:12, 51:8
**camera** [1] - 114:6
**Cameron** [5] - 3:11, 27:5, 55:14, 55:17, 105:16
**CAMERON** [1] - 1:25
**candid** [1] - 15:10
**cannot** [19] - 26:12, 35:25, 36:1, 42:5, 61:17, 62:5, 63:7, 63:24, 70:5, 70:6, 102:5, 120:18, 121:10, 122:15, 122:16, 123:7, 123:14, 128:1
**capable** [4] - 63:11, 83:24, 84:3, 86:11
**capacity** [1] - 79:22
**captured** [1] - 6:9
**car** [7] - 58:4, 116:17, 116:18, 117:12, 117:14, 117:16, 117:21
**care** [11] - 15:6, 40:1, 43:18, 44:12, 51:11, 72:6, 72:16, 72:25, 88:19, 89:10, 118:1
**cared** [1] - 116:20
**career** [1] - 30:3
**carefully** [2] - 128:23, 129:24
**caring** [1] - 76:9
**Carolina** [2] - 119:3, 135:8
**carried** [1] - 115:21
**carry** [2] - 78:6, 103:23
**cartoon** [2] - 68:11, 116:10
**CASE** [1] - 1:2
**case** [65] - 3:4, 5:20, 6:6, 6:24, 7:4, 12:15, 12:18, 12:21, 13:10, 13:23, 15:20, 16:6, 17:25, 18:2, 18:9, 18:11, 18:12, 24:14, 26:12, 26:23, 27:2, 27:4, 30:4, 30:10, 31:6, 35:19, 36:12, 36:22, 37:8, 37:18, 40:21, 42:6, 42:16, 43:16, 51:14, 51:24, 54:1, 55:20, 62:1, 63:9, 68:23, 71:7, 94:4, 96:5, 99:11, 103:5, 103:10, 103:24, 106:16, 108:10, 108:12, 108:13, 109:15, 109:20, 110:11, 114:1, 126:11, 126:19, 126:20, 129:17, 133:18, 134:20, 137:5
**cases** [21] - 22:9, 26:15, 26:16, 26:17, 26:18, 27:10, 31:7, 93:6, 99:15, 99:16, 100:20, 102:2, 102:6, 102:10, 102:15, 108:3, 109:4, 109:8, 109:25, 113:16
**categories** [1] - 100:18
**category** [22] - 4:3, 4:8, 4:15, 4:17, 21:19, 24:22, 99:25, 100:4, 100:7, 100:13, 100:18, 100:20, 100:23, 100:25, 101:2, 101:4, 101:7, 109:12, 109:25, 126:20, 126:22, 127:1
**caused** [6] - 45:17, 57:5, 95:14, 97:14, 97:25, 116:15
**causes** [1] - 30:21
**causing** [2] - 78:9, 121:10
**caution** [1] - 133:20
**cautions** [1] - 128:21
**celebrate** [2] - 44:25, 49:21
**certain** [12] - 26:16, 36:18, 37:2, 40:5, 66:22, 90:7, 101:19, 106:5, 131:3, 137:8, 137:9
**certainly** [6] - 44:10, 51:17, 77:4, 83:12, 84:3, 84:8
**certify** [1] - 138:3
**cetera** [1] - 78:9
**chambers** [1] - 87:4
**championship** [1] - 94:8
**chance** [5] - 24:11, 50:15, 65:15, 99:1, 130:12
**change** [5] - 10:19, 18:16, 26:7, 82:19, 82:20
**changed** [2] - 16:24, 82:21
**changes** [6] - 27:15, 29:24, 29:25, 39:2
**channel** [3] - 55:25, 56:2, 56:3
**Channel** [1] - 56:1
**chapter** [1] - 137:3
**characteristic** [2] - 68:16, 68:17
**characteristics** [8] - 5:6, 24:21, 64:13, 67:25, 68:7, 102:17, 108:23, 128:24
**characterization** [1] - 7:5
**characterized** [1] - 5:19
**characterizing** [1] - 7:17
**characters** [1] - 68:11
**charged** [2] - 27:3, 108:13
**charges** [2] - 46:21, 109:14
**charm** [2] - 117:5, 117:6
**chart** [4] - 98:21, 99:8, 100:15, 109:22
**child** [15] - 27:16, 35:3, 38:13, 49:9, 50:6, 57:18, 73:24, 75:24, 79:19, 81:3, 86:12, 86:14, 100:11, 100:25, 113:12
**childish** [1] - 76:3
**children** [15] - 8:11, 10:10, 36:12, 38:3, 49:16, 49:22, 68:2, 69:12, 78:1, 105:24, 120:25, 121:2, 123:5, 124:17, 125:15
**Children's** [1] - 118:15
**choose** [1] - 42:12
**chose** [3] - 104:12, 104:15, 125:25
**chosen** [1] - 8:11
**Christmas** [14] - 10:9, 13:1, 38:4, 38:7, 38:10, 45:24, 46:11, 49:17, 49:19, 49:20, 49:21, 57:25, 58:24
**circle** [1] - 37:24
**circled** [1] - 41:24
**circles** [1] - 39:13
**Circuit** [3] - 18:1, 18:11, 18:13
**circumstances** [7] - 24:20, 25:1, 73:23, 120:24, 121:17, 126:5, 128:24
**cite** [2] - 18:1, 99:11
**cited** [3] - 26:13, 108:12, 109:4
**cites** [1] - 27:10
**citing** [1] - 18:7
**civil** [1] - 67:12
**civilized** [1] - 77:17
**class** [1] - 48:23
**classification** [1] - 85:8
**classmates** [1] - 45:12
**clear** [25] - 6:16, 13:16, 13:18, 18:24, 19:18, 19:25, 20:13, 20:20, 21:7, 22:18, 27:12, 41:5, 46:17, 51:20, 54:25, 55:2, 57:10, 58:9, 63:18, 113:24, 115:2, 122:13, 123:10, 123:17, 127:4
**clearly** [7] - 24:5, 42:4, 52:3, 85:2, 104:3, 104:6, 105:1
**clerk's** [1] - 137:14
**client** [2] - 39:25, 81:16
**clients** [1] - 82:8
**clips** [1] - 28:22
**close** [7] - 45:13, 48:17, 48:20, 118:6, 123:4, 134:9, 134:25
**closed** [3] - 13:19, 13:24, 48:19
**closely** [1] - 118:4
**closer** [1] - 135:3
**closing** [1] - 70:19
**closure** [3] - 24:13, 24:15
**Clynn** [3] - 69:20, 69:21, 70:8
**coaches** [1] - 59:25
**coast** [1] - 134:10
**cognition** [1] - 77:22
**cognitive** [9] - 36:22, 69:24, 76:6, 76:8, 77:6, 81:1, 81:4, 81:6, 111:14
**cognizant** [7] - 30:8, 36:19, 40:16, 40:20, 41:15, 41:17, 65:2
**coincidence** [1] - 117:18
**coincidences** [1] - 117:20
**coincidental** [1] - 118:18
**coincidentally** [1] - 47:24
**Coleman** [5] - 34:9, 134:11, 134:19, 134:21
**colleague** [2] - 37:11, 37:15
**collected** [1] - 10:7
**collecting** [1] - 71:20
**collection** [1] - 131:25
**college** [2] - 29:14, 56:5
**Columbine** [10] - 29:1, 32:3, 39:13, 52:15, 53:4, 53:6, 53:7, 79:13, 79:14, 93:25
**comedy** [1] - 116:11
**comfortable** [2] - 87:10, 114:19
**comforts** [1] - 83:5
**coming** [11] - 23:23, 46:9, 49:25, 50:8, 51:4, 61:24, 115:22, 117:10, 117:14, 127:25
**comment** [2] - 7:3, 8:3
**comments** [12] - 6:24, 13:8, 41:23, 69:18, 71:6, 94:4, 105:15, 106:15, 106:17, 107:14, 107:15
**commiserate** [1] - 124:6
**Commission** [1] - 101:11
**commit** [2] - 124:3, 124:11
**committed** [3] - 49:13,

72:3, 130:23
**committing** [2] - 31:12, 131:23
**common** [2] - 8:15, 53:2
**communicate** [1] - 122:4
**communication** [1] - 111:19
**communications** [1] - 55:19
**community** [13] - 26:10, 33:12, 33:24, 35:14, 36:11, 38:1, 43:20, 56:11, 111:17, 125:12, 127:17, 130:16, 133:23
**comparators** [1] - 98:25
**compare** [1] - 99:17
**compared** [1] - 99:12
**compares** [1] - 108:13
**compassionate** [1] - 56:10
**compelled** [1] - 78:17
**competing** [1] - 21:22
**complaints** [1] - 33:1
**complete** [3] - 14:19, 81:2, 110:10
**COMPLETED** [1] - 138:9
**completely** [7] - 16:20, 41:16, 74:24, 92:22, 103:2, 108:15, 109:17
**comply** [5] - 21:3, 114:10, 122:24, 131:21, 132:2
**comprehend** [1] - 121:18
**computer** [6] - 33:3, 74:3, 82:16, 132:3, 132:4, 133:14
**computers** [5] - 35:11, 82:2, 86:3, 114:7, 114:9
**concept** [1] - 124:18
**concern** [12] - 30:21, 31:7, 31:10, 33:20, 72:16, 73:1, 78:22, 131:6, 133:5, 133:13, 133:22, 135:1
**concerned** [7] - 33:5, 35:6, 40:5, 40:25, 54:7, 55:14, 75:11
**concerning** [4] - 52:24, 53:2, 53:5, 53:20
**concerns** [7] - 5:16, 63:14, 72:13, 73:8, 78:11, 80:4, 103:14
**conclude** [1] - 136:21
**concluded** [1] - 137:24
**concludes** [1] - 65:21
**conclusion** [2] - 21:11, 104:24
**conclusory** [1] - 5:14
**concurrently** [2] - 130:25, 131:17
**condition** [2] - 47:14, 127:16
**conditions** [9] - 21:4, 22:5, 35:13, 35:21, 35:22, 37:3, 131:22, 132:3, 133:22
**condone** [1] - 107:21
**conduct** [16] - 5:2, 5:7, 6:6, 8:5, 10:4, 18:21, 23:4, 52:2, 63:20, 85:6, 104:3, 105:1, 113:6, 125:17, 126:4, 129:10
**conducted** [5] - 17:14, 52:15, 52:17, 104:6, 104:23
**conferring** [1] - 131:4
**confident** [1] - 42:15
**confinement** [2] - 111:8, 114:2
**confirm** [1] - 28:17
**confront** [1] - 117:14
**confronting** [1] - 120:4
**confused** [1] - 46:7
**connect** [1] - 132:21
**Connecticut** [3] - 34:10, 134:11, 135:7
**connection** [5] - 104:7, 104:17, 104:20, 105:19, 117:6
**consciously** [1] - 106:3
**consecutively** [1] - 131:1
**consider** [2] - 46:13, 116:3
**consideration** [8] - 7:14, 24:25, 43:18, 48:2, 86:13, 110:2, 110:4, 112:7
**considerations** [1] - 111:11
**considered** [6] - 71:13, 91:13, 108:11, 118:3, 128:23, 130:17
**considering** [2] - 51:11, 136:24
**consists** [1] - 130:24
**constantly** [1] - 83:1
**consulted** [4] - 15:15, 17:1, 17:4, 17:7
**consumed** [2] - 53:1, 65:3
**contact** [4] - 47:15, 109:17, 132:7, 133:15
**contacts** [1] - 4:18
**contains** [1] - 130:18
**content** [2] - 56:3, 69:2
**continue** [5] - 6:15, 59:15, 62:14, 122:4, 137:4
**contrasted** [1] - 99:13
**control** [5] - 35:11, 39:11, 52:20, 86:4, 105:22
**controlled** [2] - 85:25, 131:25
**conversation** [1] - 97:6
**conversations** [1] - 116:6
**conversely** [1] - 22:24
**convey** [1] - 42:13
**conveying** [1] - 106:6
**convicted** [2] - 46:21, 55:11
**conviction** [2] - 53:25, 136:17
**convince** [1] - 58:21
**convinced** [1] - 46:19
**cooperating** [1] - 131:25
**copied** [1] - 94:17
**copy** [6] - 14:3, 37:13, 89:22, 90:22, 95:3, 137:14
**corner** [2] - 34:16, 134:5
**correct** [29] - 3:24, 4:16, 4:19, 4:20, 4:22, 5:10, 5:12, 5:20, 5:21, 8:21, 8:25, 9:12, 9:19, 10:5, 22:1, 23:19, 32:11, 34:2, 37:5, 57:8, 74:23, 88:5, 89:19, 90:14, 92:9, 93:1, 93:4, 93:5, 110:22
**corrections** [1] - 84:15
**cost** [1] - 136:19
**counsel** [6] - 37:10, 89:22, 95:3, 125:1, 129:18, 136:9
**counseling** [2] - 27:18, 45:21
**Count** [1] - 131:1
**count** [5] - 3:24, 4:14, 20:9, 23:17, 122:15
**country** [5] - 31:5, 35:24, 36:1, 54:2, 128:14
**counts** [2] - 4:10, 23:17
**Counts** [4] - 130:25, 131:2, 131:16, 132:12
**couple** [2] - 115:20, 137:13
**course** [4] - 12:15, 55:8, 63:17, 75:6
**courses** [1] - 66:24
**Court** [62] - 1:21, 9:11, 9:12, 9:14, 9:15, 11:1, 12:1, 12:17, 16:8, 19:25, 21:2, 21:4, 21:17, 21:18, 25:7, 25:16, 28:17, 35:18, 37:13, 47:6, 48:1, 51:17, 54:4, 56:21, 61:6, 61:16, 61:24, 64:11, 64:15, 64:20, 65:2, 72:22, 74:10, 80:4, 82:8, 90:1, 99:3, 99:16, 99:18, 103:15, 109:7, 111:6, 111:7, 113:11, 113:16, 114:5, 114:10, 114:18, 115:9, 120:14, 120:24, 121:23, 122:1, 122:18, 124:22, 127:23, 130:17, 130:20, 130:22, 131:11
**COURT** [97] - 1:1, 1:10, 3:3, 3:13, 3:17, 4:20, 4:23, 5:15, 5:22, 6:20, 7:9, 7:13, 9:16, 11:3, 12:11, 16:13, 16:16, 17:17, 20:22, 21:9, 21:17, 22:6, 22:13, 23:20, 25:19, 25:25, 26:3, 28:19, 30:11, 32:11, 32:14, 34:8, 36:3, 36:10, 44:13, 44:20, 48:5, 48:7, 54:12, 54:20, 55:4, 55:8, 61:4, 61:8, 64:23, 65:8, 65:13, 65:18, 65:21, 65:25, 66:5, 70:16, 71:24, 72:1, 74:23, 74:25, 76:11, 77:3, 78:3, 79:12, 79:15, 80:3, 84:6, 84:24, 86:17, 86:20, 87:9, 87:14, 95:4, 96:6, 96:9, 98:13, 98:16, 98:25, 106:24, 109:11, 110:22, 114:16, 114:23, 115:2, 115:6, 120:9, 120:12, 131:9, 134:8, 134:16, 134:22, 134:25, 135:19, 135:23, 136:6, 136:8, 136:16, 137:10, 137:16, 137:19, 137:22
**court** [8] - 3:2, 14:16, 24:15, 43:21, 67:12, 67:16, 102:9, 133:5
**Court's** [14] - 20:14, 20:16, 21:15, 22:12, 23:23, 24:13, 44:17, 53:22, 87:8, 112:23, 113:3, 120:21, 136:9, 136:13
**courthouse** [1] - 14:15
**COURTROOM** [1] - 66:11
**courtroom** [5] - 43:14, 60:23, 66:8, 101:25, 128:1
**courts** [1] - 102:15
**Courts** [1] - 108:6
**covered** [1] - 136:4
**covers** [2] - 74:14, 136:5
**cowardly** [1] - 56:15
**crash** [1] - 121:3
**craves** [1] - 47:5
**create** [2] - 97:8, 97:9
**created** [2] - 47:25, 60:17
**creates** [1] - 39:3
**creating** [1] - 79:24
**creature** [1] - 119:6
**credentials** [1] - 37:23
**crews** [1] - 45:18
**cried** [6] - 76:10, 76:12, 79:7, 95:6, 107:9, 119:10
**crime** [17] - 24:3, 25:5, 63:17, 63:22, 72:3, 99:5, 100:10, 100:11, 124:3, 124:5, 124:20, 124:25, 125:10, 128:7, 129:3, 129:16, 137:1
**crimes** [3] - 31:13, 131:23, 133:1
**criminal** [31] - 4:2, 4:8, 4:17, 4:18, 8:5, 21:19, 24:14, 24:22, 55:23, 60:5, 63:20, 67:12, 95:11, 99:25, 100:2, 100:3, 100:7, 100:12, 100:17, 100:18, 100:20, 101:1, 101:4, 104:3, 105:1, 109:25, 116:3, 126:20, 126:22, 127:19, 129:9
**criminalize** [1] - 60:6
**critical** [1] - 76:24

**criticize** [1] - 39:22
**critiques** [1] - 129:22
**cropped** [1] - 41:9
**cropping** [1] - 13:3
**CROSS** [1] - 87:21
**cross** [4] - 2:2, 16:2, 16:3, 42:8
**cross-examination** [3] - 16:2, 16:3, 42:8
**crucial** [1] - 122:1
**cruel** [1] - 83:10
**cruelest** [1] - 51:2
**Cruz** [20] - 12:23, 18:21, 24:9, 29:2, 32:3, 32:24, 38:15, 38:23, 39:1, 39:13, 42:15, 42:17, 42:18, 47:23, 58:10, 62:8, 105:23, 108:1, 123:6, 125:21
**Cruz's** [2] - 39:5, 47:25
**cry** [1] - 95:14
**Culberson** [2] - 6:19, 6:20
**culpability** [1] - 106:4
**cure** [2] - 34:12
**curious** [1] - 78:24
**current** [1] - 101:4
**curriculum** [1] - 77:10
**custody** [4] - 30:20, 31:17, 124:1, 131:18
**customized** [1] - 120:20
**cute** [1] - 75:10
**cyberstalking** [3] - 19:3, 99:5, 126:10

## D

**dad** [3] - 57:6, 57:19, 115:8
**Dad** [1] - 58:6
**Dahmer** [1] - 32:2
**damage** [1] - 118:9
**Danbury** [6] - 34:9, 134:16, 134:22, 134:23, 134:25, 135:5
**danger** [6] - 41:12, 41:13, 42:5, 42:19, 51:20, 51:21
**dangerous** [2] - 28:10, 131:24
**dark** [1] - 56:17
**darkest** [2] - 104:4, 105:2
**data** [3] - 90:2, 124:9, 132:3
**DATE** [1] - 138:9
**date** [1] - 131:11
**daughter** [4] - 47:16, 57:15, 59:9, 59:23
**daughter's** [1] - 58:19
**day-to-day** [2] - 91:25, 97:4
**days** [13] - 69:6, 115:19, 115:20, 116:6, 118:13, 118:16, 118:24, 118:25, 119:24, 131:13, 136:18
**dead** [2] - 50:19, 102:12
**deal** [5] - 5:5, 34:19, 36:11, 71:15, 119:4
**dealing** [2] - 32:4, 134:2
**deals** [1] - 8:1
**death** [1] - 112:12
**deaths** [1] - 117:24
**debt** [2] - 62:12, 132:25
**December** [1] - 115:21
**decide** [3] - 25:20, 33:2, 73:23
**decided** [5] - 10:11, 30:19, 43:2, 46:24, 118:20
**decides** [3] - 14:10, 42:2, 122:1
**decision** [2] - 9:14, 51:25
**decrease** [1] - 111:20
**deem** [1] - 64:2
**deemed** [1] - 123:20
**deems** [1] - 114:10
**defendant** [59] - 1:6, 6:24, 12:20, 14:7, 14:15, 14:23, 14:24, 15:5, 15:24, 18:5, 18:17, 24:1, 27:9, 27:11, 28:7, 28:12, 29:17, 29:21, 34:4, 35:17, 35:20, 40:6, 40:9, 40:20, 41:6, 41:16, 42:4, 43:2, 43:16, 43:25, 55:11, 87:24, 88:3, 89:2, 89:5, 91:8, 91:9, 92:4, 93:20, 94:6, 94:15, 95:6, 102:23, 111:4, 122:16, 122:17, 124:5, 128:25, 129:4, 129:6, 130:21, 130:22, 131:14, 131:18, 131:20, 131:21, 132:2, 132:10, 136:9
**DEFENDANT** [3] - 1:17, 115:5, 134:7
**defendant's** [9] - 18:21, 28:22, 30:14, 55:20, 55:21, 55:23, 90:1, 92:14, 102:17
**defendants** [3] - 99:20, 124:8, 129:1
**defense** [38] - 4:20, 8:18, 9:8, 12:15, 13:13, 14:4, 14:11, 15:3, 15:6, 15:9, 16:9, 20:8, 20:17, 22:22, 23:2, 25:6, 26:13, 27:10, 36:6, 37:10, 37:13, 37:20, 39:23, 39:24, 40:3, 41:5, 43:4, 61:9, 61:13, 62:22, 72:2, 72:4, 83:1, 85:17, 89:21, 95:3, 125:1, 129:18
**defense's** [4] - 23:7, 25:9, 26:22, 130:1
**defer** [1] - 129:9
**defiance** [1] - 52:19
**deficiencies** [2] - 40:24, 40:25
**define** [4] - 31:16, 119:24, 133:6, 134:1
**definitely** [3] - 114:9, 120:20, 134:21
**definition** [1] - 19:2
**degree** [5] - 5:22, 51:11, 75:7, 93:7, 102:4
**delinquency** [1] - 41:19
**delinquents** [2] - 41:19, 91:1
**Delray** [1] - 58:4
**delved** [1] - 125:23
**demeanor** [1] - 113:10
**demerits** [3] - 41:18, 53:15, 73:22
**demonstrated** [3] - 53:6, 97:4, 98:10
**denied** [2] - 106:4, 122:12
**deny** [1] - 106:9
**denying** [2] - 83:10, 106:17
**depart** [1] - 22:16
**departure** [4] - 21:24, 22:2, 22:14, 22:18
**depict** [1] - 6:5
**depicts** [1] - 5:18
**depraved** [1] - 126:6
**depravity** [3] - 26:11, 47:21, 104:7
**deputy** [1] - 66:8
**DEPUTY** [1] - 66:11
**deranged** [1] - 27:20
**described** [2] - 8:18, 123:17
**description** [1] - 94:20
**deserves** [2] - 111:24, 118:25
**designate** [1] - 111:6
**designated** [1] - 134:20
**desire** [5] - 52:13, 52:14, 104:4, 105:2, 113:3
**despicable** [1] - 125:10
**despite** [3] - 84:2, 84:9, 132:22
**detailed** [2] - 66:21, 73:7
**details** [1] - 26:6
**deter** [2] - 32:7, 63:20
**determination** [2] - 16:8, 131:12
**determined** [1] - 51:18
**determining** [1] - 12:9
**deterrence** [13] - 24:1, 24:2, 32:6, 33:6, 33:17, 112:23, 112:24, 113:4, 127:5, 127:14, 127:23, 128:20
**deterrent** [1] - 103:1
**deterring** [1] - 130:13
**develop** [1] - 83:14
**developing** [1] - 95:17
**development** [2] - 34:13, 34:18
**developmental** [2] - 56:2, 67:4
**developmentally** [1] - 56:15
**develops** [1] - 95:9
**deviant** [1] - 73:11
**device** [1] - 131:24
**diagnosed** [1] - 52:22
**diagnoses** [1] - 19:12
**diagnosis** [7] - 34:14, 36:20, 55:22, 63:6, 68:8, 73:14, 132:20
**diagnostic** [1] - 67:24
**die** [2] - 38:24, 50:22
**died** [4] - 58:12, 59:9, 117:8, 117:22
**Dietz** [35] - 9:17, 9:20, 11:20, 14:2, 15:4, 15:7, 15:12, 15:14, 16:25, 17:3, 29:18, 36:17, 37:19, 37:21, 39:21, 40:2, 40:4, 40:11, 43:7, 51:10, 73:8, 75:11, 76:18, 93:7, 93:10, 96:18, 97:7, 104:9, 105:7, 105:10, 105:18, 106:19, 123:16, 123:21
**Dietz's** [9] - 15:18, 28:22, 37:11, 37:15, 37:17, 41:2, 90:14, 104:19, 107:13
**difference** [6] - 15:6, 42:17, 43:15, 56:13, 64:17, 93:15
**different** [19] - 6:23, 16:20, 19:6, 39:18, 40:22, 50:13, 53:14, 56:9, 68:2, 70:8, 72:21, 75:25, 76:5, 81:7, 91:4, 112:19, 119:4, 119:6
**differentiate** [1] - 80:18
**difficult** [11] - 23:21, 25:2, 25:7, 26:4, 34:13, 54:13, 71:23, 73:24, 130:4, 130:10, 132:21
**difficulty** [1] - 132:18
**diligence** [1] - 37:20
**diminishing** [1] - 71:10
**DIRECT** [1] - 66:17
**direct** [3] - 2:2, 16:2, 64:10
**direction** [1] - 54:5
**director** [1] - 114:8
**disabilities** [2] - 67:4, 69:24
**disability** [2] - 56:2, 121:19
**disability-related** [1] - 56:2
**disabled** [1] - 56:15
**disagree** [2] - 8:19, 37:3
**disagrees** [1] - 12:14
**disaster** [1] - 31:1
**disciplinary** [5] - 53:9, 53:10, 53:11, 53:14, 53:17
**disclosure** [2] - 132:5
**discretion** [1] - 22:16
**discuss** [2] - 114:18, 132:16

**discussed** [1] - 6:24
**discusses** [1] - 18:9
**disgraceful** [1] - 56:16
**disgusting** [1] - 55:11
**disorder** [18] - 9:23, 10:22, 11:15, 15:16, 24:24, 34:19, 36:14, 36:16, 37:16, 59:23, 59:24, 60:3, 60:6, 60:7, 63:8, 72:4, 93:1, 93:10
**disparate** [2] - 22:21, 124:7
**disparities** [1] - 129:1
**disparity** [5] - 99:13, 99:19, 108:5, 109:1, 126:18
**displacing** [1] - 29:22
**display** [2] - 98:6, 98:7
**displayed** [1] - 52:18
**disposed** [1] - 21:18
**disposition** [2] - 16:6, 51:14
**dispositional** [1] - 111:11
**dispute** [1] - 10:1
**disputed** [1] - 7:23
**disrupt** [1] - 123:3
**distinguishes** [1] - 108:13
**distort** [1] - 124:25
**distribution** [1] - 100:24
**DISTRICT** [3] - 1:1, 1:1, 1:10
**district** [6] - 26:9, 43:20, 77:2, 77:5, 86:9, 131:19
**disturbed** [1] - 47:19
**disturbing** [3] - 30:17, 123:18
**divorced** [1] - 63:24
**divulges** [1] - 40:9
**DNA** [1] - 132:1
**docket** [2] - 23:13, 122:12
**doctor** [8] - 9:10, 9:19, 17:16, 110:18, 111:11, 111:21, 112:2, 129:24
**Doctor** [6] - 71:24, 84:19, 89:18, 90:7, 92:25, 98:13
**doctors** [13] - 9:7, 9:8, 10:3, 11:9, 11:13, 11:23, 15:8, 19:12, 39:21, 110:14, 110:18, 112:1, 117:1
**document** [1] - 119:20
**documented** [2] - 24:23, 120:15
**documents** [1] - 87:23
**dogs** [1] - 58:3
**dominance** [2] - 39:11, 39:14
**dominant** [1] - 105:21
**dominated** [2] - 75:18, 75:20
**dominating** [1] - 79:1
**domineering** [2] - 75:20, 78:18
**done** [32] - 3:23, 7:15, 14:14, 14:17, 21:24, 49:17, 50:15, 57:2, 57:3, 61:19, 71:8, 76:25, 77:1, 77:5, 77:24, 85:9, 93:23, 94:1, 99:17, 99:21, 101:21, 102:16, 107:8, 114:4, 118:2, 120:5, 121:13, 121:15, 121:24, 122:17, 133:7, 137:3
**Doo** [1] - 80:17
**Doolan** [1] - 27:5
**doors** [1] - 123:15
**doubt** [4] - 24:12, 24:15, 46:19, 65:11
**Douglas** [12] - 8:12, 12:24, 18:22, 27:7, 48:12, 50:25, 53:13, 53:16, 56:6, 57:16, 95:7, 96:1
**down** [5] - 24:11, 27:21, 58:5, 72:11, 137:14
**downward** [11] - 22:8, 61:13, 102:16, 108:18, 108:22, 109:4, 109:7, 126:13, 128:21, 129:11, 136:14
**dozen** [1] - 119:19
**Dr** [92] - 9:6, 9:17, 9:18, 9:19, 10:3, 10:13, 10:16, 11:5, 11:10, 11:19, 11:20, 13:18, 14:1, 14:10, 15:4, 15:6, 15:7, 15:14, 15:18, 16:18, 16:25, 17:3, 17:9, 28:22, 29:18, 37:2, 37:6, 37:11, 37:15, 37:17, 37:19, 37:21, 39:21, 39:23, 40:2, 40:3, 40:4, 40:11, 40:18, 40:23, 41:2, 43:7, 51:10, 62:23, 63:8, 64:3, 64:9, 65:1, 65:24, 65:25, 66:19, 73:8, 75:11, 76:18, 86:18, 87:17, 87:23, 90:12, 90:13, 90:14, 92:3, 93:7, 93:10, 94:14, 95:2, 95:6, 96:10, 96:18, 97:7, 104:19, 104:22, 105:7, 105:10, 105:18, 106:19, 107:2, 110:9, 110:19, 112:3, 113:25, 121:4, 123:16, 123:21, 129:7, 134:18, 135:10
**DR** [2] - 2:3, 66:7
**dramatic** [6] - 59:7, 97:5, 97:25, 117:11, 117:22, 117:23
**driver** [2] - 116:17, 117:23
**driving** [1] - 116:18
**dropped** [1] - 41:18
**drug** [2] - 26:17, 35:25
**drugs** [1] - 41:21
**drunk** [1] - 117:23
**drunken** [1] - 116:17
**duck** [1] - 113:13
**ducks** [1] - 68:10
**due** [5] - 8:11, 9:22, 34:14, 37:19, 85:2
**DUI** [1] - 121:3
**duly** [1] - 66:8
**during** [13] - 5:18, 9:15, 10:12, 12:15, 13:2, 23:8, 23:9, 37:8, 44:6, 49:20, 82:3, 82:4, 122:8
**dying** [1] - 117:24
**Dylan** [2] - 29:1, 29:20

## E

**e-mailing** [1] - 119:13
**easier** [1] - 66:1
**easiest** [3] - 23:1, 44:16, 64:3
**Easter** [2] - 117:4, 118:18
**easy** [3] - 112:22, 129:21, 136:22
**edges** [1] - 91:16
**edgy** [4] - 74:21, 92:5, 92:6, 92:7
**editorializing** [1] - 6:14
**effect** [3] - 21:2, 43:9, 96:21
**efforts** [2] - 55:18, 62:14
**egregious** [1] - 126:6
**eight** [1] - 27:1
**either** [3] - 64:2, 82:16, 119:8
**ejaculation** [1] - 28:24
**elaborated** [1] - 11:22
**electronic** [2] - 114:3, 114:5
**element** [3] - 9:2, 12:9, 70:25
**elementary** [1] - 29:7
**elements** [1] - 20:21
**eleven** [1] - 118:24
**eleventh** [1] - 14:21
**elicit** [1] - 52:2
**Elliot** [1] - 29:12
**elsewhere** [1] - 42:3
**embarrassing** [1] - 106:22
**embolisms** [1] - 121:2
**emerged** [1] - 53:2
**emotion** [8] - 76:15, 99:10, 99:14, 102:3, 103:4, 108:16, 120:16, 120:17
**emotional** [10] - 19:11, 34:13, 57:18, 71:3, 71:16, 71:22, 72:12, 72:14, 76:9, 86:12
**emotionally** [3] - 24:5, 77:8, 102:14
**emotions** [8] - 12:5, 12:7, 77:11, 77:13, 97:5, 97:9, 98:6, 98:7
**empathize** [2] - 8:17, 132:21
**empathy** [17] - 9:22, 10:6, 10:14, 51:12, 63:5, 72:14, 76:4, 76:5, 76:6, 76:8, 76:9, 80:21, 80:22, 81:1, 81:4, 81:6, 120:16
**emphasize** [2] - 127:22, 132:6
**employer** [1] - 132:4
**emulate** [1] - 52:14
**encompassed** [2] - 7:25, 115:19
**encompasses** [1] - 67:25
**encryption** [1] - 132:3
**end** [8] - 15:11, 16:4, 22:8, 23:2, 26:2, 115:21, 128:3, 134:20
**ended** [1] - 13:4
**ending** [1] - 60:16
**enforcement** [1] - 51:6
**engage** [2] - 10:11, 62:14
**English** [1] - 91:22
**enhancement** [10] - 8:2, 15:23, 16:9, 18:5, 19:17, 19:20, 20:4, 20:21, 101:16, 136:13
**enjoy** [1] - 45:24
**enjoys** [1] - 31:22
**entire** [10] - 14:2, 19:22, 35:4, 37:17, 59:22, 62:22, 77:9, 90:19, 118:9, 127:15
**entirety** [2] - 15:18, 17:2
**entitled** [1] - 138:4
**entry** [3] - 23:13, 122:12, 136:18
**environment** [2] - 85:25, 122:5
**equal** [1] - 86:7
**equipped** [1] - 121:5
**equivalent** [1] - 101:15
**Eric** [2] - 28:25, 29:19
**escalated** [1] - 50:7
**escalation** [1] - 74:9
**escaped** [1] - 125:21
**especially** [7] - 11:18, 23:25, 41:1, 63:12, 78:17, 121:19, 130:15
**essentially** [5] - 13:24, 17:18, 34:25, 35:17, 123:12
**established** [2] - 19:21, 23:5
**et** [1] - 78:9
**eternity** [5] - 107:25, 108:1, 108:7, 108:11
**evaluated** [1] - 16:21
**evaluation** [1] - 39:24
**evaluations** [3] - 3:23, 40:22, 40:23
**evaluators** [1] - 19:7

**event** [1] - 59:12
**events** [2] - 31:8, 129:13
**eventual** [1] - 45:9
**eventually** [2] - 41:22, 86:7
**everyday** [1] - 36:14
**everywhere** [2] - 48:16, 59:2
**evidence** [16] - 6:25, 10:16, 12:19, 13:17, 19:8, 19:18, 19:24, 43:18, 46:16, 60:24, 103:8, 103:10, 103:13, 104:5, 106:1, 125:25
**evil** [1] - 47:20
**evolved** [1] - 120:2
**ex** [3] - 58:20, 102:11, 109:13
**ex-boyfriend** [1] - 58:20
**ex-spouse** [2] - 102:11, 109:13
**exact** [2] - 16:5, 74:12
**exactly** [7] - 14:6, 15:5, 15:17, 39:25, 60:13, 79:17, 105:14
**exam** [1] - 89:18
**examination** [8] - 16:2, 16:3, 40:5, 42:8, 88:23, 89:1, 89:24, 104:23
**EXAMINATION** [3] - 66:17, 87:21, 96:13
**examinations** [1] - 37:7
**examined** [1] - 34:5
**example** [6] - 52:24, 54:1, 54:5, 63:10, 89:14, 126:19
**examples** [3] - 89:17, 90:11, 92:4
**exceed** [1] - 131:12
**except** [1] - 14:13
**exception** [1] - 11:10
**excessive** [3] - 81:23, 82:5, 122:21
**excited** [1] - 58:1
**excuse** [4] - 24:24, 55:22, 77:5, 117:12
**execute** [1] - 78:5
**exercise** [1] - 22:15
**exerting** [1] - 39:14
**Exhibit** [1] - 28:16
**exhibit** [1] - 46:8
**exhibited** [3] - 26:12, 52:21, 53:20
**exhibits** [4] - 13:22, 37:8, 137:8, 137:12
**existed** [1] - 77:4
**exit** [2] - 74:11, 123:15
**expected** [2] - 22:19, 47:20
**experience** [1] - 115:23
**experienced** [3] - 38:3, 53:8, 82:21
**experiences** [6] - 77:16, 77:18, 77:20, 77:22, 85:23, 85:24
**experiential** [1] - 81:1
**experimentation** [1] - 41:21
**expert** [18] - 14:20, 14:24, 15:2, 15:3, 15:6, 15:16, 19:19, 37:16, 39:23, 67:15, 74:13, 82:10, 93:1, 93:3, 104:21, 123:16, 123:20
**expertise** [1] - 17:1
**experts** [1] - 40:21
**explain** [4] - 9:12, 11:17, 85:21, 96:24
**expressed** [1] - 52:14
**expropriate** [1] - 94:1
**extensive** [1] - 100:3
**extent** [8] - 7:14, 7:19, 20:1, 31:17, 31:23, 106:3, 128:4, 128:15
**extra** [2] - 56:17, 62:25
**extraordinarily** [1] - 55:18
**extremely** [3] - 34:21, 50:2, 123:18
**eye** [6] - 41:23, 95:12, 104:11, 104:13, 126:1, 126:2
**eyes** [2] - 76:7, 117:16


## F


**F.3d** [4] - 18:2, 18:10, 18:12, 18:13
**face** [3] - 28:6, 39:5, 46:25
**faced** [1] - 121:17
**faces** [1] - 71:4
**facility** [1] - 81:13
**facing** [1] - 125:7
**fact** [16] - 8:18, 11:21, 13:17, 18:20, 19:22, 31:20, 56:17, 65:2, 78:13, 84:4, 97:14, 99:19, 112:8, 113:12, 123:20, 136:10
**factor** [3] - 55:22, 108:6, 127:23
**factors** [8] - 23:24, 26:21, 56:17, 99:18, 99:19, 108:17, 130:19, 136:25
**facts** [5] - 14:19, 22:15, 47:24, 71:7, 109:3
**factual** [1] - 93:21
**failing** [1] - 53:9
**fair** [2] - 20:22, 37:4
**fake** [1] - 91:5
**fall** [1] - 99:2
**falls** [1] - 100:7
**fame** [1] - 52:13
**families** [11] - 47:16, 60:8, 61:1, 62:12, 62:18, 101:20, 122:20, 125:14, 126:9, 128:11, 130:7
**family** [42] - 30:14, 38:10, 41:8, 45:25, 46:12, 47:16, 49:17, 50:5, 50:8, 50:17, 57:4, 57:5, 57:10, 57:11, 57:12, 57:14, 57:17, 58:3, 58:5, 58:7, 58:14, 58:17, 58:22, 59:6, 59:7, 59:21, 60:8, 60:21, 97:1, 108:2, 112:3, 118:3, 122:6, 122:8, 123:2, 123:3, 123:5, 126:7, 129:18, 133:2, 133:9, 134:9
**family's** [1] - 59:10
**fantasies** [5] - 33:8, 74:8, 104:5, 105:2, 123:18
**fantasizes** [1] - 28:11
**fantasy** [2] - 46:20, 73:11
**far** [8] - 8:20, 35:10, 58:20, 99:23, 101:3, 123:10, 128:9
**fascination** [3] - 36:15, 53:4, 104:16
**fascinations** [1] - 103:25
**fashion** [2] - 35:7, 117:11
**fast** [2] - 45:22, 84:16
**fateful** [2] - 30:19, 122:21
**father** [21] - 21:3, 21:12, 43:17, 47:12, 55:20, 73:16, 73:24, 77:24, 81:25, 83:14, 85:17, 86:5, 86:25, 92:14, 94:5, 96:21, 97:1, 114:21, 115:13, 121:15
**favor** [5] - 6:11, 7:18, 20:3, 54:14, 55:4
**FBI** [14] - 1:25, 3:10, 3:12, 6:8, 7:18, 29:4, 30:18, 50:13, 55:16, 92:14, 106:11, 106:18, 115:22
**FBI's** [2] - 53:22, 55:18
**FCRR** [2] - 1:20, 138:9
**FDC** [2] - 135:17, 135:21
**fear** [10] - 24:16, 39:9, 45:9, 57:4, 57:7, 84:16, 124:16, 126:8, 126:12, 128:18
**fearful** [1] - 46:8
**features** [1] - 70:5
**February** [10] - 12:24, 27:17, 42:23, 44:21, 47:17, 47:23, 48:8, 56:7, 57:14, 122:21
**federal** [3] - 62:6, 114:1, 119:15
**feeding** [1] - 14:8
**feelings** [3] - 52:3, 61:24, 114:18
**felons** [1] - 35:24
**felt** [9] - 69:8, 71:11, 89:17, 98:9, 107:19, 107:24, 108:6, 119:10, 125:20
**few** [10] - 18:1, 67:22, 69:6, 86:18, 86:22, 87:12, 87:16, 89:16, 91:20, 109:4
**fiancee's** [2] - 49:17, 49:22
**fiancée** [3] - 48:9, 48:17, 49:15
**field** [4] - 16:23, 17:8, 67:15, 112:4
**fifth** [2] - 9:18, 15:3
**figure** [3] - 96:1, 96:5, 130:5
**figures** [5] - 70:5, 95:22, 95:23, 96:3, 96:4
**file** [2] - 137:7, 137:13
**filed** [6] - 3:21, 3:22, 22:2, 46:21, 136:15, 136:18
**files** [1] - 99:10
**filled** [1] - 44:23
**final** [2] - 114:23, 131:12
**finally** [4] - 42:11, 58:2, 97:23, 116:9
**financial** [1] - 56:4
**findings** [2] - 72:6, 136:10
**fine** [6] - 4:12, 16:10, 21:16, 62:25, 66:5, 130:21
**fines** [1] - 132:8
**finish** [1] - 114:25
**firearm** [3] - 26:19, 51:15, 131:24
**firearms** [2] - 35:12, 125:1
**first** [27] - 4:2, 4:15, 6:21, 9:1, 10:8, 10:10, 16:14, 20:15, 20:25, 23:6, 24:11, 25:21, 35:16, 44:15, 48:12, 49:17, 49:19, 55:12, 64:2, 64:9, 64:25, 67:22, 76:9, 91:1, 115:18, 116:10, 125:14
**fit** [1] - 64:2
**five** [16] - 3:25, 4:10, 17:10, 23:16, 40:21, 40:22, 49:3, 53:17, 112:21, 112:22, 116:17, 116:19, 117:9, 119:6, 121:2, 129:15
**five-year-old** [1] - 117:9
**fix** [1] - 33:15
**fixed** [1] - 76:23
**FL** [3] - 1:14, 1:18, 1:22
**flags** [2] - 32:25, 52:10
**flashing** [1] - 39:1
**flat** [3] - 98:3, 98:4, 98:5
**flaws** [1] - 37:7
**fleury** [2] - 132:17, 136:3
**Fleury** [55] - 3:6, 3:14, 3:16, 3:18, 3:20, 3:24, 4:17, 6:8, 9:21, 19:23, 30:10, 41:11, 42:17, 42:18, 42:19, 45:25, 46:2, 46:17, 46:25, 47:2, 47:3, 47:9, 47:11, 47:19, 47:21, 47:24, 51:12, 51:20, 56:14, 56:23, 57:4, 58:7, 59:16, 63:13, 67:19, 72:12, 86:25, 90:24, 91:19, 111:7, 114:18, 115:1, 115:2, 115:12, 120:9, 120:13, 120:23, 122:14, 122:15,

123:13, 123:25, 125:17, 127:6, 130:11, 130:22
**FLEURY** [2] - 1:6, 1:17
**Fleury's** [10] - 7:17, 21:3, 21:11, 47:7, 47:14, 63:5, 104:3, 105:1, 115:13, 130:3
**Floor** [1] - 1:21
**Florida** [3] - 46:4, 47:13, 103:23
**FLORIDA** [1] - 1:1
**fly** [1] - 30:16
**focus** [13] - 9:1, 20:15, 22:17, 22:20, 23:4, 35:19, 56:1, 64:11, 65:5, 66:21, 67:3, 67:22, 126:5
**focused** [2] - 9:2, 54:17
**focusing** [2] - 14:25, 30:12
**folks** [2] - 8:4, 85:11
**follow** [7] - 35:22, 45:21, 51:22, 86:23, 87:16, 96:9, 113:21
**follow-up** [1] - 87:16
**followed** [3] - 59:2, 113:22, 132:14
**follower** [2] - 81:24, 82:6
**followers** [1] - 36:8
**following** [7] - 3:2, 37:1, 57:17, 60:16, 63:11, 71:13, 132:2
**follows** [2] - 5:1, 66:9
**followup** [3] - 66:2, 80:3, 80:5
**fool** [1] - 51:4
**footsteps** [1] - 51:22
**FOR** [2] - 1:12, 1:17
**forbid** [1] - 124:2
**forced** [3] - 28:6, 109:15, 120:25
**foregoing** [1] - 138:3
**foremost** [2] - 37:21, 115:18
**forensic** [1] - 37:21
**foreseen** [1] - 8:23
**forever** [2] - 26:7, 27:20
**forget** [5] - 34:4, 38:15, 38:21, 55:10, 114:14
**forgot** [1] - 49:13
**form** [4] - 9:6, 53:16, 128:8, 133:16
**forma** [1] - 136:20
**formal** [5] - 6:10, 20:1, 21:24, 22:2, 23:7
**formally** [1] - 6:11
**former** [1] - 102:8
**FORT** [1] - 1:2
**Fort** [1] - 1:14
**forth** [5] - 9:18, 39:23, 103:10, 119:2, 130:19
**forthcoming** [1] - 61:12
**forties** [1] - 123:15
**fortunately** [2] - 31:9, 127:21
**forward** [4] - 23:3, 39:2, 45:22, 48:5
**four** [6] - 12:17, 23:17, 27:3, 27:6, 29:2, 101:5
**frankly** [1] - 16:7
**Franks** [2] - 18:9, 18:10
**Fred** [5] - 43:23, 55:1, 55:6, 55:14, 56:25
**free** [4] - 47:20, 65:10, 98:14, 116:25
**freshman** [1] - 91:3
**Friday** [1] - 98:22
**friend** [5] - 48:23, 58:19, 70:3, 91:22, 91:23
**friends** [18] - 30:14, 45:1, 45:2, 45:10, 45:24, 70:2, 70:23, 77:15, 77:20, 77:21, 81:2, 91:4, 91:9, 91:11, 91:14, 91:18, 91:21, 92:1
**friendship** [3] - 42:1, 91:16, 92:2
**friendships** [1] - 44:23
**frightening** [1] - 84:2
**fringes** [1] - 91:14
**Frohlich** [1] - 18:10
**front** [4] - 17:19, 74:3, 90:22, 103:18
**frozen** [1] - 45:2
**frustrated** [1] - 29:13
**full** [2] - 69:5, 106:3
**fully** [2] - 123:1, 123:11
**function** [1] - 83:3
**fundamental** [1] - 22:20
**funny** [1] - 82:1
**furthermore** [1] - 56:5
**future** [9] - 21:4, 31:18, 62:2, 63:22, 73:8, 123:14, 124:5, 124:20, 129:3

## G

**G-E-L-L-E-R** [1] - 66:15
**Gacy** [4] - 92:7, 92:8, 92:15, 92:18
**gallery** [1] - 98:14
**games** [1] - 83:6
**garage** [1] - 57:6
**Garcia** [1] - 77:9
**Geller** [35] - 9:6, 9:19, 10:3, 10:13, 10:16, 11:5, 11:19, 14:10, 16:18, 37:2, 37:6, 62:23, 63:8, 64:3, 64:9, 65:1, 65:24, 65:25, 66:15, 66:19, 86:18, 87:17, 87:23, 90:12, 90:13, 92:3, 94:14, 95:2, 95:6, 96:10, 107:2, 112:3, 113:25, 121:4, 129:8
**GELLER** [2] - 2:3, 66:7
**Geller's** [3] - 13:18, 19:10, 40:18
**general** [11] - 24:1, 32:6, 68:7, 94:20, 94:23, 103:1, 112:23, 112:24, 113:3, 127:22, 128:19
**generally** [2] - 56:9, 56:12
**gentle** [1] - 73:18
**gentleman** [8] - 30:16, 30:23, 33:8, 33:24, 35:9, 123:13, 123:25, 127:19
**gentleman's** [1] - 32:16
**gentlemen** [2] - 61:15, 61:24
**genuine** [1] - 78:20
**genuinely** [1] - 28:7
**giants** [1] - 116:14
**girl** [1] - 57:17
**given** [14] - 4:17, 25:4, 30:24, 31:7, 32:16, 51:21, 73:2, 73:3, 92:4, 119:21, 126:25, 129:14, 132:23
**GIZELLA** [2] - 1:20, 138:9
**gizella_baan** [1] - 1:23
**gizella_baan-proulx@flsd.uscourts.gov** [1] - 1:23
**glad** [1] - 53:25
**glimmer** [1] - 35:7
**goal** [4] - 105:8, 105:9, 105:10, 105:13
**God** [2] - 49:23, 124:2
**goodness** [1] - 56:18
**government** [42] - 3:7, 4:16, 6:12, 7:10, 7:18, 9:10, 10:15, 12:13, 16:15, 16:25, 20:3, 22:24, 23:4, 30:2, 31:1, 31:11, 35:2, 40:2, 51:24, 61:6, 61:13, 72:7, 72:8, 72:17, 78:10, 80:9, 86:22, 87:16, 96:16, 99:9, 100:13, 105:24, 107:7, 110:14, 110:16, 110:19, 122:18, 124:13, 129:5, 129:20, 132:23, 136:6
**Government's** [1] - 28:16
**government's** [18] - 3:10, 23:5, 23:9, 33:20, 54:9, 63:3, 63:6, 63:21, 63:23, 98:23, 99:22, 103:6, 104:21, 108:8, 108:12, 122:11, 123:16, 130:1
**grace** [1] - 56:18
**grades** [1] - 53:9
**graduating** [1] - 59:12
**granted** [1] - 30:5
**graphic** [1] - 53:1
**gratification** [2] - 39:15, 43:2
**gratitude** [1] - 62:13
**grave** [1] - 38:24
**great** [1] - 48:9
**greater** [5] - 63:15, 100:22, 100:23, 101:5, 122:23
**greatest** [2] - 41:12, 41:13
**grief** [3] - 45:20, 97:1, 97:8
**grieve** [2] - 42:10, 49:15
**grieving** [2] - 42:7, 42:8
**ground** [2] - 21:24, 22:18
**grounds** [1] - 45:19
**group** [9] - 41:19, 41:22, 60:4, 90:25, 91:1, 91:3, 91:5, 91:14, 91:16
**guarantee** [2] - 119:11, 119:18
**guess** [1] - 32:20
**guideline** [12] - 4:9, 5:13, 10:21, 21:1, 99:1, 99:3, 100:6, 108:21, 122:25, 126:15, 127:13, 128:20
**guidelines** [9] - 63:15, 63:25, 99:2, 101:10, 101:14, 122:22, 125:8, 129:15, 130:19
**guilt** [1] - 101:21
**guilty** [2] - 103:19, 103:20
**gun** [7] - 35:24, 45:5, 51:19, 73:17, 103:21, 103:22, 128:10
**gunned** [1] - 27:21
**guns** [5] - 35:25, 36:1, 36:2, 51:16, 86:3
**gunshots** [1] - 45:15
**Gutierrez** [6] - 9:17, 9:20, 110:9, 110:19, 134:18, 135:10
**GUTTENBERG** [2] - 55:6, 55:9
**Guttenberg** [13] - 27:5, 41:9, 43:23, 54:14, 55:1, 55:6, 56:25, 61:4, 117:13, 120:4, 124:15, 125:15
**Guttenbergs** [1] - 41:8
**guy** [3] - 40:15, 111:22, 116:19
**guys** [4] - 57:3, 75:10, 116:13, 116:22

## H

**habilitate** [1] - 129:8
**habilitated** [2] - 84:4, 84:8
**hacked** [1] - 27:9
**haha** [2] - 50:18, 50:20
**half** [5] - 17:10, 37:14, 56:3, 107:1, 107:4
**half-hearted** [2] - 107:1, 107:4
**hallmarks** [1] - 62:7
**hallways** [1] - 59:3
**handed** [1] - 31:11

**handful** [2] - 115:19, 115:20
**handle** [5] - 23:5, 23:13, 82:8, 83:20, 121:5
**handling** [1] - 82:10
**hands** [4] - 25:8, 47:23, 123:6, 130:8
**happiness** [1] - 76:16
**happy** [2] - 44:15, 53:25
**harass** [1] - 46:6
**harassing** [1] - 5:8
**harassment** [3] - 43:3, 101:7, 102:6
**hard** [2] - 44:2, 116:7
**harder** [1] - 80:24
**harm** [2] - 28:12, 121:10
**Harris** [2] - 29:1, 29:19
**hate** [1] - 58:11
**haunted** [1] - 24:5
**haunting** [1] - 126:7
**head** [3] - 19:21, 48:13, 133:11
**heads** [1] - 26:5
**heal** [3] - 47:8, 123:1, 123:8
**healing** [1] - 123:7
**health** [1] - 132:5
**hear** [24] - 19:10, 23:6, 23:8, 25:19, 25:20, 30:14, 44:14, 50:2, 50:3, 54:18, 54:22, 61:6, 61:10, 62:21, 63:1, 63:2, 63:3, 63:21, 68:14, 68:18, 74:13, 86:24, 98:18, 116:7
**heard** [18] - 9:15, 36:25, 42:12, 53:21, 63:6, 63:14, 65:15, 66:19, 72:7, 72:17, 76:10, 78:23, 93:23, 94:2, 95:7, 107:15, 127:24
**hearing** [4] - 45:15, 46:16, 128:1, 137:24
**HEARING** [1] - 1:8
**heart** [4] - 32:7, 61:23, 62:18, 84:16
**hearted** [2] - 107:1, 107:4
**heavy** [3] - 25:8, 30:3, 31:11
**heavy-handed** [1] - 31:11
**heck** [1] - 119:9
**held** [1] - 3:2
**helicopter** [1] - 118:5
**helicopters** [2] - 45:16, 45:19
**help** [14] - 32:21, 34:16, 48:25, 56:23, 70:5, 70:7, 83:17, 83:18, 83:19, 85:25, 105:7, 135:3, 135:11
**hereby** [1] - 138:3
**heroes** [1] - 95:22
**hidden** [1] - 63:7
**hide** [1] - 39:16
**hiding** [3] - 78:8, 80:10
**high** [22] - 27:7, 27:9, 27:10, 27:11, 27:13, 27:15, 28:4, 28:6, 29:3, 29:4, 29:18, 29:20, 29:21, 29:23, 40:12, 41:18, 77:16, 91:1, 94:7, 95:18, 95:25, 100:17
**High** [1] - 56:6
**higher** [3] - 57:7, 75:7, 99:4
**highest** [6] - 25:4, 100:25, 101:2, 109:10, 109:11, 109:21
**himself** [15] - 18:18, 39:7, 40:17, 42:9, 60:10, 69:5, 73:16, 74:11, 75:1, 83:20, 94:3, 96:22, 104:6, 117:6
**hindsight** [1] - 17:20
**hire** [1] - 15:10
**hired** [1] - 85:17
**hires** [1] - 15:9
**history** [28] - 4:3, 4:8, 4:15, 4:17, 21:19, 24:21, 24:22, 64:12, 68:9, 79:9, 99:25, 100:2, 100:4, 100:7, 100:12, 100:17, 100:18, 100:20, 101:1, 101:4, 102:17, 108:23, 109:25, 120:23, 126:20, 126:22, 127:20, 128:24
**hit** [1] - 79:6
**hoarse** [1] - 115:13
**hold** [1] - 49:12
**holds** [1] - 62:2
**hole** [1] - 123:4
**holiday** [4] - 10:9, 46:2, 125:14
**holidays** [2] - 45:24, 125:13
**Holton** [1] - 56:5
**home** [18] - 45:23, 46:12, 47:11, 49:10, 73:25, 83:15, 85:18, 85:22, 86:6, 86:7, 96:25, 111:7, 111:17, 112:2, 114:2, 119:14, 129:11, 129:19
**hometown** [1] - 46:15
**honest** [3] - 106:22, 116:22, 119:1
**honestly** [8] - 17:16, 19:19, 59:3, 102:7, 110:24, 112:3, 125:8, 128:6
**Honor** [78] - 3:8, 3:15, 4:19, 5:21, 6:18, 7:8, 7:12, 12:13, 12:16, 13:3, 13:15, 14:1, 14:6, 14:22, 15:4, 15:15, 16:2, 21:2, 23:19, 25:15, 26:2, 26:7, 26:15, 26:20, 27:2, 27:12, 28:1, 28:9, 28:15, 28:16, 28:21, 29:2, 29:16, 30:3, 31:16, 31:25, 32:12, 34:2, 34:3, 35:17, 35:21, 37:5, 37:24, 38:9, 38:22, 39:7, 40:6, 40:10, 40:19, 41:4, 41:12, 41:15, 42:4, 42:14, 43:5, 43:13, 43:19, 44:2, 44:3, 44:5, 48:4, 54:24, 61:7, 64:12, 65:11, 84:23, 86:19, 87:4, 87:19, 96:8, 101:18, 104:24, 110:20, 113:16, 120:11, 131:8, 136:7, 137:18
**honor** [1] - 60:5
**HONORABLE** [1] - 1:9
**hoo** [1] - 55:13
**Hook** [1] - 29:5
**hope** [20] - 32:19, 33:9, 33:21, 34:22, 35:7, 47:10, 47:13, 51:17, 80:23, 85:7, 110:15, 110:17, 121:22, 128:12, 128:13, 132:24, 133:10, 133:18, 133:19, 136:25
**hopefully** [3] - 108:19, 127:15, 130:13
**hopes** [2] - 56:23, 134:4
**hoping** [3] - 61:2, 121:6, 125:16
**horrible** [8] - 35:4, 49:2, 51:1, 55:10, 55:12, 101:20, 102:1, 113:1
**horribles** [1] - 30:22
**horribly** [2] - 69:9, 105:23
**horrific** [3] - 69:9, 121:3, 121:20
**horror** [3] - 27:18, 38:14, 71:10
**horrors** [1] - 81:18
**Hospital** [1] - 118:15
**hospital** [3] - 49:5, 67:11, 118:14
**hospitalization** [2] - 110:20, 111:2
**hospitalized** [1] - 34:6
**hospitals** [1] - 67:7
**hosts** [1] - 56:3
**hour** [1] - 14:21
**hours** [3] - 45:13, 119:2, 131:17
**house** [9] - 30:19, 44:22, 48:10, 51:5, 70:24, 91:15, 113:22, 115:23
**huddled** [1] - 45:13
**huge** [1] - 44:3
**human** [7] - 26:11, 35:3, 43:21, 70:24, 70:25, 116:23, 119:17
**hundred** [1] - 106:8
**hundreds** [1] - 46:5
**hurt** [3] - 30:16, 73:18, 75:13
**hurting** [2] - 51:11, 75:14
**hurts** [3] - 79:25, 88:19, 89:10

## I

**Idaho** [2] - 87:7, 113:24
**idea** [11] - 13:14, 15:13, 37:11, 41:6, 43:4, 60:9, 60:12, 63:12, 73:8, 98:24, 124:18
**ideally** [1] - 111:12
**ideas** [1] - 45:25
**identified** [1] - 51:13
**identity** [1] - 39:8
**idolize** [1] - 107:22
**idolized** [3] - 47:24, 51:23, 107:20
**ifs** [2] - 103:16, 103:17
**ignorant** [2] - 93:15, 93:17
**ignore** [6] - 30:2, 37:22, 62:5, 62:6, 62:7
**ignored** [2] - 26:12, 42:5
**II** [1] - 1:9
**illegally** [1] - 36:1
**illness** [1] - 110:3
**illnesses** [2] - 110:24, 118:7
**illustrative** [1] - 90:11
**image** [3] - 39:1, 39:2, 60:11
**images** [4] - 32:1, 32:2, 94:19
**imaginable** [1] - 127:17
**imagination** [1] - 39:20
**imagine** [15] - 61:18, 78:15, 84:13, 103:16, 116:7, 117:2, 117:24, 118:22, 119:7, 119:8, 119:21, 120:2, 120:22, 121:10
**imagined** [1] - 45:8
**immediately** [4] - 55:16, 115:16, 132:11, 137:20
**impact** [12] - 5:25, 6:2, 6:12, 7:13, 7:19, 19:11, 21:10, 21:11, 25:16, 42:13, 43:16, 55:14
**impacted** [1] - 24:4
**impacts** [1] - 7:6
**impairment** [2] - 9:24, 9:25
**imperative** [1] - 12:1
**impersonated** [1] - 18:21
**implore** [2] - 47:6, 133:10
**important** [29] - 9:10, 12:8, 14:1, 24:10, 27:6, 51:13, 63:20, 64:13, 65:14, 74:16, 76:4, 89:9, 89:11, 89:14, 89:15, 89:16, 89:17, 95:14, 100:21, 101:17, 102:18, 109:10, 110:13, 111:5, 111:10, 111:25, 112:24,

135:9
**importantly** [1] - 124:14
**impose** [1] - 35:21
**imposed** [5] - 101:1, 101:3, 101:6, 136:8, 136:17
**imposing** [1] - 127:16
**impression** [3] - 33:6, 37:3, 39:3
**imprisoned** [1] - 130:23
**imprisonment** [2] - 131:14, 132:13
**impulse** [1] - 52:20
**impunity** [2] - 128:2, 128:18
**inability** [1] - 8:17
**inaccurate** [1] - 56:16
**inappropriate** [3] - 24:6, 111:21, 124:12
**incapable** [1] - 70:25
**incapacitate** [1] - 129:5
**incarcerated** [2] - 127:7, 127:9
**incarceration** [8] - 15:1, 22:23, 25:10, 33:19, 84:21, 109:23, 111:4, 111:24
**inception** [1] - 5:20
**incessantly** [1] - 68:12
**incidents** [3] - 52:16, 52:25, 53:14
**include** [1] - 131:22
**included** [3] - 52:21, 59:2, 89:18
**includes** [1] - 107:1
**including** [5] - 52:15, 52:16, 52:19, 53:9, 95:18
**incomprehensible** [1] - 8:8
**inconceivable** [1] - 49:11
**incorrect** [1] - 14:22
**incumbent** [3] - 61:14, 61:25, 62:13
**indeed** [1] - 56:14
**indicate** [2] - 18:18, 84:6
**indicated** [1] - 73:8
**indicates** [1] - 125:25
**indicator** [1] - 125:1
**individual** [22] - 11:17, 19:2, 23:25, 24:21, 24:22, 25:8, 28:11, 36:5, 36:23, 52:10, 53:15, 54:5, 54:25, 63:13, 72:8, 73:1, 73:20, 74:10, 78:5, 78:12, 103:19, 113:25
**individuals** [14] - 8:10, 18:18, 19:1, 19:13, 23:10, 28:2, 64:18, 100:14, 101:9, 101:13, 126:1, 128:14, 130:13, 133:15
**inflicted** [1] - 28:12
**influence** [1] - 105:11
**information** [7] - 10:7, 11:24, 40:8, 40:9, 64:20, 71:21, 90:4
**informed** [1] - 9:14
**initial** [2] - 6:8, 96:25
**injected** [1] - 42:9
**injury** [2] - 118:8
**inmates** [1] - 83:8
**innocent** [1] - 130:7
**insatiable** [2] - 104:4, 105:2
**inside** [1] - 98:5
**insight** [1] - 63:9
**Instagram** [1] - 18:23
**instance** [1] - 5:8
**instead** [3] - 33:2, 45:1, 46:12
**insult** [1] - 39:16
**insulting** [1] - 104:2
**insurance** [1] - 118:14
**intellectual** [3] - 9:24, 12:2, 113:14
**intellectually** [1] - 52:2
**intelligence** [1] - 86:12
**intelligent** [1] - 71:19
**intend** [2] - 86:21, 87:1
**intended** [1] - 107:17
**intensely** [1] - 69:7
**intent** [6] - 8:16, 8:22, 60:22, 61:10, 97:12, 97:16
**intently** [1] - 129:25
**interact** [1] - 83:20
**interacting** [1] - 85:12
**interaction** [1] - 71:1
**interest** [15] - 52:24, 53:6, 75:5, 75:7, 75:9, 75:16, 75:17, 79:2, 80:9, 80:12, 80:18, 92:20, 92:21, 92:23, 103:21
**interested** [7] - 64:11, 74:20, 75:1, 75:3, 75:22, 107:20, 133:3
**interesting** [1] - 69:18
**interests** [4] - 53:1, 68:6, 68:9, 80:15
**interfered** [1] - 42:9
**internalize** [1] - 130:3
**internalized** [1] - 79:18
**internet** [21] - 8:20, 47:10, 71:14, 71:17, 71:18, 74:5, 75:21, 76:15, 78:8, 81:20, 81:22, 81:23, 109:14, 111:13, 112:25, 121:9, 125:22, 127:24, 128:6, 128:15, 130:15
**interpret** [1] - 19:24
**interrupt** [1] - 71:24
**interview** [21] - 11:20, 13:23, 14:2, 14:11, 14:17, 15:19, 17:6, 17:12, 17:13, 17:14, 40:11, 41:2, 43:6, 67:18, 67:25, 90:14, 92:13, 104:9, 106:18, 106:19, 107:13
**interviewed** [1] - 93:6
**interviews** [2] - 6:8, 28:22
**intimidating** [1] - 5:8
**intimidation** [2] - 10:12, 43:3
**intrigue** [1] - 29:8
**intriguing** [1] - 41:20
**invariably** [1] - 124:1
**invented** [1] - 80:1
**Inventory-4** [1] - 87:25
**investigation** [1] - 112:10
**Investigation** [2] - 4:5, 4:25
**invoked** [1] - 96:19
**involved** [1] - 93:6
**issue** [11] - 4:13, 4:21, 5:9, 7:6, 15:21, 17:22, 19:15, 36:22, 72:1, 126:15, 132:19
**issues** [12] - 5:24, 7:23, 10:21, 13:12, 24:23, 26:14, 53:11, 63:5, 85:11, 120:16, 134:2
**item** [1] - 88:9
**itself** [1] - 73:13

## J

**jail** [4] - 14:13, 49:25, 82:22, 112:19
**jails** [1] - 135:18
**Jamie** [1] - 42:25
**January** [2] - 58:25, 115:21
**Jeff** [6] - 55:7, 55:9, 55:25, 56:7, 56:20, 60:3
**Jeff's** [1] - 56:5
**Jeffrey** [1] - 32:2
**Jennifer** [1] - 55:15
**Jesse** [6] - 27:5, 41:9, 41:10, 43:23, 54:7, 55:15
**jinx** [1] - 118:20
**job** [5] - 82:13, 82:14, 83:17, 83:18, 129:21
**John** [5] - 27:5, 92:7, 92:8, 92:15, 92:18
**joy** [2] - 123:3, 136:23
**judge** [9] - 16:12, 60:19, 87:3, 98:21, 103:13, 107:3, 116:3, 119:15, 137:6
**JUDGE** [1] - 1:10
**Judge** [41] - 5:12, 8:25, 9:5, 10:24, 20:12, 20:13, 20:24, 22:4, 34:15, 54:11, 64:5, 66:19, 70:14, 71:25, 73:20, 80:6, 85:14, 86:15, 98:19, 99:24, 100:13, 101:11, 102:19, 107:1, 107:22, 108:18, 108:20, 109:3, 109:13, 109:17, 109:23, 111:11, 111:21, 112:1, 112:21, 114:15, 114:22, 114:25, 125:4, 135:13, 136:12
**Judge's** [1] - 80:20
**Judges** [1] - 99:16
**judges** [3] - 65:12, 103:16, 110:4
**judgment** [3] - 130:21, 136:3, 136:18
**judgments** [1] - 70:3
**junior** [1] - 77:16
**jury** [5] - 8:16, 13:16, 15:22, 17:19, 72:3
**justice** [6] - 4:18, 42:16, 44:4, 125:7, 130:9, 137:4
**justify** [1] - 110:12
**justifying** [1] - 102:24
**juvenile** [3] - 86:14, 113:15, 113:20
**juveniles** [1] - 113:17

## K

**Kasky** [3] - 27:5, 55:7, 60:3
**keep** [5] - 35:14, 60:25, 78:2, 81:21, 82:11
**keeping** [2] - 83:5, 113:8
**keeps** [1] - 127:25
**keg** [1] - 33:4
**Kentucky** [1] - 112:15
**kept** [8] - 76:21, 81:22, 93:19, 97:10, 97:16, 114:5, 116:2, 118:2
**key** [4] - 6:25, 33:19, 111:22, 127:19
**kicked** [1] - 118:14
**kid** [4] - 28:6, 39:7, 95:25, 116:11
**kidnap** [1] - 46:9
**kidnapping** [2] - 51:4, 100:11
**kids** [12] - 27:16, 29:7, 38:19, 42:21, 54:7, 55:16, 59:23, 59:24, 60:1, 60:2, 60:3, 95:19
**kill** [1] - 38:16
**killed** [6] - 29:13, 38:16, 50:19, 50:20, 59:24, 76:13
**killer** [6] - 50:8, 64:19, 74:19, 80:19, 93:3, 95:10
**killers** [23] - 28:14, 28:25, 31:22, 36:15, 39:19, 46:18, 50:4, 51:23, 73:12, 74:17, 75:1, 75:5, 80:10, 80:12, 92:5, 92:15, 92:21, 93:7, 93:14, 93:18, 104:1, 105:21, 107:20
**killings** [1] - 76:10
**kind** [23] - 24:3, 31:4, 59:10, 65:4, 68:15, 70:18,

75:23, 77:6, 78:7, 78:16, 79:8, 80:4, 84:9, 86:4, 91:8, 94:21, 112:15, 113:3, 114:17, 115:24, 125:24, 134:25, 135:14
**kinder** [1] - 56:10
**kinds** [5] - 62:15, 76:5, 78:6, 79:9, 80:15
**Klebold** [2] - 29:1, 29:20
**knit** [1] - 118:4
**knowing** [8] - 18:21, 23:22, 27:18, 61:20, 85:8, 120:22, 121:23
**knowledge** [3] - 11:9, 55:17, 93:10
**known** [6] - 9:4, 12:10, 18:6, 36:13, 93:25, 112:4
**knows** [6] - 49:25, 64:12, 72:15, 110:21, 134:18, 135:1

## L

**lack** [3] - 33:3, 81:2, 115:24
**lacked** [3] - 12:6, 12:7, 51:12
**lacks** [2] - 80:25, 85:23
**laid** [2] - 10:8, 108:23
**Lane** [3] - 28:25, 29:20, 39:12
**language** [5] - 5:5, 5:19, 6:7, 9:25, 12:2
**Lanza** [1] - 29:5
**laptop** [2] - 21:6, 66:4
**large** [1] - 79:22
**Las** [1] - 29:10
**last** [7] - 42:24, 42:25, 52:7, 72:11, 85:16, 115:14, 130:2
**lastly** [1] - 56:20
**late** [1] - 32:25
**latest** [2] - 52:5, 52:9
**LAUDERDALE** [1] - 1:2
**Lauderdale** [1] - 1:14
**laughing** [1] - 58:12
**law** [10] - 17:25, 51:6, 71:13, 82:6, 99:11, 103:5, 108:10, 110:12, 129:12, 130:12
**Law** [1] - 1:17
**law-abiding** [1] - 71:13
**laws** [1] - 35:24
**lawyer** [1] - 55:24
**lay** [2] - 9:11, 109:3
**layperson** [1] - 74:8
**leading** [1] - 14:8
**learn** [8] - 77:17, 80:22, 81:3, 81:14, 83:18, 83:20, 85:25, 134:4
**learned** [5] - 62:4, 81:6, 82:19, 82:20, 129:10
**learning** [4] - 77:6, 77:7, 83:24, 86:11
**least** [13] - 10:3, 15:24, 23:22, 25:24, 31:10, 34:11, 62:11, 74:8, 89:25, 121:1, 121:23, 129:19, 137:2
**leave** [2] - 121:21, 136:20
**leaves** [1] - 22:19
**lectured** [1] - 66:23
**led** [2] - 61:21, 104:17
**leeway** [1] - 65:14
**left** [3] - 38:18, 46:7, 127:15
**legal** [2] - 51:13, 82:8
**length** [1] - 108:5
**lengthy** [2] - 66:21, 84:21
**less** [5] - 73:2, 101:14, 110:5, 118:12, 126:24
**lesson** [1] - 129:10
**letter** [6] - 25:17, 25:20, 38:9, 44:15, 44:18, 46:24
**letters** [2] - 23:11, 61:16
**letting** [2] - 129:11, 133:6
**level** [11] - 4:5, 4:7, 4:24, 6:3, 8:2, 10:1, 29:23, 31:3, 47:21, 57:7, 127:21
**Lexie** [15] - 27:4, 28:5, 38:10, 43:24, 44:19, 44:25, 45:10, 45:21, 45:22, 46:10, 46:13, 46:25, 54:7, 58:18, 58:19
**Lexie's** [1] - 58:20
**lie** [1] - 40:17
**life** [18] - 34:20, 47:20, 49:5, 49:12, 49:13, 58:12, 59:22, 60:2, 68:12, 77:14, 82:13, 82:15, 82:19, 94:1, 115:14, 119:10, 122:9, 127:15
**Life360** [1] - 49:6
**lifetime** [1] - 32:18
**likely** [1] - 46:22
**limitation** [1] - 40:7
**limitations** [1] - 39:18
**limited** [3] - 81:1, 93:11, 111:19
**line** [1] - 18:14
**lines** [3] - 3:25, 22:23, 55:13
**list** [1] - 135:17
**Listen** [1] - 36:6
**listen** [1] - 21:6
**listened** [4] - 24:17, 126:7, 129:25, 130:2
**listening** [1] - 120:17
**litany** [3] - 32:23, 33:1, 121:17
**literally** [5] - 33:3, 65:2, 118:9, 118:11, 122:22
**live** [12] - 42:19, 43:1, 47:12, 47:20, 54:8, 60:2, 68:14, 104:4, 105:2, 118:10, 126:12, 127:15
**lived** [2] - 27:24, 58:18
**lives** [9] - 42:9, 44:24, 54:8, 123:5, 125:23, 126:8, 126:9, 128:18, 137:4
**living** [2] - 38:13, 49:2
**local** [5] - 51:9, 58:18, 58:23, 60:15, 135:18
**locations** [1] - 119:5
**lock** [1] - 127:18
**lockdown** [2] - 45:8, 45:13
**locked** [1] - 47:9
**logistical** [1] - 137:6
**long-winded** [1] - 16:4
**look** [37] - 13:21, 17:20, 17:25, 18:3, 24:19, 26:18, 26:21, 26:23, 27:1, 32:6, 34:20, 35:24, 37:6, 37:8, 52:5, 52:9, 62:10, 73:19, 75:4, 82:1, 94:22, 99:8, 99:15, 99:16, 99:18, 99:23, 108:3, 108:6, 108:10, 116:12, 121:13, 123:11, 123:25, 125:23, 126:4, 132:18
**looked** [17] - 13:18, 13:20, 13:22, 15:19, 17:2, 26:13, 27:2, 37:11, 37:15, 37:16, 37:17, 93:23, 94:19, 95:2, 109:12, 124:7
**looking** [18] - 22:4, 22:21, 22:24, 23:25, 25:1, 49:6, 56:12, 69:23, 75:12, 76:6, 88:22, 89:3, 93:22, 99:23, 110:14, 117:16, 129:18, 129:20
**looks** [3] - 49:23, 70:18, 70:19
**loosely** [1] - 128:6
**Los** [1] - 83:16
**lose** [2] - 35:3, 50:16
**loses** [1] - 42:1
**losing** [3] - 50:5, 57:18, 57:19
**loss** [7] - 8:11, 12:22, 19:4, 26:18, 45:9, 61:17, 121:1
**losses** [3] - 126:3, 131:10, 131:12
**lost** [9] - 27:15, 42:22, 45:10, 50:16, 55:15, 80:22, 80:23, 123:2, 123:5
**loud** [1] - 45:18
**love** [1] - 44:23
**loved** [6] - 13:7, 13:9, 27:18, 38:25, 50:21, 50:24
**low** [6] - 112:14, 112:15, 112:17, 134:19, 134:20
**luck** [2] - 117:5, 117:6
**lucky** [1] - 119:9
**lunch** [2] - 48:8, 48:9
**LYNDA** [3] - 2:3, 66:7, 66:15
**Lynda** [2] - 9:6, 66:15
**Lynn** [3] - 79:13, 79:14, 93:24

## M

**mailing** [1] - 119:13
**main** [3] - 5:16, 33:20, 68:7
**maintain** [1] - 122:2
**major** [1] - 23:24
**majority** [6] - 5:1, 5:5, 13:5, 41:10, 94:12, 94:18
**Malone** [1] - 18:12
**man** [12] - 29:9, 32:21, 33:1, 33:9, 33:21, 34:23, 82:6, 112:13, 116:11, 116:12, 123:13, 124:1
**man's** [1] - 32:17
**management** [1] - 111:3
**mandatory** [1] - 131:21
**manifest** [6] - 36:18, 68:1, 68:2, 73:13, 123:23, 123:24
**manipulated** [1] - 24:5
**manipulative** [1] - 107:6
**manner** [2] - 104:6, 136:10
**manufacturers** [1] - 90:4
**March** [1] - 1:5
**marching** [2] - 94:6, 94:8
**Marjory** [12] - 8:12, 12:23, 18:22, 27:7, 48:11, 50:25, 53:13, 53:15, 56:6, 57:15, 95:7, 96:1
**marks** [1] - 88:14
**Marriott** [1] - 49:3
**marshals** [1] - 135:14
**Marvel** [1] - 116:25
**mask** [1] - 39:16
**mass** [15] - 46:18, 51:22, 51:25, 52:14, 52:25, 60:10, 60:23, 93:4, 93:7, 93:14, 103:12, 103:14, 104:2, 105:20, 130:8
**masturbate** [1] - 74:18
**masturbates** [1] - 74:17
**masturbation** [1] - 28:23
**material** [1] - 65:3
**materials** [2] - 3:23, 87:10
**matter** [6] - 3:5, 16:5, 22:8, 80:13, 121:10, 138:5
**maturity** [2] - 34:18, 113:15
**max** [6] - 30:3, 30:4, 33:23, 100:17, 100:20, 122:13
**Max** [7] - 43:23, 48:18, 50:20, 55:1, 94:5, 94:7, 94:8
**maxes** [1] - 23:16
**maximum** [14] - 22:25, 25:3, 31:8, 37:25, 44:1, 47:6, 57:9, 61:2, 63:23, 73:2, 100:5, 100:19, 112:16,

122:14
**MaxSchachter** [1] - 50:19
**McDowell** [2] - 1:25, 3:11
**McLean** [1] - 69:22
**mean** [30] - 17:9, 17:16, 19:5, 19:22, 21:9, 34:8, 34:12, 34:17, 34:21, 35:12, 35:19, 36:5, 45:5, 70:24, 71:19, 76:12, 77:11, 79:18, 79:24, 80:24, 82:4, 82:22, 82:25, 102:8, 104:2, 107:23, 112:8, 113:20, 114:16, 115:18
**meaning** [8] - 43:15, 70:7, 70:10, 70:14, 71:2, 71:4, 71:17, 71:22
**means** [1] - 101:12
**meant** [2] - 46:6, 97:17
**media** [8] - 13:6, 21:7, 38:5, 47:10, 47:25, 53:1, 128:2, 128:17
**medical** [4] - 15:7, 17:21, 39:21, 129:24
**medicine** [1] - 117:2
**medium** [1] - 134:19
**meet** [3] - 36:6, 71:14, 83:19
**member** [2] - 57:11, 108:2
**members** [2] - 41:25, 123:5
**memorize** [2] - 69:4, 79:22
**memory** [1] - 6:6
**Mental** [1] - 132:5
**mental** [6] - 7:2, 8:22, 10:21, 110:3, 110:24, 118:7
**mentality** [1] - 76:3
**mention** [3] - 50:12, 81:15, 89:12
**mentioned** [5] - 70:22, 92:15, 105:4, 107:2, 110:19
**mere** [1] - 8:19
**mess** [1] - 118:25
**message** [7] - 94:8, 94:14, 103:2, 106:9, 113:3, 128:5, 128:13
**messages** [38] - 13:5, 18:23, 38:21, 38:22, 39:6, 41:7, 41:10, 41:25, 46:6, 49:20, 49:23, 49:24, 50:18, 51:2, 52:1, 55:11, 58:9, 58:10, 60:17, 68:22, 68:25, 69:3, 69:9, 93:19, 94:22, 95:19, 102:1, 106:5, 106:6, 106:8, 106:14, 109:2, 109:5, 125:18, 126:6
**messed** [2] - 38:15, 118:25
**met** [4] - 19:8, 36:7, 97:19, 117:16
**method** [3] - 72:18, 72:19, 120:19
**Miami** [4] - 1:18, 1:21, 1:22, 119:3
**MICHAEL** [2] - 1:6, 1:17
**Michael** [4] - 3:6, 30:10, 130:11, 130:22
**Michelle** [1] - 77:9
**microphone** [2] - 66:12
**mid** [1] - 123:15
**mid-40s** [1] - 33:11
**mid-forties** [1] - 123:15
**middle** [1] - 129:14
**might** [15] - 58:6, 66:1, 70:19, 71:22, 75:7, 76:8, 77:11, 78:17, 82:17, 118:17, 120:5, 122:16, 125:20, 125:21
**miles** [1] - 107:16
**mill** [2] - 26:16, 126:10
**million** [6] - 51:16, 51:17, 73:18, 101:13, 107:16, 119:11
**mimicking** [6] - 68:17, 68:19, 69:1, 79:10, 79:11, 79:16
**mind** [3] - 24:13, 111:14, 113:8
**minimize** [4] - 102:5, 128:8, 135:4, 136:1
**minimized** [1] - 106:3
**minimizing** [1] - 80:1
**minors** [1] - 54:7
**minute** [4] - 26:6, 87:2, 90:20, 121:16
**minutes** [3] - 45:3, 54:17, 87:12
**miracle** [1] - 118:17
**mirror** [3] - 126:17, 127:3, 127:9
**misbelief** [1] - 51:18
**miserable** [1] - 78:1
**misinterpreted** [1] - 11:24
**mispronounce** [1] - 117:13
**misquoted** [1] - 118:12
**miss** [3] - 13:7, 13:9, 47:1
**missed** [3] - 20:10, 20:23, 116:6
**mistake** [1] - 48:13
**mistakes** [1] - 88:8
**mitigating** [1] - 55:22
**mitigation** [2] - 15:1, 64:7
**Mitrani** [1] - 3:12
**MITRANI** [1] - 1:13
**model** [1] - 79:2
**models** [1] - 51:12
**modus** [1] - 19:22
**molested** [1] - 119:5
**moment** [2] - 16:16, 28:8
**monitor** [1] - 114:3
**monitored** [1] - 111:12
**monitoring** [2] - 114:6, 133:18
**monster** [3] - 47:4, 116:18, 119:6
**month** [1] - 126:21
**months** [36] - 4:9, 21:21, 25:11, 45:20, 46:3, 57:17, 82:22, 99:24, 100:2, 100:8, 100:17, 100:22, 101:12, 101:15, 109:5, 109:9, 109:21, 110:1, 110:5, 110:6, 110:8, 110:9, 112:21, 112:22, 113:22, 115:14, 115:20, 116:20, 126:16, 126:24, 129:15, 130:24, 131:1, 132:13
**morning** [14] - 3:3, 3:4, 3:8, 3:13, 3:15, 3:17, 3:19, 6:18, 9:6, 49:4, 57:5, 57:25, 117:12
**most** [21] - 26:4, 38:7, 40:23, 55:19, 56:18, 60:4, 64:11, 69:2, 70:1, 71:13, 74:16, 83:24, 89:8, 99:5, 100:8, 100:16, 102:6, 107:24, 119:16, 125:11, 130:15
**mostly** [1] - 90:18
**mother** [2] - 38:9, 44:18
**motion** [19] - 15:25, 22:2, 22:24, 23:5, 23:7, 23:14, 98:23, 99:10, 103:7, 106:24, 108:9, 108:22, 108:24, 122:11, 136:14, 137:7, 137:9, 137:10, 137:20
**motions** [2] - 3:21, 21:23
**motivated** [1] - 52:12
**motivates** [2] - 31:20, 128:20
**motivation** [5] - 6:25, 7:2, 29:17, 70:13, 105:19
**motive** [1] - 74:22
**mouth** [1] - 79:23
**move** [7] - 4:2, 60:18, 69:16, 90:12, 95:4, 106:24, 135:15
**movements** [1] - 70:7
**moves** [1] - 112:18
**movie** [4] - 65:21, 79:21, 117:17, 118:12
**movies** [2] - 78:19, 94:2
**MR** [4] - 48:6, 48:8, 55:6, 55:9
**MS** [53] - 3:15, 4:22, 5:12, 7:8, 8:25, 10:24, 11:7, 16:12, 16:14, 16:17, 20:12, 20:24, 22:4, 22:7, 64:5, 65:6, 65:9, 65:17, 65:23, 66:3, 66:13, 66:18, 71:5, 71:25, 80:6, 80:8, 84:18, 85:14, 85:15, 86:15, 87:3, 96:11, 96:14, 98:12, 98:19, 99:8, 106:25, 109:12, 110:23, 114:21, 114:25, 120:11, 134:14, 134:17, 134:23, 135:13, 135:20, 136:5, 136:12, 137:6, 137:11, 137:17, 137:21
**multiple** [6] - 39:2, 39:3, 39:4, 50:13, 72:21, 119:3
**murder** [3] - 29:4, 46:20, 52:1
**murdered** [3] - 32:2, 50:11, 53:24
**murderer** [10] - 49:24, 50:11, 51:25, 53:13, 53:16, 93:4, 103:12, 103:14, 104:2, 130:8
**murderer's** [1] - 51:3
**murderers** [7] - 46:19, 51:22, 93:7, 93:14, 104:8, 104:17, 105:20
**music** [3] - 21:7, 50:23, 94:9
**musician** [1] - 94:6
**must** [9] - 10:15, 58:15, 63:13, 65:3, 112:7, 119:11, 122:17, 128:2, 136:18
**muster** [1] - 43:4
**mutilate** [1] - 102:13

## N

**name** [15] - 39:3, 47:25, 50:12, 51:3, 55:2, 55:4, 56:1, 58:11, 66:12, 66:13, 66:15, 115:11, 115:12, 116:19
**named** [1] - 97:9
**namely** [1] - 3:23
**names** [2] - 106:6, 106:14
**narrative** [1] - 41:6
**narrow** [1] - 17:22
**Nathan** [4] - 118:22, 119:8, 121:3, 122:7
**Nathan's** [1] - 118:20
**nation** [1] - 26:10
**natural** [1] - 124:21
**nature** [11] - 10:4, 24:20, 25:1, 35:12, 58:9, 121:18, 124:25, 126:5, 127:10, 128:8, 128:23
**navigate** [2] - 23:22, 137:4
**near** [3] - 58:18, 134:11, 135:7
**nearby** [2] - 91:22, 121:2
**nearly** [3] - 101:3, 101:5, 101:13
**necessarily** [2] - 21:24, 123:4
**necessary** [7] - 6:1, 6:10, 16:11, 63:16, 89:25, 109:24,

122:23
**need** [26] - 6:11, 8:6, 34:23, 35:1, 54:8, 64:21, 65:13, 74:12, 81:22, 84:16, 85:3, 86:6, 90:5, 97:5, 101:18, 110:13, 111:1, 112:24, 122:6, 122:8, 127:22, 128:19, 128:25, 131:7, 134:1, 134:5
**needed** [1] - 62:17
**needs** [21] - 33:17, 54:1, 54:15, 60:1, 60:2, 63:24, 72:25, 82:19, 82:20, 83:13, 84:4, 84:8, 109:18, 111:13, 111:17, 114:12, 121:24, 127:2, 127:16, 129:7, 133:7
**negative** [4] - 78:4, 96:7, 96:21, 98:6
**neglectful** [1] - 121:16
**nervous** [1] - 51:6
**net** [1] - 122:5
**neuro** [1] - 56:11
**never** [38] - 27:19, 35:10, 39:6, 39:7, 42:18, 44:21, 45:8, 49:7, 49:10, 49:14, 49:18, 50:12, 50:23, 55:10, 57:11, 60:16, 60:17, 60:19, 62:2, 73:17, 77:21, 81:24, 83:25, 84:7, 88:3, 91:9, 91:15, 94:9, 106:16, 107:19, 108:12, 116:12, 116:13, 116:18, 119:10, 129:8
**never-ending** [1] - 60:16
**New** [1] - 49:16
**new** [4] - 57:20, 73:13, 73:14
**news** [2] - 45:18, 49:5
**next** [17] - 7:24, 28:8, 46:22, 50:9, 60:23, 64:19, 69:16, 78:21, 78:23, 91:21, 103:12, 103:14, 104:2, 104:3, 117:13, 120:5, 135:25
**nice** [2] - 82:25, 117:16
**nice-looking** [1] - 117:16
**nick** [1] - 125:5
**night** [5] - 46:10, 46:11, 72:11, 112:12, 130:2
**Nikolas** [19] - 12:23, 18:21, 24:9, 29:2, 32:3, 38:15, 38:23, 39:1, 39:5, 39:13, 42:15, 42:17, 47:23, 47:25, 58:10, 62:8, 105:23, 108:1, 123:6
**nine** [2] - 27:1, 113:22
**NO** [1] - 1:2
**nobody** [1] - 77:14
**noises** [1] - 45:18
**non** [1] - 25:10
**non-incarceration** [1] - 25:10
**none** [6] - 2:10, 2:16, 11:12, 16:24, 77:15, 89:7
**nonetheless** [1] - 37:24
**nonsense** [2] - 105:6, 105:9
**normal** [12] - 47:20, 57:20, 58:1, 58:2, 60:11, 60:20, 70:3, 91:24, 102:9, 113:13, 118:8, 125:16
**norms** [1] - 52:20
**North** [3] - 1:21, 119:2, 135:8
**note** [4] - 6:4, 22:14, 25:16, 98:25
**noted** [5] - 6:22, 13:2, 15:4, 21:13, 132:8
**notes** [2] - 14:18, 56:9
**nothing** [14] - 13:22, 44:24, 50:14, 77:24, 82:14, 82:18, 82:23, 96:8, 98:12, 102:23, 103:23, 114:13, 122:25, 123:24
**notice** [2] - 89:7, 136:17
**noticing** [1] - 76:7
**notified** [2] - 50:12, 55:16
**notify** [1] - 50:10
**notoriety** [1] - 52:13
**nowhere** [1] - 104:19
**number** [13] - 3:4, 8:3, 26:23, 26:24, 26:25, 37:7, 39:22, 49:23, 53:4, 69:6, 74:15, 97:9, 103:3
**numbers** [2] - 101:18, 110:11
**numerous** [2] - 3:20, 67:18
**nurses** [1] - 67:10
**NW** [1] - 1:18

## O

**o'clock** [2] - 49:3, 49:4
**object** [3] - 84:22, 136:9, 136:12
**objection** [7] - 4:3, 4:16, 6:23, 20:2, 20:3, 100:8, 136:13
**objections** [16] - 4:4, 4:24, 4:25, 5:1, 5:5, 5:11, 6:21, 7:16, 7:21, 7:25, 20:6, 20:8, 20:11, 21:18, 21:19
**obligation** [1] - 124:4
**oblivious** [4] - 13:14, 15:17, 41:2, 41:16
**obnoxious** [1] - 69:14
**obsessed** [5] - 46:3, 46:17, 46:18, 50:3, 68:10
**obsession** [2] - 68:10, 73:12
**obsessions** [1] - 33:7
**obsessive** [1] - 92:20
**obvious** [5] - 29:19, 76:13, 76:14, 76:15
**obviously** [9] - 62:21, 80:3, 85:8, 85:16, 89:13, 97:15, 108:1, 135:1
**occasions** [1] - 50:13
**occupational** [1] - 59:21
**occurred** [2] - 27:8, 40:12
**OF** [3] - 1:1, 1:4, 1:13
**offense** [21] - 4:5, 4:7, 4:24, 5:1, 5:6, 6:3, 18:6, 23:24, 24:20, 25:2, 25:5, 63:19, 64:13, 108:14, 108:25, 124:6, 126:5, 127:10, 127:11, 127:20, 128:24
**offenses** [2] - 56:22, 116:17
**offensive** [2] - 55:19, 105:25
**offered** [2] - 72:22, 135:9
**offers** [2] - 34:9, 34:10
**office** [5] - 6:19, 46:12, 82:7, 131:19, 137:15
**Office** [4] - 1:13, 38:11, 50:14, 102:21
**officers** [1] - 84:15
**often** [8] - 68:1, 71:3, 77:19, 77:20, 82:12, 88:4, 96:19
**old** [7] - 28:5, 29:9, 49:13, 74:3, 117:9, 117:23, 123:13
**Olivers** [1] - 55:15
**once** [5] - 79:19, 82:1, 84:7, 126:12, 127:17
**one** [92] - 4:8, 4:12, 4:17, 5:16, 7:10, 7:15, 9:21, 10:2, 10:7, 12:17, 13:4, 20:12, 20:25, 24:4, 24:17, 25:6, 25:16, 26:4, 26:23, 30:4, 30:5, 30:21, 31:6, 31:23, 32:9, 33:14, 36:5, 36:6, 36:7, 37:7, 39:4, 41:23, 41:25, 46:20, 47:22, 49:4, 49:23, 50:16, 50:24, 53:4, 57:15, 57:24, 61:19, 62:4, 64:25, 67:21, 67:22, 67:23, 68:6, 69:12, 74:16, 75:18, 75:19, 79:12, 80:1, 80:16, 80:25, 81:15, 81:24, 84:19, 87:23, 88:6, 88:10, 92:3, 92:7, 93:9, 94:4, 96:15, 99:7, 99:11, 99:19, 99:23, 101:13, 104:3, 106:20, 108:12, 108:14, 109:9, 111:10, 111:15, 115:17, 123:20, 126:21, 127:4, 129:17, 132:19, 134:13, 134:14
**one's** [1] - 118:6
**ones** [17] - 13:7, 13:9, 27:18, 28:25, 38:25, 42:22, 50:21, 52:15, 74:21, 75:9, 89:9, 89:14, 89:17, 91:5, 110:4, 134:24
**ongoing** [5] - 24:14, 61:21, 111:14, 123:7, 131:5
**online** [14] - 50:8, 52:18, 54:4, 69:3, 71:10, 75:8, 79:10, 82:12, 93:20, 93:23, 94:10, 94:13, 95:11, 96:2
**open** [1] - 3:2
**opened** [1] - 71:15
**opening** [2] - 70:19
**operandi** [1] - 19:22
**operated** [1] - 13:19
**operation** [1] - 106:5
**opinion** [4] - 23:23, 84:20, 98:6, 111:1
**opinions** [1] - 17:21
**opportunity** [10] - 3:20, 13:13, 28:18, 35:8, 51:21, 81:3, 83:25, 86:9, 119:14, 119:22
**opposite** [1] - 122:22
**options** [2] - 64:22, 81:7
**orally** [1] - 16:10
**order** [1] - 54:21
**ordered** [2] - 131:9, 132:10
**original** [1] - 61:20
**Orlando** [1] - 134:11
**Oscar** [1] - 107:5
**otherwise** [3] - 8:4, 31:2, 56:15
**ounce** [1] - 96:22
**ourselves** [2] - 21:20, 121:8
**outlier** [2] - 126:21, 126:25
**outlined** [1] - 7:12
**outpatient** [2] - 83:16, 129:19
**outright** [1] - 26:11
**outside** [2] - 45:18, 51:5
**outstanding** [1] - 20:8
**overall** [2] - 100:16, 100:19
**overarching** [1] - 127:4
**overcome** [3] - 34:14, 56:18, 121:4
**overwhelming** [3] - 12:20, 13:17, 121:18
**own** [17] - 14:7, 28:14, 28:22, 46:14, 88:7, 91:11, 93:22, 99:10, 108:9, 110:18, 111:10, 112:1, 116:15, 117:24, 123:16, 129:9

## P

**Paddock** [1] - 29:9
**page** [4] - 88:21, 88:22, 90:25, 103:9
**pages** [4] - 17:10, 39:22, 65:3, 75:4
**pain** [6] - 38:2, 45:9, 76:16, 107:25, 119:10, 123:9
**parade** [1] - 30:22

**paragraph** [4] - 5:9, 6:22, 20:23, 20:24
**paragraphs** [5] - 5:2, 6:9, 8:1, 20:5, 20:10
**parallel** [1] - 29:19
**parameters** [1] - 87:11
**parent** [2] - 61:17, 118:5
**parents** [8] - 18:25, 27:14, 36:11, 38:4, 38:19, 42:21, 77:25, 125:12
**parked** [2] - 45:18, 120:5
**parking** [2] - 57:6, 117:12
**Parkland** [10] - 27:23, 27:24, 35:4, 43:25, 46:4, 46:18, 47:17, 62:5, 76:10, 126:3
**Part** [1] - 132:9
**part** [8] - 42:7, 42:8, 63:5, 64:19, 82:12, 82:18, 92:11, 124:19
**particular** [4] - 11:17, 27:2, 113:8, 126:25
**particularly** [5] - 4:24, 8:5, 53:2, 69:18, 106:6
**partied** [1] - 41:20
**parties** [2] - 90:1, 130:18
**passed** [1] - 18:24
**passing** [1] - 117:21
**passionately** [1] - 23:16
**past** [2] - 52:17, 52:25
**path** [1] - 123:7
**Patrick** [3] - 115:1, 115:12, 130:3
**patrol** [1] - 128:15
**patterns** [1] - 30:24
**pauperis** [1] - 136:20
**pay** [4] - 130:21, 132:10, 132:25, 136:19
**pediatric** [1] - 59:21
**penalty** [1] - 47:7
**pending** [1] - 23:14
**penetrated** [1] - 83:9
**people** [100] - 12:8, 13:9, 16:20, 16:24, 27:6, 27:21, 29:10, 32:2, 36:8, 38:16, 39:4, 39:17, 41:5, 44:11, 50:12, 53:24, 54:2, 54:3, 56:8, 56:10, 56:11, 56:19, 58:15, 59:14, 60:4, 68:13, 69:4, 69:8, 70:1, 70:3, 70:9, 71:4, 71:11, 71:12, 71:13, 74:19, 74:20, 74:21, 75:2, 75:3, 75:8, 75:10, 75:12, 75:15, 75:16, 75:17, 75:18, 75:21, 76:13, 77:8, 77:10, 77:12, 77:18, 77:19, 79:10, 79:17, 81:5, 82:10, 82:12, 83:4, 83:7, 83:19, 83:24, 85:23, 88:14, 88:19, 89:11, 91:12, 91:15, 91:20, 91:24, 92:6, 92:7, 92:21, 93:16, 93:24, 93:25, 96:2, 97:24, 98:2, 98:5, 98:6, 100:15, 102:7, 104:11, 104:15, 104:16, 105:4, 105:5, 105:17, 110:3, 112:11, 113:1, 113:14, 118:24, 128:17, 128:18, 130:7
**per** [4] - 4:14, 23:17, 78:21, 122:14
**percent** [11] - 52:11, 52:15, 52:18, 52:22, 53:5, 53:8, 53:10, 53:11, 53:16, 74:20, 101:13
**percentile** [1] - 101:12
**perfectly** [1] - 83:24
**performance** [1] - 107:6
**performed** [3] - 17:11, 67:18, 69:17
**perhaps** [9] - 9:22, 23:4, 62:12, 70:2, 77:24, 83:17, 105:15, 120:19, 121:12
**period** [10] - 13:2, 50:5, 54:9, 69:6, 84:21, 85:19, 110:12, 111:7, 111:24, 122:8
**permanently** [2] - 39:1, 50:22
**permissible** [1] - 132:7
**permission** [1] - 44:17
**perseverating** [1] - 92:21
**person** [36] - 16:22, 17:2, 17:5, 20:15, 36:7, 39:4, 40:13, 41:22, 42:1, 43:24, 47:1, 50:6, 59:4, 60:21, 64:14, 69:22, 73:18, 75:14, 75:20, 80:25, 82:21, 84:9, 86:10, 87:5, 96:4, 102:10, 102:14, 103:11, 109:21, 112:15, 125:22, 131:19, 133:3, 133:19
**personality** [2] - 78:8, 79:13
**personally** [2] - 102:4, 105:14
**personnel** [1] - 67:11
**pertinent** [1] - 16:6
**ph** [2] - 9:17, 69:21
**ph.)** [1] - 69:22
**PH1** [1] - 1:18
**phase** [1] - 101:21
**phone** [7] - 39:5, 48:10, 49:6, 49:8, 87:6, 87:7, 116:5
**photo** [4] - 41:8, 60:11, 60:12, 92:8
**photograph** [1] - 94:7
**photographs** [2] - 13:3, 38:5
**photos** [1] - 53:7
**phrases** [1] - 94:2
**physically** [1] - 24:4
**physiological** [1] - 31:21
**pick** [1] - 38:18
**picked** [1] - 73:21
**picking** [1] - 77:14
**pictures** [2] - 50:8, 102:12
**pinpoint** [1] - 89:25
**pinpointed** [2] - 29:18, 40:13
**pissing** [1] - 43:10
**place** [3] - 27:20, 34:5, 85:22
**placed** [1] - 131:15
**placement** [3] - 81:11, 85:20, 112:6
**plaintiff** [1] - 1:4
**PLAINTIFF** [1] - 1:12
**plan** [1] - 58:21
**planned** [2] - 58:16, 59:6
**planner** [1] - 107:7
**planning** [3] - 58:2, 103:20, 125:2
**plans** [1] - 103:22
**play** [10] - 7:19, 21:12, 21:14, 28:21, 50:23, 64:24, 65:19, 69:19, 83:6, 94:9
**played** [1] - 50:24
**PLAYING** [1] - 65:20
**playing** [2] - 75:22, 77:14
**plays** [1] - 69:1
**pleadings** [1] - 136:15
**pleasure** [1] - 60:5
**plotter** [1] - 107:7
**podium** [2] - 42:12, 62:25
**point** [25] - 11:12, 12:21, 15:2, 17:18, 17:22, 17:25, 19:20, 24:2, 24:8, 29:19, 31:18, 32:15, 33:24, 34:15, 57:3, 64:1, 65:6, 66:20, 72:23, 73:13, 76:24, 78:16, 121:12, 124:23, 131:3
**pointed** [4] - 30:17, 37:6, 72:10, 124:25
**points** [5] - 19:17, 20:4, 66:22, 74:15, 114:23
**poor** [3] - 52:20, 77:12
**popping** [1] - 39:5
**popular** [1] - 75:3
**pornography** [2] - 100:12, 100:25
**portion** [3] - 9:3, 20:15, 78:18
**portrayed** [2] - 52:10, 78:10
**pose** [1] - 33:24
**posed** [1] - 88:7
**position** [9] - 34:1, 54:10, 62:23, 63:4, 86:25, 91:8, 124:13, 124:14, 133:20
**possess** [3] - 35:25, 36:1
**possesses** [1] - 51:20
**possessing** [3] - 51:15, 131:23, 131:24
**possession** [3] - 100:12, 100:24, 132:4
**possibility** [3] - 30:23, 37:4, 126:13
**possible** [6] - 51:14, 64:21, 123:21, 124:24, 135:21
**possibly** [2] - 33:14, 121:5
**post** [1] - 69:5
**posts** [1] - 13:6
**potential** [3] - 4:11, 4:12, 83:22
**potentially** [1] - 118:10
**powder** [1] - 33:4
**power** [6] - 38:24, 38:25, 39:11, 50:20, 50:22, 105:21
**powerful** [5] - 75:14, 75:15, 75:16, 79:1, 79:10
**practically** [1] - 40:2
**prep** [1] - 44:6
**prepare** [1] - 86:5
**prepared** [3] - 64:7, 134:3, 134:12
**preponderance** [2] - 10:15, 19:8
**present** [10] - 1:24, 3:16, 9:5, 14:21, 27:23, 46:10, 56:6, 64:1, 64:9, 72:2
**presentation** [4] - 23:9, 25:22, 61:9, 72:7
**presented** [3] - 9:7, 15:22, 92:25
**Presentence** [4] - 4:4, 4:25, 130:18, 132:9
**president** [2] - 52:7, 55:25
**pretend** [1] - 37:19
**pretrial** [5] - 82:3, 82:4, 96:25, 114:1, 114:2
**pretty** [5] - 16:3, 26:17, 97:24, 106:22, 115:14
**prevail** [1] - 42:16
**prevent** [2] - 121:7, 126:17
**previous** [2] - 52:14, 53:21
**previously** [2] - 16:21, 67:13
**preyed** [3] - 125:11, 125:12
**primarily** [1] - 37:6
**primary** [3] - 35:19, 67:7, 105:19
**prison** [14] - 56:21, 82:24, 82:25, 83:5, 83:7, 84:13, 84:25, 85:7, 112:14, 116:5, 116:8, 116:10, 123:15, 125:21
**prisoner** [1] - 112:17
**Prisons** [6] - 127:8, 130:23, 131:18, 132:17, 134:4, 135:1
**prisons** [1] - 119:3
**Prisons'** [1] - 72:20

**probation** [8] - 5:6, 5:16, 6:17, 6:19, 22:23, 110:6, 131:4, 131:19
**PROBATION** [1] - 6:18
**probative** [1] - 7:3
**problem** [5] - 11:14, 11:23, 11:25, 56:24, 64:25
**problematic** [1] - 36:23
**problems** [2] - 85:11, 116:15
**proceed** [4] - 25:21, 65:22, 115:9, 132:16
**proceeding** [1] - 61:21
**proceedings** [3] - 3:2, 54:21, 138:4
**process** [3] - 42:7, 42:8, 49:15
**proclivities** [1] - 123:19
**prodromal** [1] - 123:23
**professional** [1] - 59:22
**professionals** [1] - 67:9
**profile** [2] - 32:17, 38:6
**profound** [1] - 119:25
**program** [21] - 34:8, 34:11, 34:16, 56:4, 72:20, 83:12, 83:15, 86:7, 87:6, 87:11, 110:9, 111:6, 113:24, 114:4, 127:6, 134:3, 135:4, 135:6, 135:9, 135:10
**programs** [4] - 80:21, 81:5, 134:9, 134:13
**prohibited** [1] - 131:23
**promise** [3] - 116:20, 119:12, 119:19
**promote** [4] - 63:19, 63:24, 129:2, 129:12
**promoting** [1] - 130:12
**pronounce** [2] - 61:11, 129:2
**pronounced** [2] - 128:4, 136:11
**pronouncing** [2] - 87:1, 115:9
**proof** [1] - 10:14
**properly** [7] - 6:9, 7:16, 17:24, 19:16, 20:5, 21:20, 71:16
**proposition** [2] - 23:21, 25:10
**protect** [6] - 40:17, 51:7, 63:21, 124:4, 127:17, 129:3
**protected** [2] - 90:3, 90:4
**protecting** [1] - 133:23
**protection** [1] - 59:1
**protects** [1] - 52:6
**PROULX** [2] - 1:20, 138:9
**proulx@flsd.uscourts.gov** [1] - 1:23
**prove** [1] - 132:24
**proven** [2] - 17:19, 47:24
**provide** [3] - 40:8, 109:22, 122:4
**provided** [6] - 25:6, 37:13, 87:24, 88:23, 89:1, 94:24
**provisions** [1] - 4:10
**PSI** [1] - 20:6
**psychiatric** [2] - 19:6, 39:24
**psychiatrist** [3] - 15:11, 18:15, 37:22
**psychiatrists** [1] - 67:10
**psychologist** [4] - 15:15, 15:17, 15:18, 18:15
**psychologists** [4] - 15:9, 15:13, 30:15, 67:10
**psychopath** [3] - 27:21, 80:19, 123:19
**psychopathology** [1] - 93:16
**psychopaths** [1] - 64:18
**psychosis** [1] - 73:13
**public** [17] - 63:21, 94:25, 95:1, 95:12, 95:21, 95:23, 96:1, 96:3, 96:4, 96:5, 104:11, 104:13, 105:4, 124:4, 126:1, 126:2, 129:3
**PUGLISI** [54] - 1:17, 3:15, 4:22, 5:12, 7:8, 8:25, 10:24, 11:7, 16:12, 16:14, 16:17, 20:12, 20:24, 22:4, 22:7, 64:5, 65:6, 65:9, 65:17, 65:23, 66:3, 66:13, 66:18, 71:5, 71:25, 80:6, 80:8, 84:18, 85:14, 85:15, 86:15, 87:3, 96:11, 96:14, 98:12, 98:19, 99:8, 106:25, 109:12, 110:23, 114:21, 114:25, 120:11, 134:14, 134:17, 134:23, 135:13, 135:20, 136:5, 136:12, 137:6, 137:11, 137:17, 137:21
**Puglisi** [18] - 1:17, 3:16, 5:4, 7:5, 8:7, 20:11, 21:25, 22:17, 62:20, 64:4, 65:22, 66:2, 86:23, 86:24, 96:9, 98:16, 120:10, 134:8
**puglisilawfirm@gmail.com** [1] - 1:19
**pulled** [2] - 91:1, 105:3
**pulling** [2] - 15:24, 117:13
**punishment** [8] - 33:17, 56:22, 63:19, 76:1, 83:11, 84:12, 114:11, 119:1
**purchasing** [1] - 51:15
**purposes** [3] - 20:19, 63:16, 122:24
**pursuant** [1] - 131:9
**push** [2] - 40:16, 41:5
**pushed** [1] - 120:25
**put** [30] - 9:2, 23:3, 24:16, 26:24, 26:25, 27:1, 33:2, 39:23, 49:12, 51:1, 70:6, 72:19, 73:25, 74:3, 89:14, 89:16, 90:2, 90:5, 90:7, 92:8, 105:18, 105:24, 108:3, 116:24, 121:14, 124:23, 125:15, 133:20, 135:10, 135:24
**putting** [1] - 106:2


## Q


**qualifications** [1] - 16:20
**qualified** [1] - 9:9
**qualifies** [1] - 68:8
**qualify** [2] - 110:20, 110:25
**quantified** [1] - 26:21
**quantify** [5] - 26:15, 26:20, 26:24, 99:14, 101:19
**quantity** [2] - 26:18, 109:2
**questioning** [1] - 80:4
**questionnaire** [1] - 89:2
**questions** [13] - 14:8, 64:10, 66:2, 67:19, 84:19, 86:18, 86:22, 87:8, 87:16, 88:2, 88:6, 106:20, 106:23
**quickly** [2] - 54:6, 96:19
**quirky** [1] - 118:23
**quite** [8] - 16:6, 19:19, 68:1, 79:5, 97:5, 98:4, 125:8, 128:5
**quote** [1] - 74:1
**quote-unquote** [1] - 74:1


## R


**raise** [1] - 120:25
**raised** [1] - 5:17
**rampage** [1] - 29:12
**ran** [2] - 79:6, 116:18
**random** [4] - 18:19, 59:12, 70:18
**range** [9] - 4:9, 10:12, 19:11, 21:20, 99:3, 126:15, 127:3, 127:13, 128:22
**rape** [2] - 109:16, 127:2
**raped** [2] - 84:14, 100:14
**rate** [1] - 88:3
**rather** [1] - 98:5
**raw** [1] - 90:2
**reach** [1] - 135:24
**reached** [3] - 51:6, 120:18, 120:19
**reaction** [1] - 57:5
**read** [23] - 15:15, 25:21, 38:9, 44:14, 44:18, 55:7, 59:18, 62:22, 65:2, 70:14, 71:17, 73:7, 76:11, 79:17, 79:19, 84:24, 85:5, 87:9, 90:24, 93:24, 105:6, 107:12, 120:1
**reading** [3] - 31:22, 75:7, 75:8
**reads** [1] - 65:11
**ready** [4] - 57:23, 58:1, 65:16, 65:17
**real** [12] - 35:21, 37:4, 39:8, 51:21, 85:24, 91:4, 91:9, 91:11, 97:24, 124:16, 133:5, 133:13
**reality** [13] - 12:19, 26:7, 26:14, 30:2, 30:6, 34:3, 35:23, 37:22, 40:20, 43:1, 44:5, 59:14, 122:24
**realize** [1] - 103:10
**realized** [2] - 40:12, 137:9
**really** [54] - 4:18, 5:10, 5:23, 6:1, 7:5, 7:23, 7:25, 8:14, 8:22, 9:1, 9:2, 9:12, 11:16, 12:1, 22:17, 27:25, 29:7, 32:5, 32:7, 33:21, 34:12, 34:15, 36:5, 37:4, 43:8, 46:9, 53:21, 60:15, 63:2, 66:22, 70:18, 71:18, 72:2, 72:6, 77:21, 98:9, 99:9, 99:10, 106:9, 107:23, 110:11, 112:25, 115:20, 116:6, 121:16, 121:17, 121:22, 124:24, 125:23, 126:5, 127:22, 130:3, 133:25
**realm** [1] - 126:13
**reason** [16] - 14:10, 29:25, 44:1, 47:13, 77:11, 81:15, 82:12, 89:21, 89:24, 97:16, 99:17, 104:10, 104:14, 107:12, 110:11, 117:17
**reasons** [3] - 7:11, 69:12, 80:25
**rebuild** [1] - 137:4
**receive** [5] - 49:4, 49:20, 57:9, 111:2, 111:8
**received** [6] - 11:24, 21:19, 45:2, 53:16, 101:14, 110:5
**receiving** [1] - 71:11
**recently** [1] - 116:9
**recess** [4] - 54:15, 54:19, 87:13, 137:23
**recipient** [3] - 13:4, 41:10, 105:5
**recitation** [1] - 14:19
**recognize** [2] - 77:10, 77:23
**recognizes** [1] - 99:3
**recollection** [3] - 14:22, 106:4, 123:20
**recommend** [4] - 134:3, 134:12, 135:6, 135:12
**recommendation** [7] - 22:22, 64:22, 81:8, 81:10, 85:18, 99:22, 135:24
**recommendations** [2] -

22:21, 132:16
**recommended** [4] - 34:11, 111:2, 111:5, 111:8
**recommending** [1] - 81:13
**record** [31] - 3:7, 6:4, 6:13, 6:16, 7:15, 8:6, 9:11, 10:6, 10:23, 14:11, 15:19, 17:3, 18:1, 18:17, 21:8, 21:18, 22:14, 22:18, 28:9, 54:25, 55:3, 55:5, 65:13, 66:14, 73:19, 94:25, 95:1, 101:4, 104:6, 120:17, 135:23
**recorded** [1] - 14:2
**recording** [2] - 14:12, 14:16
**records** [1] - 132:6
**recover** [1] - 59:8
**recovery** [1] - 118:20
**recreational** [1] - 111:20
**Recross** [1] - 2:2
**red** [2] - 32:25, 52:10
**redemption** [1] - 111:23
**REDIRECT** [1] - 96:13
**redirect** [1] - 2:2
**reevaluate** [1] - 14:24
**reference** [2] - 18:23, 37:11
**referred** [1] - 37:21
**referring** [1] - 97:6
**reflect** [3] - 6:13, 7:15, 63:17
**refused** [1] - 96:22
**regard** [1] - 62:15
**regarding** [5] - 6:25, 7:3, 24:23, 34:17, 63:5
**regardless** [2] - 51:13, 121:25
**rehabilitate** [2] - 129:7, 130:12
**rehabilitated** [8] - 33:13, 47:19, 84:4, 84:5, 110:17, 120:21, 123:11, 123:14
**rehabilitation** [13] - 21:13, 32:19, 33:9, 33:18, 63:25, 72:9, 72:18, 74:11, 83:22, 84:10, 129:3, 129:9, 135:11
**rehearsed** [1] - 96:20
**reintegrated** [2] - 73:4, 132:25
**reiterate** [1] - 66:20
**rejected** [3] - 8:16, 72:3, 77:20
**rejoin** [1] - 98:14
**relate** [1] - 5:1
**related** [2] - 53:8, 56:2
**relationship** [2] - 102:7, 122:2
**relatives** [1] - 49:18
**relaxing** [1] - 45:23
**release** [13] - 4:11, 35:9, 47:14, 82:3, 114:1, 114:2, 131:14, 131:15, 131:17, 131:20, 131:22, 132:14, 133:21
**released** [3] - 31:19, 124:1, 131:20
**relevant** [1] - 71:20
**relieved** [1] - 123:10
**relitigate** [2] - 13:12, 19:19
**relitigating** [2] - 15:21, 17:19
**relive** [1] - 61:19
**relying** [1] - 114:19
**remain** [1] - 45:13
**remainder** [1] - 45:9
**remaining** [1] - 20:6
**remarkable** [1] - 37:23
**remedies** [1] - 72:22
**remember** [7] - 16:3, 31:25, 88:17, 88:20, 91:5, 106:9, 133:12
**reminder** [1] - 44:24
**reminders** [1] - 45:20
**reminds** [1] - 18:3
**remorse** [2] - 96:15, 96:23
**removed** [1] - 31:18
**repeat** [1] - 16:18
**repeated** [2] - 24:16, 96:19
**repeatedly** [2] - 46:4, 106:4
**repeating** [2] - 93:20, 97:16
**repetitive** [6] - 65:7, 68:5, 68:6, 68:9, 68:15, 69:10
**repetitively** [2] - 68:12, 94:3
**replicate** [1] - 105:20
**replicated** [1] - 105:22
**replied** [1] - 45:7
**report** [29] - 13:18, 13:22, 15:15, 17:4, 17:9, 17:15, 40:19, 41:3, 52:6, 52:9, 62:23, 66:21, 73:7, 84:25, 85:5, 88:18, 88:24, 89:4, 89:7, 89:8, 89:19, 90:18, 93:9, 104:20, 105:18, 112:11, 123:22, 129:24, 131:18
**Report** [5] - 4:5, 4:25, 87:24, 130:18, 132:9
**reported** [1] - 112:9
**REPORTED** [1] - 1:20
**Reporter** [1] - 1:21
**reporting** [2] - 62:9, 125:6
**reports** [3] - 3:21, 87:23, 90:2
**reposted** [1] - 105:16
**represent** [2] - 30:9, 129:12
**representation** [1] - 12:14
**representing** [1] - 30:7
**request** [9] - 30:6, 44:3, 61:11, 61:12, 63:23, 111:6, 122:11, 122:13, 132:22
**requested** [1] - 132:6
**requests** [2] - 82:8, 136:2
**requirement** [1] - 9:3
**requires** [2] - 44:4, 125:7
**rescues** [1] - 70:2
**research** [2] - 52:16, 52:17
**researched** [1] - 52:25
**residential** [5] - 81:13, 85:19, 87:6, 111:12, 112:6
**resolution** [1] - 6:10
**resolve** [1] - 20:5
**resolved** [2] - 6:22, 20:7
**resolving** [1] - 20:3
**resources** [1] - 122:5
**respect** [5] - 68:21, 122:19, 124:12, 129:12, 130:12
**respectfully** [3] - 48:1, 56:20, 124:19
**respects** [1] - 119:16
**respond** [3] - 12:12, 16:12, 77:8
**respondent** [1] - 70:21
**responding** [2] - 14:7, 115:25
**response** [20] - 5:15, 5:17, 7:9, 31:21, 63:3, 63:12, 70:15, 70:17, 75:25, 76:2, 79:8, 88:12, 88:20, 89:11, 89:13, 90:24, 91:2, 91:6, 91:12, 115:25
**responses** [5] - 89:5, 90:1, 90:8, 90:18, 96:20
**responsibility** [3] - 13:15, 30:7, 30:9
**rest** [4] - 27:22, 70:10, 77:16, 128:14
**restitution** [4] - 4:13, 131:4, 131:6, 132:8
**restriction** [3] - 132:3, 132:4
**restrictions** [1] - 133:12
**restroom** [1] - 54:16
**results** [2] - 68:4, 71:6
**resume** [1] - 87:15
**retained** [3] - 30:15, 39:24, 41:5
**return** [1] - 46:13
**reveal** [1] - 41:15
**revealed** [1] - 39:7
**review** [6] - 3:20, 28:18, 68:22, 90:16, 94:14, 99:2
**reviewed** [7] - 15:18, 17:14, 18:23, 37:16, 72:11, 90:13, 129:24
**ridiculous** [1] - 17:10
**rigid** [1] - 76:23
**ring** [2] - 45:4, 133:11
**risen** [1] - 29:23
**risk** [5] - 15:11, 85:12, 135:2, 135:5, 136:1
**robbery** [2] - 26:18, 100:10
**Rodger** [1] - 29:12
**RODOLFO** [1] - 1:9
**role** [7] - 21:12, 21:15, 51:12, 67:7, 69:1, 75:22, 79:2
**role-playing** [1] - 75:22
**room** [3] - 82:1, 116:25, 123:9
**roommate** [1] - 112:19
**rounded** [1] - 86:6
**RPR** [2] - 1:20, 138:9
**rubric** [1] - 19:14
**rude** [1] - 41:25
**RUIZ** [1] - 1:9
**rule** [8] - 6:11, 7:18, 36:8, 37:1, 63:10, 71:13, 81:23, 82:5
**rule-following** [1] - 71:13
**rules** [5] - 82:5, 82:20, 113:21, 113:23, 114:10
**ruling** [5] - 11:4, 20:14, 20:16, 23:6, 61:11
**run** [5] - 26:16, 40:14, 56:4, 126:10, 131:17
**run-of-the-mill** [2] - 26:16, 126:10


## S


**S&M** [2] - 75:17, 75:21
**SA** [2] - 1:25
**Sabrina** [1] - 3:16
**SABRINA** [1] - 1:17
**sad** [1] - 112:25
**sadist** [1] - 75:19
**sadistic** [1] - 75:17
**safe** [2] - 35:14, 47:8
**safely** [1] - 45:15
**safety** [1] - 122:5
**sale** [1] - 75:4
**salvage** [1] - 35:3
**Sandy** [1] - 29:5
**sanity** [1] - 110:21
**Santa** [1] - 134:10
**sat** [2] - 91:21, 107:3
**satisfaction** [1] - 47:3
**satisfied** [1] - 129:17
**satisfy** [2] - 82:7, 123:4
**Saturday** [1] - 112:12
**save** [1] - 28:20
**saved** [2] - 94:7, 124:20
**saves** [1] - 41:9
**saving** [6] - 13:3, 13:6, 13:8, 38:5
**savoring** [1] - 45:23
**saw** [21] - 28:1, 40:24, 41:7, 41:8, 43:6, 44:6, 53:5, 53:7, 55:10, 60:11, 62:7, 68:9, 78:10, 79:21, 85:5, 90:17, 92:3, 93:20, 95:12, 96:2,

98:22
**scare** [1] - 46:6
**scared** [4] - 45:14, 50:4, 83:2, 112:12
**scary** [2] - 116:14
**Schachter** [6] - 43:24, 50:20, 55:1, 94:5, 124:15
**SCHACHTER** [2] - 48:6, 48:8
**schizophrenia** [2] - 110:23, 123:23
**School** [1] - 56:6
**school** [65] - 27:6, 27:7, 27:9, 27:11, 27:15, 27:19, 28:4, 28:6, 28:8, 28:13, 29:3, 29:18, 29:20, 29:21, 29:23, 31:2, 31:5, 32:8, 32:24, 33:1, 39:12, 40:12, 41:18, 45:1, 45:3, 45:4, 45:19, 45:23, 46:13, 46:22, 47:1, 48:11, 48:15, 48:18, 49:7, 49:9, 52:8, 52:17, 53:8, 53:11, 53:14, 53:17, 57:16, 58:25, 59:3, 59:4, 59:11, 69:12, 73:21, 73:25, 77:1, 77:5, 77:23, 78:1, 78:23, 81:6, 86:9, 91:1, 94:7, 95:19, 95:25, 121:7, 124:2
**schoolers** [2] - 27:13, 29:4
**schools** [2] - 52:8, 62:6
**science** [2] - 36:20, 63:10
**Scooby** [1] - 80:17
**Scooby-Doo** [1] - 80:17
**script** [2] - 115:17
**scripted** [1] - 117:16
**se** [1] - 78:21
**seal** [3] - 137:8, 137:10, 137:20
**Sealy** [6] - 27:4, 38:10, 43:24, 44:18, 44:19, 58:19
**search** [1] - 132:7
**searches** [1] - 52:18
**seated** [4] - 3:4, 54:20, 66:11, 87:14
**second** [5] - 9:3, 12:9, 16:19, 62:8, 71:24
**Secret** [5] - 52:6, 52:12, 52:23, 53:19
**security** [4] - 59:11, 59:14, 112:14, 112:16
**see** [47] - 9:1, 10:18, 12:17, 14:6, 30:25, 34:5, 38:10, 40:3, 40:18, 42:25, 46:2, 58:6, 69:24, 70:1, 70:9, 70:12, 74:8, 75:4, 76:16, 78:1, 78:18, 78:19, 86:10, 86:25, 90:17, 97:1, 97:2, 98:1, 99:13, 100:10, 100:15, 100:16, 105:4, 107:12, 108:19, 109:2, 109:6, 109:24, 110:7, 111:25, 113:12, 116:14, 130:14, 135:24
**seeing** [1] - 70:25
**seek** [2] - 19:23, 24:14
**seeking** [3] - 16:15, 22:1, 24:13
**seem** [2] - 7:1, 73:10
**seemingly** [2] - 31:7, 34:10
**sees** [1] - 75:23
**Segall** [11] - 9:17, 9:20, 15:4, 15:6, 15:7, 15:12, 17:9, 39:21, 39:23, 40:3, 104:22
**selected** [2] - 18:19, 19:3
**Self** [1] - 87:24
**Self-Report** [1] - 87:24
**send** [8] - 46:5, 49:9, 71:18, 101:25, 103:2, 112:2, 113:3, 128:13
**sending** [7] - 41:25, 49:24, 55:12, 68:25, 85:21, 102:12, 106:5
**sends** [3] - 58:10, 94:8, 128:4
**sense** [7] - 18:20, 32:17, 33:20, 78:3, 91:18, 125:10, 137:13
**sensitive** [1] - 125:14
**sent** [9] - 34:4, 38:21, 68:23, 94:4, 94:13, 94:15, 94:23, 106:9, 109:5
**sentence** [77] - 16:15, 21:15, 23:16, 25:3, 25:4, 25:8, 30:3, 30:12, 32:18, 33:10, 35:7, 36:19, 47:7, 47:12, 47:14, 63:14, 64:16, 73:2, 87:1, 99:3, 99:22, 100:5, 100:22, 100:23, 100:24, 101:1, 101:6, 101:12, 101:14, 101:15, 101:23, 103:15, 103:18, 108:21, 110:1, 113:7, 113:17, 113:19, 114:2, 115:10, 121:11, 121:21, 121:25, 122:14, 122:15, 122:16, 122:17, 122:19, 122:23, 122:25, 123:2, 123:11, 126:14, 126:16, 126:17, 126:21, 127:12, 127:14, 128:4, 128:13, 128:20, 129:2, 129:14, 129:17, 129:23, 130:4, 130:5, 130:10, 130:14, 130:24, 132:13, 132:22, 136:3, 136:8, 136:10, 136:17, 136:24
**sentenced** [8] - 84:21, 99:12, 100:1, 100:14, 101:6, 101:9, 101:14, 111:4
**sentences** [5] - 14:18, 99:1, 99:5, 111:7, 126:22
**Sentencing** [1] - 101:11
**SENTENCING** [1] - 1:8
**sentencing** [26] - 3:19, 5:25, 6:1, 7:6, 7:14, 7:22, 17:22, 21:10, 22:20, 43:6, 43:11, 61:10, 63:16, 64:7, 64:22, 87:15, 101:10, 103:17, 122:24, 124:9, 124:10, 128:22, 129:1, 131:13, 133:3, 136:21
**separate** [4] - 74:24, 80:13, 92:22, 104:8
**separately** [1] - 41:9
**serial** [25] - 28:14, 31:22, 36:15, 39:19, 46:18, 50:3, 50:7, 51:23, 64:19, 73:12, 74:17, 74:19, 75:1, 75:5, 80:10, 80:12, 80:19, 92:15, 92:21, 93:3, 93:7, 93:14, 93:18, 104:1, 105:20
**series** [2] - 88:2, 111:14
**serious** [9] - 23:24, 24:16, 30:5, 30:6, 118:8, 127:20, 127:22, 128:9, 128:12
**seriously** [5] - 24:8, 62:16, 63:18, 113:18, 128:16
**seriousness** [5] - 51:24, 63:17, 64:13, 108:25, 129:12
**serve** [1] - 123:7
**served** [3] - 110:6, 130:25, 131:1
**Service** [5] - 52:6, 52:12, 52:23, 53:19
**services** [2] - 111:9, 114:12
**serving** [1] - 47:14
**set** [9] - 6:21, 34:7, 34:8, 54:1, 54:4, 114:7, 127:16, 130:19, 131:11
**sets** [1] - 28:3
**setting** [3] - 86:7, 111:13, 113:21
**seven** [2] - 25:12, 26:25
**several** [1] - 45:12
**severe** [2] - 110:24, 112:18
**severity** [1] - 10:1
**sex** [4] - 75:17, 75:18, 79:2, 109:16
**sexual** [25] - 29:23, 31:21, 31:23, 33:8, 39:15, 39:19, 43:2, 51:24, 73:11, 74:7, 74:22, 75:9, 75:16, 80:9, 92:23, 95:9, 95:15, 95:18, 100:11, 100:12, 100:23, 104:7, 104:15, 123:18, 127:1
**sexuality** [2] - 7:3, 81:20
**sexually** [12] - 12:22, 28:13, 28:24, 29:3, 29:13, 60:10, 83:1, 83:9, 95:17, 109:21, 112:8
**shackles** [1] - 31:18
**shadow** [1] - 46:19
**shaken** [1] - 47:3
**shaking** [1] - 46:21
**shall** [6] - 131:11, 131:15, 131:18, 131:21, 132:2, 132:10
**Shannon** [1] - 6:18
**shape** [2] - 128:8, 133:16
**shapes** [1] - 70:20
**share** [6] - 8:7, 10:19, 62:25, 63:12, 112:10, 115:3
**shared** [1] - 63:8
**shares** [1] - 10:16
**sharing** [4] - 61:24, 62:19, 120:14, 136:22
**Sheriff's** [2] - 38:11, 50:14
**sheriff's** [1] - 46:12
**shit** [1] - 38:23
**shock** [1] - 46:7
**shoot** [1] - 124:2
**shooter** [11] - 28:8, 29:6, 32:9, 32:10, 32:13, 45:4, 45:7, 46:23, 60:24, 78:23
**shooters** [9] - 28:13, 29:2, 29:3, 29:20, 32:3, 32:24, 39:12, 39:13, 60:10
**shooting** [10] - 8:12, 10:10, 12:24, 27:8, 31:2, 31:5, 48:11, 57:16, 59:12, 95:7
**shootings** [1] - 32:8
**short** [3] - 31:4, 50:5, 54:8
**shot** [4] - 29:9, 48:21, 48:24, 50:19
**shove** [1] - 40:17
**show** [11] - 9:11, 10:15, 28:9, 64:7, 96:22, 99:2, 99:21, 108:14, 108:20, 118:19, 118:21
**showed** [4] - 17:5, 19:6, 110:5, 120:17
**shown** [3] - 19:7, 47:21, 69:20
**shows** [4] - 56:3, 75:2, 109:22, 118:19
**shunned** [1] - 78:13
**Siblings** [1] - 118:22
**siblings** [2] - 19:1, 125:13
**sick** [1] - 107:19
**side** [1] - 133:3
**sides** [1] - 61:10
**sign** [1] - 129:21
**signal** [1] - 68:16
**signs** [6] - 33:7, 33:23, 36:21, 62:3, 62:5, 62:6
**similar** [3] - 62:24, 91:3, 126:25
**similarly** [3] - 99:20, 124:8, 129:1
**simple** [1] - 128:7

**simply** [3] - 24:4, 71:2, 72:15
**simultaneously** [1] - 117:14
**sincere** [1] - 128:13
**single** [12] - 10:7, 24:17, 39:6, 43:1, 43:24, 65:2, 94:14, 95:25, 96:4, 106:9, 116:4, 119:13
**sirens** [2] - 45:15, 45:18
**sister** [2] - 57:19, 58:12
**sisters** [1] - 19:1
**sit** [6] - 17:20, 39:22, 82:16, 94:17, 101:24, 119:1
**situated** [3] - 99:20, 124:8, 129:1
**situation** [6] - 33:22, 70:11, 109:18, 113:8, 121:8, 127:18
**situations** [1] - 109:7
**six** [3] - 25:12, 54:6, 131:1
**skill** [4] - 34:7, 34:8, 127:16, 133:8
**skills** [18] - 72:20, 81:14, 82:14, 82:19, 83:17, 83:18, 83:25, 86:1, 110:8, 111:6, 111:15, 111:18, 111:19, 127:6, 134:1, 134:3, 135:4, 135:9
**skinny** [1] - 116:11
**smack** [1] - 129:14
**small** [1] - 86:12
**smile** [1] - 57:21
**so-called** [1] - 56:11
**social** [28] - 12:3, 13:6, 21:7, 38:5, 47:10, 47:25, 52:20, 67:10, 69:16, 70:7, 70:13, 70:14, 71:1, 71:2, 71:3, 71:16, 71:21, 77:7, 77:22, 83:18, 83:24, 85:24, 86:11, 111:18, 113:14, 128:2, 128:17
**socialization** [1] - 81:2
**socially** [2] - 77:8, 78:13
**society** [11] - 24:2, 51:16, 63:13, 73:5, 78:19, 83:21, 103:16, 125:11, 129:6, 130:13, 132:25
**sociopath** [1] - 93:16
**sociopathic** [1] - 60:9
**solace** [2] - 121:22, 137:2
**sold** [1] - 25:9
**solitary** [1] - 85:10
**someone** [39] - 14:8, 28:7, 31:12, 31:22, 32:24, 33:13, 33:14, 36:20, 36:22, 38:2, 38:14, 38:18, 45:5, 46:9, 46:14, 47:18, 62:10, 68:8, 71:22, 72:12, 72:15, 72:16, 74:6, 78:9, 78:16, 79:1, 81:19, 83:11, 86:11, 86:14, 91:21, 91:22, 91:25, 120:18, 120:21, 124:18, 130:5
**sometimes** [2] - 88:3, 88:20
**Sometimes** [2] - 88:8, 88:15
**somewhat** [3] - 80:24, 86:11, 89:17
**somewhere** [4] - 3:24, 31:19, 33:11, 83:18
**son** [29] - 21:6, 50:11, 52:1, 56:5, 57:19, 57:22, 58:5, 58:10, 58:21, 59:1, 59:12, 59:25, 60:12, 87:1, 94:6, 94:7, 115:19, 115:24, 116:16, 116:20, 116:21, 117:3, 118:13, 118:16, 119:18, 120:6, 120:14, 120:15, 121:4
**son's** [3] - 60:11, 116:24, 121:18
**soon** [1] - 135:21
**sooner** [2] - 32:21, 124:2
**sorrow** [1] - 57:18
**sorry** [13] - 43:5, 43:7, 43:13, 43:14, 61:17, 68:18, 88:24, 89:3, 98:9, 102:19, 107:13, 117:18, 120:6
**sort** [10] - 25:5, 31:1, 33:18, 35:7, 36:22, 73:13, 74:10, 74:21, 93:25, 128:21
**sought** [2] - 129:5, 131:4
**soul** [1] - 56:17
**sounds** [2] - 15:23, 133:7
**sources** [1] - 94:18
**South** [1] - 47:13
**SOUTHERN** [1] - 1:1
**speaking** [5] - 11:8, 56:10, 56:12, 99:4, 113:25
**special** [8] - 4:14, 60:1, 60:2, 119:21, 132:3, 132:8, 132:11, 132:15
**Special** [2] - 3:11, 3:12
**specialist** [2] - 15:14, 17:7
**specialists** [1] - 11:16
**specialized** [1] - 111:3
**specialty** [1] - 11:13
**specific** [7] - 6:23, 32:6, 53:1, 94:22, 127:5, 127:10, 127:13
**specifically** [9] - 5:2, 5:24, 8:3, 8:10, 68:21, 81:16, 88:10, 90:6, 108:4
**spectrum** [16] - 9:23, 10:22, 11:15, 15:16, 24:23, 34:19, 36:14, 36:16, 37:16, 56:4, 56:7, 63:8, 72:4, 83:19, 93:1, 93:10
**speculation** [1] - 84:22
**spell** [2] - 66:12, 66:14
**spend** [1] - 10:9
**spending** [1] - 46:1
**spends** [1] - 59:22
**spent** [6] - 16:22, 46:11, 58:24, 115:19, 118:6, 125:14
**sports** [1] - 59:25
**spouse** [3] - 102:11, 109:13, 109:15
**spouses** [1] - 102:8
**spread** [1] - 42:2
**stairs** [1] - 58:5
**stalk** [1] - 51:25
**stalking** [13] - 10:11, 27:12, 27:13, 38:6, 54:3, 99:15, 101:6, 102:2, 102:6, 102:10, 102:11, 102:23, 109:14
**stand** [22] - 26:9, 26:10, 26:11, 28:2, 28:5, 28:25, 40:24, 41:1, 42:6, 43:19, 43:20, 43:21, 43:23, 43:24, 43:25, 44:1, 44:7, 66:1, 66:3
**standard** [3] - 10:14, 19:8, 131:21
**standing** [1] - 72:6
**stands** [1] - 29:16
**start** [10] - 24:7, 24:8, 57:1, 58:7, 64:6, 64:23, 73:21, 74:7, 116:8, 122:10
**started** [7] - 38:8, 41:23, 41:25, 48:10, 49:22, 103:17, 123:6
**stat** [2] - 30:3, 30:4
**state** [10] - 7:2, 8:22, 10:21, 24:15, 46:7, 47:11, 55:4, 66:12, 102:8, 115:11
**statement** [6] - 7:1, 21:5, 55:7, 59:18, 96:17, 104:18
**statements** [11] - 7:17, 18:17, 19:6, 25:18, 48:4, 63:18, 71:9, 88:7, 103:6, 130:17
**states** [2] - 72:12, 72:15
**STATES** [4] - 1:1, 1:4, 1:10, 1:13
**States** [14] - 1:13, 1:21, 3:5, 3:9, 3:10, 18:2, 18:10, 25:4, 30:8, 30:9, 43:22, 52:5, 124:8, 132:11
**stating** [1] - 93:19
**statistic** [1] - 108:14
**statistically** [1] - 99:4
**statistics** [7] - 25:7, 26:13, 26:22, 28:3, 101:10, 103:5, 110:11
**stature** [2] - 85:2, 113:10
**statutory** [11] - 4:10, 22:25, 25:2, 31:8, 33:23, 37:25, 44:1, 63:23, 73:2, 122:14, 130:19
**stay** [1] - 118:5
**staying** [1] - 49:3
**steep** [1] - 56:21
**steer** [1] - 65:1
**stemmed** [2] - 104:7, 105:1
**stems** [1] - 104:4
**step** [3] - 36:17, 38:6, 78:21
**Stephen** [1] - 29:9
**steps** [1] - 51:14
**stereotyped** [1] - 68:6
**still** [13] - 12:18, 33:12, 42:22, 49:7, 59:25, 61:20, 109:7, 111:8, 118:23, 123:7, 127:14, 133:16, 137:1
**Stoneman** [12] - 8:12, 12:24, 18:22, 27:7, 48:12, 50:25, 53:13, 53:16, 56:6, 57:15, 95:7, 96:1
**stood** [2] - 27:4, 116:24
**stop** [3] - 32:5, 60:23, 119:3
**stopped** [9] - 31:4, 31:12, 31:16, 32:9, 32:13, 74:9, 115:24, 124:20
**story** [3] - 57:14, 70:1, 70:21
**straight** [1] - 18:7
**strapped** [1] - 119:5
**strategic** [1] - 59:7
**stream** [1] - 60:17
**streaming** [1] - 55:25
**Street** [1] - 1:18
**street** [1] - 24:11
**strengthened** [1] - 122:3
**stressors** [1] - 53:8
**stretch** [1] - 39:20
**stricter** [1] - 22:5
**strikes** [1] - 130:11
**strong** [2] - 63:4, 128:19
**strongly** [5] - 12:14, 73:10, 84:11, 111:2, 134:12
**structured** [1] - 67:24
**student** [1] - 59:4
**students** [5] - 27:15, 29:14, 45:14, 52:13, 56:5
**studied** [5] - 52:12, 52:23, 53:19, 67:3, 70:8
**studies** [2] - 34:17, 78:15
**study** [1] - 52:7
**studying** [4] - 12:23, 16:22, 16:23, 38:4
**stuff** [4] - 75:21, 76:14, 115:24, 116:25
**stuffed** [1] - 113:13
**subject** [1] - 42:7
**submitted** [3] - 3:22, 23:11, 28:16
**subset** [1] - 7:24
**substance** [1] - 131:25
**substitute** [1] - 123:8
**subtle** [1] - 76:14
**successful** [1] - 114:4

**successfully** [1] - 73:4
**sudden** [4] - 13:11, 38:17, 42:2, 43:12
**suddenly** [2] - 73:22, 74:6
**suffer** [2] - 9:23, 39:10
**suffered** [2] - 19:4, 130:8
**suffering** [3] - 19:24, 61:22, 122:20
**sufficient** [2] - 63:15, 122:23
**suggests** [2] - 13:22, 56:1
**Suite** [1] - 1:14
**summarize** [1] - 26:17
**summarizes** [1] - 5:18
**summarizing** [1] - 33:25
**summary** [1] - 37:18
**superhero** [1] - 116:25
**superheroes** [2] - 68:11, 80:16
**supervise** [1] - 81:21
**supervised** [9] - 4:11, 35:9, 81:15, 111:12, 131:15, 131:20, 131:22, 132:14, 133:21
**supervision** [1] - 86:2
**support** [7] - 11:5, 54:9, 104:5, 106:1, 122:7, 133:2, 133:9
**supported** [2] - 36:20, 103:7
**supporting** [2] - 63:10, 108:18
**supports** [1] - 10:7
**supposed** [8] - 44:22, 44:25, 45:3, 82:25, 90:3, 90:5, 103:17
**surrounded** [2] - 56:8, 116:13
**surrounding** [1] - 9:13
**survived** [1] - 95:25
**survivors** [2] - 27:8, 126:2
**susceptibility** [1] - 85:2
**susceptible** [1] - 8:5
**suspect** [2] - 5:16, 22:16
**suspensions** [1] - 53:10
**SUV** [1] - 75:2
**SWAT** [2] - 48:16, 115:22
**swaths** [1] - 69:5
**swore** [1] - 118:13
**sworn** [1] - 66:8
**sympathize** [1] - 13:10
**symptoms** [2] - 52:19, 52:21
**system** [4] - 4:18, 62:13, 82:8, 122:7

## T

**T.J** [3] - 28:25, 29:20, 39:12
**table** [1] - 3:10
**tablet** [1] - 13:8
**tablets** [1] - 31:25
**tailored** [1] - 120:20
**talks** [2] - 18:11, 68:12
**tantamount** [1] - 123:12
**taped** [2] - 41:2, 106:25
**target** [2] - 59:15, 128:10
**targeted** [6] - 18:4, 18:18, 52:8, 52:16, 60:12, 95:21
**targeting** [3] - 12:22, 38:14, 103:11
**targets** [1] - 95:18
**task** [1] - 136:22
**tasks** [1] - 69:17
**taught** [3] - 67:9, 82:14, 83:14
**taunt** [1] - 46:6
**teach** [6] - 72:12, 72:14, 77:8, 77:10, 81:5, 83:13
**teacher** [1] - 45:11
**team** [1] - 115:22
**teams** [1] - 60:1
**teased** [1] - 79:5
**technical** [2] - 19:15, 20:11
**technology** [1] - 47:10
**Ted** [2] - 32:1, 92:16
**teddy** [1] - 44:23
**telephone** [2] - 132:6, 133:14
**television** [2] - 55:25, 75:2
**temper** [1] - 113:4
**tempted** [1] - 133:20
**ten** [6] - 27:1, 52:11, 110:6, 117:23, 118:13, 118:15
**tend** [1] - 5:22
**term** [7] - 5:9, 25:10, 111:4, 127:25, 128:1, 128:5, 131:15
**terminology** [1] - 5:18
**terms** [7] - 6:2, 6:5, 35:20, 78:23, 93:19, 130:24, 131:16
**terrible** [7] - 45:20, 46:1, 84:2, 102:24, 107:15, 113:6, 122:20
**terrifying** [1] - 50:2
**terror** [4] - 59:6, 59:19, 60:17, 78:9
**terrorism** [1] - 101:16
**terroristic** [1] - 55:23
**terrorize** [1] - 61:1
**terrorized** [1] - 58:14
**terrorizing** [2] - 58:7, 130:7
**Test** [3] - 67:23, 67:24, 69:21
**test** [4] - 68:4, 90:4, 90:9, 90:10
**testified** [7] - 11:10, 16:21, 28:5, 51:10, 61:15, 66:8, 67:12
**testify** [10] - 13:25, 16:1, 23:12, 24:18, 28:2, 40:24, 42:10, 97:22, 107:15, 123:1
**testimony** [17] - 6:7, 9:6, 9:8, 9:9, 11:5, 13:21, 16:11, 18:15, 19:5, 23:3, 37:12, 40:24, 41:1, 53:21, 123:18, 126:7, 129:25
**testing** [2] - 17:11, 65:15
**tests** [1] - 67:18
**text** [3] - 41:25, 45:1, 45:3
**textbook** [1] - 8:9
**thankfully** [1] - 125:6
**THE** [103] - 1:1, 1:9, 1:12, 1:17, 3:3, 3:13, 3:17, 4:20, 4:23, 5:15, 5:22, 6:20, 7:9, 7:13, 9:16, 11:3, 12:11, 16:13, 16:16, 17:17, 20:22, 21:9, 21:17, 22:6, 22:13, 23:20, 25:19, 25:25, 26:3, 28:19, 30:11, 32:11, 32:14, 34:8, 36:3, 36:10, 44:13, 44:20, 48:5, 48:7, 54:12, 54:20, 55:4, 55:8, 61:4, 61:8, 64:23, 65:8, 65:13, 65:18, 65:21, 65:25, 66:5, 66:11, 70:16, 71:24, 72:1, 74:23, 74:25, 76:11, 77:3, 78:3, 79:12, 79:15, 80:3, 84:6, 84:24, 86:17, 86:20, 87:9, 87:14, 95:4, 96:6, 96:9, 98:13, 98:16, 98:25, 106:24, 109:11, 110:22, 114:16, 114:23, 115:2, 115:5, 115:6, 115:12, 120:9, 120:12, 131:9, 134:7, 134:8, 134:16, 134:22, 134:25, 135:19, 135:23, 136:6, 136:8, 136:16, 137:10, 137:16, 137:19, 137:22
**themselves** [5] - 13:23, 37:20, 70:5, 83:6, 95:22
**theory** [1] - 77:7
**therapeutic** [1] - 111:9
**therapist** [1] - 59:22
**therapy** [6] - 33:2, 72:21, 77:7, 111:14, 111:16, 111:18
**thereabout** [1] - 33:12
**therefore** [1] - 131:11
**Thereupon** [4] - 54:19, 66:6, 87:13, 137:24
**they've** [1] - 42:22
**thinking** [8] - 38:19, 38:20, 59:3, 64:6, 76:8, 84:11, 117:2, 137:11
**thinks** [2] - 35:2, 109:7
**third** [1] - 15:3
**thorough** [2] - 40:4, 104:23
**thoughts** [5] - 42:13, 62:19, 63:4, 120:14, 136:22
**thousand** [2] - 32:1, 109:5
**thread** [1] - 8:15
**threat** [7] - 19:3, 33:24, 46:14, 106:6, 126:11, 133:4, 133:24
**threatened** [2] - 83:8, 84:14
**threatening** [7] - 5:8, 46:5, 54:3, 74:7, 84:1, 102:11, 130:14
**threats** [7] - 32:22, 43:3, 78:6, 78:7, 109:14, 121:9, 128:16
**three** [10] - 4:12, 45:13, 49:16, 74:19, 87:2, 106:7, 109:6, 121:3, 131:15, 132:14
**three-minute** [1] - 87:2
**throughout** [2] - 104:9, 125:18
**throw** [4] - 33:18, 33:19, 111:22, 127:19
**thrust** [5] - 5:10, 8:15, 9:13, 19:5, 63:22
**Thursdays** [1] - 135:16
**tick** [1] - 93:4
**tie** [1] - 109:1
**tip** [1] - 56:4
**tips** [1] - 50:14
**tired** [1] - 128:1
**today** [16] - 26:7, 30:1, 57:3, 59:17, 61:15, 61:19, 62:19, 101:21, 112:25, 121:11, 123:9, 126:8, 126:15, 127:5, 128:4, 130:2
**today's** [7] - 22:20, 42:11, 51:16, 121:8, 121:21, 128:13, 136:21
**together** [2] - 70:6, 118:4
**token** [1] - 125:9
**tolerated** [1] - 91:17
**took** [13] - 5:9, 11:23, 28:5, 38:23, 41:1, 41:8, 42:6, 54:21, 58:12, 75:6, 108:2, 110:4
**tools** [3] - 73:3, 129:7, 133:1
**torment** [3] - 24:16, 58:9, 62:11
**tormenting** [1] - 54:3
**torture** [2] - 57:17, 82:23
**tortured** [1] - 24:5
**total** [6] - 3:25, 4:5, 4:7, 4:24, 132:12, 132:13
**totality** [1] - 43:19
**totally** [2] - 91:3, 119:1
**touch** [3] - 73:6, 81:24, 82:2
**touched** [1] - 40:5
**toughest** [2] - 135:19, 135:20
**towards** [3] - 29:22, 52:19, 96:23
**track** [1] - 73:19

**tragedy** [6] - 31:4, 46:1, 46:4, 46:17, 47:17, 49:3
**tragic** [2] - 8:11, 121:1
**trained** [1] - 67:6
**training** [2] - 72:19, 82:11
**transcript** [7] - 14:3, 37:17, 40:18, 41:3, 90:13, 90:22, 105:3
**transcription** [1] - 138:4
**transferred** [1] - 47:11
**transition** [1] - 108:4
**translate** [1] - 71:7
**transpired** [4] - 12:24, 27:17, 27:20, 29:23
**transport** [1] - 135:25
**trauma** [4] - 27:17, 31:4, 45:17, 45:20
**traumatizing** [2] - 112:20
**travel** [1] - 103:22
**treated** [1] - 34:6
**treatment** [9] - 64:21, 81:7, 81:13, 83:16, 110:13, 111:3, 124:7, 129:19, 132:5
**treatments** [1] - 86:6
**tremendous** [2] - 45:18, 79:22
**tremendously** [2] - 83:23
**trends** [1] - 30:17
**trial** [34] - 5:19, 6:6, 9:8, 9:15, 12:16, 13:12, 13:21, 18:17, 18:24, 19:6, 19:18, 19:21, 23:5, 24:9, 24:10, 26:5, 28:1, 28:3, 37:9, 37:12, 37:20, 42:6, 42:15, 42:16, 44:5, 44:6, 44:7, 46:16, 50:3, 95:2, 97:19, 97:21, 122:3, 126:8
**tried** [5] - 13:12, 40:14, 48:25, 109:3, 128:7
**troll** [4] - 8:20, 79:14, 128:6, 128:12
**troller** [1] - 93:25
**trolling** [8] - 8:19, 81:16, 81:17, 81:20, 115:24, 128:7, 128:9, 128:10
**trolls** [4] - 76:23, 79:12, 97:13, 128:5
**trombone** [1] - 50:25
**trouble** [6] - 36:21, 56:12, 73:22, 81:17, 81:20, 82:17
**troubling** [1] - 62:3
**truck** [1] - 116:18
**true** [7] - 17:3, 36:9, 41:7, 48:14, 66:23, 90:7, 125:5
**truly** [6] - 21:25, 47:5, 125:10, 126:11, 127:9, 133:25
**trust** [1] - 85:12
**truth** [1] - 124:21
**truthfully** [1] - 77:24
**try** [15] - 17:20, 34:22, 35:2, 59:15, 66:21, 79:5, 79:6, 88:14, 121:4, 134:5, 134:9, 135:15, 135:16, 135:21, 137:3
**trying** [13] - 11:18, 12:18, 45:24, 49:14, 60:6, 76:18, 76:21, 76:22, 97:8, 97:11, 97:17, 132:19
**turn** [8] - 19:20, 31:6, 34:16, 61:8, 62:20, 87:15, 128:7, 134:5
**twelve** [1] - 52:15
**twenty** [2] - 34:21, 124:6
**twenty-two** [1] - 34:21
**twice** [2] - 101:3, 130:14
**Two** [1] - 31:25
**two** [30] - 8:2, 8:3, 10:2, 15:9, 15:13, 19:17, 20:4, 20:20, 22:20, 25:17, 34:21, 45:10, 48:3, 50:13, 53:1, 54:17, 74:19, 76:5, 104:8, 104:20, 106:7, 106:19, 108:8, 108:9, 109:6, 114:3, 117:25, 120:25, 125:17
**two-day** [1] - 106:19
**two-level** [1] - 8:2
**type** [7] - 5:14, 19:3, 21:11, 67:9, 67:18, 69:16, 134:20
**types** [4] - 26:15, 69:3, 78:6, 81:14
**typical** [4] - 56:11, 70:6, 70:21, 91:12
**typically** [1] - 90:2

## U

**U.S** [3] - 101:9, 101:11, 102:21
**ultimate** [2] - 16:6, 21:15
**ultimately** [6] - 7:22, 24:14, 78:22, 95:9, 111:7, 122:1
**unable** [2] - 70:13, 136:19
**unacceptable** [3] - 24:3, 85:7, 128:19
**unaccompanied** [1] - 102:25
**unbeknownst** [1] - 46:3
**unbelievably** [2] - 61:17, 124:7
**uncertain** [1] - 78:23
**uncertainty** [1] - 41:13
**unchaperoned** [1] - 111:13
**uncharged** [1] - 27:3
**uncommon** [1] - 75:5
**under** [21] - 8:2, 8:3, 18:15, 19:14, 21:24, 22:7, 22:10, 22:15, 24:19, 51:18, 86:2, 86:4, 100:16, 101:1, 101:3, 101:4, 101:9, 101:14, 120:24, 126:23, 137:8
**underlying** [1] - 64:14
**understood** [7] - 10:4, 38:2, 39:25, 72:5, 96:21, 97:3, 136:16
**undisputed** [1] - 11:14
**unexpected** [1] - 117:21
**unfettered** [2] - 74:1, 74:4
**unfinished** [1] - 14:18
**unfortunately** [5] - 60:14, 85:6, 117:8, 121:8, 137:1
**unintelligent** [1] - 86:10
**unique** [3] - 36:12, 39:17, 118:3
**uniquely** [1] - 125:25
**UNITED** [4] - 1:1, 1:4, 1:10, 1:13
**United** [14] - 1:13, 1:21, 3:5, 3:9, 3:10, 18:2, 18:10, 25:4, 30:7, 30:9, 43:22, 52:5, 124:8, 132:11
**unites** [1] - 29:3
**universe** [5] - 13:19, 13:24, 18:14, 19:7, 128:11
**university** [1] - 67:7
**unjustified** [1] - 31:5
**unlawfully** [1] - 131:24
**unless** [4] - 27:24, 90:5, 117:1
**unpaid** [1] - 132:8
**unquote** [1] - 74:1
**unreasonable** [3] - 103:3, 108:20, 108:21
**unrelentlessly** [1] - 46:5
**untrue** [1] - 107:18
**unusual** [2] - 52:23, 83:10
**unwarranted** [1] - 128:25
**unwilling** [1] - 41:15
**up** [45] - 11:19, 13:4, 15:11, 16:4, 18:11, 35:1, 35:2, 35:17, 35:18, 38:15, 38:18, 39:5, 40:14, 42:23, 44:15, 49:18, 57:25, 58:4, 60:12, 65:24, 74:16, 74:19, 77:14, 79:4, 86:6, 86:23, 86:24, 87:16, 91:9, 95:3, 96:9, 100:3, 109:13, 114:7, 115:8, 117:4, 117:13, 118:25, 119:18, 124:2, 127:18, 129:21, 134:20
**update** [1] - 131:5
**upset** [4] - 47:4, 72:16, 97:3
**upsetting** [1] - 49:20
**upward** [11] - 22:24, 23:14, 61:12, 101:2, 103:7, 108:12, 108:14, 108:19, 109:9, 109:18, 125:2
**urge** [1] - 65:1
**urges** [1] - 78:17
**urging** [1] - 62:10
**US** [1] - 3:11
**USC** [2] - 130:20, 131:10
**user** [4] - 39:3, 58:11, 106:5, 106:14
**users** [1] - 35:25

## V

**vacation** [1] - 85:1
**Valentine's** [1] - 44:25
**value** [1] - 72:2
**variance** [33] - 10:20, 15:25, 16:1, 16:10, 19:14, 21:22, 22:1, 22:9, 22:10, 22:22, 22:25, 23:9, 23:14, 61:11, 61:12, 61:13, 101:2, 103:7, 108:12, 108:14, 108:18, 108:19, 108:22, 109:4, 109:9, 109:18, 122:12, 125:3, 125:8, 126:13, 128:21, 136:14, 137:7
**variances** [1] - 109:7
**varied** [1] - 102:15
**various** [1] - 99:19
**vary** [1] - 102:16
**varying** [1] - 129:11
**Vegas** [1] - 29:10
**venture** [1] - 32:20
**veracity** [1] - 17:21
**versus** [7] - 3:5, 18:2, 18:10, 30:10, 69:25, 85:21, 134:19
**via** [1] - 116:5
**vicinity** [1] - 91:13
**victim** [24] - 8:3, 8:10, 12:4, 12:5, 15:23, 17:23, 18:5, 18:6, 18:7, 18:16, 18:25, 19:9, 20:2, 20:4, 20:16, 25:16, 39:14, 42:6, 55:13, 85:6, 96:5, 102:3, 103:10, 136:13
**victimized** [1] - 43:25
**victims** [64] - 10:8, 10:17, 12:22, 13:3, 13:4, 13:10, 13:23, 19:23, 20:18, 23:8, 24:12, 24:17, 25:17, 25:19, 26:8, 26:23, 26:24, 27:2, 27:3, 27:4, 27:10, 27:11, 28:1, 28:4, 28:9, 28:20, 35:18, 43:7, 44:14, 46:1, 47:8, 48:3, 57:15, 62:24, 64:8, 68:23, 72:17, 76:19, 79:25, 81:18, 95:18, 95:20, 95:21, 96:23, 97:15, 97:22, 98:2, 98:9, 102:5, 107:13, 107:23, 115:25, 120:13, 124:15, 125:20, 128:10, 129:20, 129:25, 132:7, 133:5, 133:13, 137:1

**victims'** [2] - 131:10, 131:12
**video** [33] - 3:22, 14:4, 14:5, 14:12, 14:14, 14:16, 37:17, 41:2, 64:6, 64:7, 64:24, 65:19, 68:10, 69:19, 70:8, 71:12, 72:10, 73:6, 73:17, 76:5, 85:5, 90:16, 90:17, 90:19, 92:3, 92:8, 92:11, 98:1, 98:20, 106:25, 114:17, 114:20, 130:2
**VIDEO** [1] - 65:20
**videos** [2] - 52:18, 94:2
**view** [9] - 10:5, 31:9, 63:6, 63:21, 70:1, 99:4, 120:21, 122:19, 124:19
**viewing** [1] - 50:7
**views** [1] - 19:11
**vigilant** [1] - 62:9
**vile** [1] - 46:5
**violated** [2] - 114:6, 133:21
**violations** [2] - 52:20, 113:23
**violence** [9] - 52:8, 52:16, 52:24, 52:25, 79:4, 102:25, 127:1, 128:10
**violent** [4] - 53:1, 100:10, 100:11, 109:17
**virgin** [1] - 58:12
**visibly** [1] - 97:2
**visit** [2] - 47:13, 116:9
**visiting** [1] - 125:2
**vocational** [1] - 82:11
**voice** [3] - 58:10, 115:13, 116:7
**voices** [1] - 42:11
**volunteer** [1] - 83:18
**volunteered** [1] - 59:24
**VORA** [54] - 1:17, 3:15, 4:22, 5:12, 7:8, 8:25, 10:24, 11:7, 16:12, 16:14, 16:17, 20:12, 20:24, 22:4, 22:7, 64:5, 65:6, 65:9, 65:17, 65:23, 66:3, 66:13, 66:18, 71:5, 71:25, 80:6, 80:8, 84:18, 85:14, 85:15, 86:15, 87:3, 96:11, 96:14, 98:12, 98:19, 99:8, 106:25, 109:12, 110:23, 114:21, 114:25, 120:11, 134:14, 134:17, 134:23, 135:13, 135:20, 136:5, 136:12, 137:6, 137:11, 137:17, 137:21
**VORA-PUGLISI** [54] - 1:17, 3:15, 4:22, 5:12, 7:8, 8:25, 10:24, 11:7, 16:12, 16:14, 16:17, 20:12, 20:24, 22:4, 22:7, 64:5, 65:6, 65:9, 65:17, 65:23, 66:3, 66:13, 66:18, 71:5, 71:25, 80:6, 80:8, 84:18, 85:14, 85:15, 86:15, 87:3, 96:11, 96:14, 98:12, 98:19, 99:8, 106:25, 109:12, 110:23, 114:21, 114:25, 120:11, 134:14, 134:17, 134:23, 135:13, 135:20, 136:5, 136:12, 137:6, 137:11, 137:17, 137:21
**vs** [1] - 1:5
**vulgar** [1] - 38:23
**vulnerable** [24] - 8:2, 8:10, 8:23, 10:17, 10:23, 10:25, 11:1, 11:2, 15:23, 17:23, 18:4, 18:7, 18:16, 19:9, 20:2, 20:4, 20:15, 20:17, 24:12, 38:7, 107:24, 125:11, 130:15, 136:13


## W


**wait** [3] - 10:8, 53:24, 137:4
**waited** [3] - 38:4, 38:7, 137:13
**waits** [1] - 13:1
**walk** [3] - 25:13, 118:11, 121:22
**walked** [3] - 27:21, 48:17, 58:5
**walking** [2] - 118:13, 118:16
**walks** [1] - 113:13
**wall** [1] - 70:18
**wants** [8] - 16:9, 21:6, 38:18, 56:20, 61:20, 75:19, 85:18
**warning** [1] - 33:23
**warrant** [2] - 109:8, 127:12
**warranted** [1] - 108:15
**waste** [4] - 16:7, 16:14, 16:17, 22:11
**wasting** [1] - 15:21
**watch** [4] - 17:5, 90:19, 90:20, 97:21
**watched** [4] - 14:4, 90:20, 130:1, 130:2
**watching** [4] - 52:18, 60:16, 69:19, 76:7
**Wayne** [4] - 92:7, 92:8, 92:15, 92:18
**ways** [3] - 77:7, 84:10, 119:6
**week** [1] - 37:14
**weekend** [1] - 65:4
**weeks** [4] - 58:25, 108:8, 108:9, 125:17
**weeping** [1] - 97:1
**weird** [3] - 116:11, 118:3, 118:23
**welcome** [1] - 129:22
**well-documented** [1] - 120:15
**west** [4] - 71:14, 74:4, 127:25, 134:10
**wet** [1] - 73:16
**what-ifs** [2] - 103:16, 103:17
**whatsoever** [1] - 132:7
**whereas** [1] - 23:3
**whereby** [1] - 72:19
**whichever** [1] - 44:16
**whole** [11] - 12:21, 14:4, 15:2, 17:6, 34:20, 77:6, 90:9, 90:10, 91:8, 94:1, 115:14
**wife** [10] - 57:22, 57:25, 58:22, 59:21, 60:19, 117:8, 117:9, 117:21, 117:25, 121:1
**Wilcox** [1] - 37:21
**wild** [5] - 71:14, 74:4, 127:25
**willing** [1] - 21:3
**wimpy** [2] - 119:8, 119:9
**winded** [1] - 16:4
**Winner** [1] - 77:9
**winter** [3] - 45:22, 46:2, 46:13
**wish** [4] - 77:1, 98:17, 98:18, 137:3
**wishes** [4] - 62:24, 63:11, 86:25, 87:16
**Witness** [1] - 2:2
**witness** [4] - 16:11, 40:4, 93:17, 104:21
**WITNESS** [1] - 115:12
**witnessed** [1] - 47:22
**witnesses** [3] - 25:17, 44:6, 44:7
**woke** [3] - 42:23, 57:25, 117:4
**woman** [1] - 109:13
**wonderful** [1] - 60:4
**wondering** [3] - 44:8, 44:9, 45:14
**WONG** [1] - 1:25
**Wong** [1] - 3:12
**word** [11] - 14:20, 18:3, 33:3, 79:20, 88:13, 94:3, 94:11, 104:19, 111:5, 127:12
**words** [30] - 5:7, 5:14, 14:7, 28:14, 28:23, 38:22, 42:13, 43:5, 43:11, 43:14, 54:12, 91:11, 98:8, 102:23, 102:24, 102:25, 103:20, 103:24, 109:2, 109:19, 113:5, 113:6, 127:20, 130:3, 130:5, 130:7, 133:11
**workers** [1] - 67:10
**workings** [1] - 93:14
**works** [2] - 42:18, 64:23
**world** [1] - 56:19
**worried** [1] - 73:15
**worries** [1] - 73:20
**worry** [2] - 42:23, 73:4
**worse** [7] - 33:14, 51:4, 58:14, 62:12, 73:23, 119:11, 133:4
**worst** [3] - 17:15, 44:24, 49:4
**worth** [1] - 121:24
**worthy** [1] - 107:6
**would-be** [1] - 128:5
**wound** [1] - 123:8
**wrap** [1] - 86:24
**wrapping** [1] - 26:5
**write** [1] - 119:19
**writes** [2] - 55:9, 71:22
**writing** [2] - 46:24, 90:18
**written** [4] - 61:16, 67:1, 67:2, 77:9
**wrongful** [1] - 10:4
**wrote** [7] - 9:1, 69:22, 72:11, 75:24, 75:25, 107:11, 107:22


## Y


**year** [4] - 57:9, 91:3, 117:9, 118:11
**years** [42] - 4:11, 4:12, 16:22, 16:24, 22:25, 23:17, 23:18, 25:12, 28:5, 47:9, 53:17, 54:6, 56:21, 61:2, 67:4, 67:5, 73:18, 74:3, 77:4, 98:23, 102:20, 103:1, 108:15, 109:6, 112:5, 114:3, 117:23, 122:11, 122:14, 122:25, 123:12, 123:13, 124:2, 124:6, 125:9, 129:16, 129:20, 131:16, 132:14
**yogurt** [1] - 45:2
**York** [1] - 49:16
**young** [12] - 32:17, 32:21, 33:1, 33:9, 33:21, 34:21, 34:23, 68:2, 82:6, 120:25, 123:13, 124:1
**younger** [1] - 116:16
**yourself** [4] - 92:25, 121:12, 121:13, 121:14
**youth** [1] - 36:24


## Z


**zero** [1] - 4:10